[Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: XYREM (SODIUM OXYBATE) ANTITRUST LITIGATION | Case No. 5:20-md-02966-LHK |

**JOINT CASE MANAGEMENT STATEMENT**

Pursuant to this Court's *Standing Order for All Judges of the Northern District of California*, Federal Rule of Civil Procedure 16, and Civil Local Rule 16-9, the parties in these actions have met and conferred on certain issues and hereby submit this Joint Case Management Statement in advance of the Case Management Conference currently scheduled for January 22, 2021 at 2:00 p.m. PST.

## I.     JURISDICTION AND SERVICE

### Jurisdiction

The Court has jurisdiction over these actions[1] pursuant to 28 U.S.C. § 1332(d) because these are class actions in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants. The Court further has jurisdiction over these actions pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 as these actions also allege violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, alleged to be actionable under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over the various state law claims under both 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367(a).

Defendants do not anticipate contesting subject matter jurisdiction, but reserve all objections pending review of the consolidated complaint that the plaintiffs in the related actions (the "Purchasers") intend to file.

---

[1] The above-captioned MDL consists of eight related antitrust suits initially filed in this District and in the United States District Court for the Southern District of New York.  While the complaints in those actions are similar—each plaintiff seeks to bring antitrust claims relating to the settlement of patent litigation concerning the narcolepsy drug Xyrem on behalf of similar putative purchaser classes—they are not identical.  The Purchasers have stipulated to filing a single consolidated complaint upon centralization of the cases in a single venue, and to a briefing schedule for Defendants' responses to such complaint thereafter.  *See* Case No. 3:20-cv-04056, ECF 50 at 2; Case No. 3:20-cv-04064, ECF 39 at 2; Case No. 3:20-cv-04671, ECF 22 at 2; Case No. 3:20-cv-04667, ECF 22 at 2; Case No. 3:20-cv-04725, ECF 35 at 2; Case No. 7:20-cv-06003 (S.D.N.Y.), ECF 28 at 3; Case No. 7:20-cv-06495 (S.D.N.Y.), ECF 34 at 4; Case No. 3:20-cv-06491 (N.D. Cal.), ECF 11 at 2-3. As noted below, filing of a Consolidated Class Action Complaint should take place after the appointment of Interim Lead Class Counsel.

**Service**

While the Purchasers'[2] allegations revolve around overlapping categories of conduct and the complaints name a largely overlapping set of entities as defendants, there is not complete overlap in the defendants sued in each complaint. The following list will break down service based on Defendant entity.

Defendants Jazz Pharmaceuticals, Inc., Hikma Pharmaceuticals USA, Inc. (f/k/a West-Ward Pharmaceuticals Corp.), Hikma Labs Inc. (f/k/a Roxane Laboratories, Inc.), EuroHealth (USA), Inc., Lupin Pharmaceuticals, Inc., Lupin, Inc., Lupin Ltd., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Sun Pharmaceutical Holdings USA, Inc., Sun Pharmaceutical Industries, Inc., Endo Pharmaceuticals, LLC, Teva Pharmaceuticals USA, Inc., Wockhardt USA LLC, Morton Grove Pharmaceuticals, Inc., Watson Laboratories, Inc., and Mallinckrodt LLC have been properly served or agreed to accept service in each of the actions in which they are named.

Several foreign Defendants have not been served in any of the actions: Jazz Pharma Ireland, Ltd. (located in Dublin, Ireland.), Jazz Pharmaceuticals plc ("Jazz plc") (Dublin, Ireland), Sun Pharmaceutical Industries Ltd. (Mumbai, India), Endo International PLC (Dublin, Ireland), Teva Pharmaceutical Industries, Ltd. (Petah Tivka, Israel), Wockhardt Ltd. (Mumbai, India), and Mallinckrodt PLC (Surrey, United Kingdom). Plaintiffs Teamsters (on July 8, 2020) and Self-Insured Schools of California ("SISC") initiated formal service on each entity they named pursuant to the Hague Convention and is awaiting confirmation of service from the foreign authorities.[3] Plaintiff SISC served Defendant Hikma Pharmaceuticals PLC ("Hikma PLC") (headquartered in the United Kingdom) pursuant to the Hague Convention in one of the original actions, but not all.  It is Plaintiffs City of Providence ("COP") and A.F. of L. – A.G.C. Building Trades Welfare Plan's (A.F. of L.) position that they served Defendant Hikma PLC through its domestic registered agent, and Plaintiff

---

[2] Defendants dispute whether the Plaintiffs, all but one of which are third-party health care insurers, are indeed "purchasers" of the pharmaceutical products at issue.

[3] Only the *Hollman* and *Self Insured School* Plaintiffs have named Endo International PLC as a Defendant.  Endo International PLC has not been served in either action.

-2-

1   A.F. of L.'s position that it served Defendants Jazz plc and Lupin Ltd. through their domestic

2   registered agents.  Defendants' position is that Plaintiffs' attempted service of these non-U.S.

3   companies through U.S. affiliates is not effective or proper service.  Counsel for the Purchasers are

4   negotiating with counsel for the foreign Defendants' domestic affiliates regarding service and to

5   determine whether these foreign Defendants are proper participants in this litigation.

6   Finally, one Defendant—Ranbaxy Laboratories Ltd.—has, since the time of the underlying

7   conduct here, been merged in Sun Pharmaceutical Industries, Inc. and so no longer exists as a

8   standalone entity.

9   ## II.     FACTS

10  **The Purchasers' Statement of Facts**

11  In July 2002, the FDA approved Xyrem (sodium oxybate oral solution) for the treatment of

12  narcolepsy (and later for other related conditions). Jazz Pharmaceuticals acquired the right to Xyrem

13  (and other drugs) in June 2005. At the time of approval, Xyrem received exclusivity from FDA

14  expiring on July 17, 2009. Defendant Jazz engaged in a multi-layered scheme to impair or delay entry

15  of generic Xyrem. This included: 1) acquiring bogus patents and enforcing them with sham lawsuits,

16  2) filing baseless citizen petitions with the FDA that had no chance of success, 3) abusing the Risk

17  Evaluation and Mitigation Strategies (REMS) system to frustrate efforts by generic manufacturers to

18  come to market, 4) entering into a series of unlawful market allocation agreements with generic

19  competitors, including defendants Hikma Pharmaceuticals plc, Roxane Laboratories, Inc., Amneal

20  Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Pharmaceuticals, Inc. and, according to

21  plaintiff SISC, Wockhardt USA LLC, Watson Laboratories, Inc., and Mallinckrodt LLC (and their

22  parent and successor entities as described fully in Plaintiffs' complaint).

23  Purchasers are insurers, health and welfare plans, and consumers seeking to represent a class

24  of individuals or entities who indirectly paid for and/or provided reimbursement for purchases of

25  Xyrem from Jazz or its single pharmacy, Express Scripts Specialty Distribution Services, Inc.

26  (ESSDS).

27

28

1    *Jazz manipulation of the patent system to acquire sham patents.* Xyrem's active ingredient,

2    gamma-hydroxybuyrate (GBH), has been used in pharmaceuticals for many years and none of

3    Xyrem's patents claim it. Instead, Jazz acquired multiple bogus patents claiming processes for

4    manufacturing Xyrem, formulation of Xyrem, methods of using a database to track prescriptions that

5    could be abused, and method of use patents that claim treatment methods for sleep disorders with

6    Xyrem.

7        When generic competitors began to file ANDAs seeking approval to market AB-rated versions

8    of Xyrem, Jazz used the alleged infringement of these patents to file multiple sham lawsuits. Two

9    defendants—Hikma and Roxane—litigated these cases for almost seven years. With those lawsuits

10   pending, Jazz filed additional patent applications based on Roxane and Hikma's non-infringement

11   defenses.

12       *Jazz manipulates the REMS program to delay generic entry.* Certain pharmaceutical are

13   required by law and FDA regulations to have a program, individualized for the specifics of the drug,

14   to control the risks of the drug. Because Xyrem's active ingredient, gamma-Hydroxybutyric acid

15   (GHB), is a Schedule I controlled substance, upon approval the FDA requested the implementation of

16   a risk management program (RiskMAP). As part of this program, Jazz chose to distribute Xyrem

17   through a single pharmacy: Express Scripts Specialty Distribution Services, Inc. (ESSDS). In 2007, a

18   change in law  required Jazz to revamp its RiskMAP. At the time, Jazz considered changing its single

19   distribution model to allow multiple pharmacies to deliver the drug. However, Jazz realized that if it

20   did so, any generic Xyrem manufacturer would not be required to have a single-pharmacy REMS

21   program when it came to market. Accordingly,, as generic entry neared, Jazz  began to argue that a

22   single-pharmacy system was the only safe way to distribute Xyrem. After seven years, the FDA

23   approved, but it criticized Jazz's REMS program and noted that its delay in having an approved

24   REMS would delay generic approval.

25       *Jazz files meritless citizen petitions with FDA.* In 2012, Jazz submitted a baseless citizen

26   petition to the FDA demanding that it not approve any generic Xyrem without first publishing

27   requirements for bioequivalence testing. A few months later, and before the FDA had responded to

28

-4-

JOINT CASE MANAGEMENT STATEMENT
Case No. 5:20-md-02966-LHK

the first petition, Jazz filed another petition arguing that any generic manufacture must use the same risk management system as Jazz. In detailed responses, the FDA denied both petitions as meritless. It noted that Jazz "will benefit from a delay in generic competition in the marketplace."

*Jazz enters into reverse payment agreements with generic manufacturers to settle pending litigation.* Beginning in January 2015, nascent generic competitors filed a series of petitions to the Patent Trial and Appeal Board (PTAB) to review the patents regarding the prescription tracking database. The PTAB eventually found that the claims, which related to Jazz's REMS program, were obvious. Even with the PTAB ruling, Jazz continued to pursue its patent lawsuits. In January 2017, one of the generic manufacturers, Hikma, received final FDA approval for its generic Xyrem, but Hikma did not launch its generic product. Instead, it entered into agreements with Jazz that both settled the patent litigation and permitted Hikma, among other things, to be the authorized generic distributor for Xyrem starting in January 2023. This agreement, in effect, allocated the market for generic Xyrem. Jazz then entered into similar unlawful agreements with generic manufacturers Par, Lupin, Amneal, and others.

The delay in generic entry resulting from Jazz's anticompetitive conduct was extremely lucrative. Jazz reported total revenue from Xyrem in 2019 of about $1.6 billion, three-quarters of the company's net product sales. As a result of Jazz's actions to delay the entry of generic Xyrem, purchasers have paid supracompetitive prices for Xyrem and are still unable to purchase lower-cost generics.

**Defendants' Statement of Facts:**

In the multiple current complaints, Plaintiffs allege that they overpaid for the prescription narcolepsy medicine Xyrem® (sodium oxybate), purportedly as a result of Defendants' conduct in litigating and settling eight different patent litigations in the District of New Jersey. The FDA approved branded Xyrem in 2002 to treat cataplexy[4] in patients with narcolepsy, a lifelong,

---

[4] Cataplexy is sudden, involuntary muscle weakness.  A cataplexy episode can cause a patient's knees to give way, head to fall to one side, jaw to drop, muscles to twitch without an obvious cause—all suddenly and without warning.

potentially disabling neurologic condition, and subsequently approved it for additional indications.  A powerful medicine for serious medical problems, Xyrem contains an active ingredient, sodium oxybate, which is a form of gamma hydroxybutyrate (GHB), a chemical with well-documented abuse and misuse potential and a controlled substance pursuant to its own specific act of Congress.  *See* Pub. L. No. 106-172, 114 Stat. 7 (2000). Xyrem is, consequently, available only through a risk evaluation and mitigation strategy (REMS) program that its manufacturer, Jazz Pharmaceuticals, developed and the FDA approved. Under the Xyrem REMS, distribution of Xyrem is strictly controlled, with all prescriptions filled by one central certified pharmacy, Express Scripts Specialty Distribution Services, Inc.

Manufacturers of generic versions of Xyrem began to file ANDAs[5] with the FDA in 2010, well before the expiration of various patents held by Jazz, some of which do not expire until 2033. Hikma was the "first filer" of an ANDA, which entitled Hikma to 180 days of generic exclusivity once it launched its product. After Hikma, the other seven generic manufacturer Defendants in this

---

[5] An ANDA, or Abbreviated New Drug Application, offers a shortened regulatory pathway toward drug approval for certain types of generic medications.  *See* 21 U.S.C. § 355(j)(2)(A)(ii)–(iv).

1    litigation—Amneal, Par, Lupin, Wockhardt,[6][7] Ranbaxy, Watson,[8] and Mallinckrodt[9]—also filed

2    ANDAs.

3        Because the ANDAs were filed prior to the expiration of Jazz's Xyrem patents, Jazz brought a

4    patent infringement suit against each ANDA filer in the District of New Jersey, as expressly

5    contemplated by the Hatch-Waxman Act of 1984. Jazz asserted in the patent cases that the ANDA

6    filers would infringe, contribute to the infringement of, or induce the infringement of three categories

7    of patents owned by Jazz: (1) patents relating to Xyrem formulations and their use (the "Formulation

8    Patents");[10] (2) patents relating to safe methods of drug distribution (the "REMS Patents");[11] and (3)

9

10

11

12    _____

         [6] Wockhardt is currently named as a Defendant in only one of the eight complaints coordinated in
13    this MDL:  *Self-Insured Schools of California v. Jazz Pharmaceuticals PLC, et al* (No 7:20-cv-06495,
       S.D.N.Y.).  Wockhardt has attempted to meet and confer on numerous occasions with counsel for
14    Self-Insured Schools of California to demonstrate that their claim against Wockhardt is frivolous, but
       counsel did not meaningfully engage with Wockhardt until the day this Joint Case Management
15    Statement was due. Notably, one other Plaintiff, Ruth Hollman, had previously named Wockhardt as a
       Defendant, but filed a notice of dismissal after engaging with Wockhardt's counsel.  *Ruth Hollman v.*
16    *Wockhardt Ltd., Morton Grove Pharmaceuticals, Inc., and Wockhardt USA LLC, et al.*, Case No.
       3:20-cv-06491 (N.D. Cal.), Dkt. No. 25.  Wockhardt has scheduled a meet and confer with Self-
17    Insured Schools on Wednesday, January 20, 2021 to discuss its claim. If Self-Insured Schools refuses
       to withdraw its allegation as to Wockhardt and instead moves forward by including Wockhardt in a
18    consolidated complaint, Wockhardt reserves all rights, up to and including moving for sanctions under
       Rule 11, as has already been communicated to counsel.
19
         [7] SISC is prepared to discuss any issues Defendant Wockhardt would like to address at the
20    upcoming meet and confer scheduled for January 20, 2021. Wockhardt offered to meet and confer
       with SISC *only if* SISC agreed to execute a secrecy agreement as a pre-condition, which delayed the
21    meet and confer. There is no issue that is ripe for the Court's attention at this time.

22        [8] Watson also has been named as a Defendant in only one of the complaints coordinated in this
       MDL.
23
         [9] Counsel for Mallinckrodt was not a party to the preparation of this Case Management Statement,
24    and the parties therefore recognize that Mallinckrodt has reserved all of its rights.

25        [10] U.S. Patent Nos. 6,472,431, 6,708,889, 7,262,219, 7,851,506, 8,263,650, 8,324,275, 8,461,203,
       8,859,619, 8,952,062, and 9,539,330.
26
         [11] U.S. Patent Nos. 7,668,730, 7,765,106, 7,765,107, 7,895,059, 8,457,988, 8,589,182, and
27    8,731,963.

28    _____
                                    -7-

patents relating to safety concerns presented by potential drug-drug interactions between Xyrem and other treatments (the "DDI Patents").[12]

The eight patent infringement lawsuits proceeded over eight years—including through a *Markman* (claim construction) hearing in the case against Hikma, as well as various *inter partes* review (IPR) and covered business method review (CBM) proceedings before the U.S. Patent and Trademark Office—and resulted in the settlements at issue starting in 2017. Plaintiffs proclaim in their statement of facts herein that they intend to try to prove the patents are "bogus" and the New Jersey patent-infringement lawsuits were a "sham." Far from a sham, the patents could have kept generic entry from the market until 2033, years after the entry dates provided for in the challenged settlement agreements.

The legality of the proposed generic products and the conditions under which they could be approved and marketed were the subject not only of patent litigation, but also of various petitions to the FDA. Xyrem's status as a controlled substance with the potential for abuse and misuse meant that any marketing of generic Xyrem products outside of Jazz's carefully designed system posed clear safety concerns. Thus, Jazz filed petitions with the FDA aimed at ensuring continued patient and community safety. Plaintiffs in this litigation highlight two of the three petitions filed by Jazz:  The first, filed in May 2012, related to what method of bioequivalence testing the FDA would deem acceptable for Xyrem; that petition was denied in November 2012. The second, filed in July 2012, asked FDA to require that any generics have a REMS program comparable to Jazz's; the FDA denied that petition in December 2012. Thus, the two petitions Plaintiffs emphasize in this litigation were addressed by the FDA eight years ago, and none of the Complaints pleads any antitrust injury arising therefrom.

Jazz also filed a third petition in September 2016. This petition, which only some Plaintiffs mention in their complaints, related to whether generic Xyrem manufacturers should be required to include on their labeling the same safety information regarding potential drug-drug interactions (DDI)

---

[12] U.S. Patent Nos. 8,772,306, 9,050,302, and 9,486,426.

as appeared in branded Xyrem labeling. The FDA sided with Jazz and *granted* this petition in January

2017. Jazz's position was that the FDA's requirement that this safety information be included on

generic Xyrem labels meant the ANDA filers would induce infringement of Jazz's DDI patents.  In

April 2017, with both sides weighing their prospects for success against their respective risks of

litigation, Jazz and "first filer" Hikma settled their District of New Jersey litigation with Jazz. Under

the settlement, Hikma agreed not to launch a product that would infringe Jazz's patents for six years,

until 2023.  This settlement occurred as the patent litigation was evolving favorably for Jazz

generally, and particularly with respect to the DDI Patents.

   For example, one of the generic manufacturers, Amneal, had filed an IPR before the Patent

Trials and Appeals Board ("PTAB") of the Patent and Trademark Office in February 2016

challenging the validity of one of the DDI Patents. Despite the lower evidentiary standard at the initial

stage of an IPR,[13] the PTAB in July 2016 found that Amneal had "not demonstrated that the

information presented shows that there is a reasonable likelihood that it would prevail in proving the

unpatentability of claims 1–34 of the '306 patent." *Amneal Pharmaceuticals LLC v. Jazz*

*Pharmaceuticals Ireland Ltd., et al.*, Case IPR2016-00546 (P.T.A.B. July 28, 2016), Paper No. 11 at

14-15. Jazz thus was well positioned to defend the validity of the claims of this DDI Patent in its

District of New Jersey litigation against the generic manufacturers.

   And, as noted, Jazz's infringement allegations as to the DDI Patents also were strengthened by

the FDA's January 2017 Citizen Petition decision requiring generic Xyrem manufacturers to include

on their labeling the same safety information regarding potential drug-drug interactions as appeared in

branded Xyrem labeling. Par itself had explained the significance of this decision only months before

---

[13] At the initial stage of an IPR, challengers need show only a reasonable likelihood they
ultimately will succeed in demonstrating by a preponderance of the evidence the invalidity of a
challenged patent claim.  *See* 35 U.S.C. § 314; *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d
1334, 1340 (Fed. Cir. 2020).  By contrast, in federal district court proceedings, challengers must
demonstrate the invalidity of a patent claim by clear and convincing evidence.  *Microsoft Corp. v. I4I
Ltd. P'ship*, 564 U.S. 91, 95 (2011).

in a November 2016 submission to the FDA asking the agency to reject Jazz's Citizen Petition: "The difference between permitting Par's proposed labeling carve-out and denying it [*i.e.*, granting Jazz's petition] means a difference of nine (9) additional years of exclusive marketing for Xyrem . . . Jazz's '302 and '306 patents expire on March 15, 2033."  Par Comments to Docket No. FDA-2016-P-2672 (Nov. 15, 2016), available at https://www.regulations.gov/ document?D=FDA-2016-P-2672-0017, at 18. Jazz and the generic manufacturers alike recognized that the DDI patents could prevent lawful generic sodium oxybate entry until 2033.

In settling the New Jersey patent litigation against Hikma for an entry date in 2023, Jazz agreed to license its patents on terms that would allow Hikma to enter the market a decade earlier than patent expiry, with Hikma paying Jazz a royalty. Following the April 2017 Jazz-Hikma settlement, Par, Amneal and Lupin reached settlements with Jazz in 2018, under which they are licensed to begin selling generic Xyrem 180 days after Hikma enters the market. The remaining Defendants reached settlements allowing those ANDA filers to begin selling generic versions of Xyrem on December 31, 2025—seven years before the expiration of the last of Jazz's DDI patents.

The Complaints in this litigation now attack various terms of these settlements that were made public in securities disclosures filed several years ago. Plaintiffs are belatedly trying to attack settlement terms that are entirely lawful.

Not surprisingly, therefore, Plaintiffs have failed to plead adequately any cognizable antitrust claims, including any claims (a) that the settlements of the New Jersey patent litigations were anticompetitive; (b) that Jazz engaged in "sham litigation" over its Xyrem patents; (c) that Jazz filed baseless petitions or manipulated the REMS system to delay generic entry; (d) that Plaintiffs have standing as direct purchasers of Xyrem; or (e) that Plaintiffs have suffered any adequately articulated antitrust injury. Defendants will respond more specifically to Plaintiffs' allegations upon the filing of a single consolidated complaint.

1    **Joint Statement of the Principal Factual Issues in Dispute**[14]

2    The parties provide the following list of principal factual issues that may be in dispute[15]:

3       1.  Whether Defendants entered into unlawful agreements or restraints of trade;

4       2.  Whether Jazz unlawfully maintained and continues to maintain monopoly power in
5           any cognizable relevant market;

6       3.  Whether any of the challenged settlements contained a large and unjustified payment
            from Jazz to one of the ANDA-filer Defendants;
7
        4.  Whether the challenged settlements were procompetitive and/or whether there were
8           less restrictive means of settling the patent litigations;

9       5.  Whether the Defendants' alleged scheme, in whole or in part, has substantially affected
10          intrastate and/or interstate commerce;

11      6.  Whether and, if any, which Purchasers suffered any injury and damages as a result of
            Defendants' alleged conduct;
12
        7.  Whether Defendants conspired to delay generic competition for Xyrem;
13
14      8.  Whether the challenged agreements and/or alleged conduct delayed the marketing of
            generic sodium oxybate products;
15
        9.  Whether, in the absence of the challenged conduct, Jazz would have prevailed in the
16          underlying patent litigation in proving the ANDA-filer Defendants infringed valid
17          Formulation patents, REMS patents, and/or DDI patents;

18      10. Whether and, if so, when, in the absence of the challenged conduct, the ANDA-filer
            Defendants would have been able to market FDA-approved generic sodium oxybate
19          products;

20      11. Whether and, if so, when, in the absence of the challenged conduct, the ANDA-filer
            Defendants would have been able to obtain FDA approval for the distribution of their
21          products;

22

23      _____
        [14] Recitation of a factual issue in this section should not be construed as an agreement by any
24   party that the standard or terminology stated therein is the correct or applicable one.

25      [15] To the extent any items on Defendants' below list of legal issues potentially in dispute are more
     appropriately characterized as factual issues, Defendants incorporate them here as well.  Defendants
26   reserve all rights to move to dismiss the forthcoming consolidated complaint on the basis of legal
     deficiencies and, at the appropriate time, to move for summary judgment with respect to some or all
27   of Plaintiffs' claims on the ground that material facts are not in dispute.

28                                          -11-

12. Whether the ANDA-filer Defendants would have been able to operationalize safe, FDA-approved distribution mechanisms for their products;

13. Whether and, if any, to what extent each plaintiff would have purchased generic sodium oxybate products instead of brand-name Xyrem earlier than they otherwise would have purchased those products in the absence of the challenged settlements;

14. Whether the Purchasers' policies and practices, including with respect to formularies and other restrictions on their members' access to medicine, caused or contributed to any reduction in choice or access to generic sodium oxybate products and other substitutable alternatives to Xyrem;

15. Whether Plaintiffs and members of the putative classes they purport to represent suffered any injury as a result of any of the alleged conduct;

16. Determination of the amount of delay, if any, the Defendants' allegedly unlawful monopolistic conduct caused; and

17. The amount of alleged overcharges, if any, paid by the classes in the aggregate and by individual members of the putative classes the Plaintiffs purport to represent.

Defendants' note, however, that, because there are eight different cases, and because of variance in the allegations and theories pleaded in these cases, the precise factual contours of this case await the filing of the single, consolidated complaint, which the Purchasers have represented they will file on behalf of one (or more[16]) putative classes.  As such, Defendants view the above list as preliminary; upon filing of a consolidated complaint, Defendants will be able identify the principal factual issues in dispute.

### III.    LEGAL ISSUES[17]

The Purchasers provide the following list of principal legal issues in dispute:

1.  Whether Defendants unlawfully restrained trade in violation of 15 U.S.C. § 1 and the certain States' antitrust and consumer protection laws by entering into the agreements;

---

[16] Counsel to Plaintiffs have indicated that they have not yet decided whether to proceed in their consolidated complaint on behalf of one putative class, or multiple putative classes.  A threshold legal issue in this case will be whether Plaintiffs can proceed as a putative class of "direct purchasers," under federal antitrust law, and/or whether they can proceed (as several of the initially filed complaints did) as a class of "indirect purchasers" under the laws of certain states.

[17] Recitation of a legal issue in this section should not be construed as an agreement by any party that the standard or terminology stated therein is the correct or applicable one.

2.  Whether Defendants monopolized or conspired to monopolize the alleged market for Xyrem and its AB-rated generic equivalents in violation of 15 U.S.C. § 2 and certain States' antitrust and consumer protection laws;

3.  Whether Defendants were unjustly enriched by their alleged misconduct;

4.  Whether Defendants possessed and maintained substantial market power (*i.e.*, monopoly power) with respect to Xyrem and its AB-rated equivalents;

5.  Whether Defendants' unlawful conduct was a contributing factor in causing some amount of delay of the entry of generic Xyrem;

6.  Whether Defendants caused antitrust injury to the Purchasers and class members;

7.  Whether the Purchasers' allegations of an agreement in restraint of trade are sufficient to state a claim against each of the defendants under Rule 12(b)(6) of the Federal Rules of Procedure; and

8.  Whether the claims should be certified to proceed as a class action under Rule 23.

Defendants' position is the same as with respect to the factual issues: upon the filing of a consolidated complaint, Defendants will be able identify the principal legal issues in dispute. At present, Defendants note that at least the following legal issues may be in dispute[18]:

1.  Whether the Plaintiffs' allegations are sufficient to state a claim against each of the Defendants under Rule 12(b)(6) of the Federal Rules of Procedure.

2.  Whether Plaintiffs can meet their burden to show that any of the Defendants, or all of the Defendants, entered in any agreement to unlawfully restrain trade;

3.  Whether Plaintiffs can meet their burden to show that but for the challenged settlements, any of the ANDA-filer Defendants would have been able to lawfully launch their products prior to the filing of the complaints;

4.  Whether the challenged settlements pro-competitively facilitated the market entry of the ANDA-filer Defendants;

5.  Whether patent settlement provisions requiring the payment of royalties by a licensee to a patentee constitute a "reverse payment" from the patentee to the licensee within the meaning of *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013);

---

[18] To the extent any items on Defendants' above list of factual issues potentially in dispute are more appropriately characterized as legal issues, Defendants incorporate them here as well. Defendants reserve all rights to move to dismiss the forthcoming consolidated complaint on the basis of legal deficiencies and, at the appropriate time, to move for summary judgment with respect to some or all of Plaintiffs' claims on the ground that material facts are not in dispute.

6. Whether settlement provisions permitting the marketing of authorized generic versions of Xyrem nonetheless constitute a "reverse payment" and "no-authorized-generic" agreement within the meaning of *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013);

7. Whether settlement provisions providing a volume-limited license under a patent can constitute unlawful market allocation under the antitrust laws;

8. Whether Defendants can be found liable for unlawful market allocation where they are not alleged to have reached agreement to limit total market supply;

9. Whether Plaintiffs can meet their burden to show that Jazz's patent infringement litigations against generic manufacturers were so objectively baseless as to constitute "sham litigation";

10. Whether Plaintiffs can meet their burden to show that the two Citizen Petitions that Jazz submitted to the FDA and that the FDA denied were so objectively baseless as to constitute "sham petitions";

11. Whether Plaintiffs can meet their burden to show that the 2016 Citizen Petition that the FDA granted (docket number FDA-2016-P-2672) was nevertheless a "sham petition";

12. Whether, given the FDA's grant of the 2016 Citizen Petition, any of the ANDA-filer Defendants could have lawfully come to market prior to 2033, but for the challenged settlements;

13. Whether any of the Plaintiffs are direct purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and if not, whether they state any claims under the patchwork of state laws their complaints rely upon; and

14. Whether the Defendants caused antitrust injury to the Plaintiffs and class members, and if so, which Plaintiffs and class members.

## IV.   MOTIONS

*Consolidation*: On August 12, 2020, Plaintiff A.F. of L. filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to centralize all related actions in the Southern District of New York that were pending in the Southern District of New York and the Northern District of California. (MDL No. 2966, ECF No. 1).  On August 13, 2020, plaintiffs New York State Teamsters Council Health and Hospital Fund, Blue Cross and Blue Shield Association, Government Employees Health Association, and UFCW Local 1500 Welfare Fund filed a motion to consolidate the related actions that were currently pending in the Northern District of California. (20-cv-4056, ECF No. 47). The motion was fully briefed. ECF No. 55 (opposition).

On October 15, 2020, Hon. Vince Chhabria held a hearing to consider the motion to consolidate. Hon. Chhabria ruled that because the submission of a consolidated complaint should occur after all of the cases were before a single judge, a decision on consolidation should be denied without prejudice. (20-cv-4056, ECF No. 80).

On January 4, 2020, the JPML issued a Transfer Order transferring all of the related actions to the Northern District of California.  (MDL No. 2966, ECF No. 65). At this time, eight related actions are pending before Your Honor.

The parties agree that the actions pending in this MDL should be consolidated and, if the Court agrees, will submit a motion and/or proposed order to consolidate the actions pursuant to Federal Rule of Civil Procedure 42(a).

*Appointment of Interim Lead Counsel*: Counsel for the Purchasers anticipate that there will be competing motions for Interim Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g). The Purchasers anticipate discussion of this issue at the Case Management Conference and are amenable to the Court's preferences. Based on this Court's prior preliminary case management orders in other similar actions, the Purchasers suggest a deadline of seven days after the initial conference to submit those motions, which shall be no more than 10 pages in length.  A response of no more than three pages may be filed three days after the initial filing.

*Motion(s) to Dismiss*: Defendants will move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and the parties in the various litigations and Districts have stipulated that such motion shall be due forty-five (45) days following the filing of a single consolidated complaint.  *See supra* note 1. Defendants anticipate seeking leave for an extension of page limits in connection with this motion, and the parties will meet and confer regarding such extension within five days of the filing of the consolidated complaint and provide a submission to the Court.

*Class Certification*: The Purchasers intend to file a motion for class certification pursuant to Fed. R. Civ. P. 23.

The parties anticipate that there will be further motions, including, potentially, motions for summary judgment, motions to exclude expert testimony, and motions in limine.

## V.      AMENDMENT TO PLEADINGS

Purchasers anticipate filing a Consolidated Class Action Complaint, but believe that the filing of a consolidated complaint should occur after the appointment of Interim Lead Class Counsel. Purchasers propose that the deadline to file a consolidated complaint be 14 days after the appointment of Interim Lead Class Counsel.

## VI.      DOCKET MAINTENANCE

There are currently a few errors in the case dockets. Plaintiff Ruth Hollman is listed as a plaintiff in the *New York State Teamsters Council Health and Hospital Fund* action (20-cv-4056). Ms. Hollman is not a plaintiff in that action. Likewise, Teamsters are mistakenly listed as a plaintiff in the *City of Providence* action (20-cv-4064).

## VII.      EVIDENCE PRESERVATION

The parties certify that they have reviewed this Court's Guidelines Relating to the Discovery of Electronically Stored Information, are aware of their obligations, and have taken appropriate steps to preserve potentially relevant evidence. The parties confirm that they have met and conferred concerning these obligations.

## VIII.   DISCLOSURES

The parties have not served initial disclosures. The Purchasers propose that initial disclosures be served one week after the case management conference. Defendants propose that the exchange of initial disclosures occur seven days after a decision on Defendants' motion to dismiss the consolidated complaint, assuming the complaint is not dismissed in its entirety.

The parties understand and will comply with their ongoing duty under Rule 26(e) to supplement their disclosures.

## IX.      DISCOVERY

The parties have not taken any discovery to date.

The parties have not entered into any stipulations regarding e-discovery or confidentiality.

**Scope of anticipated discovery**

Based on the factual and legal issues described above, the parties anticipate that if and when discovery begins, it will cover the following, non-exhaustive areas of inquiry, noting that the parties are not unanimous in their assessment of the importance or relevance of each area, and that the list is therefore preliminary and subject to revision:

- The development and approval of Xyrem and AB-rated generic Xyrem including all NDAs and ANDAs and supplements thereto;

- The filing and prosecution of patents covering Xyrem and all acquisitions thereof and assignments thereto and the decisions to list or not list such patents in the Orange Book;

- Actual or potential challenges to the validity and enforceability of the patents purporting to cover Xyrem in litigation or before the U.S. Patent & Trademark Office, and claims of non-infringement of the patents;

- Litigation and settlement of actual or potential claims concerning the patents purporting to cover Xyrem and AB-rated generic Xyrem and other agreements to license, supply, sell, and refrain from selling Xyrem and AB-rated generic Xyrem, including those agreements to settle threatened, perceived, potential or actual infringement litigation; and the negotiation thereof;

- The RiskMAP and REMS programs for Xyrem, and in particular, the "single pharmacy" REMS program for Xyrem;

- The May 18, 2012, July 10, 2012, and September 2, 2016 citizen petitions filed by Jazz;

- The manufacture, marketing, sale, and distribution of Xyrem and AB-rated generic Xyrem, including the actual, perceived, and/or expected readiness, willingness, or ability of any Defendant or other pharmaceutical company to develop, formulate, scale up, process validate, manufacture, market, and sell AB-rated generic Xyrem;

- The market for Xyrem and AB-rated generic Xyrem, including Defendants' alleged agreements to allocate such a market;

- Sales of Xyrem and AB-rated generic Xyrem and calculation of the Purchasers' alleged overcharge damages based on those purchases, if any;

- Revenues and profits, and projected revenues and profits, derived from the sale of Xyrem and AB-rated generic Xyrem and the economic and therapeutic substitutability or interchangeability among Xyrem, AB-rated generic Xyrem, and other products;

- Plaintiffs' policies in connection with the reimbursement for, coverage of, and/or safe distribution of Xyrem;

- Definition of the relevant antitrust market in which Xyrem competes;

- Projections of the Purchasers or their pharmacy benefit managers regarding timing of generic entry;

- The Purchasers' contracts with insurers and/or pharmacy benefit managers;

- The Purchasers' or their pharmacy benefit managers' formularies;

- The treatment of narcolepsy, excessive daytime sleepiness, and/or cataplexy; and

- Investigations by government or state entities regarding the conduct alleged in the Purchasers' complaints, if any.

**Timing of discovery**

***The Purchasers' Position***: While the Purchasers are willing to defer the production of custodial documents until after the hearing on the motion to dismiss, certain types of documents and information should be produced in the coming months to expedite the overall case schedule in the event the Court denies Defendants' motion to dismiss. The Purchasers' position is that at least the following documents and information should be produced by April 30, 2021:[19]

- The settlement agreements between Jazz and the ANDA-filer Defendants;

- Any agreements between Jazz and Express Scripts related to the sale and/or distribution of Xyrem;

- All Citizen Petitions, ANDAs, marketing and/or distribution applications, and related documents provided to the FDA, including any comments, supplements, or amendments thereto;

- Unredacted versions of all filings, document productions and deposition transcripts in the patent litigation, including any expert reports;

---

[19] *See*, *e.g.*, *In re Qualcomm Antitrust Litig.*, Case No. 17-md-02773-LHK (N.D. Cal.), ECF No. 36 (ordering that "[d]iscovery shall begin immediately.  Qualcomm shall produce documents it submitted to government investigatory agencies . . . ."

- Data reflecting Jazz's sales of Xyrem, as well as any rebates, coupons, discounts, or other promotion payments or incentives provided by Jazz relating to the sale or utilization of Xyrem;

- Any documents produced or provided to the Federal Trade Commission, Department of Justice, or any other government regulators or agencies regarding the conduct at issue in this litigation; and

- Defendants should disclose whether they intend to rely upon the advice of counsel as a defense in this matter.

The Purchasers also propose that, even though they are willing to defer custodial document discovery, the parties promptly begin the process of negotiating discovery-related pretrial orders, such as orders governing confidentiality, the production of electronically stored information, privilege, and remote depositions. Having such orders in place prior to the commencement of document productions will ensure that such discovery is not unnecessarily delayed.

***Defendants' Position***: Defendants' position is that all discovery—not simply the custodial discovery that Plaintiffs agree should be deferred—should await the filing of a consolidated complaint and resolution of Rule 12 briefing thereon.  The Court has broad discretion to stay discovery pending the disposition of a dispositive motion.  Defendants intend to file motion(s) to dismiss that would resolve the entire action, and a preliminary peek at the motion(s), when filed, will confirm that commencing discovery prior to resolution of the motions would be a waste of resources.  If Plaintiffs are unable to state a claim, then they have no basis on which to obtain access to Defendants' confidential documents and data.

If Plaintiffs are able to state a claim, and the parties have the Court's guidance on which claims are properly pled, then the parties can proceed efficiently to exchange document requests and negotiate the reasonable scope of discovery relevant to the parties' claims and defenses.  To date, Plaintiffs are not yet aligned on definition of the putative class, or of how many classes there will be, and which of various theories they will pursue among the competing complaints.  Requiring Defendants to make decisions that will affect their discovery burdens before Defendants are able to

-19-

understand which claims and allegations will be at issue in these cases would be premature and unfair.[20]

## X.      CLASS ACTIONS

All attorneys of record have reviewed the Procedural Guidance for Class Action Settlements.

Certain parties have proposed schedules(s) for the filing of the Purchasers' motion for class certification below.

Defendants intend to dispute class certification, but will meet and confer on such issues upon the filing of a single complaint on behalf of the putative class(es).

## XI.     RELATED CASES

The eight related actions filed in this District and the Southern District of New York have been centralized before this Court by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407.

## XII.    RELIEF

### The Purchasers' position

The Purchasers have pled that they have suffered injury as a result of the Defendants' unlawful anticompetitive conduct delaying entry of AB-rated generic versions of Xyrem and are entitled to damages in the form of overcharges. The Purchasers are also seeking multiple damages and treble damages under State antitrust and consumer protection laws and/or disgorgement under State unjust enrichment law. Finally, the Purchasers are seeking injunctive relief against defendants to ensure competition in the Xyrem market.

Proof at trial, largely in the form of expert testimony, will determine the amount of damages.

Entitlement to injunctive relief, and the scope of such relief, will be determined by the Court following trial.

---

[20] Plaintiffs' citation to the *Qualcomm* matter is wholly unavailing.  There, the documents the Court ordered the defendant to produce prior to Rule 12 briefing consisted of documents that the FTC had previously seen fit to subpoena (and that the defendant had previously produced) as part of a government investigation of the conduct in dispute.  Plaintiffs point to no such regulatory subpoena or investigation here, because there is none.

**The Defendants' position**

Because the Plaintiffs have not yet filed their operative complaint, Defendants' statement is premised upon the separate complaints filed to date and/or the characterizations set forth by Plaintiffs above.  Defendants deny that Plaintiffs have adequately pleaded any legal claims, including but not limited to that Defendants illegally monopolized any cognizable antitrust relevant market and that Defendants engaged in any conduct constituting unlawful exclusionary or anticompetitive conduct that harmed competition in any cognizable antitrust relevant market.  Defendants also deny that Plaintiffs have standing to assert any such claim and that Plaintiffs have adequately pleaded any injury.

## XIII.   SETTLEMENT AND ADR

No settlements have been reached by the parties. The parties do not believe ADR efforts would be productive at this time. The parties have complied with ADR Local Rule 3-5, or will do so by the deadline set forth below.

## XIV.   CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES

The parties do not consent to proceed before a magistrate judge for all purposes.

## XV.   OTHER REFERENCES

This case is not suitable for reference to arbitration or a special master.  The Judicial Panel on Multidistrict Litigation already has centralized these cases before this Court pursuant to 28 U.S.C. § 1407.

## XVI.   NARROWING OF ISSUES

The parties have not identified any issues that can be narrowed at this juncture but will meet and confer on any such issues, as well as methods to expedite the presentation of evidence at trial.

## XVII.   EXPEDITED TRIAL PROCEDURE

The parties do not consent to the Expedited Trial Procedure of General Order No. 64.

JOINT CASE MANAGEMENT STATEMENT
Case No. 5:20-md-02966-LHK

# XVIII. SCHEDULING

The parties propose the following schedule[21]:

| Event | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| Deadline to submit application for appointment of interim lead counsel | 7 days after the Case Management Conference | 7 days after the Case Management Conference |
| For parties that have not already done so, last day to:<br>- Meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan; and<br>- File ADR Certification signed by Parties and Counsel | | Feb. 17, 2021 |
| Purchasers' Consolidated Class Action Complaint ("CAC") | 14 days after appointment of Interim Lead Class Counsel | 14 days after appointment of Interim Lead Class Counsel |
| Deadline to Finish Meeting and Conferring Regarding ESI and Confidentiality Orders | | 21 days after appointment of Interim Lead Class Counsel |
| Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement. | | 28 days after appointment of Interim Lead Class Counsel |
| Case Management Conference | | At the Court's convenience. |
| Defendants' Motion to Dismiss the Consolidated Complaint | 45 days after filing of the Consolidated Complaint | 45 days after filing of the Consolidated Complaint |
| Preliminary Document Productions due | | Apr. 30, 2021 |
| Purchasers' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint | 28 days after filing of Defendants' Motion to Dismiss the Consolidated Complaint | 28 days after filing of Defendants' Motion to Dismiss the Consolidated Complaint |

---

[21] Defendants believe certain of the deadlines proposed by Plaintiffs are unnecessary or that it would be premature to schedule them at this early date, before appointment of interim lead Plaintiffs' counsel, filing of a consolidated complaint, or resolution of the motion(s) to dismiss. These entries are left blank in the column presenting Defendants' Proposal.

| Event | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| Defendants' Reply in Support of Motion to Dismiss the Consolidated Complaint | 21 days after Purchasers' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint | 21 days after Purchasers' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint |
| Hearing on Motion to Dismiss | June 2021 or at the Court's convenience | June 2021 or at the Court's convenience |
| Initiation of Fact Discovery | 7 days after a decision on Defendants' Motion to Dismiss the CAC in the event the motion is denied in whole or in part | |
| Commencement of full discovery | | 7 days after a decision on Defendants' Motion to Dismiss the CAC in the event the motion is denied in whole or in part |
| Fact Discovery Cutoff | June 24, 2022 | Plaintiffs BCBS, Teamsters, GEHA, Local 1500, and Hollman: March 25, 2022<br><br>Plaintiffs A.F. of L., COP, and SISC suggest that the remaining dates be negotiated by Interim Lead Class Counsel and defense counsel following a decision on the Defendants' Motion to Dismiss.[22] |
| Purchasers' Motion for Class Certification Including Expert Declarations | July 1, 2022 | March 4, 2022[23] |
| Opposition to Class Certification | Aug. 19, 2022 | April 8, 2022 |

---

[22] Defendants agree with Plaintiffs A.F. of L., COP, and SISC that, given the early stage of this case, it would be premature to set deadlines beyond the end of fact discovery at this time.  To the extent the Court is inclined to set deadlines beyond the end of fact discovery in the initial Case Management Order, however, Defendants submit below their proposal.  Plaintiffs BCBS, Teamsters, GEHA, Local 1500, and Hollman have included these dates per Paragraph 17 of the Standing Order for All Judges of the Northern District of California.

[23] The following dates are proposed by Plaintiffs BCBS, Teamsters, GEHA, Local 1500, and Hollman.

JOINT CASE MANAGEMENT STATEMENT
Case No. 5:20-md-02966-LHK

| Event | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| Reply in Support of Class Certification | Sept. 9, 2022 | May 6, 2022 |
| Hearing on Motion for Class Certification | September 2022 or at the Court's convenience | May 2022 or at the Court's convenience |
| Opening Expert Reports | Sept. 16, 2022 | May 20, 2022 |
| Rebuttal Expert Reports | Nov. 4, 2022 | June 24, 2022 |
| Reply Expert Reports | Dec. 2, 2022 | July 22, 2022 |
| Expert Discovery Cutoff | Dec. 23, 2022 | August 12, 2022 |
| Dispositive Motions and *Daubert* Motions | Jan. 20, 2023 | September 2, 2022 |
| Summary Judgment and *Daubert* Oppositions | Feb. 17, 2023 | September 30, 2022 |
| Summary Judgment and *Daubert* Replies | Mar. 10, 2023 | October 21, 2022 |
| Hearing on Dispositive Motions and *Daubert* Motions | March/April 2023 or at the Court's convenience | November 2022 |
| Exchange of Rule 26(a)(3)(A) Disclosures | | January 11, 2023 |
| Exchange of Proposed Voir Dire, Preliminary Jury Instructions, Final Jury Instructions, and Proposed Jury Verdict Form | | January 18, 2023 |
| Exchange of Objections Pursuant to Rule 26(a)(3)(B) | | January 25, 2023 |
| Submission of Joint Pretrial Statement, Joint Exhibit List (With Objections), and Deposition Designations (With Objections) | | February 8, 2023 |
| Submission of Voir Dire, Preliminary Jury Instructions, Final Jury Instructions, and Proposed Jury Verdict Form | | February 15, 2023 |
| Pretrial Conference | June 2023 or at the Court's convenience | February 2023 |
| Trial | July 2023 or at the Court's convenience | March 2023 |

## XIX.   TRIAL

The Purchasers request a jury trial but reserve their right to request a bench trial on issue so triable. At this time, the Purchasers estimate that such trial will take approximately four weeks.

The Defendants do not anticipate disputing the Plaintiffs' jury demand, reserving their rights pending the filing of the operative complaint.

## XX. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

All parties have filed or will file their Certification of Interested Entities or Persons required by Civil Local Rule 3-15.

The law firms representing the Purchasers are self-funding the litigation.

## XXI. PROFESSIONAL CONDUCT

The parties attest that all attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

## XXII. PLAN FOR JUNIOR ATTORNEYS' INVOLVEMENT

Senior counsel will ensure the involvement of junior attorneys.

## XXIII. PROTOCOL FOR INTERVIEWING ABSENT PUTATIVE CLASS MEMBERS

Neither Purchasers' nor Defendants' counsel shall interview absent putative class members regarding this matter without including opposing counsel in the interview. The Purchasers may, however, communicate with absent class members regarding the procedural status of the case and regarding their actual or potential participation in the matter as named class representatives. Defendants may continue ordinary course of business communications with any absent putative class members who are customers or potential customers of defendants. If a defendant is producing a document or information that requires notice to a customer who is also a putative class member, the defendant may provide such notice.

## XXIV. REGULAR STATUS CONFERENCES

The Purchasers request that this Court hold a regular status conference every month, or on such other regular basis as the Court may order. Except as otherwise indicated by the Court, counsel can attend status conferences by telephone or video. If all counsel agree that there is no need for a particular status conference given activity in the case, counsel may contact the Court's Clerk and seek to have the Court cancel the status conference.

1

Dated: January 15, 2021

2

3
By: /s/ Dena C. Sharp
Dena C. Sharp (State Bar No. 245869)

4
**GIRARD SHARP LLP**
601 California Street, Suite 1400

5
San Francisco, CA 94108
Tel: (415) 981-4800

6
Fax: (415) 981-4846
dsharp@girardsharp.com

7

8
*Attorneys for Plaintiff New York State*
*Teamsters Council Health and Hospital Fund*

9

10
By: /s/ Michael M. Buchman
Michael M. Buchman

11
Michelle C. Clerkin
777 Third Avenue, 27th Floor

12
New York, NY 10017
(212) 577-0050

13
mbuchman@motleyrice.com
mclerkin@motleyrice.com

14

15
*Attorneys for Plaintiff The City of Providence,*
*Rhode Island*

16
By: /s/ Thomas M. Sobol
Thomas M. Sobol

17
Jessica MacAuley
**HAGENS BERMAN SOBOL SHAPIRO**

18
**LLP**
55 Cambridge Parkway, Suite 301

19
Cambridge, MA 02142
Tel: (617) 482-3700

20
Fax: (617) 482-3003
tom@hbsslaw.com

21
jessicam@hbsslaw.com

22

23
*Attorneys for Plaintiffs Blue Cross Blue Shield*
*Association and Government Employees*

24
*Health Association*

25
By: /s/ Greg S. Asciolla
Gregory S. Asciolla

26
**LABATON SUCHAROW LLP**
140 Broadway

27

By:  /s/ Jeffrey Faucette
Jeffrey Faucette (State Bar No. 193066)
**SKAGGS FAUCETTE LLP**
Four Embarcadero Center
Suite 1400 PMB #72
San Francisco CA 94111
Tel: (415) 295-1197
Fax: (888) 980-6547
jeff@skaggsfaucette.com

By:  /s/ Heidi K. Hubbard
Heidi K. Hubbard (*pro hac vice*)
Stephen Andrews (State Bar No. 205961)
Stanley E. Fisher (*pro hac vice*)
Benjamin M. Greenblum (*pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
725 12th Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com
sandrews@wc.com
sfisher@wc.com
bgreenblum@wc.com

*Attorneys for Defendants Jazz Pharmaceuticals,*
*Inc. and Jazz Pharmaceuticals Ireland Limited*

By:  /s/ Devora W. Allon
Devora W. Allon, P.C. (*Pro hac vice*)
Jay P. Lefkowitz, P.C. (*Pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Tel:  212-446-4800
devora.allon@kirkland.com
lefkowitz@kirkland.com

*Attorney for Defendants Amneal*
*Pharmaceuticals, LLC, Lupin Pharmaceuticals*
*Inc., Lupin Inc., Lupin Ltd., Sun*
*Pharmaceutical Holdings USA, Inc., and Sun*
*Pharmaceutical Industries, Inc.*

28

-26-

New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com

*Attorneys for Plaintiff UFCW Local 1500
Welfare Fund*

By: /s/ Thomas M. Loper
Thomas M. Loper (*Pro hac vice*)
**LOPER LAW LLC**
452 Government Street, Suite E
Mobile, AL 36602
Phone: (251) 288-8308
tloper@loperlawllc.com

*Attorneys for Plaintiff A.F. of L. – A.G.C.
Building Trades Welfare Plan*

By: /s/ Joseph R. Saveri
Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kyle P. Quackenbush (State Bar No. 322401)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
kquackenbush@saverilawfirm.com
areddy@saverilawfirm.com

*Attorneys for Plaintiff Self-Insured Schools of
California*

By: /s/ John Macoretta
John Macoretta
**SPECTOR ROSEMAN & KODROFF PC**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
jmacoretta@skrattorneys.com

*Attorneys for Ruth Hollman*

By:  /s/ Benjamin G. Bradshaw
Benjamin G. Bradshaw
Stephen McIntyre
Brett J. Williamson
Monsura A. Sirajee
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
10th Floor
Washington, DC 20006
Tel: (203) 383-5300
Fax: (203) 383-5414
bbradshaw@omm.com
smcintyre@omm.com
bwilliamson@omm.com
msirajee@omm.com

*Attorneys for Defendant Par Pharmaceutical,
Inc.*

By: /s/ Heather M. Burke
Heather M. Burke (SBN 284100)
**WHITE & CASE LLP**
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
Tel: (650) 213-0300
Fax: (650) 213-8158
hburke@whitecase.com

Jack E. Pace III (*pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
jpace@whitecase.com

Kathryn J. Mims (*pro hac vice*)
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, District of Columbia 20005
Telephone: (202) 626-3600
Fax: (202) 639-9355
kmims@whitecase.com

*Attorneys for Defendants Hikma
Pharmaceuticals USA Inc., Eurohealth*

-27-

1    (U.S.A.), Inc., Roxane Laboratories, Inc., and
     West-Ward Pharmaceuticals Corp.

2

3    /s/ Amanda H. Russo
     Amanda H. Russo (SBN 319617)

4    **GOODWIN PROCTER LLP**
     601 South Figueroa Street

5    Los Angeles, CA 90017
     Tel.: +1 213 426 2500

6    Fax: +1 213 623 1673
     arusso@goodwinlaw.com

7

8    /s/ Christopher T. Holding
     Christopher T. Holding (*pro hac vice*

9    forthcoming)
     **GOODWIN PROCTER LLP**

10   100 Northern Avenue
     Boston, MA 02210

11   Tel.: (617) 570-1000
     Fax: (617) 523-1231

12   cholding@goodwinlaw.com

13
     *Attorneys for Defendants Watson Laboratories,*
14   *Inc. and Teva Pharmaceuticals USA, Inc.*

15

16    /s/ Wendy L. Devine
     Wendy L. Devine (SBN 246337)

17   **WILSON SONSINI GOODRICH &**
     **ROSATI**

18    One Market Plaza
     Spear Tower, Suite 330

19   San Francisco, CA 94105
     wdevine@wsgr.com

20

21   Jeffrey C. Bank (pro hac vice forthcoming)
     Brendan J. Coffman (pro hac vice forthcoming)

22   **WILSON SONSINI GOODRICH &**
     **ROSATI**

23   1700 K St. NW
     Fifth Floor

24   Washington, DC 20006
     jbank@wsgr.com

25   bcoffman@wsgr.com

26

27
                              -28-
28          JOINT CASE MANAGEMENT STATEMENT
                 Case No. 5:20-md-02966-LHK

*Counsel to Wockhardt Ltd, Wockhardt USA*
*LLC, and Morton Grove Pharmaceuticals, Inc*

**ATTESTATION**

I, Dena C. Sharp, am the ECF user whose identification and password are being used to file this document.  I attest under penalty of perjury that concurrence in this filing has been obtained from counsel listed above.

  /s/ *Dena C. Sharp*_____