UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE XYREM (SODIUM OXYBATE) ANTITRUST LITIGATION

Case No. 20-md-02966-RS

**ORDER GRANTING MOTION TO DISMISS**

# I. INTRODUCTION

Defendants move to dismiss Plaintiff Blue Shield Blue Cross Association ("BCBSA") under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that BCBSA lacks standing. In particular, Defendants argue that BCBSA cannot demonstrate injury in fact because the funds it uses to purchase prescription drugs on behalf of enrollees belong to the federal government; thus, it is the federal government, not BCBSA, that has allegedly been injured. Defendants' position is persuasive: BCBSA has not established that it has been injured, though it may be able to bring suit on behalf of the federal government. As such, the motion is granted, without prejudice to BCBSA filing a new complaint as discussed below.

# II. BACKGROUND[1]

As discussed in greater detail in prior orders, *e.g.*, Dkt. 138, Plaintiffs in this multidistrict

---

[1] This section draws on the facts alleged in the Consolidated Amended Class Action Complaint ("CAC"), which need not be taken as true under a Rule 12(b)(1) motion, as well as evidence beyond the CAC. *Safe Air for Everyone v. Meyer*, 373 F.3d 1085, 1089 (9th Cir. 2004).

litigation aver that Defendants engaged in anticompetitive conduct by delaying generic versions of Xyrem, "a drug used to treat cataplexy and daytime sleepiness in patients with narcolepsy," from entering the market. Dkt. 234, at 1. Defendants are all pharmaceutical manufacturers; Plaintiffs include eight health benefits plans, including BCBSA, and one individual purchaser.

BCBSA is "a national association of 35 independent and locally operated Blue Cross Blue Shield ('BCBS') companies providing health plans" to over 100 million members across the country. Dkt. 62 ("CAC") ¶ 12. Since 1960, the U.S. Office of Personnel Management ("OPM") has contracted with BCBSA as the carrier for the Federal Employee Program ("FEP"),[2] the largest of the comprehensive health insurance plans available to federal employees and established under the Federal Employees Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8902 *et seq*. Like other employer-sponsored health care plans, the federal government (as the employer) pays "about 75% of the premiums; the enrollee pays the rest." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 684 (2006) (citing 5 U.S.C. § 8902(d)). As a carrier, BCBSA's role is to administer the FEP on OPM's behalf. While the 35 independent BCBS companies (the "Local Blues") "underwrite and administer FEP in their individual locales" for most services, BCBSA itself manages pharmaceutical benefits for FEP enrollees; this includes, for example, purchasing Xyrem. CAC ¶ 12. BCBSA receives "a fixed service charge" in exchange for administering the FEP. *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1246 (9th Cir. 2017) (quoting *McVeigh*, 547 U.S. at 703 (Breyer, J., dissenting)).

Relevant to this motion is the way these prescription drug payments are made. First, the FEP premiums are deposited into a special fund (or letter of credit account) within the U.S. Treasury. BCBSA works with a pharmacy benefits manager ("PBM") that more directly manages the FEP's prescription drug benefits. Once the PBM does this on behalf of an enrollee (for instance, by buying a prescription drug), it sends an invoice to BCBSA. BCBSA, in turn, pays the invoice using a special FEP operating account; "[n]early simultaneously in most instances,

---

[2] The Plan is also called the Blue Cross and Blue Shield Service Benefit Plan. Dkt. 376-15 ¶ 4.

BCBSA requests an aggregate drawdown from the [Treasury account] to reimburse BCBSA" for these payments. Dkt. 376, Ex. G, at 15; *see* Dkt. 376 ("Mot."), at 5; Dkt. 401 ("Opp."), at 10–11. If the FEP funds were ever to run short, BCBSA and the Local Blues, as the Plan's underwriters, would be obligated to fill the gap.[3] OPM retains any funds left in the Treasury account at the end of a given year and determines what to do with them.

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction over the asserted claims. The plaintiff bears the burden of proving jurisdiction at the time the action is commenced. *See Tosco Corp. v. Cmtys. for Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *overruled on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack "asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Id.* In a factual attack, by contrast, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* In resolving a factual attack on jurisdiction, the Court need not presume the truthfulness of the plaintiff's allegations and it may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Id.* Once a factual challenge has been raised, the party opposing dismissal must present "affidavits or other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

Article III requires that a plaintiff establish standing to bring suit. This in turn requires demonstrating three things: (1) they "have suffered an injury in fact"; (2) there is "a causal

---

[3] More specifically, BCBSA would pay the shortfall in the first instance as the agent of the Local Blues, but since the Local Blues "jointly underwrite the FEP," they would ultimately bear the cost of the shortfall and would be obligated to compensate BCBSA for its payment. Opp., at 7–8; *accord* Mot., at 6–7. According to Defendants, this has never happened, as "the federal government has always provided sufficient funds to pay all FEP claims." Mot., at 12.

connection between the injury and the conduct complained of"; and (3) it is likely "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citation omitted). Standing must be demonstrated "separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). A plaintiff's failure to establish standing requires dismissal for lack of subject-matter jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

## IV. DISCUSSION

The first key question raised by the motion is this: who (or rather, what entity) is injured by Defendants' alleged misconduct? Defendants contend the answer is OPM. The funds used to purchase prescription drugs, including Xyrem, for FEP members are held in and transferred from the U.S. Treasury account, and BCBSA is effectively just paying bills for the government. BCBSA does not claim that it has personally been injured; rather, it argues the FEP *itself* has been injured, and BCBSA has brought suit on its behalf. Answering this question ultimately requires a clear understanding of the relationship between OPM, BCBSA, and the FEP.

The FEP is a unique program. Unlike Medicare, for example, which is "established, maintained, and underwritten by the federal government itself," FEHBA carriers design and underwrite their respective FEHBA plans. Brief of the United States as Amicus Curiae Supporting Respondents, *Health Care Serv. Corp. v. Pollitt*, No. 09-38, 2010 WL 360215, at *30–31 (U.S. Feb. 1, 2010). The carriers compete amongst themselves to "provide the best range of benefits [to federal employees] at the lowest costs." Dkt. 376, Ex. N ("Stuhan Decl.") ¶ 4. At the same time, unlike a fully private plan, the carriers do not exercise full control over the funds. They do not, for instance, retain as profit "any difference between plan premiums and the cost of benefits." *Goncalves*, 865 F.3d at 1246 (quoting *McVeigh*, 547 U.S. at 703 (Breyer, J., dissenting)). Thus, the FEP, as with all FEHBA plans, is best understood as a "public-private partnership" rather than a purely private or purely government-sponsored enterprise. Stuhan Decl. ¶ 3.

This divided responsibility can make it conceptually difficult to trace injury to either side. However, the Ninth Circuit's opinion in *Goncalves ex rel. Goncalves v. Rady Children's Hospital*

*San Diego* provides useful guidance. There, several Local Blues removed a state court action to federal court by invoking the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See* 865 F.3d at 1243. To determine whether the Local Blues had "acted under" the direction of a federal officer when pursuing a subrogation claim, the Ninth Circuit analyzed the relationship between FEHBA plan carriers and "the relevant federal officer, OPM." *Id.* at 1245. The panel observed that OPM, rather than the carrier, resolves disputes concerning the extent of coverage, and that subrogation recoveries sought by carriers are deposited "directly to the special U.S. Treasury fund." *Id.* at 1246. The panel also noted that the premiums deposited into the Treasury fund belong to OPM — not the carrier. This portion of the opinion drew in large part from Justice Breyer's dissent in *Empire Healthchoice Assurance, Inc. v. McVeigh*, another case involving BCBSA and the FEP. In relevant part, Justice Breyer observed:

> The carrier typically withdraws money from the [U.S. Treasury] fund to pay for covered health care services; however, the fund's money belongs, not to the carrier, but to [OPM]. After benefits are paid, any surplus in the fund can be used at the agency's discretion to reduce premiums, to increase plan benefits, or to make a refund to the Government and enrollees. The carrier is not at risk. Rather, it earns a profit, not from any difference between plan premiums and the cost of benefits, but from a negotiated service charge that the federal agency pays directly.

547 U.S. at 703 (Breyer, J., dissenting) (citations omitted). *Goncalves* added to Justice Breyer's analysis the further conclusion that BCBSA "is not acting as an insurer *so much as it is acting as a claims processor*, serving as the government's agent while the government takes the place of the typical health insurer in hedging bets." 865 F.3d at 1246 (emphasis added); *see Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1234 (8th Cir. 2012) ("The carrier's assistance to the federal government in all respects in no way can be described as simple compliance with federal law, but rather it has been delegated particular authority by OPM . . . ."), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021).

Although *Goncalves* arose in the context of a subrogation action and addressed the federal officer removal statute, its analysis is not only controlling, but also intuitive. Indeed, another court in this District recently applied *Goncalves* to a practically indistinguishable set of facts and

concluded that BCBSA lacked standing to bring an antitrust suit. In *In re HIV Antitrust Litigation*,[4] plaintiffs allege that defendants, a group of pharmaceutical manufacturers, have engaged in an unlawful scheme to "extend patent protection for their drugs, impair entry by would-be generic competitors, and charge exorbitant, supracompetitive prices for the drugs that people living with HIV need to survive." No. 19-cv-02573-EMC, Dkt. 788, at 1 (N.D. Cal. Dec. 15, 2021). Just as it has done here, BCBSA brought suit "in its capacity as the carrier of [the FEP]." *Id.* at 170; *see* CAC ¶ 12. Two of the defendants moved to dismiss BCBSA on the theory that it lacked standing "because it is not a 'true' purchaser — *i.e.*, it did not use its own funds to buy any drugs and/or, even if it did, it was ultimately reimbursed for those purchases by the federal government." *Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2022 WL 789123, at *1 (N.D. Cal. Mar. 14, 2022). The court initially rejected this argument, finding that BCBSA had laid out a *prima facie* case that it paid for the drugs and that the defendants had not shown enough evidence to the contrary (that is, that "BCBSA does not initially put up its own money"). *Id.* at *7.

After further discovery occurred and the defendants renewed their Rule 12(b)(1) motion, the court found in their favor and granted the motion. It reasoned that *Goncalves* "answers the question of 'whose money' is used to pay benefits: it is the government's, and not BCBSA's." *Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2022 WL 17816213, at *3 (N.D. Cal. Aug. 5, 2022). Thus, because BCBSA's money was not at stake, it had not adequately established standing to seek damages nor injunctive relief. While the court acknowledged that there was, "in theory, room for an argument that [OPM] has authorized BCBSA or delegated to BCBSA the authority to file a lawsuit," it chose not to address this possibility given that the relevant putative class definitions had excluded "all federal government entities." *Id.* at *4.

These cases, and especially their analysis of how the FEP operates, lend strong support to the conclusion that it is the federal government — specifically, OPM — that is injured by any

---

[4] The case was previously captioned *Staley v. Gilead Sciences, Inc.*, and the parties exclusively refer to it as such in their briefs. This order instead refers to the case by its current caption.

alleged overcharges of prescription drugs like Xyrem, and thus it is OPM that has Article III standing. True, BCBSA is the entity that has paid for Xyrem in the first instance, namely by paying invoices to the PBM. However, these payments are accompanied by contemporaneous "aggregate drawdowns" from the U.S. Treasury fund. Dkt. 376, Ex. G, at 15. BCBSA's corporate designee specifically clarified that these drawdowns are not reimbursements from OPM to BCBSA; rather, these drawdowns constitute the payment for each pharmaceutical benefits claim. *See* Dkt. 376, Ex. H, at 156:2–4, 156:10–12. Further, any recoveries — whether for erroneous payments, subrogation claims, or, here, antitrust damages — are returned directly to the Treasury fund. *See Goncalves*, 865 F.3d at 1246; Stuhan Decl. ¶ 7.

BCBSA cites numerous cases for the proposition that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." Opp., at 15 (citing, e.g., *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)). Yet this principle does not, as BCBSA suggests, "foreclose [Defendants' arguments] as a matter of law." *Id.* That is because these cases take for granted that the overcharged plaintiff paid an unlawful premium for the product in the first place. Injury occurs because this money could have been allocated elsewhere or retained as profit, rather than used to cover or otherwise offset the illegal increase. The Supreme Court elaborated on this principle in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968):

> If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. . . . The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher. It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

*Id.* at 489. The same is true for a government purchaser. As the Court noted in *Hawaii v. Standard*

1  *Oil Co. of California*, 405 U.S. 251 (1972), an overcharge to the State of Hawaii would have had
2  the effect of "increasing taxes, or reducing government services, or both." *Id.* at 262 n.14.[5]
3  Likewise here, if OPM incurred overcharges when purchasing Xyrem, it would have less
4  flexibility to "reduce the cost of future benefits or to increase benefits provided by the FEP." Dkt.
5  376, Ex. G, at 16.

BCBSA approaches this entire question differently. It takes the position that the FEP itself was injured, and because the FEP is "not a juridical entity but instead a private insurance plan established in accordance with federal law," its interests "must be protected by a representative." Opp., at 19. Thus, BCBSA, as this "representative," likens itself to a trustee, a fiduciary, an executor of an estate, or a successor in interest, arguing the FEP is analogous to a trust or an estate since it is similarly a "collection of assets and liabilities." *Id.* While creative, this position is not well supported. Regardless of whether "California law smiles on this arrangement" in the abstract, *id.*, accepting BCBSA's argument would effectively require inventing a new genus of representative relationships. BCBSA cites to no authority in which California courts (or any courts, for that matter) have "had occasion to weigh in on the matter of the legal status of health plans," let alone any that endorse the view that a party can represent a health plan in this capacity. *Id.* That the FEP is a collection of assets and liabilities does not automatically mean that it requires representation through a third party. Defendants convincingly address this point by analogizing the FEP not to a trust, but to a bank account. While an overcharge "would appear as a debit to [a] person's bank account," and while the account itself could not initiate a lawsuit, "that does not mean someone must have standing to sue on the account's behalf because the account is not injured, the account holder is." Dkt. 412, at 4. At a more basic level, though, the simpler and more compelling view is the one articulated above: OPM is injured, not the FEP itself.

---

[5] All of the cases BCBSA cites for support, *see* Opp., at 14–15, invoke the same inapposite principle. *See, e.g.*, *Nexium*, 777 F.3d at 27 (citing *Hawaii*, 405 U.S. at 262 n.14); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 557–58 (S.D.N.Y. 2021) (citing *Nexium*, 777 F.3d at 27; and then *Hawaii*, 405 U.S. at 262 n.14); *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 481 (N.D. Cal. 2020) (citing *Nexium*, 777 F.3d at 27; and then *Hawaii*, 405 U.S. at 262 n.14).

This conclusion does not end the inquiry, however. Having established that OPM is injured, and BCBSA is not, the next question is whether BCBSA has been granted authority to bring suit on OPM's behalf. BCBSA points to both the language of its contract with OPM and to the longstanding course of business between them to argue it has "the right and responsibility to recover improperly spent FEP funds." Dkt. 376, Ex. A, at 2. The contract itself provides weak support for BCBSA's argument. The two provisions BCBSA points to concern (1) subrogation actions and (2) actions for "erroneous payments" — neither of which provide authority to bring an *antitrust* action. Dkt. 376, Ex. L §§ 2.3(g), 2.5(b). Similarly, the other portions of the contract requiring BCBSA to detect fraud and abuse detail an administrative monitoring and compliance program, but similarly do not provide express authority to bring a suit such as this. *Id.* § 1.9. Indeed, the *HIV* Court reviewed the same contract (among other materials) and reached the same conclusion, noting it was "not persuaded that the [relevant] provision gives BCBSA the unilateral right to file a lawsuit on behalf of OPM so long as fraud or abuse is at issue." *In re HIV Antitrust Litig.*, No. 19-cv-02573-EMC, 2022 WL 5221477, at *4 (N.D. Cal. Oct. 5, 2022).

However, the parties' course of conduct does suggest BCBSA has been granted such authority. As its general counsel states, BCBSA and other carriers "have brought numerous antitrust, RICO, and related cases against pharmaceutical manufacturers for many years and BCBSA has submitted claims for recovery in more than two dozen pharmaceutical class action settlements over the last twenty or so years." Stuhan Decl. ¶ 6; *see, e.g.*, *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, No. 13-cv-4663-JS (E.D. Pa. Aug. 12, 2013). These actions have been brought without objection by OPM, nor, it seems, from any defendants, at least until *HIV*. In fact, BCBSA has stated it believes it is obligated to bring such cases. *See* Stuhan Decl. ¶ 6; *cf.* Declaration of Brendan Stuhan, *Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC (N.D. Cal. Nov. 24, 2021), Dkt. 746-4 ¶ 4 ("[BCBSA has] long understood the terms of engagement with OPM to permit, and in fact require, the Association to assert claims for recovery on behalf of the FEP when warranted."). The flip side is true too: BCBSA states it is unaware of any actions in which OPM itself has pursued "recoupment claims like those in this case." Opp., at 9. Most

convincingly here, OPM has weighed in to voice its support for BCBSA participating in this action. Specifically, the same OPM contracting officer who signed the OPM-BCBSA contract relayed that "OPM affirms and agrees that BCBSA's efforts to recover FEHB funds through this class action are consistent with its responsibilities pursuant to the contract with OPM." Dkt. 376, Ex. M; *see* Dkt. 376, Ex. L (naming contracting officer and noting that "[o]nly the Contracting Officer acting within the scope of his or her authority may execute a contract modification on behalf of the government"). Such express authorization was not present in *HIV*.

This all strongly suggests that BCBSA, acting as OPM's agent, has acted within the scope of its implied actual authority in bringing suit. *See Goncalves*, 865 F.3d at 1246 (describing FEP carriers as "the government's agent" in this relationship); Dkt. 376, Ex. F (BCBSA representative describing BCBSA as "the agent for the plans related to the [FEP]"); RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006) (defining "implied authority" to mean "actual authority . . . to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent"). On this view, Defendants' motion is better interpreted as objecting to BCBSA suing in its own name, rather than in the name of OPM as the real party in interest. 6A FED. PRAC. & PROC. CIV. § 1553 (3d ed.) ("As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of the principal rather than in the agent's own name."); *Airlines Reporting Corp. v. S & N Travel, Inc.*, 857 F. Supp. 1043, 1046–47 (E.D.N.Y. 1994). If that is the case, the proper remedy would be to allow a reasonable opportunity to join OPM, substitute BCBSA with OPM, or obtain proper ratification from OPM.[6]

---

[6] While the email from OPM acknowledging its concurrence with the present suit strongly suggests it has ratified BCBSA's actions, it does not include any language agreeing to bind OPM by the result of this suit. As such, it does not constitute a proper ratification. *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992) (citing *ICON Group, Inc. v. Mahogany Run Dev. Corp.*, 829 F.2d 473, 478 (3d Cir. 1987)); Fed. R. Civ. P. 17 cmt. (purpose of Rule 17 is to "protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata").

*See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1128–29 (9th Cir. 2017); *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 110–11 (W.D. Pa. 2003).

The trouble with this, however, is that BCBSA has expressly disavowed this position. In its opposition to the motion to dismiss, BCBSA rejects the "assertion that [it] seeks to act in a representative capacity *for OPM* (rather than for the FEP)," noting this argument "ignores the plain language of the complaint and the parties' many communications on the matter." Opp., at 21 (citing Stuhan Decl. ¶ 9; Dkt. 376, Ex. E, at 1–2). It reiterated this position at oral argument. Dkt. 480, at 31:2–5 ("[W]e're not seeking to stand in the shoes of OPM. . . . [T]he claim is that the plan was harmed."). While it would otherwise make sense to read BCBSA's position as effectively seeking to represent "the FEP and, by extension, OPM," its express disavowal forecloses that interpretation. The proper course, then, is to grant the motion and dismiss BCBSA, without prejudice to BCBSA filing a complaint in a representative capacity for OPM, with OPM's ratification.

It should be noted that while BCBSA would be allowed to continue prosecuting its own case against Defendants, it would not be able to do so as part of the class action. *See HIV*, 2022 WL 5221477, at *3. This is because the class definitions proposed by Plaintiffs specifically exclude federal government entities. If BCBSA seeks to bring this suit on behalf of OPM, it would have to be excluded from the class to the same extent OPM would be. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) ("[A] class representative *must be part of the class* and 'possess the same interest and suffer the same injury' as the class members." (emphasis added)). The fact that the FEHBA carriers are not excluded under the class definitions is of no moment given the untenable legal position of seeking to represent the FEP itself.

## V. CONCLUSION

For the foregoing reasons, the motion to dismiss is granted, without prejudice to BCBSA filing a new complaint in a representative capacity for OPM.

**IT IS SO ORDERED**.

Dated: May 12, 2023

_____
RICHARD SEEBORG
Chief United States District Judge