1  Todd M. Schneider (SBN 158253)
2  Jason H. Kim (SBN 220279)
   Matthew S. Weiler (SBN 236052)
3  J. Caleigh Macdonald (SBN 302592)
   **SCHNEIDER WALLACE**
4  **COTTRELL KONECKY LLP**
5  2000 Powell Street, Suite 1400
   Emeryville, CA 94608
6  Telephone: (415) 421-7100
   TSchneider@schneiderwallace.com
7  JKim@schneiderwallace.com
   MWeiler@schneiderwallace.com
8  JMacdonald@schneiderwallace.com
9
   *Attorneys for Plaintiffs Blue Cross & Blue Shield*
10 *of Florida Inc., and Health Options, Inc.*
11
   [Additional counsel on signature page]
12
13            **UNITED STATES DISTRICT COURT**
14       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
              **SAN FRANCISCO DIVISION**
15

16 BLUE CROSS AND BLUE SHIELD OF     | **Master File No. 3:20-md-02966-RS**
17 FLORIDA, INC.; HEALTH OPTIONS,    |
   INC.,                             | Case No. 3:24-cv-00514
18                                   |
19            Plaintiffs,            | **AMENDED COMPLAINT**
20        v.                         |
21 JAZZ PHARMACEUTICALS, INC.; JAZZ  | **DEMAND FOR JURY TRIAL**
   PHARMACEUTICALS IRELAND           | **AND DECLARATORY RELIEF**
22 LIMITED; JAZZ PHARMACEUTICALS     | **REQUESTED**
   PUBLIC LIMITED COMPANY; HIKMA     |
23 PHARMACEUTICALS PLC; HIKMA        |
   PHARMACEUTICALS USA INC.;         |
24 HIKMA LABS, INC.; and             |
   EUROHEALTH (USA), INC.;           |
25                                   |
26            Defendants.            |
27
28
              AMENDED COMPLAINT
   *Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................2

II.  JURISDICTION AND VENUE ..........................................................5

III. THE PARTIES ......................................................................................7

IV. REGULATORY BACKGROUND ......................................................12

    A.   Regulatory Structure for Approval and Substitution of Generic Drugs. .13

         1.   The Prescription Drug Marketplace .................................13

         2.   The Hatch-Waxman Act and FDA Approval Process. ......................14

         3.   Use of Authorized Generics to Maximize Profits Following Generic Entry ............................................................ 22

         4.   Acceleration Clauses As a "Poison Pill" to Further Generic Entry ... 24

V.   DEFENDANTS' ANTICOMPETITIVE CONDUCT ........................................ 26

    A.   The Development of Sodium Oxybate ................................................. 26

    B.   Sodium Oxybate as a Treatment for Narcolepsy .................................... 28

    C.   Jazz Obtains All Rights To Xyrem Through Orphan Medical Acquisition ................................................................. 30

    D.   The Xyrem Patents ...................................................................... 31

         1.   The '431 Family Of Patents (Formulations And Methods Of Treatment) ...................................................................32

         2.   The '730 Family Of Patents (Drug Distribution System And Method) ...................................................................33

         3.   The '302 Family Of Patents (Method Of Administration) ...............34

    E.   Jazz Jacks Up Xyrem Prices "to the Moon". ...........................................35

    F.   Jazz Seeks A Multiple Pharmacy Rems In Conjunction With Its Request For Approval To Market Xyrem For Fibromyalgia ................................. 38

    G.   Generic Challengers Make Paragraph IV Certifications. ...................... 38

    H.   Jazz Files Sham Litigation to Combat Roxane's (Now Hikma's) Threat. ................................................................. 39

    I.   Jazz Reverses Course In Its REMS Negotiations, Discouraging Generic Entry ................................................................. 40

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

i

K.    The '730 Family Are Declared Invalid in Inter Partes Review. ...............45

L.    The Jazz-Hikma Reverse Payment Agreement ...................................... 46

M.    Jazz Enters Into Unlawful Reverse Payment Agreements With Par, Lupin, And Amneal................................................................................ 50

N.    The Jazz-Hikma Agreement Has Caused, And Will Continue To Cause, Anticompetitive Effects ........................................................................54

VI.    DEFENDANTS' ANTICOMPETIVE EFFECTS IN THE MARKET FOR SODIUM OXYBATE ........................................................................57

VII.    JAZZ'S MONOPOLY POWER ...................................................................59

VIII.    EFFECTS ON TRADE AND COMMERCE ..................................................... 60

IX.    ANTITRUST INJURY ........................................................................ 61

X.    PLAINTIFFS' CLAIMS ARE TIMELY ................................................ 62

A.    Defendants Fraudulently Concealed by Omission Their Unlawful Agreements............................................................................................ 63

B.    Defendants' Continuing Violations........................................................ 64

C.    Equitable Tolling Applies Here.............................................................65

XI.    CLAIMS FOR RELIEF ........................................................................65

XII.    DEMAND FOR JUDGMENT ........................................................................ 94

XIII.    JURY DEMAND ............................................................................95

Plaintiffs Blue Cross and Blue Shield of Florida, Inc. and Health Options, Inc. ("HOI") (collectively, "Plaintiffs"), bring this action against Defendants Jazz Pharmaceuticals, Inc., Jazz Pharmaceuticals Ireland Limited, Jazz Pharmaceuticals Public Limited Company, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., and Hikma Labs, Inc., and Eurohealth (USA), Inc. (collectively, "Defendants") for violations of antitrust, consumer protection, and common laws. Plaintiffs' claims concern Defendants' scheme to restrain competition for branded Xyrem and its AB rated generic bioequivalents in the United States. Defendants, the brand manufacturer of Xyrem and several competitors, abused the patent laws for profit by allocating the market for a drug that was invented nearly 150 years ago. Sodium oxybate, sold under the brand name Xyrem (also known as γ-hydroxybutyric acid (GHB)) is a naturally occurring substance found in the central nervous system. Xyrem is manufactured by Jazz Pharmaceuticals, Inc., and its affiliates ("Jazz"). Xyrem has historically been Jazz's main source of revenue, making up 70% or more of its revenues since 2007. Jazz's growth and profits have been entirely linked to its ability to increase prices on Xyrem and keep the market to itself. To prevent generic competition and unlawfully maintain this monopoly, Jazz first manipulated an FDA safety program meant to mitigate safety risks of certain drugs ("REMS"); engaged in sham patent litigation; abused the REMS process to further frustrate generic competitors; and finally agreed with Defendants and Amneal Pharmaceuticals LLC,  Lupin Ltd., Lupin Pharmaceuticals Inc., Lupin Inc., and Par

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

Pharmaceutical, Inc. ("Par" and collectively, "Co-Conspirators") to delay generic

entry in exchange for allocating the generic market for AB-rated generic Xyrem.

All the while, Jazz imposed a series of grotesque price hikes that would have been

impossible had generic entry been successful. This scheme caused Plaintiffs to

pay inflated prices for Xyrem from July 17, 2017 through the present, until the

anticompetitive effects of the Defendants' unlawful conduct cease.

# I.    INTRODUCTION

1.      This litigation challenges a comprehensive anticompetitive scheme

to suppress generic competition for Xyrem, a leading treatment of narcolepsy.

Defendants abused an FDA drug safety program called "Risk Evaluation and

Mitigation Strategy," engaged in sham patent litigation, and entered into reverse

payments to generic manufacturers to preserve their monopoly in Xyrem.

Through this scheme Defendants suppressed generic competition and raised the

price of Xyrem 841% between 2007 and 2014. Third-party payors such as

Plaintiffs footed the bill for this manipulation.

2.      Sodium oxybate, the active ingredient in Xyrem, is a central nervous

system depressant that has been widely available in the United States since the

1960s. Sodium oxybate is the chemically derived version of γ-Hydroxybutyric

acid (GHB), which occurs naturally in human bodies' central nervous systems, as

well as wine, beef, small citrus fruits, and almost all animals.[1]

---

[1] *Gamma-hydroxybutyric acid (GHB), Critical Review Report*, World Health Organization
Expert Committee on Drug Dependence (2012);
https://www.who.int/medicines/areas/quality_safety/4.1GHBcritical_review.pdf

3.    Narcolepsy is a disorder characterized by excessive daytime sleepiness ("EDS") and intermittent manifestations of REM sleep during wakefulness. In 1994, the Food and Drug Administration's ("FDA") Orphan Products Development Division and a non-profit advocacy organization approached a small Minnesota-based drug company, Orphan Medical, to suggest the development of sodium oxybate for treatment of cataplexy, which is a common symptom of narcolepsy manifested by sudden episodes of bilateral skeletal muscle weakness induced by an emotional trigger such as laughter, anger, embarrassment, or surprise.

4.    Orphan Medical began development of what would become Xyrem and, in 2002, obtained FDA approval to market sodium oxybate for the treatment of cataplexy associated with narcolepsy in adults. Orphan branded its product "Xyrem." In 2005, Orphan Medical obtained FDA approval to market Xyrem for EDS associated with narcolepsy in adults. Until 2021, Xyrem was the only drug approved by the FDA to treat both EDS and cataplexy associated with narcolepsy. In 2020, the FDA also approved Jazz's follow-on sodium oxybate product, Xywav, for the treatment of those conditions.

5.    In 2005, Jazz Pharmaceuticals, Inc. acquired Orphan Medical. "The acquisition was unprofitable at first ....  By 2009, Jazz was on the verge of

[https://web.archive.org/web/20140910002840/https://www.who.int/medicines/areas/quality_safety/4.1GHBcritical_review.pdf].

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
3

bankruptcy .... Jazz responded by replacing its management team."[2] Jazz then began a series of epic price hikes. In May of 2014, Bloomberg published a ranking of drug price increases from 2007 to 2014. Xyrem ranked first with an overall increase of 841% from 2007 to 2014, well-ahead of notorious products such as EpiPen.[3] Overall, from 2007 to the present the price of Xyrem has increased from about $2/ml to over $31/ml, an increase of over 1000%.

6.    Jazz could only impose these gruesome price hikes on Plaintiffs and other parties responsible for managing health care costs because it unlawfully maintained its monopoly in Xyrem. As Jazz's CEO admitted at a 2011 investor conference, Jazz's monopoly was central to its value proposition: "There's really no competition. The other drugs used to treat narcolepsy for the excessive daytime sleepiness part of narcolepsy are stimulants. Those can and are used together with Xyrem, so that's not an 'either/or', it's an 'and' proposition. Probably 80% to 90% of our patients and the patients in our clinical trials were also on stimulants."[4]

7.    To maintain its Xyrem monopoly, Jazz enacted a series of anticompetitive measures directed at ensuring there would be "no competition"

---

[2] *In re Xyrem Antitrust Litig.*, Case No. 3:20-md-02966-LHK, ECF No. 138, at 2 (N.D. Cal. Aug. 13, 2021).

[3] *Drug Prices Soar for Top-Selling Brands*, Bloomberg, May 1, 2014, https://www.bloomberg.com/graphics/infographics/drug-prices-soar-for-top-selling-brands.html.

[4] Conference Call Transcript, Jazz Pharmaceuticals, Inc. at Piper Jaffray Health Care Conference, Jazz Pharmaceuticals (Nov. 30. 2011), https://investor.jazzpharma.com/node/12191/html.

from AB-rated generic Xyrem, the only product that could reign in Jazz's ability to profitably inflate prices.

8.    Jazz's scheme "had three main parts that operated in roughly chronological but overlapping order: (a) abuse of an FDA drug safety program called 'Risk Evaluation and Mitigation Strategy'; (b) sham litigation; and (c) reverse payments to four of the generic manufacturers."[5]

9.    The capstone to Jazz's scheme came in 2017, when it agreed with perhaps its strongest competitor, Hikma, to delay generic entry in exchange by a promise by Jazz to not launch an authorized generic. This "no AG" agreement, which was hidden from the market when it was reached in 2017, ensured Jazz would see no serious generic competition until July 2023: "on April 5, 2017, after nearly seven years of trying to bring an AB-rated generic to market, Hikma agreed to buy and relabel Xyrem rather than manufacture a generic version of Xyrem. By agreeing to this, Hikma delayed its allegedly impending entry into Jazz's market over six years until at least July 1, 2023 (i.e., the end of the six month term for Hikma's AG)."[6]

10.    Plaintiffs seek damages for the overcharges they paid as a result of Defendants' conduct as well as injunctive relief to prevent the Defendants from continuing their unlawful agreements.

## II.    JURISDICTION AND VENUE

---

[5] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 8 (N.D. Cal. Aug. 13, 2021).
[6] *Id.* at 29.

11.     As this is an action asserting claims under Sections 1 and 2 of the Sherman Act, 28 U.S.C. §§ 1 and 2, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Defendants and Plaintiffs are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.     This Court has subject-matter jurisdiction over the state-law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are factually and legally related to the federal claims such that they form part of the same "case or controversy." Similar state law claims are pending in the Northern District of California, in *In re Xyrem Antitrust Litig*., Case No. 5:20-md-02966-LHK, thus exercising subject-matter jurisdiction avoids unnecessary duplicity or multiplicity of actions.[7] Supplemental or pendant jurisdiction should be exercised in the interest of judicial economy and avoiding both duplicative litigation and inconsistent results.

14.     Venue is appropriate in this District under 28 U.S.C. §1391 because the claims alleged in this action accrued in this District and the Defendants regularly transact business within this District, and Defendants have directed their conduct towards Plaintiffs this District.

---

[7] Plaintiff has pled all applicable causes of action, but seeks only to presently advance in the Northern District of California those claims identified by Judge Koh as "10 causes of action for the parties to litigate through resolution." *Xyrem*, ECF No. 83 at 2.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
6

15.    Each Defendant has transacted business, maintained substantial

contacts, or committed overt acts in furtherance of the illegal scheme and

conspiracy throughout the United States, including in this District. The scheme

and conspiracy have been directed at persons and businesses residing in, located

in, or doing business throughout the United States, including in this District.

**III.    THE PARTIES**

       **PLAINTIFFS**

16.    Plaintiff Blue Cross and Blue Shield of Florida, Inc., a Florida health

insurance company, was created in 1980, through the merger of two companies:

one that started out as the Florida Hospital Services Corporation (the original

name for Blue Cross of Florida, Inc.); and the other that started out as the Florida

Medical Service Corporation (the original name for Blue Shield of Florida, Inc.).

Following a corporate reorganization in 2014, Plaintiff Blue Cross and Blue

Shield of Florida, Inc. became a wholly owned subsidiary of GuideWell Mutual

Holding Corporation, a Florida not-for-profit corporation, as part of a mutual

insurance company holding system including Plaintiff HOI, a licensed Florida

Health Maintenance Organization (HMO).

17.    Plaintiffs are corporations organized under the laws of the State of

Florida with their principal places of business located in Jacksonville, Florida.

18.    Plaintiffs' assignor affiliates and subsidiaries provide, inter alia: (1)

Medicare benefits through contracts with the Centers for Medicare and Medicaid

Services ("CMS"), for Medicare beneficiaries through a variety of Medicare

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

7

Advantage plans offered under Part C of Medicare, and prescription drug benefits under Part D of Medicare; (2) benefits under various states' Medicaid programs; and (3) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. These benefits include prescription drug coverage under which claims for Xyrem were submitted and paid. Plaintiffs' assignor affiliates and subsidiaries insure and administer health plan benefits for members and group customers, including self-funded group customers (known as "administrative services only" customers) that contract with Plaintiffs' assignor affiliates and subsidiaries to, among other things, administer claims processing on the customers' behalf and to pursue recoveries related to those claims. Plaintiffs are pursuing this recovery on behalf of itself and on behalf of its administrative services only customers.

**DEFENDANTS**

19.    Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland. Its U.S. headquarters is located at 3170 Porter Drive, Palo Alto, California 94304, with offices in Philadelphia, Pennsylvania and Ewing, New Jersey. Jazz principally develops, manufactures, and markets brand name drugs.

20.    Defendant Jazz Pharmaceuticals Ireland Limited is a corporation organized and existing under the laws of Ireland, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland.

21.     Defendant Jazz Pharmaceuticals Public Limited Company is an Ireland public limited biopharmaceutical company organized and existing under the laws of Ireland, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland. Jazz Pharmaceuticals plc common stock is publicly traded in the United States on the NASDAQ stock exchange. Jazz Pharmaceuticals plc is the parent company of Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited.

22.     Each of the three Jazz Defendants was directly and substantially involved in planning and undertaking the anticompetitive acts alleged in this complaint. Among other things, Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited were parties to the document styled as the "Settlement Agreement" in this complaint. Among other things, Jazz Pharmaceuticals plc was directly involved in the negotiation of the unlawful agreements described in this complaint. The three Jazz entities are referred to collectively as "Jazz."

23.     Jazz manufactures and sells Xyrem, the only product approved by the FDA to be marketed in the U.S. for the treatment of both cataplexy and excessive daytime sleepiness, or EDS, in both adult and pediatric patients with narcolepsy.

24.     Defendant Hikma Pharmaceuticals plc is a public limited company organized and existing under the laws of the United Kingdom, with its principal

place of business at 1 New Burlington Place, London, W1S 2HR and its U.S.

headquarters at 246 Industrial Way West, Eatontown, New Jersey, 07724.

25.    Defendant Hikma Pharmaceuticals USA Inc. is a corporation

organized and existing under the laws of the State of Delaware, with its principal

place of business at 246 Industrial Way West, Eatontown, New Jersey, 07724,

and is a wholly owned subsidiary of Hikma plc. Before June 20, 2018, Hikma

Pharmaceuticals USA Inc. was organized under the name West-Ward

Pharmaceuticals Corp., which had been acquired by Hikma Pharmaceuticals plc

in 1998.

26.    Defendant Hikma Labs, Inc. is a corporation organized and existing

under the laws of the State of Nevada, with its principal place of business at 1809

Wilson Road, Columbus, Ohio, 43328. Hikma Labs, Inc. was formerly known as

Roxane Laboratories, Inc., which was purchased by West-Ward Pharmaceuticals

Corp. in 2016 and is now a wholly owned subsidiary of Hikma Pharmaceuticals

plc. In June 2018, the company's name was changed from Roxane Laboratories,

Inc. to Hikma Labs, Inc.

27.    Defendant Eurohealth (USA), Inc. is a holding company for Hikma

Pharmaceuticals USA Inc. and a wholly owned subsidiary of Hikma

Pharmaceuticals plc, organized and existing under the laws of the State of

Delaware, with its principal place of business at 246 Industrial Way West,

Eatontown, New Jersey, 07724.

28.     Each of the Hikma-related Defendants was directly and substantially involved in planning, entering into, and performing under the agreements reached beginning in 2017, as alleged in this complaint. Among other things, Roxane Laboratories, Inc., West-Ward Pharmaceuticals Corp., Eurohealth (USA), Inc., and Hikma Pharmaceuticals plc were parties to the document styled as the "Settlement Agreement" in this complaint.

29.     All of Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

**NON-PARTY CO-CONSPIRATORS**

30.     Co-Conspirator Amneal Pharmaceuticals LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey, 08807.

31.     Co-Conspirator Lupin Ltd. is a public limited company organized and existing under the laws of India, with its principal place of business at B/4 Laxmi Towers, Bandra-Kurla Complex, Bandra (E), Mumbai 400 051, India.

32.    Co-Conspirator Lupin Pharmaceuticals Inc., a wholly owned subsidiary of Lupin Ltd., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 111 South Calvert Street, Baltimore, Maryland, 21202.

33.    Co-Conspirator Lupin Inc., a wholly owned subsidiary of Lupin Ltd., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 111 South Calvert Street, Baltimore, Maryland, 21202.

34.    Co-Conspirator Par Pharmaceutical, Inc., which filed for bankruptcy in 2022, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Ram Ridge Rd., Chestnut Ridge, New York 10977. Par is a subsidiary of Endo International plc, an Irish public limited company with its U.S. headquarters located in Malvern, Pennsylvania. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par Pharmaceutical, Inc., and combined it with Endo's existing generics subsidiary, Qualitest Pharmaceuticals. As used in this complaint, "Par" encompasses relevant predecessors-and-successors-in-interest.

**IV.    REGULATORY BACKGROUND**

**A.    Regulatory Structure for Approval and Substitution of Generic Drugs.**

**1.    The Prescription Drug Marketplace**

35.    Defendants manipulated the unique features of the prescription drug marketplace, ensuring that their anticompetitive market allocation scheme would reap them the maximum profits to the detriment of purchasers such as Plaintiffs.

36.    In the pharmaceutical marketplace, the consumer does not freely select pharmaceuticals as he or she does groceries in a supermarket.

37.    Prescription drugs may be dispensed only pursuant to a doctor's prescription for a given script, and a pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent.

38.    In most instances, the patient and his health insurer pay for the prescription drug that a doctor has prescribed.  Like the pharmacist, their "choice" is limited to the brand name drug named in the prescription or its AB-rated generic equivalent.

39.    Therefore, the doctor's prescription defines the relevant product market because it limits the consumer's (and pharmacist's) choice to the drug named therein.

40.    When there is no generic competition for a brand name drug, the brand manufacturers can set and maintain prices without losing market share.

The ability to do this is the result of the brand name drug company's monopoly power over the market for that drug in both its brand name and generic form.

### 2.    The Hatch-Waxman Act and FDA Approval Process.

41.    The Federal Food, Drug and Cosmetics Act (21 U.S.C. §§ 301-392) ("FDCA"), provides that a manufacturer that creates a new drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA is submitted with extensive, expensive testing data, that must include submission of specific data concerning the safety and efficacy of the drug and identify any patents claiming the drug. 21 U.S.C. § 355(b).

42.    To encourage substitution of generic drugs, and reign in high drug costs, Congress in 1984 amended the FDCA with the enactment of the Hatch-Waxman Act ("Hatch-Waxman"). The Hatch-Waxman Act streamlined and simplified the process for approving generic drugs. The Act replaced the lengthy and costly NDA approval process with an expedited Abbreviated New Drug Application ("ANDA") process. ANDA was intended to be a game-changer that would reduce the regulatory hurdles for prospective generic manufacturers.[8] Under the Act, an ANDA applicant may rely on the safety and efficacy findings of the NDA for the referenced brand-name drug if the ANDA demonstrates the proposed generic drug is "bioequivalent," i.e., it contains the same active ingredient(s), dosage form, route of administration, and strength as the brand-

---

[8] See Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

name drug, and is absorbed at the same rate and to the same extent as the brand-name drug.

43.     For drugs that are submitted through this ANDA process successfully, the FDA assigns them an "AB" rating. To be an "AB" rated generic drug is to be in the eyes of U.S. regulatory authorities a substitute for the brand drug in terms of the ingredients and efficacy.

44.     The Act, along with paving the road for generic competition, gave some protection to brand manufacturers in the form of delay to facilitate legitimate exercise of brand manufacturer's patent rights. The Act allowed the brand-name manufacturer a 30-month stay, simply by filing a patent infringement lawsuit. This process, which gives the equivalent of a preliminary injunction to the brand manufacturer for up to 30 months has, sadly, been repeatedly abused by brand manufactures who file frivolous patent lawsuits to delay generic competition.[9]

45.     When the FDA approves a brand-name manufacturer's NDA, it lists in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to the information supplied to the FDA by the brand-name

---

[9] C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553 (2006); Rebecca S. Eisenberg & Daniel A. Crane, *Patent Punting: How FDA and Antitrust Courts Undermine the Hatch-Waxman Act to Avoid Dealing with Patents*, 21 Mich. Telecomm. & Tech. L. Rev. 197 (2015); Saami Zain, *Antitrust Liability for Maintaining Baseless Litigation*, 54 Santa Clara L. Rev. 729 (2014).

manufacturer: (1) claim the approved drug or its approved uses; and (2) for which a "claim of patent infringement could reasonably be asserted if a person is not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(g)(7)(A)(iii).

46.     To obtain FDA approval of an ANDA the generic manufacturer must certify that it will infringe no patent listed in the Orange Book claiming the brand-name drug, because either: (1) No patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification"); (2) The patent for the brand-name drug has expired (a "Paragraph II Certification"); (3) The patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or (4) The patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV Certification").[10] When a generic manufacturer files a Paragraph IV Certification, it must notify the brand manufacturer and patent owner, and Hatch-Waxman makes the ANDA filing itself an artificial act of patent infringement, entitling the patent holder to sue for injunctive relief.

47.     If the patent holder sues the ANDA filer within 45 days of receiving the Paragraph IV Certification, Hatch-Waxman prevents the FDA from granting final approval to the ANDA until the earlier of (a) 30 months after the lawsuit is commenced, or (b) the court presiding over the patent infringement action rules

---

[10] 21 U.S.C. § 355(g)(2)(A)(vii).

that the patent is invalid or not infringed by the ANDA. 21 U.S.C. §

355(j)(5)(B)(iii). It is almost always the case that the 30 months expire before the

court rules, resulting in a 30-month statutory stay.

48.    However, during the 30-month stay, the FDA may grant "tentative

approval" to an ANDA applicant if the FDA determines that the ANDA would

otherwise qualify for final approval, but for the 30-month stay.

49.    Hatch-Waxman grants a 180-day period of market exclusivity to the

first Paragraph IV ANDA applicant to file a substantially complete ANDA. During

the 180-day exclusivity period (measured from the first commercial marketing of

the generic drug or the date of a court decision finding the listed patent invalid,

unenforceable, or not infringed, 21 U.S.C. § 355(j)(5)(B)(iv)); see also 21 C.F.R. §

314.107(c)(1), the first ANDA filer enjoys 180 days of freedom from competition

from other generic versions of the drug, and during that period can capture

almost all of the market for the drug while selling the generic for higher prices

than the market will support after additional generics enter the market.

50.    The Supreme Court has recognized that "this 180-day period of

exclusivity can prove valuable, possibly 'worth several hundred million dollars'"

to the first filer.[11]

51.    Prior to 2003, if the first filer did not commercially market the

generic drug and there is no court decision on the relevant Orange Book-listed

---

[11] *FTC v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006).

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

patent, the commencement of the first filer's 180-day exclusivity period will be delayed indefinitely, blocking final FDA approval of all subsequent ANDAs. This is colloquially referred to as "bottlenecking" or the "statutory block" of a subsequent ANDA.

52.    To frustrate and prevent this type of collusive behavior, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 (Public Law 108-173; 21 U.S.C. A. § 355(j)(5)(D)) ("MMA"). The MMA creates numerous conditions under which a first filer forfeits its 180-day exclusivity, thereby allowing other ANDA filers to enter the market. For example, forfeiture occurs if the first filer fails to obtain tentative approval within 30 months from filing, unless the failure is caused by a change in, or review of, the approval requirements.

53.    Under the "Agreement with another applicant" provision, 21 U.S.C. A. § 355(j)(5)(D)(i)(V), the first filer will forfeit the exclusivity period if it "enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the [Paragraph IV certification]...."

54.    Under the "failure to market" provision, 21 U.S.C.A. § 355(j)(5)(D)(i)(I), a first filer forfeits its 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (1) 75 days after receiving final FDA approval; or (2) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the

patents qualifying the first applicant for exclusivity (i.e., as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (1) a final decision of invalidity or non-infringement; (2) a settlement order entering final judgment including a finding the patent is invalid or not infringed; or (3) the NDA holder delists the patent from the Orange Book.

55.   Branded manufacturers and first filers can structure their "pay-for-delay" settlements to circumvent the above provisions and keep the 180-day exclusivity in place by, among other things, settling their litigation before a final judgment of invalidity or non-infringement can be entered, or by seeking a consent judgment that does not include a finding that all the patents for which the first filer submitted a Paragraph IV certification were invalid or not infringed. Consequently, a subsequent ANDA filer can fight this only by itself obtaining a judgment that all patents for which the first filer filed a Paragraph IV certification are invalid or not infringed, thereby triggering forfeiture of the first filer's 180-day exclusivity rights.

56.   When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA, signifying it is therapeutically equivalent to the brand-name drug. Therapeutic equivalence indicates that the generic is both pharmaceutically equivalent (same dosage form, route of administration, identical strength or concentration) and bioequivalent (no significant difference

in the rate and extent of absorption of the active pharmaceutical ingredient) to the brand-name drug.

57.    Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a brand-name drug predictably decrease, sometimes as much as by 90% because of price competition among generic manufacturers. This price drop starts immediately when one generic manufacturer enters the market and quickly accelerates as other manufacturers enter.

58.    The FDA also reports that in 2010, the use of FDA-approved generics saved $158 billion, or $3 billion per week, and that one year after entry, a generic drug takes over 90% of the corresponding brand-name drug's sales at 15% of the price. Generic drug entry, therefore, is a huge threat to the continued profitability of a branded drug.

59.    As the price gap between the brand-name drug and its corresponding generic drug widens, the former's sale's volume shrinks. Price is the only material difference between a brand-name drug and its AB-rated generic equivalent.

60.    Due to Hatch-Waxman and follow on legislation, for every step in the prescription drug sales and distribution process there is a financial benefit in prescribing generic drugs. Except for the brand-name drug manufacturer.

61.    Pharmacies normally earn a higher markup on generic drugs because of pricing structure and federal reimbursement rules. Private health insurers typically offer incentives to pharmacies to fill prescriptions with generics. And to incentivize patients to request generic drugs, health insurers often offer lower copays for generic drugs than for brand-name drugs. A prescription drug may be dispensed in the United States to a patient only by a licensed pharmacist pursuant to a doctor's prescription which identifies the drug, and the prescription may be filled only with the brand name drug identified or an AB-rated generic version of the brand name drug. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor.

62.    Automatic substitution laws, passed since the Hatch-Waxman Amendments, provide further savings to consumers. Every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use facilitate both a rapid price decline and a rapid sales shift from the brand to the generic following the launch of AB-rated generic. Generic competition enables purchasers to purchase a generic version of a brand-name drug at substantially lower prices. However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug which competes effectively

with the brand-name drug, and therefore, the brand-name manufacturer can continue to charge supra-competitive prices without losing sales. Given their acute knowledge of the effects of generic entry into a market, brand-name manufacturers like Jazz have a strong incentive to delay the entry of a generic drug onto the market, including by entering reverse, "pay for delay" settlement agreements and filing frivolous lawsuits, among other anticompetitive tactics.

### 3. Use of Authorized Generics to Maximize Profits Following Generic Entry.

63.    Rational profit-maximizing brand drug companies sell authorized generics ("AGs") in order to capture part of the competing AB generic drug market following generic entry. Brand AGs compete on price with AB generic upstarts. "[P]harmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[12]

64.    The AG is chemically identical to the brand drug, as with other AB generic drugs.

65.    Brand drug manufacturers generally only employ AGs following generic entry to avoid competing with their own brand product. To facilitate this strategy a brand manufacturer may sell an AG before the first-filed generic manufacturer enters the market so that it can take advantage of existing networks and pipelines prior to the broader entry of generic competition.

---

[12] Kevin A. Hassett & Robert J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* 3, SONECON (2007), http://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
22

66.    Competition from a brand's AG leads to lower prices and profits for the first-filed generic entrant. Empirical analysis of drug markets show "authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[13]

67.    It is generally accepted that, as estimated by the FTC, an AG reduces the first-filed generic manufacturer's revenues by about 50% on average. This is due to the lower market share, and the lower prices that prevail when a first-filed generic manufacturer encounters an AG.

68.    AGs are pro-competitive because they can result in purchasers and third-party payors such as Plaintiffs paying far less for AB generic drugs. They are the only potential source of price competition during a first-filed generic manufacturer's 180-day exclusivity period.

69.    When the brand manufacturer's brand product competes against only the first-filer generic manufacturer's product, the two manufacturers enjoy a duopoly. Profit margins are very high without additional generic competition. These high margins benefit the brand and generic manufacturers in a market allocation scheme to the detriment of third-party payors such as Plaintiffs, which pay the profits in the form of supracompetitively priced Xyrem. Thus, the brand

---

[13] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 Health Affairs 790, 796 (2007).

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
23

and the generic manufacturer share a common aim to prevent competition from other generic manufacturers.

70.    To preserve the high margins and profits for longer periods of time, brand and generic manufacturers began to agree to "no-AG" provisions. Patent litigation that is settled with "no-AG" agreements deliver exclusivity and the ability to charge high prices to the generic manufacturer during the 180-day exclusivity period. The agreement to allow future generic entry with a "no-AG" provision in a settlement is therefore tantamount to a large cash payment.

### 4.    Acceleration Clauses As a "Poison Pill" to Further Generic Entry.

71.    To enforce an anticompetitive "no AG" agreement, the brand and generic manufacturers at times resort to a deterrent for future generic manufactures seeking to challenge a weak patent. Later-filed generic manufacturers could win a challenge to the patent, or they could negotiate entry in the event the first-filed generic manufacturer loses its exclusivity. To guard their monopoly against these contingencies, brand and generic companies use acceleration clauses, such as most favored entry agreements.

72.    Acceleration clauses serve as a bottleneck and a disincentive for other generic companies to come to market.[14]

73.    Acceleration clauses included in a "pay to delay" settlement accelerate the otherwise delayed entry in the event a later-filed generic

---

[14] Keith M. Drake & Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, 16 J. Competition L. & Econ. 188, 188 (2020).

manufacturer is successful in entering the market. Under these provisions, the first-filed generic manufacturer's entry date is accelerated to the same date as the successful later-filed generic manufacturer.

74.    This provision operates as a "poison pill" with respect to other potential entrants in the market for generic manufacturing by providing a disincentive to enter the market. There is a disincentive for potential generic entrants because they would have to share the generic market with the first-filed generic manufacturer.

75.    These provisions enforce the "pay to delay" provisions by diminishing the value of any opportunity to take advantage of the first-filed generic manufacturer's decision to agree to delay its entry. Most-favored entry clauses can also contain a provision that goes even further and provides that the brand manufacturer will not grant a patent license to any other generic manufacturer to enter the market under the authority of the generic competitor's ANDA until a defined period of time after the first filer enters. The clause may state that the brand manufacturer will not grant a license to any later filer to enter the market until 180 days after the first filer enters.

76.    A most favored entry "plus" agreement forecloses the possibility that the brand will license its patents to a second generic manufacturer, which can then enter the market under its own ANDA. Most favored entry "plus" agreements eliminate the ability of later-filed generic manufacturers to negotiate a licensing agreement with a brand manufacturer as part of a settlement, and

further disincentivize other generic manufacturers from challenging weak patents.

77.     Empirical study demonstrates the anticompetitive nature of acceleration clauses.  Such "acceleration clauses have never promoted earlier generic entry where, as here, the first-filer (Hikma) has retained its 180-day period of exclusivity."[15] Indeed, in "the 54 cases in which the first filer retained sole rights to the 180-day exclusivity period, there were no cases of early generic entry. In other words, there were no cases in which the first-filer's entry was accelerated, and there were no cases in which a different generic entered before the entry date set in the first-filer's settlement."[16]

## V.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.     The Development of Sodium Oxybate

78.     Synthesis of the chemical sodium oxybate was first reported in 1874. Beginning in the 1960s, sodium oxybate, under the name GHB,[17] was marketed in the United States as an unregulated dietary supplement in health food stores, training gyms, fitness centers, and on the Internet beginning in the 1980s.[18] It

---

[15] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 39 (N.D. Cal. Aug. 13, 2021)

[16] Keith M. Drake & Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, 16 J. Competition L. & Econ. 188, 194 (2020).

[17] *Gamma-hydroxybutyric Acid (GHB) Critical Review Report*, World Health Organization Expert Committee on Drug Dependence Thirty-fifth Meeting, Hammamet, Tunisia, 4-8 June 2012.

[18] David E. Fuller, M.D., and Carl S. Hornfeldt, Ph.D., *From Club Drug to Orphan Drug; Sodium Oxybate (Xyrem) for the Treatment of Cataplexy*, Pharmacotherapy 2003; 23(9): 1205–1209.

1    was also the subject of numerous preclinical and clinical studies for treatment of

2    various diseases and conditions, including treatment of insomnia.

3        79.    By 1990, GHB had gained notoriety as a substance of abuse. Users

4    reported effects of disinhibition similar to that associated with alcohol

5    consumption but without "hangover" effects. At the same time, an increasing

6    number of people taking GHB experienced overdoses requiring hospital

7    emergency care; many had combined GHB with alcohol, which produces

8    synergistic CNS depressant effects. GHB was also implicated in an increasing

9    number of drug-facilitated sexual assaults. Like many other CNS depressants,

10   GHB can cause anterograde amnesia, especially when combined with alcohol,

11   leaving the assault victim unable to recall details of the event.

12       80.    In 1990, the FDA warned against, and then banned, consumption of

13   GHB after several reports of overdose. Despite the ban on sales, GHB continued

14   to be abused, which eventually resulted in the DEA designating it as a Schedule I

15   controlled substance under the Controlled Substances Act. This designation

16   threatened to hinder future development of GHB for therapeutic applications.

17   Successful lobbying efforts on behalf of physicians and patients, however, led to

18   modification of the Controlled Substance Act to create a bifurcated schedule for

19   GHB, allowing sodium oxybate to be designated a Schedule III controlled

20   substance for medical purposes while retaining Schedule I penalties for illegal

21   use.

**B.     Sodium Oxybate as a Treatment for Narcolepsy**

81.     "The journey for Orphan Medical began in 1994 when the FDA approached the company to gauge its interest in developing GHB as a treatment for narcolepsy. The drug previously had been under development for narcolepsy[.] [Cataplexy] a symptom of the chronic sleep disorder narcolepsy, is an alarming condition, resulting in sudden, brief episodes of muscle weakness or paralysis brought on by strong emotions such as laughter, anger, surprise, or anticipation."[19]

82.     Studies that dated back to the 1970s strongly suggested that sodium oxybate could be used to treat narcolepsy.

83.     "Narcolepsy is a chronic sleep disorder characterized by overwhelming daytime drowsiness [excessive daytime sleepiness or 'EDS'] and sudden attacks of sleep. People with narcolepsy often find it difficult to stay awake for long periods of time, regardless of the circumstances. Narcolepsy can cause serious disruptions in your daily routine. Sometimes, narcolepsy can be accompanied by a sudden loss of muscle tone (cataplexy), which can be triggered by strong emotion."[20]

84.     Narcolepsy is a chronic condition for which there's no cure.

---

[19] Elisabeth Pena, *Xyrem: Awakenings*, PharmaVOICE (October 2002), https://www.pharmavoice.com/article/2002-10-xyrem-awakenings/
[20] *Narcolepsy*, Mayo Clinic (Jan. 14, 2023), https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497.

85.     Jazz banked on the fact that narcolepsy was a chronic condition, and that "90% of insured patients have access" to the drug, and that health plans overwhelmingly footed the bill for payment for Xyrem.[21]

86.     Orphan Medical eventually submitted a new drug application to the FDA. On July 17, 2002, the FDA approved sodium oxybate for the treatment of cataplexy in patients with narcolepsy. The approval provided New Chemical Entity ("NCE") exclusivity through July 17, 2007. The FDA extended the exclusivity period to July 17, 2009 when it designated Xyrem an orphan drug because it treated a rare disease.

87.     Orphan Medical branded the product Xyrem. Xyrem is an oral solution that is recommended to be taken two times each night, the first dose right at bedtime and the second dose two-and-a-half to four hours later.

88.     Because of concerns about the risk of drug diversion, Orphan Medical collaborated with the FDA, experts in drug abuse prevention, and clinicians to create the Xyrem Risk Management Program, known as "RiskMAP." The program's goals were to ensure responsible distribution of Xyrem to patients with narcolepsy and to provide education to physicians and patients about safe and responsible administration of the drug.  Components of the original plan included: (a) a single, centralized pharmacy housed in a secure facility; (b) a program to educate physicians and patients about the risks and benefits of

---

[21] Jazz Pharmaceuticals, Inc., *Jazz Pharmaceuticals and Azur Pharma Rule 425 Filing*, SEC File No. of Jazz Pharmaceuticals, Inc.: 001-33500, (Sept. 20, 2011), https://www.sec.gov/Archives/edgar/data/1232524/000119312511252617/d234572d425.htm.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
29

Xyrem; (c) requiring prescribers and patients to read educational materials before filling the initial prescription; and (d) maintenance of a registry of all patients and a record of all prescribers.

89.    Xyrem was and is exclusively dispensed by Express Scripts Specialty Distribution Services, Inc. ("ESSDS"), the only pharmacy authorized under the REMS program to distribute Xyrem. The centralized pharmacy maintained comprehensive patient and physician registries and verified the eligibility of prescribing physicians before filling Xyrem prescriptions. In addition, pharmacists were trained to be alert for compliance issues and suspicious behavior. Under the RiskMap program, Orphan owned the inventory and the centralized pharmacy maintained it on consignment. From the date of its FDA approval, Jazz has dispensed Xyrem directly to patients under the RiskMAP and REMS through ESSDS.

90.    ESSDS ships and distributes Xyrem directly to Plaintiffs' members.

**C.    Jazz Obtains All Rights To Xyrem Through Orphan Medical Acquisition**

91.    In April 2005, Jazz Pharmaceuticals, then a small privately held drug company formed in 2003, announced plans to acquire Orphan Medical (and thereby all rights to Xyrem) in a leveraged acquisition.[22][13] Xyrem has since been

---

[22] Businesswire, *Jazz Pharmaceuticals to Acquire Orphan Medical; Combines Orphan Medical's Growing Central Nervous System Product and Commercial Team with Jazz Pharmaceuticals' Development Pipeline* (Apr. 19, 2005), https://tinyurl.com/y3ev85of.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

Jazz's main source of revenue, contributing up to 75% (or more) of Jazz's revenue.

92.    The FDA approved Xyrem for the treatment of EDS in adult patients with narcolepsy in October 2005. EDS is the most common and disabling symptom of narcolepsy. It is present in all patients with the disease.

93.    Subsequent to approval, the FDA granted Xyrem an NCE exclusivity of five years from the NDA approval date, expiring on July 17, 2007, and orphan drug exclusivity of seven years from the NDA approval date, expiring on July 17, 2009. These exclusivity grants meant that Xyrem would not face competition from generic competitors until at least mid-2009.

**D.    The Xyrem Patents**

94.    After acquiring Orphan Medical, Jazz filed for and obtained several patents claiming aspects of Xyrem and its use. According to a Congressional report, evergreening "is the practice of filing for new patents on secondary features of a particular product as earlier patents expire, thereby extending patent exclusivity past the original twenty-year term. Later-filed patents may delay or prevent entry by competitors, thereby allowing the brand-name drug manufacturer (the brand) to continue charging high prices."[23]

95.    Evergreening covers "secondary" aspects of brand drug, such as dosages, method of use, and does not concern active ingredients. Evergreening

---

[23] Kevin T. Richards, Kevin J. Hickey, & Erin H. Ward, Cong. Research Serv., R46221, Drug Pricing and Pharmaceutical Patenting Practices, 1 (2020),https://sgp.fas.org/crs/misc/R46221.pdf.

allows weak secondary patents to unduly delay generic entry: "the combination of secondary patents and a strong primary patent creates a barrier to generic entry because a generic manufacturer may delay or simply decline entry when faced with the prospect of defeating both patents."[24]

96.    When Jazz acquired Orphan Medical it obtained a series of secondary patents—the '431 family, the '730 family, and the '302 family—through evergreening.

### 1.    The '431 Family Of Patents (Formulations And Methods Of Treatment)

97.    The parent patent for the '431 family of patents is U.S. Patent Application No. 09/470,570 (filed Dec. 22, 1999). Jazz obtained the '431 patents eight to seventeen years after the parent patent, as part of an "evergreening" strategy to frustrate generic competition. The '431 patents are:

**THE '431 PATENT FAMILY: LISTED IN THE ORANGE BOOK**

| U.S. Patent No. | Application Date | Issue Date | Expiry (w/o ped. excl.) |
|---|---|---|---|
| 7,262,219 | July 7, 2004 | Aug. 28, 2007 | July 4, 2020 |
| 7,851,506 | July 13, 2007 | Dec. 14, 2010 | Dec. 22, 2019 |
| 8,263,650 | Apr. 13, 2012 | Sept. 11, 2012 | Dec. 22, 2019 |
| 8,324,275 | Apr. 13, 2012 | Dec. 4, 2012 | Dec. 22, 2019 |
| 8,859,619 | Nov. 26, 2012 | Oct. 14, 2014 | Dec. 22, 2019 |
| 8,952,062 | March 6, 2013 | Feb. 10, 2015 | Dec. 22, 2019 |

---

[24] *Id.* at 17.

| | | | |
|---|---|---|---|
| 9,539,330 | Nov. 9, 2015 | Nov. 8, 2016 | Dec. 22, 2019 |

98.    The '431 family concerns formulations of patents includes formulations of sodium oxybate or other salts of GHB (the '889, '219, '650, '619, and '330 patents); methods of treatment (the '506, '650, '275, and '062 patents); and manufacturing processes (Patent No. 6,472,421, issued Oct. 22, 2002 and expired Dec. 22, 2019, and Patent No. 8,461,203, issued June 11, 2013 and expired Dec. 22, 2019, neither of which are listed in the Orange book).[25]

## 2.    The '730 Family Of Patents (Drug Distribution System And Method)

99.    The parent patent to the '730 family is U.S. Patent Application No. 10/322,348 (filed on Dec. 17, 2002). The Orange book listed '730 family of patents are:[26]

### THE '730 PATENT FAMILY: LISTED IN THE ORANGE BOOK

| U.S. Patent No. | Application Date | Issue Date | Expiry (w/o ped. excl.) |
|---|---|---|---|
| 7,668,730 | Dec. 17, 2002 | Feb. 23, 2010 | June 16, 2024 |
| 7,765,106 | Nov. 2, 2004 | July 27, 2010 | June 16, 2024 |
| 7,765,107 | Apr. 1, 2005 | July 27, 2010 | June 16, 2024 |
| 7,895,059 | Feb. 11, 2010 | Feb. 22, 2011 | Dec. 17, 2022 |

[25] Most '431 family patents were set to expire on December 22, 2019. The '889 and '219 patents, however, received adjustments under 35 U.S.C. § 154(b). In 2018, the FDA granted pediatric exclusivity to the Orange Book-listed patents, and that six-month exclusivity expired June 22, 2020 (for the '506,'650, '275, '619, '062 and '330 patents) and January 4, 2021 (for the '889 and '219 patents)

[26] The '730 family also includes a questionable non-Orange Book United States Patent No. 7,797,171, covering an "exclusive" central computer database for controlled distribution As it was never listed in the Orange Book, it was never listed in a Xyrem ANDA application.

| 8,457,988 | Aug. 27, 2012 | June 4, 2013 | Dec. 17, 2022 |
| 8,589,182 | Aug. 27, 2012 | Nov. 19, 2013 | Dec. 17, 2022 |
| 8,732,963 | Aug. 22, 2012 | May 20, 2014 | Dec. 17, 2022 |

100.    The patents in the '730 family are secondary as they "relat[e] to a drug distribution system for tracking prescriptions of a 'sensitive drug.'" *Jazz Pharmaceuticals, Inc. v. Amneal Pharmaceuticals, LLC*, 895 F.3d 1347, 1350 (Fed. Cir. 2018).

101.    Subsequently the FDA granted pediatric exclusivity extension (to December 16, 2024) for the '730, '106 and '107 patents, and for the '059, '988, '182, and '963 patents (to June 17, 2023). The Patent Trial and Appeal Board ("PTAB") invalidated the '730 family as explained below.

### 3.    The '302 Family Of Patents (Method Of Administration)

102.    The parent patent to the '302 family is (filed United States Patent Application No. March 15, 2013). The Xyrem-related '302 family of patents listed in the Orange Book are:

**THE '302 PATENT FAMILY: LISTED IN THE ORANGE BOOK**

| U.S. Patent No. | Application Date | Issue Date | Expiry (w/o ped. excl.) |
| --- | --- | --- | --- |
| 9,050,302 | Mar. 15, 2013 | June 9, 2015 | Mar. 15, 2033 |
| 8,772,306 | Apr. 29, 2013 | July 8, 2014 | Mar. 15, 2033 |
| 9,486,426 | May 8, 2015 | Nov. 8, 2016 | Mar. 15, 2033 |
| 10,213,400 | Jan. 12, 2018 | Feb. 26, 2019 | Mar. 15, 2033 |

103.    The patents in the '302 family asserted methods of treatment for reducing GHB sales in treating sleep disorders, when a patient is already taking valproate or divalproex sodium.

104.    Subsequently, the FDA granted pediatric exclusivity extension to the Orange Book-listed '302 family patents for Xyrem (to September 15, 2033).[27]

**E.    Jazz Jacks Up Xyrem Prices "to the Moon".**

105.    Prior to exploiting its Xyrem monopoly, Jazz was foundering. Jazz announced a "net loss" of $138.8 million for the 2007 fiscal year.[28]

106.    Jazz's Initial Public Offering ("IPO"), held in June 2007, was a disappointment. It missed its target price of $24 to $26 per share, raising $108 million at $18 a share.[29]

107.    In 2008 and 2009, Jazz's stock price cratered, and serious questions were raised about its solvency. Jazz had negative equity, meaning its debt exceeded the value of all its asset: "[Jazz was] in default on our debt, literally talking to bankruptcy attorneys every day,"[30] according to its CEO. How did Jazz "turnaround," raising its stock price from $0.53?

---

[27] This extension did not apply to the '400 patent, not listed in the Orange Book until 2019, and which is not currently listed in the Orange Book with pediatric exclusivity.
[28] Kristin Bhavnani, *Jazz Pharmaceuticals, Inc. Announces Fourth Quarter and Full Year 2007 Financial Results*, Jazz Pharmaceuticals, (Feb. 13, 2008), https://investor.jazzpharma.com/news-releases/news-release-details/jazz-pharmaceuticals-inc-announces-fourth-quarter-and-full-year.
[29] *Jazz Pharmaceuticals' IPO Falls Short*, The Business Journals (June 1, 2007), https://www.bizjournals.com/sanjose/stories/2007/05/28/daily56.html.
[30] Rob Wright, *From Foundation, to Darkest Days, to Finest Hour: The Jazz Pharmaceuticals Success Story*, Lifescienceleader.com (2015), https://www.jazzpharma.com/wp-content/uploads/2015/10/Life-Science-Leader.pdf.

108.    Jazz increased the price of Xyrem "To the Moon, Alice!"[31]

109.    Jazz's price increases started gradually in 2009: it told investors in June 2010 "Total product sales were $34.3 million in the first quarter, an increase of 61% over the first quarter of 2009 driven primarily by price increases taken on Xyrem during 2009."[32] Its first quarter 2010 revenues roughly equaled its yearly revenue in recent years.

110.    On May 1, 2010, Jazz announced a 15% price increase for Xyrem.

111.    Jazz assured its investors on a June 2010 investor call that these price increases were sustainable: "it's important to remember that the vast majority of our Xyrem patients have fixed monthly co-pays. These patients should not see any impact to their monthly co-pay from price increase. Approximately 80% of our Xyrem patients have monthly out-of-pocket costs of $50 or less."[33] The reason Jazz had such confidence is because it knew Plaintiffs and other end-payors were footing the massive bill.

112.    In November 2010 Jazz raised the price of Xyrem another 22%. Robert M. Myers, Jazz's president, explained the strategy with the incremental price increases: "We do want to avoid big jumps in price, abrupt changes in price,

---

[31] Jim Edwards, *How a Sleeping Drug Company Increased Prices 300% Without Anyone Noticing*, CBS News MoneyWatch (Nov. 12, 2010), https://www.cbsnews.com/news/how-a-sleeping-drug-company-increased-prices-300-without-anyone-noticing/.
[32] Kate Falberg, et al., *Jazz Pharmaceuticals, Inc. Q1 2010 Earnings Call Transcript*, Seeking Alpha (May 5, 2010), https://seekingalpha.com/article/203249-jazz-pharmaceuticals-inc-q1-2010-earnings-call-transcript.
[33] *Id.*

which can have a negative impact on payers, physicians and, most importantly, patients."[34] But these steady price increases added up.

113.    Jazz CEO Cozadd noted Jazz had "substantial pricing power" because there is "nothing else that does what [Xyrem] does. There is no substitute."[35]

114.    Jazz's price increases stood out, even in a crowded field of greedy companies that sought to take advantage of patients on maintenance medications needed to treat long-term conditions. "Pharmaceutical industry expert Tracy Staton, from FiercePharma, said the company had increased the cost of Xyrem by more than 800 per cent in seven years. 'Jazz's price increases have been quite large, among the very biggest price increases among drugs in the last 10 years,' she said. 'We did a ranking in 2014 across the industry and Jazz was at the top.'"[36]

115.    Bloomberg published data showing that Jazz increased prices by 841% from 2007 to 2014 alone: "According to Bloomberg data, this year Xyrem costs $19.40 per 1-milliliter dose, up from just $2.04 in 2007—an 841% jump. And it's those price hikes that accounted for most of last year's sales growth,

---

[34] Andrew Pollack, *Coupons for Patients, but Higher Bills for Insurers*, N. Y. Times (Jan. 1, 2011) https://www.nytimes.com/2011/01/02/business/02coupon.html.
[35] Final Transcript, Jazz Pharmaceuticals Inc. at LCM Annual Healthcare Conference (Nov. 17, 2010), available at https://tinyurl.com/y4lchnrs.
[36] Sophie Scott & Meredith Griffiths, *Drug Company Behind Narcolepsy Medicine Xyrem Criticised for Huge Price Hikes*, ABC News (June 23, 2017), https://www.abc.net.au/news/2017-06-24/narcolepsy-xyrem-drug-company-slammed-for-price-hikes/8647626.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
37

according to the Irish company's annual report. Volume increased by 12% last year, with the price rocketing up by nearly one-third."[37]

**F.    Jazz Seeks A Multiple Pharmacy Rems In Conjunction With Its Request For Approval To Market Xyrem For Fibromyalgia**

116.    As Jazz's ability to raise price was central to its business philosophy, Jazz took a series of measures to wall off generic competition. Jazz's REMS proposal was one way Jazz managed to restrict competition.

117.    After first promulgating single-pharmacy distribution, Jazz proposed to change the REMS process in August 2009 by certifying multiple pharmacies in its distribution. In doing so, Jazz admitted by implication this would increase access and still be safe.[38]

118.    Jazz then sought FDA approval for a new indication of Xyrem in December 2009, to treat fibromyalgia. The FDA rejected this request, by a panel vote of 20-2, which included REMs with "proposed distribution from 15 pharmacies to meet the expected larger demand" for fibromyalgia.[39]

**G.    Generic Challengers Make Paragraph IV Certifications.**

119.    Roxane, which was acquired by Hikma, was the first filer, filing in July 2010 an ANDA for a 500 mg/ml product that listed multiple Xyrem Orange

---

[37] Eric Palmer, *The Top 10 Most Expensive Drugs of 2013*, FiercePharma (Oct. 14, 2014), https://www.fiercepharma.com/special-report/xyrem-jazz-pharmaceuticals.
[38] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 9-12 (N.D. Cal. Aug. 13, 2021).
[39] Lisa Richwine, *US FDA Panel Rejects Jazz Drug for Fibromyalgia*, Reuters (Aug. 20, 2010); https://www.reuters.com/article/jazz-fda/update-3-us-fda-panel-rejects-jazz-drug-for-fibromyalgia-idUSN2013534120100820.

Book patents (the '107, '889, '219, '730, '106 patents) in its Paragraph IV certifications. Roxane thus was entitled to the 180 days of exclusivity.  On October 14, 2010, Roxane sent Jazz a Paragraph IV letter that explained these five patents were invalid, unenforceable, and/or not infringed.

**H.    Jazz Files Sham Litigation to Combat Roxane's (Now Hikma's) Threat.**

120.    Jazz sued Hikma on November 22, 2010, alleging infringement of the five patents. In early 2011, Jazz commenced two additional lawsuits to add three more patents.

121.    In the District of New Jersey Jazz filed nine lawsuits: 2:10-cv-06108 (covering the '889, '219, '730, '106,'107 patents); 2:11-cv-00660 (the '431, '506 patents); 2:11-cv-02523 (the '059 patent); 2:12-cv-06761 (the '650 patent); 2:12-cv-07459 (the '275 patent); 2:15-cv-01360 (the '203, '306, '619 patents); 2:15-cv-03684 (the '062 patent); 2:16-cv-00469 (the '302 patent); 2:16-cv-04971 (the '963 patent).

122.    Jazz's litigation was a delay tactic in which it took advantage of learning Hikma's non-infringement defenses to stall litigation of even more patent applications. It then used these newly issued patents in yet more patent infringement lawsuits.

123.    Jazz's shifting positions caused litigation to mushroom.

124.    Jazz learned in the first lawsuit (2:10-cv-06108) that Hikma would argue the '219 or '889 patents were non-infringed because Hikma included no

"pH adjusting agent." What did Jazz do? It filed for and obtained the '650 patent, in which Jazz claimed patent protection for a formulation that also had no "pH adjusting agent" in its formulation. Then it sued Hikma in 2:12-cv-06761 under the '506 patent.

125.    Jazz's '506 patent covered "concentrated" medium of sodium oxybate, and Hikma claimed it used a "diluted medium" in its application prior to application. In response to this non-infringement defense, Jazz promptly obtained two patents ('650 and '275) in September 2012 that purportedly covered these "diluted medium" applications. Jazz filed two separate patent infringement lawsuits based on these newly issued patents in October and December 2012.

126.    In 2:11-cv-00660, Hikma defended the claim concerning the '431 arguing that patent required sodium oxybate be added to an "aqueous medium," while Hikma did not add sodium oxybate to an "aqueous medium." In response, Jazz got a patent (the '203) where it claimed no addition of sodium oxybate was required, and sued Hikma in 2:15-cv-01360.

**I.    Jazz Reverses Course In Its REMS Negotiations, Discouraging Generic Entry**

127.    In yet another pivot, Jazz patented its REMS processes, even though it had already admitted that multiple pharmacies were just as safe as a single pharmacy set up.

128.    In a November 2011 investor conference, Cozadd said "We have nine patents covering the product, seven of which are in the Orange Book. Those patent dates go out to 2024. Five of the patents are around the restricted

distribution system, although there are other patents for formulation and use. The restricted distribution system patents, we think, are particularly important because part of the FDA's approval in sodium oxybate back in 2002 was conditioned on having a very tight distribution system for this controlled substance, in part to ensure that there's not abuse or diversion." [40]

129.    The REMs patents were especially important, according to Cozadd: "We think any generic company — Roxane included — will have a difficult time setting up their own distribution system that … doesn't infringe our intellectual property."[41]

130.    The FDA has adopted Elements To Assure Safe Use exception ("ETASU") to waive certain burdensome barriers to entry. ETASU "provides safe access for patients to drugs with known serious risks that would otherwise be unavailable," if (i) the burden of forming a single shared system outweighs the benefits of having one; or (ii) an aspect of the REMS is covered by a patent or is a trade secret and the generic applicant certifies that it sought a license for use of that aspect and was unable to obtain one. 21 U.S.C. § 355-1. ETASU introduced the threat that generic companies could get around Jazz's REMS program.

## J.    Additional Paragraph IV Challengers Emerge and Face REMS Issues

---

[40] Jazz Pharmaceuticals Inc. Conference Call Transcript (Nov. 30, 2011), https://investor.jazzpharma.com/node/12191/html.
[41] *Id.*

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

41

131.    In October 2012, Roxane (now Hikma) sought Jazz's agreement to develop a single shared system REMS.

132.    Amneal submitted an ANDA seeking FDA approval to market an AB-rated generic version of Xyrem on December 10, 2012. Jazz sued Amneal after receiving its Paragraph IV notice letter. After Amneal sent its initial Paragraph IV notice letter to Jazz, Jazz filed a patent infringement action against Amneal. This initiated a series of ANDAs and Paragraph IV certifications, as shown below:

| ANDA Applicant | Date of Paragraph IV Letter |
|---|---|
| Amneal Pharmaceuticals, LLC | Dec. 10, 2012 |
| Par Pharmaceutical, Inc. | Nov. 20, 2013 |
| Ranbaxy Laboratories Limited and Ranbaxy Inc. | June 3, 2014 |
| Watson Laboratories, Inc. | Oct. 29, 2014 |
| Wockhardt Bio AG | June 8, 2015 |
| Lupin Ltd. and Lupin Pharmaceuticals, Inc. | July 23, 2015 |

133.    Jazz knew that the FDA was likely to reject aspects of its REMS program as unduly restrictive. Jazz noted on September 30, 2013, in an SEC quarterly filing that "depending on the extent to which certain provisions of our Xyrem deemed REMS which are currently protected by our method of use patents covering the distribution of Xyrem are changed as part of updating our REMS documents, the ability of our existing patents to protect our Xyrem distribution system from generic competitors may be reduced."

134.    As shown above, by December 2013, Jazz faced Paragraph IV challenges from Amneal and Par. Around that time, the FDA informed Jazz that its single pharmacy distribution restriction would need to be modified. Jazz disclosed this in its SEC filings:

[W]e disagree with the FDA's current position that, as part of the current REMS process, the Xyrem deemed REMS should be modified to enable the distribution of Xyrem through more than one pharmacy, or potentially through retail pharmacies and wholesalers, as well as with certain modifications proposed by the FDA that would, in the FDA's view, be sufficient to ensure that the REMS includes only those elements necessary to ensure that the benefits of Xyrem outweigh its risks, and that would, in the FDA's view, reduce the burden on the healthcare system. The FDA notified us that it would exercise its claimed authority to modify our REMS and that it would finalize the REMS as modified by the FDA unless we initiated dispute resolution procedures with respect to the modification of the Xyrem deemed REMS.  Given these circumstances, we initiated dispute resolution procedures with the FDA at the end of February 2014. We received the FDA's denial of our initial dispute resolution submission in the second quarter of 2014 and have submitted a request for further supervisory review to the next administrative level of the FDA.[42]

135.    At the same time that it was resisting the FDA's efforts to modify the Xyrem REMS to allow for multiple pharmacies, Jazz was obstructing ANDA applicants who were seeking to meet their obligation to participate in a single shared system REMS.

136.    Generic ANDA filers began to raise their concerns to the FDA, which was at the same time dealing with Jazz's frivolous appeals of its actions concerning single-pharmacy REMS set up.

137.    In February 2015, the FDA approved Jazz's single-pharmacy plan but noted both Jazz's inconsistent positions and the anticompetitive nature of Jazz's conduct:

[The] FDA has sought to finalize and approve the REMS for Xyrem since 2008. In doing so, we have faced repeated, lengthy delays. The REMS you submitted on November 7, 2014, which we are now approving, contains a requirement that Xyrem be distributed only by a single pharmacy. Jazz's position that a single pharmacy is critical to the safe use of Xyrem has not

---

[42] Jazz Pharmaceuticals Inc. June 30, 2014 10-Q at 8, http://investor.jazzpharma.com/node/13961/html.

been a consistent one. In 2009, Jazz submitted a supplemental NDA for a new indication for Xyrem for treatment of fibromyalgia in which it proposed to include multiple certified pharmacies. However, by early 2011, after FDA declined to approve the fibromyalgia indication, Jazz changed its position. By that time, Jazz had been granted several patents related to its single pharmacy distribution system. In its 2013 SEC filings, Jazz noted that it expected FDA modifications to the Xyrem REMS and stated that, 'depending on the extent to which certain provisions of our Xyrem deemed REMS which are currently protected by our method of use patents covering the distribution of Xyrem are changed as part of updating our REMS documents, the ability of our existing patents to protect our Xyrem distribution system from generic competitors may be reduced.' This statement, in conjunction with Jazz's change in position regarding the necessity of the single pharmacy requirement, suggests Jazz's awareness that the Xyrem REMS could have the effect of blocking or delaying approval of generic versions of Xyrem. Such an outcome would reflect the use of REMS to block or delay generic competition in a manner inconsistent with section 505-1(f)(8). It would also place an unjustified burden on patient access and on the healthcare delivery system.[43]

138.    Jazz promptly sought to take advantage of generic entrants by refusing to cooperate with them and interfere with their ability to get FDA approval, causing the FDA to reverse course. "On January 17, 2017, in response to generic manufacturer's allegations, the FDA waived the single-pharmacy requirement for generic versions of Xyrem. In issuing this waiver, the FDA reiterated generic manufacturer's allegations that 'Jazz ha[d] engaged in a strategy that 'entails serial attempts to impose unreasonable contractual terms and conditions on the ANDA [filers] while concurrently issuing self-serving statements to FDA and the ANDA [filers] about Jazz's commitment to the process.'"[44]

---

[43] U.S. Food & Drug Admin., Supplemental Approval of Supplemental New Drug Application NDA 021196/S-015 (Feb. 27, 2015), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/021196Orig1s015ltr.pdf.
[44] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 11 (N.D. Cal. Aug. 13, 2021).

139.   "The FDA then found that the 'burden of creating a single, shared system outweighs the benefits.' ... Among the burdens were Jazz's 'obvious incentives' 'to delay generic competition [] by failing to agree on [single, shared system] REMS terms.' ... The FDA thus concluded that allowing ANDA applicants to proceed with their own drug distribution systems would 'remove a barrier to generic products coming to market.'"[45]

## K.    The '730 Family Are Declared Invalid in Inter Partes Review.

140.   Par and Amneal sought inter partes review ("IPR") before the PTAB of Jazz's '730 family of patents. Wockhardt and Ranbaxy also sought IPR.

141.   The '730, '106, '107, '059, '988, '182, and '936 patents were subject to IPR review starting in January 2015.

142.   As noted above, on April 28, 2016, Jazz settled with Wockhardt and granted Wockhardt a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025, or "earlier depending on the occurrence of certain events" (the import of which is discussed below).

143.   Jazz settled with Ranbaxy next, granting it a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025, or "earlier depending on the occurrence of certain events" (the import of which is discussed below) on May 9, 2016.

144.   These settlements resolved Wockhardt and Ranbaxy's IPRs.

---

[45] *Id.*

145.    Amneal and Par's IPRs were resolved in decisions by the PTAB from July 2016 to March 2017, finding that "by a preponderance of the evidence" all claims of the '730, '106, '107, '059, '182, '988 patents, and claims 24, 26, and 27 of the '963 patent, were unpatentable as obvious.

146.    The PTAB found that these claims, which related to Jazz's REMS program and described a centralized database containing patient, physician, and prescription information, were obvious because Orphan Medical had disclosed the program long before it filed the first patent application (i.e., Orphan's disclosure at a publicly held FDA Advisory Committee meeting on June 6, 2001) and such information was posted to the FDA's website.

147.    Jazz appealed the ruling to the Federal Circuit. In July 2018, the Federal Circuit affirmed the PTAB invalidity rulings.

**L.    The Jazz-Hikma Reverse Payment Agreement**

148.    Hikma obtained final approval from the FDA for its AB-rated generic Xyrem product pursuant to its ANDA on January 17, 2017.

149.    Hikma's trial with Jazz was set for July 2017. Hikma's prospects of brining a generic product to market were bolstered by the FDA's decision to waive the single-pharmacy REMs requirement, as noted above.

150.    Jazz publicly announced the settlement on April 5, 2017, in a Form 8-K:

> In connection with the settlement, Jazz has granted Hikma and its wholly owned subsidiary, West-Ward Pharmaceuticals Corp. (West-Ward), the right to sell an authorized generic (AG) version of Xyrem in the U.S. under the Xyrem New Drug Application (NDA), commencing on January 1, 2023,

or earlier under certain circumstances customary for settlement agreements of this nature. The AG product will be marketed through the Xyrem Risk Evaluation and Mitigation Strategy (REMS) program. The initial term of the AG arrangement is six months, and Hikma has the option to continue the sale of the AG product for up to a total of five years. Jazz will receive a meaningful royalty on net sales of the AG product, with the royalty rate increasing during the initial AG term based on increased AG sales. There will be a substantial increase in the royalty rate should the AG term be extended beyond one year. Jazz will also be paid for supply of the AG product and will be reimbursed for a portion of the service costs associated with the operation of the Xyrem REMS and distribution of the AG. Specific financial and other terms related to the AG product are confidential. Hikma has been granted a license to sell its generic sodium oxybate product under its ANDA at the end of the AG term.

151.    The settlement resolved litigation pending since 2010. Although some details of the settlement were public, many were kept secret. Jazz concealed the "no AG" agreement as well as the details of the licensing agreement.

152.    A "no AG" agreement was necessary because Hikma knew that even if it were successful at trial Jazz would have launched an authorized generic, undercutting the value of the victory.

153.    Taken together, the Jazz-Hikma settlement had three reverse payments.

154.    "First, Jazz promised not to license AG to any third party other than Hikma between at least January 1, 2023 and July 1, 2023. Second, Jazz created a royalty structure of escalating payments from Hikma to Jazz that undermined Jazz's economic interest in marketing its own AG. ... Third, the Jazz-Hikma agreement contained an 'acceleration clause.' ... An acceleration clause is a type of most-favored-entry clause that allows a generic manufacturer to enter a market sooner if certain contingencies occur. ... In the Jazz-Hikma agreement, the

acceleration clause allegedly allowed Hikma to immediately market Hikma

Authorized Generic ('AG') if (1) a generic version of Xyrem were to market itself

without Jazz's permission; or (2) anyone were to successfully invalidate or render

unenforceable Xyrem's unexpired patent claims."[46]

155.    Acceleration agreements like this deter generic entry because it

ensures generic entrants face competition if they enter the market, thereby

making entry less valuable.[47]

156.    As noted above, and explained in further detail below, Jazz

weaponized the acceleration clause in the Jazz-Hikma agreement against later

generic challengers Par, Lupin, and Amneal.

157.    Under the Jazz-Hikma Agreement, Jazz granted Hikma the right to

sell an authorized generic version of Xyrem in the U.S. for an initial term of six

months commencing on January 1, 2023[48] "or earlier under certain

circumstances." Those circumstances include "the licensing or market entry of

another generic sodium oxybate product, a final decision that all unexpired

claims of the Xyrem patents are invalid and/or unenforceable, or a substantial

reduction in Xyrem net sales over specified periods of time. We also granted

---

[46] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 14 (N.D. Cal. Aug. 13, 2021).

[47] *See* Keith M. Drake & Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, 16 J. Competition L. & Econ. 188, 188 (2020).

[48] Defendant Hikma launched its authorized generic of Xyrem in the United States on January 3, 2023, as stipulated under its unlawful reverse payment agreement with Jazz and is now selling Xyrem in Florida and throughout the United States. *See Hikma Launches Authorized Generic of Xyrem ® (Sodium Oxybate) in the US*, Hikma. (Jan. 3, 2023), https://www.hikma.com/newsroom/article-i6081-hikma-launches-authorized-generic-of-xyrem-sodium-oxybate-in-the-us/.

[Hikma] a license to launch its own generic sodium oxybate product as early as six months after it has the right to sell the AG Product, unless it elects to continue to sell the AG Product, which it may do for up to a total of five years."[49]

158.    In return, Hikma agreed to pay Jazz "a meaningful royalty" on net sales of the AG, with the royalty rate increasing based on increased net sales of the authorized generic. The Jazz-Hikma agreement had a royalty provision that operated to delay price competition. It "created a royalty structure that will charge Hikma a royalty rate that increases with Hikma's market share. This escalating royalty structure (1) disincentivizes output because 'market share' is defined in terms of unit volume (e.g., number of bottles); and (2) incentivizes higher prices because Jazz and Hikma can boost revenue while keeping volume low by raising prices"[50]

159.    Although Hikma has a license to launch a generic product as of July 1, 2023, if it does so, Hikma will no longer have the right to sell an AG product through the Xyrem REMS.

160.    Hikma agreed to purchase its supply from Jazz and distribute the AG through the Jazz REMS. According to Jazz's 2017 10-K, Jazz "will also receive payment for the supply of the [Hikma] AG Product and reimbursement for a

---

[49] Jazz Pharmaceuticals Inc. 2017 10-K at 5, https://www.sec.gov/Archives/edgar/data/1232524/000123252418000018/jazz1231201710k.htm.
[50] *Id.* at 49.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

49

portion of the services costs associated with the operation of the Xyrem REMS and distribution of the [Hikma] AG Product."

161.    Jazz also granted Hikma a non-exclusive license under the Xyrem patents to make, have made, and market its generic sodium oxybate product under the Roxane ANDA in the U.S., which license was to be effective after the end of the AG sales period. Hikma agreed that it would not otherwise make, use, or sell a generic version of Xyrem for "so long as the Xyrem Patents remain in effect."

162.    Finally, under the guise of "attorneys' fees," Jazz made a cash payment to Hikma that was redacted from the 8-K: "Jazz shall make a one-time payment of [REDACTED] by wire transfer to an account designated by Roxane, in recognition of the savings inuring to Jazz in terms of the avoidance of costs and expenditure of time and resources associated with prosecuting the Actions." This cash payment was another reverse payment.

**M.    Jazz Enters Into Unlawful Reverse Payment Agreements With Par, Lupin, And Amneal**

163.    In 2017 Ascent Pharmaceuticals, Inc. and Mallinckrodt submitted ANDA applications, in June and November. Jazz filed patent infringement actions against them in the U.S. District Court for the District of New Jersey.

164.    Ascent abandoned its challenge, and Jazz gave notice of dismissal of its action, 2:17-cv-05487, on August 29, 2017.

165.    Mallinckrodt abandoned its challenge, and Jazz gave notice of dismissal of its action, 2:18-cv-00029, on June 15, 2018.

166.    But generic challenges from Par, Lupin, and Amneal would continue.

167.    Jazz had entered into reverse payment agreements with Par, Lupin, and Amneal and that also had three reverse payments.

168.    "First, Jazz made multi-million-dollar cash payments to [Defendant Par as well as Co-Conspirators Lupin and Amneal]—ostensibly for Jazz's avoided litigation costs. ... Second, Jazz allegedly gave [Defendant Par, and Co-Conspirators Lupin and Amneal] a limited license to sell a constrained supply of AG. Each license (1) began only after the expiration of Hikma's 180-day exclusivity period in July 2023; (2) was capped at a low-single-digit market share; and (3) required a royalty payment, as a percentage of sales, that increased over time. ... Third, Jazz's agreements with [Defendant Par, and Co-Conspirators Lupin and Amneal] contained acceleration clauses like the acceleration clause in the Jazz-Hikma agreement discussed above. ..." [51]

169.    In January 2018, Jazz granted Defendant Par a right to sell a limited volume of an authorized generic version of Xyrem (the "Par AG") for a term beginning July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025. This "Jazz-Par Agreement" further allocated the market for the Xyrem AG by giving Par the ability to sell "a low single digit percentage" of Xyrem sales volume during the calendar year preceding the entry date of the Par

---

[51] *Id.* at 15-16.

AG. In effect, Jazz simply agreed to pay to Par a share of the supracompetitive profits it was gaining through the anticompetitive conditions it had created.

170.    In June 2018, Jazz granted Co-Conspirator Lupin a right to sell a limited volume of an authorized generic version of Xyrem (the "Lupin AG") for a term beginning July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025. This "Jazz-Lupin Agreement" further allocated the market for the Xyrem AG by giving Lupin the ability to sell "a low single digit percentage" of Xyrem sales volume.

171.    In October 2018, Jazz granted Co-Conspirator Amneal a right to sell a limited volume of an authorized generic version of Xyrem (the "Amneal AG") for a term beginning July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025.[52] This "Jazz-Amneal Agreement" further allocated the market for Xyrem AG by giving Amneal the ability to sell "a low single digit percentage" of Xyrem sales volume.

172.    In exchange for their respective share of Jazz's brand Xyrem revenue (via volume- limited AG supply), Par, Lupin, and Amneal each agreed to abandon their challenge to Jazz's patents and delay the launch of their own AB-rated generic until December 31, 2025.

---

[52] Co-Conspirator Amneal launched its authorized generic of Xyrem in the United States on July 3, 2023, as stipulated under its unlawful reverse payment agreement with Jazz and is now selling generic Xyrem in Florida and throughout the United States. *See Amneal Launches Authorized Generic for Xyrem® (Sodium Oxybate) and Receives FDA Approval for Five Complex Generics in the Second Quarter*, Amneal (July 3, 2023), https://investors.amneal.com/news/press-releases/press-release-details/2023/Amneal-Launches-Authorized-Generic-for-Xyrem-sodium-oxybate-and-Receives-FDA-Approval-for-Five-Complex-Generics-in-the-Second-Quarter/default.aspx.

173.    Each of the Par, Lupin, and Amneal Agreements had cash payments that were suspicious under *Actavis* because they were "multi-million-dollar cash payments" "ostensibly for Jazz's avoided litigation costs."[53]

174.    With respect to the Par, Lupin, and Amneal Agreements, the use of fractionalized allocation was done to incentivize high prices for Xyrem. In the Agreements, "market share [is] defined by total units sold—again incentivizing higher prices because volumes were capped."[54]

175.    Each of Par, Lupin, and Amneal Agreements also included an "acceleration clause" that allows earlier entry if the Jazz patents were invalidated, another generic manufacturer entered the market, or there is a substantial reduction in Xyrem net sales over a specified period of time.

176.    Par, Lupin, and Amneal all made conscious decisions to restrict or block generic entry, throttle competition for Xyrem, and became part of the scheme to allocate the market for Xyrem.

177.    At the time of entering into the Jazz-Amneal Agreement, Amneal was aware of the arrangements between Jazz, Hikma, Lupin, and Amneal.

178.    As with the Jazz-Hikma Agreement, Jazz's agreements with Par, Lupin, and Amneal will not increase overall output, reduce price, or increase consumer choice; they will merely substitute Par, Lupin, and Amneal as the sellers of millions of dollars' worth of Xyrem for the sole purpose of paying them

---

[53] *Id.* at 42.
[54] *Id.* at 50.

to delay market entry of less- expensive generic sodium oxybate, preserving Jazz's massive monopoly profits in exchange for doling out a small slice of them to Par, Lupin, and Amneal.

### N.    The Jazz-Hikma Agreement Has Caused, And Will Continue To Cause, Anticompetitive Effects

179.    The Jazz-Hikma Agreement has numerous anticompetitive effects, most immediately that Hikma abandoned its patent challenge and could have entered the market after trial in July 2017 or shortly thereafter. Other generic entrants such as Par, Lupin, and Amneal could have entered 180 days thereafter.

180.    Short of a litigation victory for Hikma, Jazz and Hikma could have, and would have absent their illegal agreement, settled for terms that did not include several illegal reverse payments.

181.    The same is true for Par, Lupin, and Amneal.

182.    Had these reverse payments not been reached, there would be agreed upon generic entry prior to July 2023.

183.    The Jazz-Hikma agreement has an "implicit" "no AG" agreement. "As circumstantial evidence of an implicit no-AG agreement, Plaintiffs rely on explicit parts of the Jazz-Hikma agreement. These parts of the Jazz-Hikma agreement allegedly (1) disincentivize Jazz from marketing its own AG; and (2) further compensate Hikma in order 'to maintain supracompetitive prices to be

shared among the patentee here, Jazz] and the challenger [here, Hikma] rather than face what might have been a competitive market.'"[55]

184.    The Jazz-Hikma agreement has several poison pills that disincentivize Hikma from entering the market with its own generic before July 2023. If Hikma entered, it would have forfeited the ability to use Jazz's REMS, causing Jazz to launch an AG, and after 180 days, other generic entrants would have entered and reduced Hikma's profits. Thus, the Jazz-Hikma agreement locked up Hikma's ability to market its own product.

185.    Jazz also used the "acceleration clause" in the Jazz-Hikma Agreement to cause a roadblock to Par, Lupin, and Amneal. The "acceleration clause" destroyed the value of any successful challenge because victory would only mean that Hikma and Jazz, through an AG, would immediately compete. In this way, the Par, Lupin, and Amneal Agreements allocated the market by ensuring the challengers would take the payoff of high prices for their fractional share of Jazz's AG rather than seek to introduce true generic competition.

186.    The royalty provisions in the Jazz-Hikma Agreement undermined price competition because Hikma got a higher royalty rate if it increased its market share: "This escalating royalty structure (1) disincentivizes output because 'market share' is defined in terms of unit volume (e.g., number of

---

[55] *Id.* at 30-31 (quoting *Actavis*, 570 U.S. at 157).

bottles); and (2) incentivizes higher prices because Jazz and Hikma can boost revenue while keeping volume low by raising prices."[56]

187.    The value of Jazz's reverse payment to Hikma alone is at least $480 million and as much as $705 million.[57] The logic of these estimates is that without having to contend with Hikma, Jazz could continue its price increases, and grow its sales steadily (as it had done before) from $1.5 billion in sales in 2018 until at least 2023. Had Hikma entered with a generic product, however, Jazz's profits would have been greatly reduced over the same period, as generic entry would have reduced the price of Xyrem immediately by as much as 50%, with 80% or more of the market going to the AB-rated generic.

188.    The fractional share of value to Par, Lupin, and Amneal is worth tens of millions of dollars. The math that explains Par, Lupin, and Amneal were each allocated tens of millions of dollars of value in their settlements with Jazz is as follows. Assuming $2 billion in annual sales, a modest projection from Jazz's 2020 brand revenues of $1.74 billion, [58] and that an authorized generic would be discounted by 10%, each 1% allocated to Par, Lupin, and Amneal would be worth $20 million.[59]

---

[56] *Id.* at 49.

[57] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 58-59 (N.D. Cal. Aug. 13, 2021).

[58] *Jazz Pharmaceuticals Announces Full Year and Fourth Quarter 2020 Financial Results*, Jazz Pharmaceuticals (Feb. 23, 2021), https://investor.jazzpharma.com/news-releases/news-release-details/jazz-pharmaceuticals-announces-full-year-and-fourth-quarter-2020#:~:text=Xyrem%20net%20product%20sales%20increased,the%20same%20periods%20in%202019.

[59] $2 billion x 90% x 1%.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

189.   Jazz touted the anticompetitive effects of the agreements. "At a conference on December 4, 2019, Jazz's CEO stated that 'in terms of dynamics on price, it's – th[e] [market] is not what you would think of as a generic free for all' because of the 'very limited volumes' for Par, Lupin, and Amneal. … Similarly, on November 14, 2018, a senior Jazz executive explained that 'after th[e] the 6-month exclusivity period for the first-filer [Hikma], 3 of the second filers [allegedly Par, Lupin, and Amneal] get to come again with a limited generic. And they are limited to low single-digit volume of the previous year Xyrem sales. So again, relatively low incursion on Xyrem here.'"[60]

190.   In November 2020 Jazz launched Xywav, a therapeutic equivalent of Xyrem. Jazz priced Xywav just below the price of Xyrem, in a further attempt to provide an obstacle for generic entry of Xyrem. Jazz hopes to convert the market for Xyrem to Xywav, such that when generic versions of Xyrem do eventually enter the market, the market will have shifted to Xywav.

## VI.   DEFENDANTS' ANTICOMPETIVE EFFECTS IN THE MARKET FOR SODIUM OXYBATE

191.   Jazz's conduct as described above harmed competition in at least several respects.

192.   First, Jazz's REMs process (and its manipulation of the FDA approved protocol in this respect) initially required a single certified distributor

---

[60] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 11 (N.D. Cal. Aug. 13, 2021).

and interfered with downstream competition on price among competing

distributors.

193.    Second, Jazz interfered with and refused to cooperate with generic

drug companies that sought FDA approval, creating a barrier to entry.

194.    Third, Jazz confounded generic entry by taking inconsistent

positions with its REMs programs, manipulating the statutory and regulatory

mechanisms by which generic competition takes place.

195.    Fourth, Jazz engaged in sham litigation, taking shifting positions in

mushrooming litigation in the District of New Jersey that caused years of

recursive litigation.

196.    Fifth, Jazz entered into pay-for-delay agreements blocked and

delayed generic entry, and allocated the market for Xyrem and its AB-rated

equivalents among Defendants and Co-Conspirators.

197.    Jazz interfered with the normal operation of market conditions by

throttling generic entry through market allocation that was intended to, and

would have the effect of, preventing full price competition to Xyrem from AB-

rated generic equivalents. This deprives consumers and Plaintiffs of the benefit of

generic competition in the form of discounted AB-rated generic Xyrem. Jazz's

scheme prevented generic competition—which could have occurred as early as

July 2017.

198. There is no procompetitive justification or consumer benefit to Jazz's self-serving scheme. Generic drugs offer enormous cost savings, which outweigh any non-pretextual, if there even are any, justifications Jazz could possibly offer.

## VII. JAZZ'S MONOPOLY POWER

199. Jazz has 100% of the share in the market for sodium oxybate.

200. It has exercised its market power to exclude competition, and to raise the price of Xyrem substantially without losing enough sales to make the price increases unprofitable.

201. Jazz has serially and continually increased prices of Xyrem, as alleged above, generating substantial profits.

202. Only AB-rated generic Xyrem could take significant sales away from Xyrem. A small but significant price increase in Xyrem would not cause Jazz to lose significant sales of Xyrem.

203. Branded Xyrem has no significant cross-price elasticity with any other pharmaceutical product, including any treatment for narcolepsy.

204. There is no therapeutic substitute for Xyrem because other pharmaceutical products that treat cataplexy and/or EDS are not therapeutically equivalent. Physicians typically prescribed Xyrem in addition to other treatments for narcolepsy, such as amphetamines or wakefulness drugs. The fact that Xyrem is not a therapeutic substitute for those other products is demonstrated by the fact that lower-priced generic versions of those products were available during

the conduct period, but those lower- priced generic drugs did not take market share from Xyrem.

205.   Direct evidence of Jazz's market power includes the fact that AB-rated Xyrem would have entered the market at a steep discount to Xyrem, and only AB-rated Xyrem could take significant sales away from Xyrem.

206.   Direct evidence of market power also includes Jazz's gross margins on Xyrem (in excess of 90%), and also that Jazz repeatedly and profitably raised prices of Xyrem.

207.   Further direct evidence is shown by the fact that Jazz never lowered the price of Xyrem in response to competition from any other treatment or product.

208.   In the alternative, and to the extent Plaintiffs must indirectly define a market, the relevant product market is sodium oxybate—Xyrem, Xywav, and its AB-rated generic equivalents. The relevant geographic market is the United States.

**VIII.   EFFECTS ON TRADE AND COMMERCE**

209.   The drugs at issue in this case are sold in interstate commerce. Defendants' unlawful activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

210.   At all material times, Xyrem, manufactured and sold by Jazz, was shipped across state lines and sold to customers outside its state of manufacture. Jazz directed the sale of Xyrem throughout the United States and into California.

211.    Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce in the states in which Plaintiffs' health plans purchased Xyrem for their members, and interstate commerce flowing into or out from California.

212.    At all relevant times, Plaintiffs were contractually responsible for the payments for the drugs at issue dispensed to Plaintiffs' Insureds. Plaintiffs entered agreements with PBMs, pursuant to which Plaintiffs were, and are, responsible for paying for pharmaceutical drugs, including Xyrem, prescribed and dispensed to Plaintiffs' Insureds throughout the United States.

213.    The anticompetitive acts by Defendants and their Co-Conspirators had, and continue to have, a direct, substantial, and reasonably foreseeable effect on California trade and commerce, including by artificially raising and fixing prices for the drugs at issue, as were paid in, and/or out from, California, and otherwise injuring corporations and persons located in California.

## IX.    ANTITRUST INJURY

214.    There is currently no AB-rated generic Xyrem on the market. Absent Defendants' conduct, there would have been one as early as January 2018.

215.    Plaintiffs paid substantially inflated prices for Xyrem due to Defendants' scheme to frustrate and delay generic entry of AB-rated generic Xyrem.

216.    The price of Xyrem was artificially inflated, and price competition from AB-rated generic Xyrem was curtailed.

217.    Defendants' scheme is the proximate cause of Plaintiffs' injuries. But for Defendants' efforts to keep AB-rated generic Xyrem off the market, there would be substantially lower prices for Xyrem.

218.    Plaintiffs would have substantial savings if the scripts for brand Xyrem were instead, as they would have been, scripts for AB-rated generic Xyrem. The absence of generic substitution and competition caused Plaintiffs to pay overcharges for Xyrem that continue to the present.

219.    Plaintiffs will present evidence of the overcharges it has paid in the form of econometric analysis.

220.    Plaintiffs suffered injury when they paid for prescriptions of Xyrem, at inflated prices, for members located across the United States. Defendants' conduct had a substantial effect in Plaintiffs' business operations in these states because Plaintiffs' health plans purchased Xyrem for members located in these states.

221.    Antitrust injury is further shown by, as explained above, the "alleged reverse payments are plausibly large and unexplained," and "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself."[61]

## X.    PLAINTIFFS' CLAIMS ARE TIMELY

---

[61] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 57 (N.D. Cal. Aug. 13, 2021) (quoting *Actavis*, 570 U.S. at 158).

**A.      Defendants Fraudulently Concealed by Omission Their Unlawful Agreements.**

222.   Defendants fraudulently concealed the existence and the scope of the agreements alleged here.

223.   The April 2017 Jazz-Hikma agreement was concealed from the public, as explained above. Jazz and Hikma suppressed their tacit agreements, as well as the implied "no AG" agreement.

224.   The "implicit" "'no-AG' agreement is that Jazz will not sell an authorized generic of Xyrem for 'at least the first six months that Hikma is eventually on the market' with the Hikma AG, which is Jazz's Xyrem under the label of Hikma AG."[62] Although the agreements appeared to give Jazz the ability to launch its own AG, these provisions were illusory: "Plaintiffs plausibly allege the existence of an implicit or de facto no-AG agreement between Jazz and Hikma. As circumstantial evidence of an implicit no-AG agreement, Plaintiffs rely on explicit parts of the Jazz-Hikma agreement. These parts of the Jazz-Hikma agreement allegedly (1) disincentivize Jazz from marketing its own AG; and (2) further compensate Hikma …. Plaintiffs specifically identify three parts of the Jazz-Hikma agreement that disincentivize a Jazz AG and convey value to Hikma. The first is Jazz's promise not to license Jazz's AG through any third party for six months. The second is the royalty structure, which escalates kickbacks from Hikma to Jazz to undermine Jazz's economic interest in competing to sell Jazz's

---

[62] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 25 (N.D. Cal. Aug. 13, 2021).

own AG. The third is the Jazz-Hikma agreement's 'acceleration clause,' a type of most-favored-entry clause that allows Hikma to sell AG immediately if (1) a generic version of Xyrem were to market itself without Jazz's permission; or (2) anyone were to successfully invalidate or render unenforceable Xyrem's unexpired patent claims."[63]

225.    The true state of affairs concerning the Jazz-Hikma agreement was concealed from Plaintiffs until the secret documents were disclosed in the briefing in the *Xyrem Antitrust* litigation motion to dismiss.

226.    Accordingly, Plaintiffs may recover damages reaching back beyond four years before the filing of this Complaint.

227.    Plaintiffs had no knowledge of the terms of Defendants' agreements and did know the nature and extent of the scheme alleged. Nor could it have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this Complaint.

228.    Defendants actively concealed the existence of their agreements and ongoing scheme.

**B.    Defendants' Continuing Violations.**

229.    Plaintiffs allege a scheme that is a continuing course of wrongdoing that includes actions taken within the limitations period.

230.    Each time Plaintiffs' health plans purchased brand or AB-rated generic Xyrem at an inflated price, a claim accrued. Each such sale was an overt

---

[63] *Id.* at 30-31.

action taken by Defendants in furtherance of the scheme alleged herein. A cause of action accrued to Plaintiffs each time they paid an overcharge—i.e., each time it made a payment for Xyrem at a price higher than would have been paid absent Defendants' unlawful conduct. Plaintiffs began to pay overcharges as early as July 17, 2017.

231.    Plaintiffs reserve the right to allege that they began to pay overcharges at an earlier time based on evidence disclosed in discovery.  Jazz's agreements with Hikma have not been made public, nor have the agreements with Par, Lupin, and Amneal.

**C.    Equitable Tolling Applies Here.**

232.    A class of end-payors sued Jazz and the other Defendants on June 18, 2020. See Exhibit A.

233.    The end-payor class continues to litigate its claims against Jazz and other Defendants. Plaintiffs' claims are tolled, in whole or in part, by the causes of action under the state laws identified in Exhibit A.

**XI.    CLAIMS FOR RELIEF**

**COUNT I**

**CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE**

**UNDER STATE LAW**

(AGAINST JAZZ AND HIKMA)

234.    Plaintiffs incorporate by reference the preceding allegations.

235.   Jazz and Hikma entered into an agreement or combination in restraint of trade in violation of many states' laws.[64] Jazz and Hikma engaged in a continuing contract, combination or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

236.   Jazz and Hikma entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

237.   Jazz and Hikma's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

238.   As a result of Jazz and Hikma's unlawful conduct, Plaintiffs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

239.   In formulating and carrying out the alleged agreement, understanding, contract, combination, and conspiracy, Jazz and Hikma did those

---

[64] Plaintiffs understand that certain Plaintiffs in the *In re Xyrem Antitrust Litigation*, MDL No. 3:20-md-02966-RS, provided notice to the state attorneys general of to the attorneys general in Alabama, Alaska, Arizona, California, Connecticut, Hawaii, Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nevada, New York, Oregon, Rhode Island, South Carolina, Utah, Vermont, West Virginia, and Wisconsin by providing a copy of their class action complaint. *See Xyrem* ECF No. 62 at p. 88. Out of an abundance of caution Plaintiffs provided copies of this amended complaint to these attorneys general. Plaintiffs will seek to only advance here claims for which they have purchases in these states, and Plaintiffs' analysis of the states in which they have purchases is ongoing.

things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

240.    Jazz and Hikma's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Hikma delayed generic entry and its attendant lower prices for Plaintiffs, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

241.    Jazz and Hikma engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

242.    There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiffs and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with FTC v. Actavis, Inc., 570 U.S. 136 (2013).

243.    By engaging the foregoing conduct, Jazz and Hikma intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

o) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

p) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

q) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

r) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

s) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

t) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

u) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

v) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

w) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

x) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

y) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

z) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

cc) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

244.   Plaintiffs have been injured in their business or property by reason of Jazz and Hikma's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Hikma's unlawful conduct. These injuries are of the type that the above

laws were designed to prevent and flow from that which makes Jazz and Hikma's conduct unlawful.

245.   Plaintiffs seek damages and multiple damages as permitted by law.

## COUNT II

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW

(AGAINST JAZZ AND AMNEAL)

246.   Plaintiffs incorporate by reference the preceding allegations.

247.   Defendant Jazz and Co-Conspirator Amneal entered into an agreement or combination in restraint of trade in violation of many states' laws. Jazz and Amneal engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

248.   Jazz and Amneal entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

249.   Jazz and Amneal's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

250.   As a result of Jazz and Amneal's unlawful conduct Plaintiffs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

251.    In formulating and carrying out the alleged agreement, understanding, contract, combination, and conspiracy, Jazz and Amneal did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

252.    Jazz and Amneal's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Amneal delayed generic entry and its attendant lower prices for Plaintiffs, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

253.    Jazz and Amneal engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

254.    There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiffs and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with FTC v. Actavis, Inc., 570 U.S. 136 (2013).

255.    By engaging the foregoing conduct, Jazz and Amneal intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

) Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.f) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

o) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

p) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

q) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

r) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

s) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

t) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

u) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

v) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

w) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

x) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

y) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

z) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

cc) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

256.    Plaintiffs have been injured in their business or property by reason of Jazz and Amneal's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Amneal's unlawful conduct. These injuries are of the type that the above

laws were designed to prevent and flow from that which makes Jazz and Amneal's conduct unlawful.

257.  Plaintiffs seek damages and multiple damages as permitted by law.

## COUNT III

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW

### (AGAINST JAZZ AND LUPIN)

258.  Plaintiffs incorporate by reference the preceding allegations.

259.  Defendant Jazz and Co-Conspirator Lupin entered into an agreement or combination in restraint of trade in violation of many states' laws. Jazz and Lupin engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

260.  Jazz and Lupin entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

261.  Jazz and Lupin's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

262.  As a result of Jazz and Lupin's unlawful conduct, Plaintiffs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

263.   In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Jazz and Lupin did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

264.   Jazz and Lupin's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Lupin delayed generic entry and its attendant lower prices for Plaintiffs, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

265.   Jazz and Lupin engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

266.   There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiffs and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with FTC v. Actavis, Inc., 570 U.S. 136 (2013).

267.   By engaging the foregoing conduct, Jazz and Lupin intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
75

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Fla. Stat. §§ 502.201, et seq., with respect to purchases in Florida.

f) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

o) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

p) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

q) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

r) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

s) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

t) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

u) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

v) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

w) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

x) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

y) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

z) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

cc) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

268.   Plaintiffs have been injured in their business or property by reason of Jazz and Lupin's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Lupin's unlawful conduct. These injuries are of the type that the above

laws were designed to prevent and flow from that which makes Jazz and Lupin's conduct unlawful.

269.    Plaintiffs seek damages and multiple damages as permitted by law.

## COUNT IV

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW

(AGAINST JAZZ)

270.    Plaintiffs incorporate by reference the preceding allegations.

271.    Defendant Jazz and Co-Conspirator Par entered into an agreement or combination in restraint of trade in violation of many states' laws.  Jazz and Par engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

272.    Jazz and Par entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

273.    Jazz and Par's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

274.    As a result of Jazz and Par's unlawful conduct, Plaintiffs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

275.   In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Jazz and Par did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

276.   Jazz and Par's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Par delayed generic entry and its attendant lower prices for Plaintiffs, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

277.   Jazz and Par engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

278.   There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiffs and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with FTC v. Actavis, Inc., 570 U.S. 136 (2013).

279.   By engaging the foregoing conduct, Jazz and Par intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.f) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

o) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

p) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

q) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

r) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

s) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

t) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

u) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

v) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

w) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

x) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

y) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

z) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

cc) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

280.   Plaintiffs have been injured in their business or property by reason of Jazz and Par's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Par's unlawful conduct. These injuries are of the type that the above

1  laws were designed to prevent and flow from that which makes Jazz and Par's

2  conduct unlawful.

3      281.   Plaintiffs seek damages and multiple damages as permitted by law.

4
                                    **COUNT V**
5
       **CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE**
6
                              **UNDER STATE LAW**
7
                          (AGAINST ALL DEFENDANTS)
8

9      282.   Plaintiffs incorporate by reference the preceding allegations.
10
       283.   Defendants and the Co-Conspirators entered into agreements or
11
12  combinations in restraint of trade in violation of many states' laws.  Defendants

13  and the Co-Conspirators engaged in a continuing contract, combination, or

14  conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade
15
16  and commerce, in violation of the various state antitrust statutes set forth below.

17     284.   During the Relevant Period, Defendants and Co-Conspirators

18  entered into an unlawful reverse payment agreement that restrained, and

19  continues to restrain, competition in the market for Xyrem and/or its AB-rated
20
21  generic equivalents.

22     285.   Defendants' and Co-Conspirators' acts and combinations in

23  furtherance of the conspiracy have caused unreasonable restraints in the market

24  for Xyrem and/or its AB-rated generic equivalents.

25

26

27

28
                          AMENDED COMPLAINT
             *Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
                                     82

286.   As a result of Defendants' and Co-Conspirators' unlawful conduct, Plaintiffs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

287.   In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

288.   Defendants' and Co-Conspirators' conspiracy had the following effects, among others:

a) It delayed and continues to delay generic entry of Xyrem in order to lengthen the period in which Jazz's brand Xyrem could and can monopolize the market and make supracompetitive profits;

b) It will keep an authorized generic from Jazz off the market during Hikma's 180-day generic exclusivity period, thereby allowing Hikma to monopolize the generic market for Xyrem during the period, and allowing Hikma to make supracompetitive profits;

c) It will, after Hikma's exclusivity period ends, continue to keep an authorized product from Jazz off the market as Amneal, Lupin, and Par enter with "very limited" quantities (throttled by Jazz) of generic Xyrem; and

d) It raised and maintained the prices that Plaintiffs would and will pay for Xyrem at supracompetitive levels.

289.   From January 2023 until at least December 31, 2025, Jazz will share its monopoly power with Hikma, Amneal, Lupin, and Par, and the companies will jointly maintain an illegal monopoly throughout that time.

290.    Defendants and Co-Conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

291.    There was no legitimate, non-pretextual, pro-competitive business justification for these reverse payment agreements that outweigh their harmful effects on Plaintiffs and competition. Even if there were some conceivable and cognizable justification, the payments were not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

292.    By engaging the foregoing conduct, Defendants and Co-Conspirators intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.f) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

o) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

p) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

q) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

r) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

s) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

t) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

u) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

v) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

w) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

x) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

y) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

z) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

cc) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

293.   Plaintiffs have been injured in their business or property by reason of Defendants' and Co-Conspirators violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' and Co-Conspirators' conduct unlawful.

294.   Plaintiffs seek damages and multiple damages as permitted by law.

<u>COUNT VI</u>

<u>MONOPOLIZATION AND MONOPOLISTIC SCHEME UNDER STATE LAW</u>

(AGAINST ALL DEFENDANTS)

295.   Plaintiffs incorporate by reference the preceding allegations.

296.   The relevant market is sodium oxybate (Xyrem, Xywav, and Xyrem's AB-rated generic equivalents).

297.   As described above, before January 2023, Jazz has maintained and will maintain its monopoly power in the relevant market and, after that point, will share its monopoly power with Hikma first, followed by Amneal, Lupin, and Par, in an illegal monopoly.

298.   Jazz willfully and unlawfully engaged in continuing illegal conduct to monopolize the relevant market through at least December 31, 2025, by engaging in an anticompetitive scheme to keep AB-rated generic equivalents of Xyrem from the market—not as a result of providing a superior product, business acumen, or historical accident.

299.   Jazz knowingly and intentionally maintained and enhanced its monopoly power in the relevant market, as described herein, injuring Plaintiffs. Jazz accomplished this scheme by:

a) Delaying generic entry of Xyrem in order to lengthen the period in which Jazz's brand Xyrem could monopolize the market and make supra- competitive profits;

b) Keeping an authorized generic off the market during Hikma's 180-day generic exclusivity period, and, subsequently when Amneal, Lupin, and Par are permitted to enter with only limited quantities of generic Xyrem, through at least December 31, 2025, thereby allowing Defendants to monopolize the generic

market for Xyrem during the period, and allowing Defendants to make supracompetitive profits;

c) Raising and maintaining the prices so that Plaintiffs would pay supracompetitive prices for Xyrem; and

d) Otherwise conspiring with the other Defendants to unlawfully monopolize the relevant market, including through the use of anticompetitive "acceleration" clauses.

300. The goal, purpose, and effect of Jazz's scheme was also to maintain and extend its monopoly power with respect to Xyrem. Jazz's illegal scheme allowed it to continue charging supracompetitive prices for Xyrem, without a substantial loss of sales, reaping substantial unlawful monopoly profits. Jazz's scheme will allow Hikma to reap the benefits of reduced generic competition in the United States.

301. There is and was no legitimate, non-pretextual, procompetitive justification for Jazz's conduct that outweighs its harmful effects. Even if there were some conceivable justification, the conduct is and was broader than necessary to achieve such a purpose.

302. As a result of Jazz's illegal conduct, Plaintiffs were compelled to pay (and did pay), and continue to be compelled to pay (and do pay), more than it would have paid for Xyrem and/or its generic Xyrem absent Defendants' unlawful conduct. But for Jazz's unlawful conduct, competitors would have begun

selling generic Xyrem sooner, and prices paid for the drug or its generic

equivalents, would therefore, be less.

303.   Had manufacturers of generic Xyrem entered the market and

lawfully competed with Jazz (and one another) in a timely fashion, Plaintiffs

would have substituted lower-priced generic Xyrem for the higher-priced brand-

name Xyrem for some or all of their Xyrem requirements, and/or would have

paid lower net prices on their remaining Xyrem and generic Xyrem purchases.

304.   But for Jazz's illegal conduct, competitors would have begun

marketing generic versions of Xyrem well before January 2023, and they would

be able to market such versions successfully.

305.   By engaging in the foregoing conduct, Jazz intentionally, willfully,

and wrongfully monopolized the relevant market in violation of the following

state laws:

a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in

Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, with respect to purchases in California.

c) C.G.S.A. §§ 35-27, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4503, et seq., with respect to purchases in the District

of Columbia.

e) Fla. Stat. § 501.201., et seq., with respect to purchases in Florida.

f) Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to purchases in

Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

AMENDED COMPLAINT
*Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*

h) Iowa Code § 553.5, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

n)  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

o) Mo. Rev. Stat. §§ 407.020, et seq., with respect to purchases in Missouri.

p) Mont. Code Ann. §§ 30-14-101, et seq., with respect to purchases in Montana.

q) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to purchases in New Hampshire.

t) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

v) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

w) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

x) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

y) P.R. Laws Ann. tit. 10, §§ 260, et seq., with respect to purchases in Puerto Rico.

z) R.I. Gen. Laws §§ 6-36-5 et seq., with respect to purchases in Rhode Island.

aa) S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

bb) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

dd) Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

ee) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

ff) Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

306.   Plaintiffs have been injured in their business or property by reason of Jazz's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

307.   Plaintiffs seek damages and multiple damages as permitted by law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VII

## FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS

## OF SECTION 16 OF THE CLAYTON ACT, 15 U.S.C. §§ 1-2, 26)

(AGAINST ALL DEFENDANTS)

308.    Plaintiffs incorporate by reference the preceding allegations.

309.    Plaintiffs seek declaratory and injunctive relief under state antitrust laws.

310.    As set forth above, Defendants have violated Section 16 of the Clayton Act, 15 U.S.C. § 26.

311.    Plaintiffs have been injured in their business or property by reason of Defendants' antitrust violations. This injury consists of paying higher prices for Xyrem than Plaintiffs would have paid in the absence of those violations. These injuries will continue unless halted.

312.    Plaintiffs, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, hereby seeks a declaratory judgment to correct the anticompetitive effects caused by Defendants' unlawful conduct and to restore competition in the market for Xyrem.

## COUNT VIII

## UNJUST ENRICHMENT UNDER STATE LAW

## (AGAINST ALL DEFENDANTS)

313.    Plaintiffs incorporate by reference the preceding allegations.

314. Defendants benefitted from monopoly profits on the sale of Xyrem resulting from the unlawful and inequitable acts alleged in this Complaint.

315. Defendants' financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for Xyrem by Plaintiffs.

316. Plaintiffs have conferred upon Defendants an economic benefit, profits from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiffs.

317. It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract for their purchases of Xyrem.

318. It would be futile for Plaintiffs to seek to exhaust any remedy against an immediate intermediary in the chain of distribution from which it indirectly purchased Xyrem, as they are not liable and would not compensate Plaintiffs for unlawful conduct caused by Defendants.

319. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Xyrem is a direct and proximate result of Defendants' unlawful conduct.

320. The economic benefits derived by Defendants rightfully belong to Plaintiffs, as they paid anticompetitive and monopolistic prices between as early as July 17. 2017 and the present, benefiting Defendants.

321. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States for Defendants to be permitted to retain any of the overcharges for

Xyrem derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. Plaintiffs assert claims under all such states' laws.

322.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.

323.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs all unlawful or inequitable proceeds they received.

324.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiffs.

## XII.    DEMAND FOR JUDGMENT

325.    WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    A declaration that the conduct alleged in this Complaint is in violation of the law, including each of the laws asserted in this Complaint;

B.    An award of Plaintiffs' overcharge damages, in an amount to be proven and determined at trial, trebled as provided by law; with pre- and post-judgment interest at the statutory rates;

C.    An award to Plaintiffs of equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

D.    An award to Plaintiffs of reasonable costs and expenses, including attorneys' fees; and

1    E.    An award of all other legal or equitable relief as the Court deems just

2    and proper.

3    **XIII. JURY DEMAND**

4    Plaintiffs demand a jury trial on all claims so triable under Federal Rule of

5

6    Civil Procedure Rule 38(b).

7    DATED:   March 15, 2024

8                                   */s/ Matthew S. Weiler*
9                                   **SCHNEIDER WALLACE**
                                    **COTTRELL KONECKY LLP**
10                                  Matthew S. Weiler (SBN 236052)
                                    Todd M. Schneider (SBN 158253)
11                                  J. Caleigh Macdonald (SBN 302592)
                                    2000 Powell Street, Suite 1400
12                                  Emeryville, CA 94608
                                    Telephone: (415) 421-7100
13                                  TSchneider@schneiderwallace.com
                                    MWeiler@schneiderwallace.com
14                                  JMacdonald@schneiderwallace.com
15

16                                  Jason H. Kim (SBN 220279)
17                                  300 S. Grand Avenue, Suite 2700
                                    Los Angeles, CA 90071
18                                  Telephone: (415) 421-7100
                                    JKim@schneiderwallace.com
19

20                                  **LOWEY DANNENBERG, P.C.**
                                    Peter D. St. Phillip (*Pro hac vice*)
21                                  Uriel Rabinovitz (*Pro hac vice*)
                                    Noelle Ruggiero (*Pro hac vice*)
22                                  44 South Broadway, Suite 1100
                                    White Plains, NY 10601
23                                  Telephone: (914) 997-0500
                                    PStPhillip@lowey.com
24                                  URabinovtiz@lowey.com
                                    NRuggiero@lowey.com
25

26

27

28
                        AMENDED COMPLAINT
          *Blue Cross & Blue Shield of Florida, Inc. v. Jazz Pharms., Inc., et al.*
                               95

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HOLLAND & KNIGHT LLP**
Laura B. Renstrom (*Pro hac vice* to be filed)
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Telephone: (904) 798-7222
Laura.Renstrom@hklaw.com

*Counsel for Plaintiffs Blue Cross & Blue Shield of Florida Inc., and Health Options, Inc.*