[*Submitting counsel on signature page*]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: XYREM (SODIUM OXYBATE) ANTITRUST LITIGATION | Case No. 3:20-md-02966-RS-SVK |
| This Document Relates to: | **DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DECERTIFY THE DAMAGES CLASS** |
| All Actions | Judge:      Chief Judge Richard Seeborg<br>Date:       July 19, 2024<br>Time:       9:30 a.m.<br>Courtroom:  Courtroom 3, 17th Floor |

**NOTICE OF MOTION AND MOTION TO DECERTIFY THE DAMAGES CLASS**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 19, 2024, at 9:30 a.m., or as soon thereafter as the matter can be heard, in the courtroom of the Honorable Chief Judge Seeborg, located at San Francisco Courthouse, Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA, 94102 Defendants Jazz Pharmaceuticals, Inc., Jazz Pharma Ireland, Ltd., and Jazz Pharmaceuticals plc ("Jazz"), and Defendants Hikma Labs, Inc. (f/k/a Roxane Laboratories, Inc.), Hikma Pharmaceuticals USA Inc., Eurohealth (USA) Inc., and Hikma Pharmaceuticals plc ("Hikma") (collectively, "Defendants"), hereby move the Court, under Rule 23(c)(1)(C), to decertify the Damages Class.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of Alexander S. Zolan and the exhibits submitted therewith, the pleadings and papers on file in this action, any other such matters upon which the Court may take judicial notice or which are incorporated by reference, the arguments of counsel, and any other matters that the Court may properly consider.

1

**CONTENTS**

2    AUTHORITIES .................................................................................................................iii

3    STATEMENT OF ISSUES .............................................................................................vii

4    INTRODUCTION ............................................................................................................. 1

5    BACKGROUND ................................................................................................................ 3

6    I.   Procedural History ...................................................................................................... 3

7    II.  New Developments ...................................................................................................... 5

8    LEGAL STANDARDS....................................................................................................... 7

9    ARGUMENT ...................................................................................................................... 8

10   I.   New Injury Data Warrant Revisiting Certification. ................................................... 8

11        A.  Generic Erosion Has Occurred Far Slower Than Dr. Conti Predicted. ................. 9

12        B.  DAW Prescriptions Consistently Limit Generic Erosion. ................................... 10

13        C.  Many Class Members Have Never Reimbursed for Generic Xyrem.................... 12

14   II.  Plaintiffs Have Not Shown That Common Questions Predominate. ......................... 15

15        A.  Dr. Conti's Model Cannot Prove Classwide Injury. ............................................ 16

16             1.   The Court Must Resolve the Dispute Between Dr. Hughes and Dr. Conti..................... 16

17             2.   Dr. Conti's Model Cannot Sustain a Reasonable Classwide Finding............................ 17

18        B.  Individual Injury Assessments Would Overwhelm a Trial................................... 20

19             1.   Plaintiffs Have Not Proven *De Minimis* Class Members Were Uninjured.................... 20

20             2.   Proving Injury Is Fact-Intensive and Cannot Be Done After Trial................................ 21

21   CONCLUSION................................................................................................................. 25

22

23

24

25

26

27

28

DEFS.' MOT. TO DECERTIFY                                    Case No. 3:20-md-02966-RS-SVK

**AUTHORITIES**

**CASES**

*Andrade v. Am. First Fin., Inc.,*
No. 18-CV-6743, 2022 WL 3369410 (N.D. Cal. Aug. 16, 2022)........................22–23

*Angeles v. US Airways, Inc.,*
No. 12-CV-5860, 2017 WL 587658 (N.D. Cal. Feb. 13, 2017) ...............................14

*Arredondo v. Delano Farms Co.,*
301 F.R.D. 493 (E.D. Cal. 2014) .............................................................................14

*Bautista v. Valero Mktg. & Supply Co.,*
No. 15-CV-5557 (RS), 2018 WL 11356583 (N.D. Cal. Dec. 4, 2018) ....................22

*Berger v. Home Depot USA, Inc.,*
741 F.3d 1061 (9th Cir. 2014)................................................................................7–8

*Bowerman v. Field Asset Servs., Inc.,*
60 F.4th 459 (9th Cir. 2023) ....................................................................................22

*Briseno v. ConAgra Foods, Inc.,*
844 F.3d 1121 (9th Cir. 2017)............................................................................23–25

*Cahill v. Nike, Inc.,*
No. 3:18-CV-1477, 2022 WL 19226181 (D. Or. Nov. 22, 2022) ..............................8

*Castillo v. Bank of Am., NA,*
980 F.3d 723 (9th Cir. 2020).............................................................................7, 22

*City of Rockford v. Mallinckrodt ARD, Inc.,*
No. 3:17-CV-50107, 2024 WL 1363544 (N.D. Ill. Mar. 29, 2024)..........................19

*Cruz v. Dollar Tree Stores, Inc.,*
No. 07-CV-2050, 2011 WL 2682967 (N.D. Cal. July 8, 2011)................................14

*Dukes v. Wal-Mart Stores, Inc.,*
603 F.3d 571 (9th Cir. 2010)...........................................................................14, 24
564 U.S. 338 (2011) .................................................................................................24

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011)......................................................................................8

*Gutierrez v. Wells Fargo Co.,*
No. 07-CV-5923, 2009 WL 1247040 (N.D. Cal. May 5, 2009) ...............................14

*Heredia v. Eddie Bauer LLC,*
No. 16-CV-6236, 2020 WL 127489 (N.D. Cal. Jan. 10, 2020) ...............................14

*In re Aluminum Warehousing Antitrust Litig.,*
336 F.R.D. 5, 50 (S.D.N.Y. 2020) ...........................................................................23

*In re Asacol Antitrust Litig.,*
907 F.3d 42 (1st Cir. 2018) .................................................................20, 21, 23–25

*In re AutoZone, Inc.*,
No. 3:10-MD-2159, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ........................................ 14

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ............................................................................................... 8

*In re HIV Antitrust Litig.*,
No. 19-CV-2573, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ..................................... 20–21

*In re Intuniv Antitrust Litig.*,
No. 1:16-CV-12396, 2019 WL 3947262 (D. Mass. Aug. 21, 2019) ........................................ 21

*In re Lamictal Direct Purchaser Antitrust Litig.*,
No. 12-CV-995, 2021 WL 2349828 (D.N.J. June 7, 2021) ..................................................... 21
957 F.3d 184 (3d Cir. 2020) ................................................................................................... 21

*In re Lipitor Antitrust Litig.*,
No. 3:12-CV-2389, 2024 WL 2865074 (D.N.J. June 6, 2024) ............................................... 21

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) .......................................... 19

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) ......................................................................................... 21

*In re Niaspan Antitrust Litig.*,
464 F. Supp. 3d 678 (E.D. Pa. 2020) ...................................................................................... 21

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34, 60 (1st Cir. 2016) ............................................................................................... 23

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311, 315 (N.D. Cal. 2014) ...................................................................................... 8

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) .......................................................................................... 20, 23

*In re Thalomid & Revlimid Antitrust Litig.*,
No. 14-CV-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) ................................................. 21

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) ............................................................................................... 7, 14

*In re Zetia Antitrust Litig.*,
No. 2:18-MD-2836, 2022 WL 4362166 (E.D. Va. Aug. 15, 2022) ........................................ 12

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017) .................................................................................................. 7
586 U.S. 188 (2019) ................................................................................................................. 7

*Landen v. Electrolux Home Prod., Inc.*,
No. 13-CV-1033, 2014 WL 2980977 (C.D. Cal. July 1, 2014) ............................................... 19

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134, 1138 (9th Cir. 2022) ....................................................................................... 20

*Loughlin v. Vi-Jon, LLC*,
   No. 20-CV-11555, 2024 WL 1347092 (D. Mass. Mar. 29, 2024).............................................20

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*,
   No. 2:20-CV-11518, 2022 WL 4596597 (C.D. Cal. Aug. 4, 2022).....................................20, 24

*Marlo v. United Parcel Serv.*,
   639 F.3d 942 (9th Cir. 2011)..........................................................................................................7

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012)..........................................................................................................7

*Mr. Dee's Inc. v. Inmar, Inc.*,
   No. 1:19-CV-141, 2023 WL 5436178 (M.D.N.C. Aug. 23, 2023)...............................................20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) .................................. 7–8, 15–16, 20, 21, 22, 25

*Robbins v. Phillips 66 Co.*,
   343 F.R.D. 126 (N.D. Cal. 2022) .................................................................................................22

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009)..........................................................................................................7

*Series 17-03-615 v. Express Scripts, Inc.*,
   No. 3:20-CV-50056, 2024 WL 1834311 (N.D. Ill. Apr. 26, 2024) .............................................19

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. Glaxo-SmithKline, PLC*,
   No. 04-CV-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ..................................................21

*Stiner v. Brookdale Senior Living, Inc.*,
   665 F. Supp. 3d 1150 (N.D. Cal. 2023) ......................................................................................23

*Tyson Foods v. Bouaphakeo*,
   577 U.S. 442 (2016).............................................................................................................7, 25

*Willis v. Koning & Assocs.*,
   No. 21-CV-819, 2023 WL 2541327 (N.D. Cal. Mar. 15, 2023)...................................................16

*Wollam v. Transamerica Life Ins. Co.*,
   No. 21-CV-9134, 2024 WL 1117050 (N.D. Cal. Mar. 13, 2024)..................................................22

*Utne v. Home Depot U.S.A., Inc.*,
   No. 16-CV-1854 (RS), 2022 WL 16857061 (N.D. Cal. Nov. 10, 2022) ....................................25

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
   No. 21-CV-3500, 2022 WL 17177267 (E.D. Pa. Nov. 23, 2022)..................................................21

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) .............................................................................................21–22

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
   No. 2:06-CV-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015)................................................20

*Vizcarra v. Unilever U.S., Inc.*,
   339 F.R.D. 530 (N.D. Cal. 2021) .................................................................................................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3) .......................................................................................*passim*

Fed. R. Civ. P. 23(c)(1)(C) ............................................................................. 7–8, 13–15

**STATEMENT OF ISSUES**

1.     Whether new evidence showing that nearly a quarter of payors in the Damages Class have reimbursed only for branded Xyrem since generic entry warrants reexamination of whether the Damages Class should be certified.

2.     Whether Class Plaintiffs have met their continuing burden to show that common questions predominate over individual issues.

1

## INTRODUCTION

2  Defendants move to decertify the Damages Class based on new information—more than fif-

3  teen months of new data since the launch of generic Xyrem indicating that many Class members were

4  uninjured—that was not available when the parties briefed class certification.

5  Plaintiffs in this case allege they were harmed by conduct that supposedly delayed the launch

6  of generic versions of Xyrem, a branded prescription narcolepsy medicine.  More specifically, they

7  claim they were harmed because they "would have paid less" by "purchasing generic Xyrem at lower

8  prices sooner" if the challenged conduct had not occurred.  D.I. 62 ¶ 321.  Class Plaintiffs—insurance

9  companies and benefit plans that pay for Xyrem consumers' prescriptions—moved to certify a class

10  under Rule 23(b)(3), claiming they could prove with common evidence that they would have paid

11  less for generic Xyrem sooner.  But their "evidence" was tantamount to an assumption that trends and

12  averages in the pharmaceutical industry, necessarily based on other drugs, were predictive.  Specifi-

13  cally, Class Plaintiffs argued based on these trends and averages that: (1) if generic Xyrem had en-

14  tered the market sooner, almost all consumers would have quickly switched from the branded drug

15  and paid less; and (2) most Class Plaintiffs paid for so many Xyrem prescriptions that they would

16  almost certainly have paid for at least one generic purchase in Plaintiffs' but-for world.

17  Class Plaintiffs moved for certification before generic Xyrem entered the market, based on

18  Xyrem sales data through March 2022, so there was no real-world evidence available to shed light on

19  what generic entry would look like for Xyrem.  Even so, some characteristics of Xyrem—primarily

20  its very small patient population and indications that Xyrem patients and prescribers would tend to

21  request the branded version—suggested that generic entry for Xyrem would not be as Class Plaintiffs

22  predicted.  Pointing to those characteristics, Defendants challenged Class Plaintiffs' ability to prove,

23  in one stroke, that they all would have paid for at least one generic Xyrem prescription but for the

24  challenged conduct.  Class Plaintiffs denied that those characteristics would have caused fewer pay-

25  ments for generic Xyrem, relying on their expert Dr. Rena Conti's prediction that generic Xyrem

26  would have performed like most other generics.

27  Lacking direct evidence that Xyrem would have strayed from industry-wide trends, this Court

28  found Dr. Conti's predictions plausible, and thus credited Class Plaintiffs' classwide injury theory.  It

certified the following Damages Class soon after generic Xyrem entered the market in January 2023:

> All entities in [certain states] that, for consumption by their members, employees, insureds, participants, or beneficiaries, and other than for resale, paid and/or provided reimbursement for some or all the purchase price for Xyrem during the time from January 17, 2017, through and until May 12, 2023.

D.I. 500 at 28.[1]  The Court concluded, in May 2023 based on Class Plaintiffs' predictions, there "appear[ed] to be, at most, a *de minimis* number of completely uninjured [Class members]."  *Id.* at 15.

Generic Xyrem has now been available for well over a year, generating new, real-world evidence against which Dr. Conti's predictions can be tested and with which Class members' injuries (or lack thereof) can be assessed.  Defendants collected and produced this new evidence at Class Plaintiffs' request, after the close of fact discovery, because Class Plaintiffs planned to use it to support their forthcoming attempt to expand the Class definition.

Instead, that new evidence exposes the inadequacy of Class Plaintiffs' classwide injury theory. Almost 16 months after generic entry, generic Xyrem's market share was ███████████—far below even the most conservative model proposed by Dr. Conti.  In those 16 months, ████ ███████████████████████████████.  These Class members are "loyal" to brand Xyrem, and this brand loyalty is real-world evidence of how those Class members would have behaved in Plaintiffs' but-for world.  Brand loyalty in the but-for world would mean those Class members were uninjured.  Yet the number of uninjured Class members is likely even higher than ███████████ ███████████████ has not reimbursed for *any* form of Xyrem since generic entry.  The Class members that have not paid for any version of Xyrem since generic entry are, like the Class members that have paid only for branded Xyrem since generic entry, small in terms of the number of patients they insure and prescriptions they pay for.  Combined with generic Xyrem's low market share, that patient population means those Class members are unlikely to have paid for generic Xyrem in Plaintiffs' but-for world.

Given these new data, the model Dr. Conti used to support class certification is not just implausible; it is now demonstrably unreliable.  Thus, Class Plaintiffs cannot use it as classwide proof

---

[1] The Damages Class excludes "(1) Defendants and their counsel, parents, subsidiaries, and affiliates; (2) Express Scripts Specialty Distribution Services, Inc. and any of its counsel, parents, subsidiaries, and affiliates; and (3) federal and state governmental entities[ ] [except] cities, towns, municipalities, or counties or carriers for Federal Employee Health Benefit plans."  D.I. 500 at 28.

of antitrust injury.  And they have no alternative except for exhaustive, individual inquiry into whether each Plaintiff would have reimbursed for the generic in their but-for world.  That method of proof (or disproof) would amount to nearly ███ mini-trials—far from the aggregation-fueled efficiencies class certification should generate.  Rule 23(b)(3)'s predominance requirement prevents that outcome.

Because new, real-world evidence disproves Class Plaintiffs' assertions that common questions predominate over individual issues, this Court should decertify the Damages Class.

## BACKGROUND

### I. Procedural History

Class Plaintiffs' theory of injury depends on the prediction that all or nearly all "Class members would have purchased the less expensive generic had it been available."  D.I. 352-1 at 30.  Class Plaintiffs dismissed the possibility that some Class members would have reimbursed only for branded Xyrem in their but-for world as a "largely hypothetical situation."  *Id.* at 31–32 (quotation omitted).

As "common evidence" of that phenomenon, Class Plaintiffs proffered projections from Dr. Rena Conti.  Dr. Conti used a "yardstick" method, which assumed that another drug's generic entry can be used to reliably predict what would have happened if generic Xyrem had launched earlier.  D.I. 352-24 ¶¶ 106–15.  Dr. Conti selected Provigil as a yardstick and used the rate at which Provigil consumers switched to a generic to model what consumers of Xyrem supposedly would have done.  *Id.* ¶ 127.[2]  On that basis, she predicted that a year after generic entry, generic Xyrem would have achieved ██████████ market share.  *Id.* at 161 (Attachment C.4); *see also id.* at 224 (Attachment D.4) (predicting, in the alternative, ██████████ based on Defendants' forecasts).

Class members are insurance companies and benefit plans ("payors"), not consumers, so assessing whether they experienced injury requires a second step: determining whether each payor reimbursed a consumer for a Xyrem purchase that would have been filled with the generic in the but-for world.  Dr. Conti defines a payor as injured if any of its insured consumers would ever have purchased the generic in Plaintiffs' but-for world.  *See* D.I. 352-24 ¶¶ 57(b), 80.  Class Plaintiffs claimed payors "typically provide prescription benefit coverage for a large number of beneficiaries."

---

[2] In the alternative, Dr. Conti used her interpretation of "Jazz's 2016 and 2017 forecasts" to model this figure.  D.I. 352-24 ¶ 127.

D.I. 352-1 at 31.  So they argued it was "exceedingly unlikely that members of the [Damages] Class would have been uninjured" because of both (1) the ostensibly high market share generic Xyrem would have quickly attained, and (2) the large number of prescriptions, for varying consumers, for which Class members ostensibly would have paid.  *See id.* at 30–31.

Defendants disagreed on both fronts.  On generic market share, they argued Dr. Conti had far overestimated the extent to which Xyrem prescriptions would have converted to a generic.  D.I. 409 at 17–23.  And they pointed out that, unlike in most cases, there is little difference here between payors and consumers for antitrust-injury purposes because Xyrem treats a rare disorder, meaning that most payors have few insureds who take the drug, and many have only one.  *Id.* at 15–17.  Defendants contended that Dr. Conti's counterfactual assumptions failed to provide classwide evidence of injury, leaving Class Plaintiffs with no common method of doing so.  *Id.* at 23–24.  Thus, they explained, Class Plaintiffs' need to prove injury and damages with individual evidence would predominate over any common questions present here.  *Id.* at 30–32.

Defendants supported those positions with analysis by Dr. James Hughes.  Dr. Hughes identified several unique characteristics of Xyrem that explain why generic entry was unlikely to erode the brand's market share as quickly or as extensively as in other cases.  D.I. 409-2 ¶¶ 66–96.  One of the most significant characteristics he identified was the high proportion of Xyrem prescriptions designated "dispense as written" (DAW), which augured minimal generic erosion because such prescriptions prevent generic substitution even in states with automatic-substitution laws.  *Id.* ¶¶ 93–96.  Dr. Hughes also quantified the relative rarity of payors' reimbursements for Xyrem, noting that, in the data then available, ███████████ reimbursed three or fewer members, and ███████ reimbursed only one.  *Id.* ¶ 105.  For those reasons, among others, he concluded that as many as 30 percent of payors may have been uninjured.  *Id.* ¶ 112(ii).

Class Plaintiffs challenged that analysis in two reply expert reports.  First, Dr. Conti claimed the high rate of DAW prescriptions was "not reflective of physicians choosing to prescribe the brand instead of the generic" and thus did not show what would have happened after generic entry in Plaintiffs' but-for world.  D.I. 450-2 ¶ 50.  Second, Laura Craft asserted the DAW data were "[p]otentially] unreliab[le]" and could reflect "inadvertent" physician behavior.  D.I. 450-3 ¶¶ 5–15.  Dr.

- 4 -

Conti also questioned Dr. Hughes's calculation of the proportion of payors that reimbursed three or fewer insureds for Xyrem, opining that variations in how the data recorded payors' names might have inflated those figures—although she did not "undertake this analysis for the full dataset." D.I. 450-2 ¶ 8. Class Plaintiffs therefore brushed off Dr. Hughes as having "offer[ed] no more than speculative scenarios about [payors] that may have escaped injury." D.I. 450 at 17.

The Court concluded Class Plaintiffs satisfied their predominance burden. D.I. 500 at 8–15. It pointed out that, across the pharmaceutical industry, generic erosion tends to be quick and extensive, *see id.* at 13–14, and that courts tend to reject claims that payor classes contain uninjured members because payors tend to reimburse for many prescriptions, *id.* at 9–10. It found that the data then available did not necessarily mean Xyrem would be meaningfully different from most other drugs. For instance, it noted that the high rate of pre-generic-entry DAW prescriptions may not translate into minimal generic erosion, observing that a DAW prescription has "no practical consequence" when there is no generic. *Id.* at 12–13. The Court also suggested "the layout of the [prescription] forms themselves" might have contributed to pre-generic-entry DAW prescriptions. *Id.* at 13. And it credited Dr. Conti's claim that Dr. Hughes had likely overstated the number of payors that insured fewer than three Xyrem patients. *Id.* at 10–11. Given those alternative potential explanations, the Court concluded that Dr. Conti's Provigil-based projection was "plausible," so it found her yardstick method was an acceptable classwide means of proving antitrust injury. *Id.* at 14–15. It certified the Damages Class under Rule 23(b)(3). *Id.* at 28.

## II.    New Developments

Dr. Hughes's initial analysis was based on Xyrem sales data through March 2022, and DAW data through January 2023. *See* D.I. 409-2 ¶¶ 95, 105; Ex. 1 (Hughes Suppl. Rpt.) ¶ 7 n.9. Two material changes have since occurred. *First*, Class Plaintiffs requested updated transaction data they hoped would support their forthcoming motion to expand the class definition to add new claims and a new damages theory. Those data contain more than fifteen months of information about sales of Hikma's authorized generic Xyrem, which was unavailable at class certification. Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 5, 7 & n.9. The new data also show what happened after Amneal Pharmaceuticals launched its authorized generic Xyrem in July 2023. *Id.* ¶ 33. Simply put, real-world, Xyrem-specific

evidence now sheds light on the market share generic entrants would have attained in Plaintiffs' but-for world.  *Second*, the opt-out deadline has now passed.  *See* D.I. 524 at 5.  The composition of the Damages Class is now knowable, which enables analysis of "the entire universe of Xyrem pharmacy transactions" particular to the payors in this Class.  *See* D.I. 409-2 ¶ 26.

Dr. Hughes performed new analysis to account for those changes.  Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 5–6.  He analyzed every transaction for all relevant payors during the first fifteen-plus months of generic entry: January 2023 through mid-April 2024.  *Id.* ¶¶ 7, 10.  To ensure that naming conventions in the data could not impact his conclusions, Dr. Hughes reviewed each entry to ensure that each payor was treated as only a single unit—and resolved any ambiguities in favor of combining similar entries.  *Id.* ¶¶ 13–16.[3]  He then examined (1) the rate at which generic Xyrem has eroded the brand's market share; (2) the rate of DAW prescriptions; and (3) the number of payors in the Class that ever reimbursed for generic Xyrem.  *Id.* ¶¶ 9–12, 17–37.

That new evidence contradicts Dr. Conti's initial analysis.  After fifteen months, generic Xyrem achieved ███████████ market share.  Ex. 1 (Hughes Suppl. Rpt.) at 26 (Exhibit 9).  That is partly because ██████████ of Xyrem prescriptions are still marked DAW.  *Id.*  Generic prices, however, have approached Dr. Conti's Provigil-based predictions.  *Id.* ¶¶ 21–22.  Thus, both price and non-price factors likely explain the failure of Dr. Conti's prediction of rapid, near-total generic erosion.  *Id.* ¶¶ 26–37.

Dr. Conti's forecast of widespread reimbursement for generic Xyrem has fared no better.  ████████████ certified Damages Class have few insureds who take Xyrem, and ████████████ has only one.  Ex. 1 (Hughes Suppl. Rpt.) at 19 (Exhibit 6B).  For that reason, reimbursements for Xyrem remain rare; ██████████████████ have not reimbursed for brand or generic Xyrem in the nearly sixteen months between generic entry in January 2023 and mid-April 2024.  *Id.* ¶ 12.  As for Class members that *have* reimbursed for Xyrem since January 2023, ████████████ ████████████████  *Id.* ¶¶ 12, 14.  And Class members with few insureds are much more likely than those with many insureds to fall into one of those two categories.  *Id.* ¶ 29.  The real-

---

[3] This analysis, however, hardly impacts Dr. Hughes's conclusions, suggesting that naming conventions in the data are immaterial.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 14.

world experiences of the ███ of Class members that have reimbursed only for branded Xyrem are strong evidence that they would have done the same in Plaintiffs' but-for world. *Id.* ¶¶ 19, 22. It is more difficult to glean whether Class members that have not reimbursed for Xyrem at all since generic entry would have reimbursed for generic Xyrem in Plaintiffs' but-for world, but those members resemble the brand-loyal members much more closely than they resemble the members that have reimbursed for the generic, suggesting that many of these Class members would have reimbursed only for branded Xyrem. *Id.* ¶¶ 11, 29. In sum, the new evidence indicates that at least ███ of Class members—and possibly many more—were uninjured.

## LEGAL STANDARDS

Under Rule 23(c)(1)(C), a class-certification order "may be altered or amended before final judgment." So the Court "may decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). Defendants should first identify "some change in the law or facts that justifies reversing the initial certification decision." *Bautista v. Valero Mktg. & Supply Co.*, No. 15-CV-5557 (RS), 2018 WL 11356583 (N.D. Cal. Dec. 4, 2018). But it remains Class Plaintiffs' "burden [to] demonstrate[e] that the Rule 23 requirements are satisfied." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019); *see also Marlo v. United Parcel Serv.*, 639 F.3d 942, 947 (9th Cir. 2011).

Rule 23(b)(3) requires Class Plaintiffs to show that "questions of law or fact common to class members predominate." Predominance means that "common, aggregation-enabling, issues" outweigh "non-common, aggregation-defeating, individual issues." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). A question enables aggregation if it can be answered "in one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). Although a district court has discretion in determining how to weigh issues in the predominance analysis, *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009), certification is usually inappropriate where the class would include "a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct," *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (quotation omitted).[4]

---

[4] *See also, e.g., Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *partially overruled*

Analysis of Class Plaintiffs' predominance showing "must be rigorous and may entail some overlap with the merits." *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 315 (N.D. Cal. 2014) (quotation omitted). That requires resolving disputes about whether evidence suffices as class-wide proof (or disproof) of an element of their claims. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983–84 (9th Cir. 2011). In other words, the Court need not resolve disputes about "ultimate issues on the merits," but it must resolve disputes about "whether the plaintiffs' evidence is *capable* of resolving a common issue central to the plaintiffs' claims." *Olean*, 31 F.4th at 667 (emphasis added). So where predominance is contested, a district court must determine whether the evidence shows "that an individualized inquiry will be necessary for each plaintiff." *E.g.*, *Cahill v. Nike, Inc.*, No. 3:18-CV-1477, 2022 WL 19226181, at *23 (D. Or. Nov. 22, 2022).

## ARGUMENT

### I.    New Injury Data Warrant Revisiting Certification.

Common proof of antitrust injury "often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (quotation omitted). On the record available when Class Plaintiffs moved for certification, the Court concluded individual-injury questions would likely not predominate because there "appear[ed] to be, at most, a *de minimis* number of completely uninjured [Class members]." D.I. 500 at 15. It did so after crediting Class Plaintiffs' and their experts' criticisms of Dr. Hughes's injury analysis. *Id.* at 8–14. Those experts' criticisms, however, crumbled on contact with reality.

More than fifteen months of data on Xyrem sales after generic entry support Dr. Hughes's initial estimates of uninjured class members. *First*, the data show far less generic erosion than Dr. Conti assumed would occur. *Second*, most DAW prescriptions have persisted since generic entry, showing that such prescriptions reflect meaningful, intentional prescriber behavior that limits generic erosion. *Third*, many Class members have never reimbursed for generic Xyrem, both because of limited generic erosion and because most Class members insure very few consumers of the drug.

---

*on other grounds*, *Olean*, 31 F.4th at 682 n.32 (overruling on Rule 23(b)(2) requirements); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), *abrogated on other grounds*, *Microsoft Corp. v. Baker*, 582 U.S. 23, 42 (2017) (abrogating on appellate jurisdiction).

New, real-world evidence—requested by Class Plaintiffs—thus suggests far lower rates of injury than the Court perceived based on the data available when it certified the Damages Class.

**A.      Generic Erosion Has Occurred Far Slower Than Dr. Conti Predicted.**

The rate at which generic Xyrem would have eroded the brand's market share in Plaintiffs' but-for world is a critical determinant of antitrust injury.  As the Court observed in its order certifying the Damages Class, a low rate of generic erosion "indicate[s] [a] high portion of uninjured class members."  D.I. 500 at 14.  The Court previously found the possibility of a low erosion rate unlikely based on the experiences of other drugs.  *Id.*  Now it may review data from Xyrem specifically.

Generic Xyrem took over a year to erode ███████ the sales of branded Xyrem, and it has still achieved ████████████ Ex. 1 (Hughes Suppl. Rpt.) ¶ 8.  Even those limited gains in market share do not necessarily reflect conversions from branded Xyrem; absolute sales of the generic ████ ████████ since October 2023, so its ██████████████████████ reflect ██████████████████ ███████████████████████████████████████████████ *Id.* ¶ 34 & n.40; *id.* at 28 (Exhibit 10).  Accordingly, there is also little reason to think generic Xyrem will achieve substantially more market share in the future.  *Id.* ¶ 34.  That generic-erosion rate is far below even the more modest of the rates Dr. Conti used as inputs to her model:

*Id.* at 5 (Exhibit 2).

Those real-world data are the best evidence of what would have happened in Plaintiffs' but-for world. For one thing, such data are inherently superior to forecasts, which, as Class Plaintiffs' expert economist Thomas McGuire explained in his deposition, ███████████████████ ██████████████████████████ There is also good reason to think generic Xyrem's actual experience mirrors what would have happened in Plaintiffs' but-for world. The actual generic-price discount—the ratio between the prices of the Hikma and Amneal generics and the price of Xyrem—has been similar to the ratio Dr. Conti used to construct her generic-erosion forecast. Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 21–22. Thus, Class members' incentives (or lack thereof) to induce consumers to switch to the generic were similar to what Class Plaintiffs assert they would have been in Plaintiffs' but-for world. *Id.* ¶ 22. Yet many consumers remained with the brand.

**B.      DAW Prescriptions Consistently Limit Generic Erosion.**

Much of the prior debate between Dr. Hughes and Dr. Conti about why consumers might or might not switch to a generic once available is now moot. Regardless of the combinations of incentives that influenced their choices, many consumers have, in fact, decided to remain with the brand. Ex. 1 (Hughes Suppl. Rpt.) ¶ 8. The rate of DAW prescriptions, however, remains relevant because it indicates the number of consumers (and their prescribers) who choose the branded drug over the generic for reasons besides its price—and are therefore unlikely to switch even if the generic were to become cheaper in the future. *See id.* ¶ 33.[5]

The Court previously observed that a DAW prescription has no practical consequence before generic entry. D.I. 500 at 13. That is no longer true after generic entry, and the new data show that DAW prescriptions remained high. █████████ of Xyrem prescriptions are still designated DAW by a prescriber or at a patient's request. Ex. 1 (Hughes Suppl. Rpt.) at 26 (Exhibit 9). And that figure omits ██████████████ of Xyrem prescriptions that are filled with the branded drug even though neither the prescriber nor the patient requests the branded drug—because the *Class member*

---

[5] Even so, the price *consumers* pay remains a powerful explanation why many consumers have remained with the brand. Comparing consumers' out-of-pocket costs among brand-loyal and non-brand-loyal Class members reveals ████████████████████████████████████ Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 30–31.

*itself* prefers the branded drug. *Id.* (Exhibit 9 & n.1). These trends are powerful real-world evidence confirming "the durability of physicians' and patients' preferences for the brand." D.I. 409-2 ¶ 95; *see also* Ex. 1 (Hughes Suppl. Rpt.) ¶ 33.



*Id.* at 26 (Exhibit 9).

Class Plaintiffs have tried to minimize the significance of DAW prescriptions by baldly asserting there is something untoward or confusing about Xyrem's prescription forms. D.I. 450-2 ¶ 50; D.I. 450-3 ¶¶ 12–15. Those assertions are unfounded. As Dr. Debra Stultz explains, Xyrem's prescription form is not confusing; she intentionally marks some prescriptions DAW because she believes the branded drug is a better option for those patients. Ex. 3 (Stultz Decl.) ¶¶ 13–16. That explanation supports Dr. Oneil Bains's opinion that the Xyrem prescription form makes it "clear" how a prescriber can "permit generic substitution" if he or she chooses. Ex. 4 (Bains Rebuttal Rpt.) ¶¶ 73–76. Dr. Bains, unlike Dr. Stultz, chooses not to mark Xyrem prescriptions DAW. *See id.* ¶ 47. But both prescribers make that decision deliberately. *Id.* ¶ 75; Ex. 3 (Stultz Decl.) ¶¶ 14–15.

- 11 -

More importantly, Class Plaintiffs' assertions about Xyrem's prescription forms are irrelevant to this case.  Plaintiffs do not challenge any Xyrem prescription form in this case as itself an antitrust violation.[6]  Their complaint does not so much as mention prescription forms.  D.I. 62.  So the forms would have been the same in Plaintiffs' but-for world—that is the defining attribute of a but-for world. *In re Zetia Antitrust Litig.*, No. 2:18-MD-2836, 2022 WL 4362166, at *16 (E.D. Va. Aug. 15, 2022) ("[A]ny economic conditions unlinked to the alleged anticompetitive settlement agreement remain in the But-For World.").  Class Plaintiffs cannot wish away inconvenient facts merely by assigning them the conclusory label "anticompetitive."  D.I. 450-2 ¶ 50.  Absent evidence or even allegations to the contrary, the high DAW rate reflects the same selections of the branded drug that would have occurred in Plaintiffs' but-for world.

### C.   Many Class Members Have Never Reimbursed for Generic Xyrem.

Unsurprisingly, those trends have led to many Class members' never reimbursing for the generic. ▉▉▉▉▉▉▉ have yet done so. Ex. 1 (Hughes Suppl. Rpt.) at 9 (Exhibit 3B). ▉▉▉▉ ▉ of Class members have not reimbursed for sodium oxybate at all since generic entry, reflecting the rarity of the condition it treats.  *Id*.  Of the Class members that have reimbursed for sodium oxybate, ▉▉▉▉ have reimbursed only for the branded drug.  *Id*.



---

[6] There is also no reason to think that Xyrem's prescription forms are unusual.  As Dr. Hughes explains, "numerous" publicly available prescription forms for other drugs use the same method for a prescriber to indicate DAW.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 37.

*Id.*

1

2     These data confirm that a Class member with few insureds who take Xyrem is far less likely

3 to reimburse for the generic than one with many such insureds.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 29; *id.*

4 at 21 (Exhibit 7B).  That conclusion is significant for two reasons.  *First*, ███████████ of Class

5 members have ██████████ insureds who take Xyrem.  *Id.* at 19 (Exhibit 6B).  That composition,

6 combined with the now-available evidence of low generic-reimbursement rates among those mem-

7 bers and the high rate of DAW prescriptions, indicates that the proportion of Class members that has

8 reimbursed for generic Xyrem is unlikely to increase substantially in the future.  *Id.* ¶¶ 19–20.  In

9 fact, that proportion has remained stable for several months.  *Id.* at 13 (Exhibit 4B).  *Second*, the Class

10 members that have not reimbursed for sodium oxybate since generic entry (Row 1 in the table above)

11 have, on average, even fewer insureds than those who have reimbursed only for the branded drug

12 (Row 2)—and far fewer than those who have reimbursed for the generic (Row 3).  *Id.* at 9 (Ex-

13 hibit 3B).  That composition suggests that in Plaintiffs' but-for world, these Class members would

14 have been less likely to reimburse for generic Xyrem than even ████████ figure described above

15 suggests.  *Id.* ¶ 29.  █████████████ is thus a conservative estimate of the proportion of Class

16 members for which there is no evidence of antitrust injury.

17                             *  *  *

18     New evidence undermining the basis of Class Plaintiffs' asserted ability to prove an element

19 of their claims with common evidence is a well-recognized reason for decertification.  For example,

20 this Court has decertified a Rule 23(b)(3) class that it had previously certified based on "repeated

21 assurances" that available data would eventually obviate individual inquiries about signs at nearly

22 200 different locations over time.  *Bautista*, 2018 WL 11356583, at *1, *3.  The plaintiffs' assertions

23 about what that data would show "failed to materialize," leaving only "piecemeal evidence," which

24 prompted this Court to reconsider (and reverse) its certification decision.  *Id.* at *6, *9.  In other

words, the Court concluded that "evidence not available at the time of certification disprove[d] Plaintiffs' contentions that common issues predominate." *See Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 579 (9th Cir. 2010), *rev'd on other grounds*, 564 U.S. 338 (2011).[7]

So too here. Class Plaintiffs argued that individual injury inquiries would be unnecessary because all or nearly all Class members suffered injury. D.I. 352-1 at 30–31. They defended that position by predicting that all of Xyrem's characteristics that distinguish it from the average drug would not prevent an average generic entry. Class Plaintiffs assured the Court that prediction would hold in their but-for world, and the Court's certification decision accepted those assurances.

But as explained above, Class Plaintiffs' prediction missed the mark, leaving Dr. Conti's yardstick analysis and Class Plaintiffs' predominance arguments unmoored. Provigil's experience turned out not to reveal "what would have happened when generic Xyrem entered the market," D.I. 500 at 14; new, real-world data reveal that ████████████████████████████████, Ex. 1 (Hughes Suppl. Rpt.) ¶ 8. Even if naming conventions in the data "increas[ed] the number of [Class members] with low reported numbers of insureds who take Xyrem," D.I. 500 at 10–11; new, real-world data reveal they do not affect the proportion of Class members that have reimbursed for generic Xyrem, Ex. 1 (Hughes Suppl. Rpt.) ¶ 14. In practice, a Xyrem consumer's probability of choosing the brand over the generic for any individual transaction is not independent of her prior choices, D.I. 500 at 11; new, real-world data show that brand-loyal consumers' choices remain stable over time, Ex. 1 (Hughes Suppl. Rpt.) ¶ 20. The lower sticker price of generic Xyrem did not cause all Class members to compel consumers to switch, D.I. 500 at 11–12; new, real-world data show the generic discount approached what Dr. Conti assumed it would be, and yet many consumers stuck with

---

[7] *See also, e.g.*, *Gutierrez v. Wells Fargo & Co.*, No. 07-CV-5923, 2009 WL 1247040, at *7–10 (N.D. Cal. May 5, 2009) (decertifying a class because the "record include[d] no foundation whatsoever to support plaintiffs' blanket and universal assumption" of injury); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-CV-2050, 2011 WL 2682967, at *6–7 (N.D. Cal. July 8, 2011) (decertifying a class after finding that the form of evidence underpinning its predominance finding "cannot serve as reliable common proof"); *Heredia v. Eddie Bauer LLC*, No. 16-CV-6236, 2020 WL 127489, at *3–6 (N.D. Cal. Jan. 10, 2020) (decertifying a class after finding that "new evidence shows that there are no common questions or common answers" on an important issue (quotation omitted)); *In re AutoZone, Inc.*, No. 3:10-MD-2159, 2016 WL 4208200, at *8–13 (N.D. Cal. Aug. 10, 2016) (decertifying a class after the plaintiffs' representation that a common question could be proven with the defendant's records proved incorrect); *Angeles v. US Airways, Inc.*, No. 12-CV-5860, 2017 WL 587658, at *3–4 (N.D. Cal. Feb. 13, 2017) (similar); *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 527–28, 547 (E.D. Cal. 2014) (decertifying sub-classes after considering evidence developed after certification).

the brand, Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 19–20.  Generic coupon programs such as Hikma's did not

obviate Jazz's coupons, D.I. 500 at 11–12; new, real-world data show that many brand-loyal consum-

ers ███████████████████████████████████████████████████████,

Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 30–31.  And DAW prescriptions now have "practical consequence,"

D.I. 500 at 12–13, because new, real-world data show they persisted after generic entry, Ex. 1

(Hughes Suppl. Rpt.) ¶ 33.  They also continue to reflect a genuine preference for brand loyalty.  Ex. 3

(Stultz Decl.) ¶ 16.

      The result of comparing Class Plaintiffs' assumptions to the new data they requested is that

antitrust injury—an essential element of their claims—cannot simply be presumed for each Class

member.  That conclusion is underscored by the most important pieces of new data: as explained

above, most Class members have not, in fact, reimbursed for generic Xyrem, including ███████ of

those with post-generic-entry reimbursements for sodium oxybate.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 12.

Because so many Class members appear to be uninjured, injury must be assessed for each member—

in nearly ████ unique cases.[8]  That evidentiary development warrants a fresh look at Class Plaintiffs'

showing on predominance.

## II.    Plaintiffs Have Not Shown That Common Questions Predominate.

      Class Plaintiffs' predominance showing cannot withstand reexamination.  Their motion for

certification identified only "Dr. Conti's analysis" as supposedly "common" evidence of injury.

D.I. 352-1 at 30–31.  The Court previously found her projections plausible, D.I. 500 at 14, but that is

no longer true now that real-world data paint a different picture.  Without that illusory common an-

swer—and faced with concrete evidence that many Class members were in fact uninjured—Class

Plaintiffs cannot prove that common questions would predominate over individual issues.  Far from

being able to resolve antitrust injury "in one stroke," *Olean*, 31 F.4th at 664, Class Plaintiffs must

now prove injury plaintiff-by-plaintiff for ███████ Class members.  As many courts have found in

analogous cases, that necessity destroys predominance.

---

[8] Dr. Hughes's "grouped" analysis shows ██████████████████, while his "ungrouped" analysis
shows ███.  *Compare* Ex. 1 (Hughes Suppl. Rpt.) at 7 (Exhibit 3A) with *id.* at 9 (Exhibit 3B).  To be
conservative, this brief uses the grouped figures throughout.

1

**A.      Dr. Conti's Model Cannot Prove Classwide Injury.**

2

Dr. Conti's model is incapable of reliably proving classwide injury because it assumes im-

3

portant facts that are inconsistent with the real-world evidence discussed above.  That evidence also

4

demonstrates that many Class members were likely uninjured.

5

**1.      The Court Must Resolve the Dispute Between Dr. Hughes and Dr. Conti.**

6

In certifying the Damages Class, the Court explained that "the particular generic erosion curve

7

applicable [here] is a question for the jury to decide," so it need not determine "whether Dr. Conti's

8

projection is correct."  D.I. 500 at 14.  That is an accurate statement of law, but there remains a dispute

9

about the adequacy of Dr. Conti's model that the Court must resolve at the certification stage.  The

10

Ninth Circuit distinguishes between disputes about the *persuasiveness* of an expert's model—which

11

district courts should not resolve—and those about the *capability* of an expert's model to prove a

12

Rule 23 factor—which district courts must resolve.  *Olean*, 31 F.4th at 665–66, 679.  A dispute is

13

about capability if it relates to "factors that may undercut the model's reliability (such as unsupported

14

assumptions, erroneous inputs, or nonsensical outputs such as false positives)."  *Id.* at 683.  And a

15

model is capable of showing predominance only if it "could sustain a reasonable jury verdict on the

16

merits of a common question as to all class members."  *Willis v. Koning & Assocs.*, No. 21-CV-819,

17

2023 WL 2541327, at *4 (N.D. Cal. Mar. 15, 2023); *see also Olean*, 31 F.4th at 667 (noting that that

18

evidence capable of establishing a Rule 23 factor must be able to "sustain[ ] a reasonable jury finding

19

on the merits of a common question" (quotation omitted)).

20

This dispute goes to capability because it is about unsupported assumptions rendering Dr.

21

Conti's model incapable of supporting a reasonable classwide jury finding.  In urging the Court not

22

to resolve the dispute between Dr. Hughes and Dr. Conti at the certification stage, Class Plaintiffs

23

relied on *Olean*, *see* D.I. 450 at 7–8, but that case undermines their position.  The district court in

24

*Olean* had already partially "resolved [a] methodological dispute between the experts" by concluding

25

the plaintiffs' model "was capable of showing that . . . class members suffered antitrust impact on a

26

class-wide basis, notwithstanding [a defense expert's] critique."  *Id.* at 680–81 (emphasis omitted).

27

The Ninth Circuit found that any lingering dispute went to persuasiveness, not capability, because the

28

defense expert asserted the plaintiffs had *entirely* "failed to prove antitrust impact on a class-wide

- 16 -

basis," leaving *no* "individualized questions regarding which [class] members . . . had suffered an injury." *Id.* at 681.

Dr. Hughes's critique here is different, and the outcome must be as well. He shows that even in Class Plaintiffs' but-for world, strong evidence indicates that at least a quarter of Class members did not experience injury. Ex. 1 (Hughes Suppl. Rpt.) ¶ 12. But because the ultimate question is what those Class members would have done in Plaintiffs' hypothetical but-for world, that evidence does not identify exactly which Class members did or did not experience injury. That indefiniteness is compounded by the fact that so many Class members that appear unlikely to reimburse for generic Xyrem have not reimbursed for sodium oxybate at all since generic entry, making certainty about their behavior unachievable. *Id.* ¶ 11. Accepting Dr. Hughes's critique thus reveals, not resolves, individualized questions about which Class members experienced injury. Leaving the accuracy of that critique unresolved before trial would impermissibly surrender to the jury the question whether Class Plaintiffs have proven predominance. *Cahill*, 2022 WL 19226181, at *24 & n.22; *see also Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 552 (N.D. Cal. 2021) (district courts must "resolve any factual disputes necessary to determine whether the Rule 23 requirements have been met.").

### 2. Dr. Conti's Model Cannot Sustain a Reasonable Classwide Finding.

The Court should resolve that dispute in favor of Dr. Hughes at this stage. As Dr. Hughes demonstrates, Dr. Conti's reliance on unsupported assumptions about generic erosion makes her model unreliable. In light of the real-world evidence demonstrating Xyrem's uniquely limited generic-erosion curve, no reasonable jury could credit Dr. Conti's yardstick-based generic-erosion estimates—on which her conclusions about antitrust injury and Class Plaintiffs' certification arguments depend. Her model is thus incapable of proving injury classwide.

Dr. Conti's claim that all or nearly all Class members were injured depends on her assumption that, in Plaintiffs' but-for world, "generic Xyrem would have rapidly captured the majority of brand Xyrem market share." D.I. 352-24 ¶¶ 75–80. She thus criticized Dr. Hughes's use of lower generic-erosion rates as "[t]he most critical" supposed error in his analysis. D.I. 450-2 ¶ 11. As soon as 6 months after generic entry, it became clear that Dr. Conti had erred: she predicted ███████ generic market share by then (or alternatively, ██████████), but the actual figure was ████████████.

D.I. 352-24 at 161 (Attachment C.4); *id.* at 224 (Attachment D.4); Ex. 1 (Hughes Suppl. Rpt.) ¶ 8; *id.* at 5 (Exhibit 2).

   That overestimation persists in the most current data.  Within fifteen months of generic entry, Dr. Conti assumed generic Xyrem would reach a market share of ████████████.  D.I. 352-24 at 161 (Attachment C.4); *id.* at 224 (Attachment D.4).  Based on the latter figure, she estimated that, throughout the Class period, "only 1.5% of [Class members] would have paid for only the brand and never the generic" and thus been uninjured.  D.I. 450-2 ¶ 15 & Table 2.  Generic Xyrem's actual market share at that point was ████████████.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 8.  As explained above, that figure means far more Class members than Dr. Conti predicted—████████████ ████—have reimbursed for only the brand and never for the generic since generic entry.  Such Class members in Plaintiffs' but-for world *could not* have been injured.  *In re Intuniv Antitrust Litig.*, No. 1:16-CV-12396, 2019 WL 3947262, at *3 (D. Mass. Aug. 21, 2019).  And as explained above, good evidence indicates that number would have been even higher in Plaintiffs' but-for world.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 29; *supra* Section I.C.

   Faced with those data, Class Plaintiffs will have little choice but to claim their but-for world would somehow have been different.  For example, Dr. Conti has previously dismissed evidence that other drugs experienced lower generic erosion than she predicted for Xyrem as having (inexplicably) been "contaminated by . . . alleged anticompetitive conduct."  D.I. 450-2 ¶ 11.  Such an assertion would be implausible here.  Class Plaintiffs' theory of injury holds that, because of lower generic prices in the but-for world, Class members would have "applied all the tools at their disposal to switch Xyrem patients to the lower-priced generic."  Ex. 1 (Hughes Suppl. Rpt.) ¶ 21 (quoting Dr. Conti's Merits Report ¶ 82).  So Dr. Hughes analyzed whether there is evidence that actual generic prices are substantially higher than they would have been in Plaintiffs' but-for world, which could arguably weaken Class members' incentives to use those "tools."  *Id.* ¶¶ 21–22.  There is not.  The actual ratio between generic and brand prices has been close to what Dr. Conti assumed it would be.  *Id.*  On Dr. Conti's own terms, the generic erosion that occurred in the real world and the resulting pattern of Class members' reimbursements is thus the best evidence of what would have happened in Plaintiffs'

but-for world.  Class members and consumers simply did not respond to generic entry as Dr. Conti predicted they would.

Class Plaintiffs may also argue that nearly sixteen months of data is inadequate to show that a Class member would not have reimbursed for the generic drug during the entire Class period.  That argument would be misguided for at least three reasons.  *First*, Dr. Conti predicted that generic erosion would already have been near its final mark within fifteen months of generic entry.  D.I. 352-24 at 161–65, 224–28.  *Second*, the consistently high rate of DAW prescriptions, combined with ███

███████████  indicates the same is true in the real world: generic Xyrem will likely erode little (if any) more market share with additional time.  Ex. 1 (Hughes Suppl. Rpt.) ¶¶ 33–34; *see also supra* Section I.B.  Bolstering that conclusion, the proportion of Class members that have reimbursed only for the brand—the figure that ultimately matters—has remained stable even as generic market share has slightly increased.  *Id.* ¶ 19.  *Third*, it is Class Plaintiffs' burden to show their evidence can prove classwide injury, not Defendants' burden to disprove injury.  *Landen v. Electrolux Home Prods., Inc.*, No. 13-CV-1033, 2014 WL 2980977, at *1 (C.D. Cal. July 1, 2014).  Defendants' point, in other words, is not that ████████ (or more) of Class members were conclusively uninjured; it is that Dr. Conti's model relies on critical assumptions that are contradicted by the best available evidence.  For those reasons, the yardstick on which Dr. Conti based her model collapses under evidentiary scrutiny.

Dr. Conti's unfounded assumption that her inapposite yardstick reflects reality prevents a rational jury from adopting her conclusion.  A model cannot prove predominance if it uses data that are "inadequa[te] . . . to perform the required analyses."  *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2017 WL 1391491, at *18 (N.D. Cal. Apr. 12, 2017) (finding such a model incapable of "showing . . . antitrust impact").  For example, a court recently excluded a yardstick-based damages model because the chosen yardstick was unsupported by evidence particular to the relevant drug.  *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 3:17-CV-50107, 2024 WL 1363544, at *7–9 (N.D. Ill. Mar. 29, 2024); *see also Series 17-03-615 v. Express Scripts, Inc.*, No. 3:20-CV-50056, 2024 WL 1834311, at *3–4 (N.D. Ill. Apr. 26, 2024) (similar).  Dr. Conti's model is analogously unreliable because its prediction of injury depends on a yardstick—derived from another drug—that

assumes far faster and more extensive generic erosion than actually happened here.  Thus, her yard-stick is a poor "stand in for the market under consideration," *City of Rockford*, 2024 WL 1363544, at \*7, which makes it a fatal "unsupported assumption," *see Olean*, 31 F.4th at 683.

For those reasons, Class Plaintiffs have failed to show that Dr. Conti's yardstick "model is . . . viable or cognizable," so it cannot support certification.  *See, e.g.*, *LSIMC, LLC v. Am. Gen. Life Ins. Co.*, No. 2:20-CV-11518, 2022 WL 4596597, at \*5–6 (C.D. Cal. Aug. 4, 2022).  That conclusion leaves their assertion that "all or virtually all [Class] members" experienced injury, D.I. 352-1 at 27, not just unsupported—but contradicted by the best evidence now available.

## B.   Individual Injury Assessments Would Overwhelm a Trial.

Yet none of this new evidence conclusively resolves whether any Class members were injured or, if so, which ones.  Nor have Class Plaintiffs identified any common evidence of antitrust injury besides Dr. Conti's unreliable model.  But antitrust injury is an essential element of their claims, proof of which, absent common evidence, "will require an individualized determination for each plaintiff." *See, e.g.*, *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022).  For the reasons explained below, that series of inquiries would predominate at trial.

### 1.   Plaintiffs Have Not Proven *De Minimis* Class Members Were Uninjured.

The best available evidence shows that at least ███████ of Class members were likely un-injured.  Ex. 1 (Hughes Suppl. Rpt.) ¶ 12.  Although some courts have held that a class may contain a few uninjured members, they have done so only where the number of such members is *de minimis*. *Loughlin v. Vi-Jon, LLC*, No. 20-CV-11555, 2024 WL 1347092, at \*13 (D. Mass. Mar. 29, 2024). But ██████ far exceeds the rate of uninjured class members that any court has deemed *de minimis*. The majority rule is that "5% to 6% constitutes the outer limits of a *de minimis* number."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (quotation omitted); *accord Mr. Dee's Inc. v. Inmar, Inc.*, No. 1:19-CV-141, 2023 WL 5436178, at \*14 (M.D.N.C. Aug. 23, 2023); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at \*20 (E.D. Pa. June 10, 2015) (finding 5 percent to be more than *de minimis*).  A few courts have suggested a limit near 10 percent.  *E.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47, 53–54 (1st Cir. 2018) (finding 10 percent greater than *de minimis*); *In re HIV Antitrust Litig.*, No. 19-CV-2573, 2022 WL

22609107, at \*25 (N.D. Cal. Sept. 27, 2022) (finding that "11% is arguably still a de minimis num-ber"). Dr. Hughes's conservative estimate of uninjured class members is ███████ that higher limit—and Class Plaintiffs have not proven the number is below *any* established limit.

Instead, Class Plaintiffs pointed out that there is no per se rule against certifying a class con-taining more than *de minimis* uninjured members. D.I. 352-1 at 27 (citing *Olean*, 31 F.4th at 669). True, yet that is not Defendants' argument. As explained below, the problem is that proving (or disproving) injury with individualized evidence here will outweigh any common questions because of the number of Class members, the definition of injury in this complex case, and the nature of the evidence needed to assess it. Even so, it is significant that courts regularly reject certification in reverse-payment cases where they find that more than *de minimis* putative class members were likely uninjured.[9] That trend reflects the "extensive individualized inquiry" needed to prove antitrust injury in such cases without common evidence, *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-CV-6997, 2018 WL 6573118, at \*14, (D.N.J. Oct. 30, 2018), not some per se rule not followed in the Ninth Circuit. This case is no exception.

**2.    Proving Injury Is Fact-Intensive and Cannot Be Done After Trial.**

███████████ of Class members still had never reimbursed for generic Xyrem almost six-teen months after generic entry. Ex. 1 (Hughes Suppl. Rpt.) at 9 (Exhibit 3B). But to prevail at trial, each Plaintiff must prove that it would have paid less for Xyrem in Plaintiffs' but-for world. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192 (3d Cir. 2020). Plaintiffs do not allege branded Xyrem would have been cheaper in their but-for world, so a Class member that would not have reimbursed for the generic cannot prove it overpaid. Thus, the new data is "evidence that at least some [C]lass members lack meritorious claims." *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir.

---

[9] *E.g.*, *Asacol*, 907 F.3d at 51–54; *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. 21-CV-3500, 2022 WL 17177267, at \*11–13 (E.D. Pa. Nov. 23, 2022); *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 12-CV-995, 2021 WL 2349828, at \*18–21 (D.N.J. June 7, 2021); *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 720–21 (E.D. Pa. 2020); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 402–04 (D.R.I. 2019); *Intuniv*, 2019 WL 3947262, at \*7–9; *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-CV-6997, 2018 WL 6573118, at \*11–14 (D.N.J. Oct. 30, 2018); *Vista Health-plan*, 2015 WL 3623005, at \*17–21; *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. Glaxo-SmithKline, PLC*, No. 04-CV-5898, 2010 WL 3855552, at \*26–28 (E.D. Pa. Sept. 30, 2010); *cf. also In re Lipitor Antitrust Litig.*, No. 3:12-CV-2389, 2024 WL 2865074, at \*20 (D.N.J. June 6, 2024) (refusing to certify a consumer class where Dr. Hughes showed that some consumers were likely uninjured and could be identified only with "further individualized inquiry").

2023).  That means, before proceeding, the Court "must determine whether the [Class Plaintiffs have] proven by a preponderance of the evidence that . . . a class-member-by-class-member assessment of [antitrust injury] will be unnecessary or workable."  *Id.*

Class Plaintiffs have not even tried to prove that individualized assessments would be workable—and for good reason.  Almost ████████ remain in the Damages Class.  Ex. 1 (Hughes Suppl. Rpt.) at 9 (Exhibit 3B).  A Class member's injury (or lack thereof) is determined in large part by the behavior of its insureds, as well as the relative costs of its reimbursements for branded and generic Xyrem.  With respect to Class members with few patients on Xyrem, the preferences and behavior of a few individual insured consumers can be dispositive.  As to insured consumers, proof of whether they would have switched to generic Xyrem in Plaintiffs' but-for world requires consideration of their incentives to do so, both financial and non-financial, including patient-assistance programs, coupons, whether and when the particular relevant Class member might have changed its formulary structure, whether a particular consumer's prescriptions have been marked DAW—*and* whether those consumers switched after generic entry in the real world.  *See generally* D.I. 409-2 ¶¶ 66–96; Ex. 1 (Hughes Suppl. Rpt.) ¶ 24.  As to Class members themselves, proof of whether their insureds' switching to the generic would have increased their reimbursements (even setting aside maximizer programs, rebates, or Medicare subsidies) additionally requires consideration of their individual contractual arrangements with Pharmacy Benefit Managers and how those would have been affected by generic entry in Plaintiffs' but-for world.  *See generally* D.I. 409-2 ¶¶ 134–41.  Entertaining that grinding sequence of ██ mini-trials would mire a trial in endless, repetitive inquiries into those details rather than resolving liability "in one stroke."  *Olean*, 31 F.4th at 664.  That sort of proceeding—a litany of "complicated questions of who was ever [injured]"—is inconsistent with a finding of predominance.  *Castillo*, 980 F.3d at 730–33.[10]

---

[10] *See also, e.g.*, *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469–71 (9th Cir. 2023) (affirming a finding of no predominance "[i]n light of the complexity of the individualized questions [about injury] and the absence of any representative evidence"); *Bautista*, 2018 WL 11356583, at *7 (finding that "192 mini-trials" on complex issues "is not a viable process"); *Robbins v. Phillips 66 Co.*, 343 F.R.D. 126, 131 (N.D. Cal. 2022) (finding no predominance where an element of the claim could "depend on facts unique to each claimant, necessitating mini-trials"); *Wollam v. Transamerica Life Ins. Co.*, No. 21-CV-9134, 2024 WL 1117050, at *5–6 (N.D. Cal. Mar. 13, 2024) (finding that the need to conduct about 1,000 mini-trials defeated predominance); *Andrade v. Am. First Fin., Inc.*, No.

1    Class Plaintiffs have instead asserted that such individualized assessments will be unneces-

2    sary. Primarily, that is because they insist "Dr. Conti has presented a model capable of demonstrating

3    class-wide impact." D.I. 450 at 9–16. For the reasons already explained, that is not so. As a fallback

4    position, Class Plaintiffs also suggest the Court may simply ignore the issue of antitrust injury until

5    some vaguely defined post-trial "claims administration process" during which Class members will

6    aver injury and damages by submitting affidavits. D.I. 352-1 at 37–38; D.I. 450 at 9, 21–22.

7    That suggestion lacks merit for at least two reasons. *First*, antitrust injury is about Defend-

8    ants' *liability*, not the allocation of damages. To even reach the claims-administration phase, "proof

9    must be furnished to cover each element of the [claim] for each class member," *Gutierrez*, 2009 WL

10   1247040, at *6, and antitrust injury is an essential element of those claims, *In re Nexium (Esompra-*

11   *zole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016). Class Plaintiffs' proposal amounts to disre-

12   garding this element of liability because it supposedly will not matter for final damages, on the theory

13   that "no harm, no foul." *See Asacol*, 907 F.3d at 56 (rejecting this argument). But Defendants have

14   a due-process right to "challenge . . . a plaintiff's ability to prove an element of liability," too—not

15   just the final calculation or allocation of damages. *Id.* at 53; *accord Rail Freight*, 934 F.3d at 625; *In*

16   *re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49–50 (S.D.N.Y. 2020). An injury IOU

17   cannot change the fact that "individualized inquiry is necessary to determine [Defendants'] *liability*

18   to any given class member as a threshold matter." *See Stiner v. Brookdale Senior Living, Inc.*, 665 F.

19   Supp. 3d 1150, 1196–99 (N.D. Cal. 2023) (finding that this problem defeated predominance).

20   Class Plaintiffs have repeatedly invoked *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th

21   Cir. 2017), yet that case does not help them. *Briseno* rejected the Third Circuit's class-certification

22   requirement that plaintiffs identify an administratively feasible method of ascertaining class members,

23   *id.* at 1132—but Defendants do not advance such an objection. In that context, the Ninth Circuit

24   recognized that "individualized claim determinations" may be conducted via affidavits "*after* a find-

25   ing of liability." *Id.* at 1131 (emphasis added). And that order was unimportant to class certification

26   in *Briseno* because of the nature of the plaintiffs' liability theory. The plaintiffs asserted "*aggregate*

27

28   _____

18-CV-6743, 2022 WL 3369410, at *5 (N.D. Cal. Aug. 16, 2022) (finding no predominance where "separate mini-trials" would be required for each class member).

liability" based on every sale the defendant had made.  *Id.* at 1132 (emphasis added).  That is why the Ninth Circuit noted that identifying uninjured class members "will not affect a defendant's liability in every case": the defendant in *Briseno* would be liable (or not) for the same conduct regardless of the composition of the class.  *Id.*

The same is not true here.  Class Plaintiffs do not claim that every sale of Xyrem caused antitrust injury—only those that would supposedly have been sales of generic Xyrem in their but-for world.  D.I. 450 at 21.  This case thus presents the more common scenario where alleged liability arises from "the sum of damages suffered by a number of individuals, such that proving that the defendant is not liable to a particular individual because that individual suffered no injury reduces the amount of the possible total damage."  *Asacol*, 907 F.3d at 55.  Put differently, it matters that many Class members are likely uninjured because this case is nothing more than "the aggregation of individual claims," and uninjured class members' claims cannot be proven.  *Id.* at 56.  Class certification is a procedural device; it cannot give a plaintiff a claim it would not be able to assert individually, and it cannot prevent defendants from asserting defenses to those individual claims.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).  So plaintiff-by-plaintiff proof must play out as part of the determination of Defendants' liability—before any damages are calculated or allocated.

*Second*, even if aggregate damages were all that mattered, Class Plaintiffs unjustifiably treat that calculation as independent from the defects with their supposed common proof.  Uninjured Class members "will have no bearing on the aggregate damages award," they claim, "because Dr. Conti removed all brand loyal transactions from her aggregate damages calculation."  D.I. 450 at 21–22 (emphasis omitted).  But of course, their offer of proof for that calculation is the same yardstick model that so badly overestimated generic erosion within the first fifteen months of entry.  So that model is no more capable of reliably estimating aggregate damages than it is of showing injury.  *See, e.g.*, *LSIMC, LLC*, 2022 WL 4596597, at *6 (finding no predominance where an unsupported model failed to "establish harm and damages on a class-wide basis").

Pivoting to a more realistic generic-erosion input would not solve this problem (although Class Plaintiffs have not proposed doing so).  Again, aggregate damages are simply the sum of individual Class members' damages, not some abstract figure derived only from Defendants' alleged

- 24 -

conduct.  *Asacol*, 907 F.3d at 55.  And evidence that would not suffice as proof in individual actions cannot do so in a class action.  *See Tyson Foods*, 577 U.S. at 458–59.  Given the relatively low rates of generic erosion and injury present here, no individual plaintiff could rely on such a model to prove its individual damages because that would amount to an impermissible inference "extrapolated from a representative sample of injured class members."  *Cf. Utne v. Home Depot U.S.A., Inc.*, No. 16-CV-1854 (RS), 2022 WL 16857061, at *5 & n.7 (N.D. Cal. Nov. 10, 2022) (excluding aggregate damages calculations lacking "enough specificity as to the class members") (citing *Gutierrez*, 2009 WL 1247040, at *4).  Thus, even a revised model based on real-world generic erosion would not be capable of proving damages on a classwide basis because it could not "reasonably sustain a jury verdict" on any individual plaintiff's damages.  *Cf. Olean*, 31 F.4th at 667–68.  Accordingly, the jury could not render any aggregate-damages award without considering the plaintiff-by-plaintiff evidence described above—and that would occur before any claims-administration process.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court decertify the Damages Class.

Dated: June 13, 2024

Respectfully submitted,

By: */s/ Jeffrey Faucette*
Jeffrey Faucette (State Bar No. 193066)
**SKAGGS FAUCETTE LLP**
Four Embarcadero Center
Suite 1400 PMB #72
San Francisco CA 94111
Tel: (415) 295-1197
Fax: (888) 980-6547
jeff@skaggsfaucette.com

By: */s/ Jack E. Pace*
Jack E. Pace III (*pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
jpace@whitecase.com

By: */s/ Heidi K. Hubbard*
Heidi K. Hubbard (*pro hac vice*)
Stanley E. Fisher (*pro hac vice*)
Benjamin M. Greenblum (*pro hac vice*)
Alexander S. Zolan (*pro hac vice*)
Teagan J. Gregory (*pro hac vice*)
Lauren H. Uhlig (*pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, D.C. 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com
sfisher@wc.com
bgreenblum@wc.com
azolan@wc.com
tgregory@wc.com
luhlig@wc.com

Kathryn J. Mims (*pro hac vice*)
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, D.C. 20005
Telephone: (202) 626-3600
Fax: (202) 639-9355
kmims@whitecase.com

Heather M. Burke (SBN 284100)
**WHITE & CASE LLP**
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
Tel: (650) 213-0300
Fax: (650) 213-8158
hburke@whitecase.com

*Attorneys for Defendants Hikma
Pharmaceuticals USA Inc., Hikma
Pharmaceuticals PLC, Eurohealth (U.S.A.),
Inc., Roxane Laboratories, Inc., and
West-Ward Pharmaceuticals Corp.*

*Attorneys for Defendants Jazz
Pharmaceuticals, Inc., Jazz Pharmaceuticals
Ireland Limited, and Jazz Pharmaceuticals
Public Limited Company*

DEFS.' MOT. TO DECERTIFY

Case No. 3:20-md-02966-RS-SVK

**FILER'S ATTESTATION**

I, Alexander S. Zolan, am the docket user whose identification and password are being used to file Defendants' Motion to Decertify the Damages Class.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

/s/ Alexander S. Zolan

1

**CERTIFICATE OF SERVICE**

2      I, Alexander S. Zolan, hereby certify that I have caused to be served a copy of all materials

3  filed under seal on at least one counsel of record for each plaintiff and each defendant via

4  electronic mail on June 13, 2024.

5      Executed on June 13, 2024 in Washington, D.C.

6

7                                      */s/ Alexander S. Zolan*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28