# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: XYREM (SODIUM OXYBATE) ANTITRUST LITIGATION<br><br>This Document Relates To: All Actions | Case No. 3:20-md-02966-RS-SVK |

**REBUTTAL EXPERT REPORT OF ONEIL BAINS**

**January 19, 2024**

**HIGHLY CONFIDENTIAL**

1

## I. INTRODUCTION

1. Defendants Jazz Pharmaceuticals, Inc., Jazz Pharmaceuticals Ireland Limited, and Jazz Pharmaceuticals Public Limited Company have retained me to provide expert testimony in connection with *In re Xyrem (Sodium Oxybate) Antitrust Litigation*, No. 3:20-md-02966-RS-SVK. Specifically, I have been retained to provide testimony about my experience diagnosing and treating patients with narcolepsy, including prescribing Xyrem and Xywav; my interactions with Express Scripts Specialty Distribution Services, Inc. ("ESSDS"), the single, central pharmacy through which Xyrem and Xywav are distributed; and my experience with the Xywav and Xyrem Risk Evaluation and Mitigation Strategy (REMS).

2. The statements set forth in this declaration are based on my personal knowledge. I am being compensated at my usual rate of $900.00 per hour for the time spent preparing this declaration, and my compensation is not contingent on the outcome of any matter or any of the opinions provided below. I have no financial interest in the outcome of this matter.

3. My opinions are based on my 22 years of experience in the field of sleep medicine—treating patients, including those with narcolepsy; teaching medical students and residents; and conducting research in the field—and on the materials cited herein.

4. This declaration is based on information currently available to me. To the extent that additional information becomes available, I reserve the right to supplement my opinions or to address any information obtained, or positions taken, based on any new information that comes to my attention throughout this proceeding. I also reserve the right to testify more generally on background matters related to sleep medicine and narcolepsy, and to testify using demonstrative exhibits illustrating my opinions.

II. **QUALIFICATIONS**

5. Since 2002, I have practiced as a full-time sleep medicine specialist at Virginia Mason Medical Center in Seattle, Washington. I received my M.D. Degree in 1996 from the State University of New York (SUNY) Upstate Medical University. I completed my internal medicine residency at Emory University Medical Center, and later completed a fellowship in sleep medicine at Stanford University Medical Center.

6. I have been a member of the American Academy of Sleep Medicine since 2001. I am currently board certified in sleep medicine and have taken and passed this exam 3 times to maintain certification.

7. Throughout my career practicing medicine, I have exclusively treated patients with sleep disorders, including insomnia, sleep apnea, sleep disordered breathing, and narcolepsy. Over the course of my 22 years in practice, I perform approximately 4500 office visits per year. This includes new and return patients, and includes all sleep complaints and conditions. Each year, I treat approximately 175 patients with narcolepsy, including 100 patients with cataplexy, and all have severe excessive daytime sleepiness ("EDS"). I also treat approximately 100 patients with idiopathic hypersomnia ("IH"), another neurologic disorder characterized by severe EDS. Of these patients with narcolepsy, with and without cataplexy, and idiopathic hypersomnia, approximately 100 are taking Xyrem, and another 50 are taking Xywav.

8. My *curriculum vitae*, which I've attached as **Exhibit A** to this declaration, recites a fuller description of my background and qualifications.

4

of my patients who were taking Xyrem are now taking Xywav due to its lower sodium content. Indeed, some of my patients who suffered from hypertension (which has been directly linked to excessive sodium intake) while they were taking Xyrem, have had their blood pressure decrease to normal levels once they started taking Xywav. While Dr. Wynn is correct that no clinical study has shown a dose-related increase in blood pressure with Xyrem use,[53] it is accepted that high sodium increases the risk of developing heart disease, and Xyrem has very high sodium content. And many of my patients started directly on Xywav without ever taking Xyrem, either because they have IH (for which Xyrem is not indicated) or because it was the best decision for them.

43. Nevertheless, some of my patients on oxybate therapy have decided to continue taking Xyrem. As I described earlier, many patients suffering from narcolepsy struggled with their symptoms for years or decades before discovering Xyrem. Some of these patients, whose symptoms of narcolepsy are currently controlled with Xyrem, are reluctant to try yet another treatment option. In my experience, about 25–30% patients switching from Xyrem to Xywav need to re-titrate their nightly dose, a process that can be disruptive to these patients' lives. As a result, many of my patients are still taking Xyrem. And Jazz continues to make Xyrem available to patients who, through discussions with their physician, prefer to remain on Xyrem.

### G. Authorized Generic Sodium Oxybate

44. An authorized generic is "an approved brand name drug that is marketed without the brand name on its label. . . . An authorized generic may be marketed by the brand name drug company, or another company with the brand company's permission."[54]

---

[53] Wynn Rep. ¶ 57.

[54] FDA, *FDA List of Authorized Generic Drugs*, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-

45. On January 3, 2023, Hikma Pharmaceuticals launched an authorized generic version of Xyrem.[55] Different from a generic version of Xyrem, this product is the exact same product as Xyrem, but does not carry the "Xyrem" brand name or label. On July 3, 2023, Amneal Pharmaceuticals also launched an authorized generic. I understand that both of these authorized generics use the REMS established by Jazz Pharmaceuticals to distribute their products.

46. As described above, many patients spend years obtaining a diagnosis for narcolepsy, and numerous additional years finding a medication regimen appropriate for them. For this reason, some patients are unwilling to switch to a generic or even an authorized generic. Similarly, there is often a transaction cost to switching medications, requiring patients to fill out different insurance or pharmacy paperwork. The prescriber or patient can request that a prescription be filled "dispensed-as-written," or DAW, meaning that the pharmacy should not replace the brand with a generic or authorized generic.

47. In some cases, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug."[56] I understand that the authorized generics currently on the market have slightly lower wholesale prices than branded Xyrem. However, I also understand that after coupons and patient assistance programs are applied, patients themselves experience little difference in cost between the authorized generic and branded Xyrem. This may factor into why some patients request that their Xyrem prescription

---

drugs#:~:text=Is%20an%20Authorized%20Generic%20Drug,brand%20name%20on%20its%20label (last visited Jan. 12, 2024).

[55] FDA, *FDA List of Authorized Generic Drugs*, https://www.fda.gov/media/77725/download?attachment (last updated Jan. 4, 2024) (attached list).

[56] *Id.*

be filled DAW, rather than with an authorized generic. Nevertheless, as a prescriber, I am often put under pressure by insurers to omit "DAW" from any prescriptions, given that the cost for generics and authorized generics can be less than for branded products for insurers—even if the costs are similar for the patients themselves. To discourage DAW prescriptions, some insurance companies keep track of prescribers who prescribe brand rather than authorized generic or generic versions of a product. If a prescriber has a higher percentage of prescriptions for a brand product (written DAW), the insurer can impact the prescriber's status as "in-network" for patients, or may refuse to cover patients seeking care from the prescriber. In my experience, this is an effective way for insurance companies to ensure that prescribers avoid prescribing DAW, even when the out-of-pocket cost is the same for patients for both branded, authorized generic, and generic products.

48. Given that Xyrem is an orphan medicine and prescribed to relatively few patients, there are a number of prescribers who only prescribe Xyrem to at most a handful of patients. I suspect that prescribers who prescribe Xyrem to only a small handful of patients or fewer may be more inclined to prescribe Xyrem DAW particularly if the patient has had an excellent response to the medication. In these cases, I suspect that insurance companies are less likely to push back on the DAW prescription because the paucity of patients means that the impact of the brand's cost on the insurance company's bottom line is negligible.

**H.    Lumryz**

49. In 2022, the FDA approved another sodium oxybate product, Lumryz. Produced by Avadel Pharmaceuticals, Lumryz is an "extended-release oral suspension" used to treat adults

71. I understand that Lumryz utilizes a multiple pharmacy REMS. Lumryz has not been on the market for long enough to assess sufficiently the efficacy of this REMS in terms of mitigating the abuse, misuse, and diversion of sodium oxybate. Notwithstanding the current lack of data, the use of multiple pharmacies to distribute sodium oxybate raises concerns for me as a prescriber because there is simply not the same level of control over the distribution chain when multiple wholesalers/distributors and multiple pharmacies enter the picture. The same is true when there are multiple REMS systems both distributing oxybate products—the more touchpoints, the more potential there is for abuse, misuse, and diversion. For example, while the single central pharmacy has a single point of distribution, a multiple pharmacy approach introduces multiple points of distribution, and thus multiple points for diversion and error. Further, while I can trust that the single central pharmacy has real-time, historical insight into each and every prescriber, patient, and prescription, the potential for gaps in data is greater when more actors and more touchpoints are involved. This would not necessarily prevent me from prescribing Lumryz, but it would take a period of time to trust their ability to execute a "bulletproof" REMS program.

## VIII. THE XYREM PRESCRIPTION FORM

72. I understand that one of Plaintiffs' experts, Dr. Conti, asserts that the prescription form for Xyrem is set up in a confusing way that may cause doctors to indicate inadvertently "Dispense as Written" (DAW) without intending to. I understand that Dr. Conti attributes the confusion to the prescription form's two lines for the physician's signature: if the physician signs on the left side, that indicates DAW, and if they sign on the right, that indicates that substitution is allowed.

73. As a physician and prescriber of Xyrem, I do not find the prescription form confusing.[63] It is clear to me that if I want to indicate DAW, then I should sign the form on the left-side signature line (which is labeled "Dispense as Written" immediately below the line), but if I want to permit substitution to the generic, I should sign on the right-side signature line (which is labeled "Substitution Allowed" immediately below the line).

74. I understand that Dr. Conti further asserts that the left-side signature line is the one that someone would most naturally sign. I disagree. I, like any responsible physician, carefully read the prescription form and sign where appropriate based on the instructions on the specific prescription form.

75. I have never accidentally signed the form on the left side to indicate DAW when I intended to permit generic substitution.

76. Further, my colleagues and I carefully read the Xyrem label before prescribing Xyrem and prescribe in accordance with the label.

## IX. CONCLUSION

77. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are true; and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: January 19, 2023  By: /s/ *Oneil S Bains MD*
Oneil S. Bains, M.D.

---

[63] Xywav and Xyrem REMS, *Xyrem Prescription Form*, https://xywavxyremrems.com/pdfs/XYREM_Prescription_Form.pdf (last visited Jan. 10, 2024).