UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: XYREM (SODIUM OXYBATE)
ANTITRUST LITIGATION

This Document Relates To: All Actions

Case No. 20-md-02966-RS

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

**PUBLIC REDACTED VERSION**

## I.   INTRODUCTION

In this multidistrict litigation, Plaintiffs[1] aver manufacturers of the drug sodium oxybate, which is most commonly known by the brand name Xyrem, violated federal and state antitrust laws relating to the allegedly delayed market entry of generic versions of Xyrem. Xyrem is a central nervous system depressant used to treat narcolepsy. There are three pending summary judgment motions. Defendants Jazz Pharmaceuticals, Inc., Jazz Pharma Ireland, Ltd., and Jazz Pharmaceuticals plc ("Jazz") have filed a motion for summary judgment, and Jazz and Defendants Hikma Labs, Inc., Hikma Pharmaceuticals USA Inc., Eurohealth (USA) Inc., and Hikma Pharmaceuticals plc ("Hikma") (collectively, "Defendants") have filed a motion for summary

---

[1] Plaintiffs are A.F. of L.–A.G.C. Building Trades Welfare Plan; City of Providence, Rhode Island; Government Employees Health Association; New York State Teamsters Council Health and Hospital Fund; Self-Insured Schools of California; UFCW Local 1500 Welfare Fund; and Ruth Hollman ("Class Plaintiffs"); Humana Inc.; Health Care Service Corporation; Molina Healthcare, Inc.; Blue Cross Blue Shield of Florida, Inc.; Health Options, Inc.; and United Healthcare Services, Inc.

United States District Court
Northern District of California

judgment. Plaintiffs have filed their own motion for partial summary judgment. Oral argument on these motions was heard on July 19, 2024. For the reasons set forth below, each of the motions for summary judgment is granted in part and denied in part.

## II. BACKGROUND

The factual background of this case has been detailed in prior orders and need not be recounted at great length here. Sodium oxybate is a drug that has been used to treat narcolepsy since the 1960s. A company named Orphan Medical (acquired by Jazz in 2005) won Food and Drug Administration approval to sell sodium oxybate under the brand name Xyrem in 2002. Though Jazz's financial position immediately after this acquisition was precarious, Plaintiffs allege it was able to raise prices by more than 800% between 2007 and 2014, which led to a corresponding rise in Jazz's stock price. Nine potential competitors indicated an intent to enter the sodium oxybate market between July 2010 and November 2017. Despite this, to date, no Jazz competitor has brought a bioequivalent ("AB-rated") drug—otherwise known as a "generic"—onto the market. Hikma finally entered the sodium oxybate in January 2023 with an authorized generic ("AG") version of Xyrem. Amneal Pharmaceuticals LLC ("Amneal") launched its AG Xyrem in July 2023.

In April 2024, final approval was granted for a settlement between Class Representative Plaintiffs, Amneal, and Lupin Ltd., Lupin Pharmaceuticals Inc., and Lupin, Inc. ("Lupin"). In this settlement, Amneal and Lupin agreed to pay a combined $3,400,00.00 to Class Representative Plaintiffs to be used for continued litigation against the non-settling defendants. The other Plaintiffs in this MDL settled their claims against Amneal and Lupin separately. The remaining Defendants are Jazz, Hikma, and Par Pharmaceutical, Inc. ("Par"), though Plaintiffs' claims against Par are currently stayed due to Par's bankruptcy proceedings.

The parties were initially directed to select ten of the original seventeen claims for relief included in the CAC to proceed through initial litigation. Of these ten, three have been dismissed. The current phase of litigation involves seven claims for relief. Claims 7–11 of the Consolidated Amended Class Action Complaint ("CAC") each aver conspiracy and combination in restraint of

trade under state law; Claim 12 avers monopolization and monopolistic scheme under state law; and Claim 17 seeks declaratory and injunctive relief for violations of the Sherman Act, 15 U.S.C. § 2.

### III. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, discovery, and affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of proof to "make a showing sufficient to establish . . . the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the movant succeeds in demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3; see also Fed. R. Civ. P. 56(c)(1)(B).

Evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

### IV. JAZZ'S SUMMARY JUDGMENT MOTION

Jazz seeks summary judgment on (1) Plaintiffs' sham litigation claims, (2) Plaintiffs' claims concerning Jazz's REMS-related conduct, (3) whether the Opt-Out Plaintiffs are entitled to damages for Jazz's Xywav launch, and (4) whether the laws of California, Kansas, New York, and Tennessee recognize Plaintiffs' theory of unilateral monopolization against Jazz.

### A. Sham Litigation Claims

Plaintiffs have agreed no longer to pursue allegations of sham litigation in this action and that such allegations should be dismissed. Accordingly, Plaintiffs' sham litigation allegations are dismissed.

### B. REMS-Related Conduct

Jazz seeks summary judgment on Plaintiffs' REMS-related claims. Specifically, Plaintiffs contend (1) Jazz's petitioning of the FDA to maintain a single central pharmacy distribution model constituted unlawful sham petitioning and (2) the positions Jazz took in shared REMS negotiations with generics was part of Jazz's anticompetitive scheme. Jazz argues Plaintiffs have failed to put forward a triable issue of fact regarding whether Jazz's alleged conduct either constitutes antitrust violations or injured Plaintiffs.

#### 1. Unlawful sham petitioning

Jazz claims, now that discovery in this case has concluded, that it is clear "no reasonable juror could conclude that Jazz's REMS petitioning lacked a valid basis in law or fact for its position," and, thus, that its conduct satisfied the sham petition exception to the *Noerr-Pennington* doctrine. Dkt. 657-1, at 8. Under that doctrine (and as explained at the motion to dismiss stage), "[t]hose who petition government for redress are generally immune from antitrust liability." *Prof. Real Estate Investors, Inc. v. Columbia Pics. Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"). This doctrine recognizes that "the Sherman Act does not punish 'political activity' through which 'the people . . . freely inform the government of their wishes.'" *Id.* (quoting *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961) ("*Noerr*")). *Noerr-Pennington* immunity ceases to apply where petitioning activity is a "mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Id.* (quoting *Noerr*, 365 U.S. at 144). This sham exception has two elements. First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. Second, the petitioner's "subjective motivation" must have been "to thwart competition." *FTC v. AbbVie Inc.*, 976 F.3d 327, 360 (3d Cir. 2020) (citation omitted). The Supreme Court has noted a "successful

1    effort to influence government action certainly cannot be characterized as a sham." *PRE*, 508 U.S.

2    at 58 (cleaned up).

3           There is no dispute the FDA conditioned its 2002 approval of Xyrem on the drug having a

4    restricted distribution program in order to mitigate the risks that Xyrem's active ingredient,

5    gamma-hydroxybutyric acid ("GHB"), would be misused. The parties disagree about the extent to

6    which Orphan Medical's inclusion of a single central pharmacy in its proposed distribution plan

7    was a specific "requirement" of the FDA's approval. Plaintiffs describe the single central

8    pharmacy as a voluntary component of Orphan Medical's proposal; Jazz argues the "single central

9    pharmacy was a condition of Xyrem's approval in 2002." Dkt. 657-1, at 10. In 2009, Jazz

10   submitted a proposal for a REMS for Xyrem using multiple pharmacies for the FDA's review.

11   Jazz supported its proposal with peer-reviewed studies showing that the risks associated with

12   Xyrem distribution relating to GHB abuse had declined. The FDA acknowledged the low number

13   of reported cases of abuse and misuse of Xyrem in recent years.

14          Around the same time, Jazz pointed to similar evidence in proposing multiple pharmacy

15   distribution for another sodium oxybate drug (Rekinla) that would treat fibromyalgia. The FDA

16   denied this New Drug Application ("NDA") for Rekinla but did not do so because of Rekinla's

17   proposed multi-pharmacy distribution plan. Dkt. 657-19, at 4 n.7. Then, in 2011 (after Hikma had

18   submitted its ANDA application), Jazz changed its position concerning multiple pharmacies and

19   proposed a single pharmacy REMS for Xyrem. In 2012, the FDA asked Jazz to modify its Xyrem

20   REMS to permit distribution through multiple pharmacies. Jazz opposed this modification. The

21   FDA insisted on the change, and Jazz initiated the Agency's dispute resolution procedures. The

22   Agency argued over the course of this process that there was no data to support the idea a single-

23   pharmacy REMS was necessary to ensure the safe distribution of Xyrem.

24          Years later, in February 2015, the FDA approved the Xyrem REMS and its single central

25   pharmacy requirement. The Agency, however, was very clear that its approval:

26                 should not be construed or understood as agreement with Jazz that
                   limiting dispensing to a single pharmacy is the only way to ensure that
27                 the benefits of Xyrem outweigh the risks . . . . We continue to be

28
                                                                ORDER ON MOTIONS FOR SUMMARY JUDGMENT
                                                                CASE NO. 20-md-02966-RS

                                              5

United States District Court
Northern District of California

concerned that limiting distribution of Xyrem to one pharmacy imposes burdens on patient access and the healthcare delivery system.

Dkt. 690-2, at 41.

At the motion to dismiss stage, Defendants attempted to invoke *Noerr-Pennington* immunity on the grounds the FDA approved the Xyrem single-pharmacy REMS. The district judge previously assigned to this case rejected this argument, reasoning that while a successful action is an objectively reasonable one under that doctrine, "Defendants' REMS petitions are not 'successful' on the allegations here." MTD Order at 64. It so held in part because of the FDA's statement that its approval did not signal agreement with Jazz but rather represented an attempt to halt the drain on agency resources caused by the dispute. *Id.* (quoting FDA memorandum clarifying that FDA's approval "should not be construed or understood as agreement with Jazz" and noting the dispute, which was dragging on, "had the potential to affect only a small number of drug products"). The district court found this sort of "passive" government approval insufficient for *Noerr-Pennington* immunity to apply. *Id.* (citing *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001)).

The same conclusion is warranted here; there is a factual dispute regarding whether Jazz could have reasonably expected success on the merits of its petition to FDA. Jazz points to several salient facts in seeking a different result, including the FDA's repeated acknowledgments of a single pharmacy requirement, the "FDA-mandated black box warning referencing distribution through a single central pharmacy" on Xyrem labels, and that Orphan Medical's initial recommendation of a single central pharmacy was reasonable. Dkt. 657-1, at 9. The FDA's conclusion in 2002 regarding a single central pharmacy does not mean the same requirement would remain reasonable years later.[2] Indeed, Jazz acknowledges how, years later, it proposed a multiple pharmacy distribution framework for a drug, Rekinla, that would be prescribed far more

---

[2] The parties dispute whether Jazz or the FDA had the initial burden to explain why having multiple pharmacies was an unsafe option or that multiple pharmacies would be an equally safe option, respectively. This disagreement need not be resolved here because regardless of where this initial burden lay, a factual dispute over whether Jazz could have reasonably expected success on the merits remains.

widely than Xyrem. A reasonable factfinder could decide no reasonable litigant could expect

success on the merits of a petition seeking a single pharmacy requirement where, along with other

facts, that litigant had previously taken the opposite stance for that same drug and another one

more widely-prescribed.

Though the FDA eventually approved Jazz's proposed REMS along with its single central

pharmacy requirement, Plaintiffs' evidence that the FDA's approval was "passive," not meant to

be "construed or understood as agreement with Jazz," and intended to end the drain on the

Agency's resources remains compelling. *See* Dkt. 693-2. The FDA told Jazz more than once that it

should revise its REMS to allow for multiple pharmacies, but Jazz refused. Jazz itself, at various

points, changed its position on what the science said about the necessity of a single pharmacy. *See*

Dkt. 690-2, at 41 (contending Jazz "deviated from its previous proposals"). Whether the FDA's

approval of Jazz's single pharmacy requirement was "on the merits" is a question for the jury.

Indeed, it is a given that any time a government agency approves a requirement it does not

necessarily do so on the merits.

### 2.  Shared REMS negotiations

The 2007 Food and Drug Administration Amendments Act created a process by which

generic companies could negotiate a shared REMS with the brand company. *See* 21 U.S.C. § 355-

1(i)(1)(C)(i)-(ii) (amended Dec. 19, 2019). Jazz and the generic companies engaged in shared

REMS negotiations between 2012 and 2015. Jazz seeks summary judgment on Plaintiffs'

arguments that Jazz engaged in anticompetitive conduct during these shared negotiations.

Plaintiffs point to Jazz's advocacy for a voting structure requiring its consent before material

changes to the REMS could be made and for a provision that all members of the shared REMS

would share liability for its failures. When the parties were unable to negotiate a shared REMS

with Jazz, they applied for a waiver of the requirement. The FDA eventually granted the requested

waiver of the requirement that the generic companies had to negotiate a shared REMS with Jazz,

noting that negotiations had been taking longer than for other drugs.

Plaintiffs argue that Jazz's conduct related to shared REMS negotiations has to be

United States District Court
Northern District of California

United States District Court
Northern District of California

1   considered as part of Jazz's broader monopolization scheme. *See Eastman v. Quest Diagnostics*

2   *Inc.*, No. 15-cv-415, 2015 WL 7566805, at *14 (N.D. Cal. Nov. 25, 2015) (noting courts must

3   look to aggregate, synergistic effects of alleged exclusionary practices in assessing potential

4   violations of antitrust laws). Jazz rejects the suggestion it could have violated antitrust laws merely

5   by "failing to reach agreement on a forced sharing of resources between competitors." Dkt. 657-1,

6   at 14.

7           There is evidence in the record that Jazz considered the shared REMS requirement—at

8   least before a waiver—to be a useful barrier to generic competition. *See* Dkt. 690-2, at 44 (citing

9   P.D.2. Exs. 441, 442, 443). In *In re Suboxone (Buprenorphine Hydrochloride & Naloxone)*

10  *Antitrust Litigation*, the district court declined to grant summary judgment where it was "efforts at

11  delaying and ultimately stalling the shared REMS process that caused the anticompetitive effect."

12  622 F. Supp. 3d 22, 82 (E.D. Pa. 2022). A reasonable juror could find that Jazz's conduct during

13  the shared REMS negotiations was part of an anticompetitive scheme to delay generic entry into

14  the sodium oxybate market.

15              **3. Injury**

16          Jazz argues that even assuming its REMS-related conduct was unlawful, no reasonable

17  juror could find that this conduct injured Plaintiffs. This is so, Jazz contends, because the FDA

18  granted Hikma a waiver in 2017 allowing it to create its own REMS but that Hikma would not

19  have brought a generic to market before 2017. Plaintiffs have to show a "direct causal connection

20  between the alleged violation and the alleged injury" to prevail on an antitrust claim. *Magnetar*

21  *Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015) (citation omitted). Jazz argues

22  Hikma would not have launched a generic before January 2017 because Hikma was unwilling to

23  launch "at risk" of infringement damages. *See* Dkt. 657-1, at 15 (citing testimony from Hikma's

24  President of Generic Drugs that Hikma knew an unsuccessful launch at risk had the potential to

25  bankrupt the company). The relevant standard, Jazz argues, is not whether Hikma *could* have

26  launched a generic before January 2017, but whether a reasonable jury could find Hikma "would

27  have" launched at risk. Dkt. 715-1, at 5 (citing *In re Wellbutrin XL Antitrust Litig. Indirect*

28

*Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017)).

Plaintiffs respond that because Hikma "chose to engage in unlawful, anticompetitive conduct," the relevant question is actually "what a rational, law-abiding company in Hikma's position would have done absent the violations." Dkt. 690-2, at 34 (citing *In re Glumetza Antitrust Litig.*, No. 19-cv-5822, 2021 WL 1817092, at *13 (N.D. Cal. May 6, 2021) ("Our jury will craft the but-for world, in which defendants acted rationally and lawfully, based on measured deviation from the record.")). Though Jazz points to one witness's belief Hikma would not have launched at risk, Plaintiffs' expert Donald Allen opined that Roxane (Hikma's immediate predecessor) "*did* seriously consider an at-risk launch." Dkt. 690-2, at 34; *see also* Dkt. 655-3, Allen Rpt. ¶ 97 ("Roxane indicated that it was 'on track' for a launch on October 1, 2014"). A reasonable jury could rely on evidence of Roxane's plans to launch at risk in concluding a rational, law-abiding company in *Hikma's* position would have done so. At the end of the day, though the issue is a close one, there is a factual dispute about whether Hikma would have launched at risk, and summary judgment on this issue is inappropriate.

## C. Xywav Damages

Next, Jazz seeks summary judgment on the Opt-Out Plaintiffs' allegations of anticompetitive conduct and resulting damages related to Xywav. Jazz contends Opt-Out Plaintiffs have no theory of anticompetitive conduct upon which to base their claim for damages, especially given that Plaintiffs have not alleged a viable "product hop" theory. Rather, patients are still able to choose between Xyrem and Xywav depending on the recommendations of their treating physicians. An antitrust plaintiff has to show "a direct causal link between the anticompetitive practice and plaintiff's damages" to establish proximate causation. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008). Jazz argues Opt-Out Plaintiffs can make no such showing here because they have no evidence "anticompetitive conduct by Jazz coerced patients to choose or doctors to prescribe Xywav." Dkt. 715-1, at 6–7.

Opt-Out Plaintiffs respond that Xywav is an appropriate alternative for Xyrem "for much of the patient population" and that the lack of available generic versions of Xyrem—the result of

United States District Court
Northern District of California

Defendants' alleged anticompetitive conduct—caused them to pay for branded Xywav instead. Dkt. 690-2, at 45–46. Additionally, Opt-Out Plaintiffs point to evidence that Xyrem and Xywav are therapeutic equivalents such that providers pick between the two based on cost. *See* Dkt. 690-2, at 46 (claiming "Non-Class Plaintiffs could use their utilization management tools . . . to instead pay for the lower priced version for most patients"). Indeed, Jazz acknowledges AG Xyrem has "negatively impacted and [is] expected to continue to negatively impact Xyrem *and Xywav* sales for patients with narcolepsy." Dkt. 694-7, at 37 (emphasis added). Thus, there is evidence some patients who were previously prescribed Xywav were then prescribed AG Xyrem when it came to market. *See* Dkt. 690-2, at 47.

However, that some Xywav patients eventually switched to generic Xyrem is an insufficient basis to sustain Opt-Out Plaintiffs Xywav damages claim. There is an insufficient causal link between the anticompetitive conduct Jazz is accused of engaging in relating to Xyrem and Opt-Out Plaintiffs' reimbursements for Xywav.[3] Opt-Out Plaintiffs cite *Lorix v. Crompton Corp.* for the proposition that Minnesota state law (which governs United's damages claims) takes the expansive view that antitrust damages are recoverable for direct and indirect injuries caused by an antitrust violation. 736 N.W.2d 619, 626 (Minn. 2007). Proximate cause remains a relevant consideration under Minnesota law. *See id.* at 631. Indeed, in *Lorix*, the plaintiff was "an end user of a consumer good whose price was inflated by anticompetitive conduct earlier in the chain of manufacture." *Id.* Here, Opt-Out Plaintiffs point to no anticompetitive conduct anywhere in Xywav's production history to connect to the claimed overcharges. Opt-Out Plaintiffs are not entitled to damages where they reimbursed for a different drug for which no anticompetitive conduct is alleged. Defendants are entitled to summary judgment to the extent Opt-Out Plaintiffs seek damages related to Xywav reimbursements.

---

[3] Courts have required a showing of coercion (that patients were coerced into purchasing a drug) even in cases where plaintiffs allege an anticompetitive product hop theory. *HIV I*, 656 F. Supp. 3d at 976.

**D. Unilateral Monopolization**

Jazz seeks summary judgment to the extent Plaintiffs pursue unilateral monopolization claims under the laws of California, Kansas, New York, and Tennessee. It asserts those four states do not recognize such claims when they are based on unilateral conduct, ostensibly in reference to Jazz's REMS-related petitioning of the FDA and Jazz's positions in the shared REMS negotiations. *See Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 642 (N.D. Cal. 2020) (dismissing state law claims to the extent based on unilateral action). Plaintiffs agree California, Kansas, and New York state law do not permit unilateral monopolization claims but contend Tennessee law does not preclude such claims premised on unilateral conduct. More persuasive, though, are those cases that have interpreted the text of the relevant Tennessee statute to require concerted action. *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1314 (D. Kan. 2018); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 284 (D. Mass. 2004).

Next, Plaintiffs dispute the implication that their REMS-related claims are premised on unilateral conduct. For instance, Plaintiffs argue that Jazz, with respect to Jazz's REMS-related conduct, did not act unilaterally but rather worked with Express Scripts (the single central pharmacy) in order actually to dispense Xyrem. That Jazz distributed Xyrem through a single central pharmacy does not change the unilateral nature of either its FDA petitioning or its actions in the shared REMS negotiations. Plaintiffs do not explain how the fact Jazz used an entity to dispense Xyrem (or that Jazz sent a dispute resolution letter to the FDA) changes the unilateral nature of its petitioning conduct. Jazz's motion for summary judgment is granted to the extent Plaintiffs based their monopolization claims under the laws of California, Kansas, New York, and Tennessee on Jazz's unilateral REMS petitioning.

**V. DEFENDANTS' SUMMARY JUDGMENT MOTION**

Defendants collectively seek summary judgment on (1) the alleged reverse payments in Jazz's patent litigation settlements with Hikma, Par, Lupin, and Amneal, (2) Defendants' alleged conspiracy to allocate the market, (3) causation due to a lack of evidence any ANDA filer could

have launched a generic before 2024, (4) Humana's and HCSC's claims for damages on behalf of

non-parties for lack of standing, and (5) Plaintiffs' claim for injunctive relief.

### A.  Reverse Payments

#### 1.  Jazz-Hikma Settlement

##### i.      *Implicit no-AG agreement*

At the motion to dismiss stage, the district court found an implicit no-AG agreement could

constitute a reverse payment under *Actavis*. MTD Order at 30–34; *see also In re Intuniv Antitrust*

*Litig.*, 496 F. Supp. 3d 639, 671–72 (D. Mass. 2020) (finding existence of implicit no-AG

agreement question of fact for jury). It did so in part because Jazz agreed not to "license its AG

through any other third party for Hikma's first 180 days selling Hikma AG," there was evidence

Jazz's own AG manufacturing capacity was limited, and based on a showing that brand

manufacturers "almost never launch their own AG." MTD Order at 32, 34. Jazz contends

discovery has revealed no evidence upon which a reasonable factfinder could rely to substantiate

Plaintiffs' theory that Jazz and Hikma entered into an implicit or *de facto* no-AG agreement.

Under the terms of its settlement with Hikma, Jazz explicitly retained its right to launch an

AG. Of course, this does not preclude the possibility that the parties had an implicit no-AG

agreement. *See, e.g.*, *In re Intuniv*, 496 F. Supp. 3d at 671–72. Moreover, Jazz has supplied

branded Xyrem, Xywav, a Hikma AG, and an Amneal AG without evidence of supply shortages.[4]

Plaintiffs do not seriously dispute that Jazz had the manufacturing capacity to bring an AG to

market had it wanted to do so, but suggest that Jazz's decision not to market an AG given this

capacity evidences an implicit no-AG agreement. Nor is there evidence to suggest Jazz would

have been unable to distribute an AG had it decided to market one. On the other hand, the Jazz-

Hikma settlement included an explicit bar on third-party distribution of a Jazz AG for the first six

months following Hikma's generic entry. Given, Plaintiffs argue, that "[b]rand name

---

[4] Plaintiffs' expert Allen agreed Jazz was capable of launching an AG. Dkt. 655-4, Allen Reply
Rpt. ¶ 10 n.6.

United States District Court
Northern District of California

1    manufacturers almost never launch their own AG," Dkt. 690-2, at 8, the fact that Jazz could have

2    distributed its own AG would not preclude a reasonable juror from relying on the third-party

3    limitation as evidence in favor of finding an implicit no-AG agreement.[5]

4         Defendants also contend the royalty structure of the settlement is not evidence of an

5    implicit no-AG agreement. That royalty structure provided Hikma would pay an increasing royalty

6    rate (i.e. share a higher percentage of its profits) as its AG took more market share from Jazz.

7    Defendants claim Jazz did not *sacrifice* anything when it agreed to the royalty provisions; in both

8    the but-for world and the real world, Jazz retained its right to launch an AG. The fact that the

9    profit-sharing agreement agreed to by the parties might have benefitted them both, however,

10   would not preclude a factfinder from determining that escalating royalties incentivized Jazz to

11   delay launching its AG and "evidence[d] the substantial value [the generic manufacturer] secured

12   through the no-AG agreement." *FWK Holdings LLC v. Shire PLC*, No. 16-CV-12653-ADB, 2017

13   WL 11449668, at *8 (D. Mass. Oct. 10, 2017). By entering the royalty agreement, Jazz gave up its

14   ability to market its own AG—at least as profitably as it otherwise could—because doing so

15   would reduce the profits Jazz would earn through royalties.

16        Defendants also argue the royalty structure did not necessarily incentivize Jazz to remain

17   out of the AG market because Plaintiffs' expert Dr. Thomas McGuire found it still would have

18   been profitable for Jazz to launch an AG under some factual scenarios. *See* Dkt. 658-1, at 9–10

19   (attempting to distinguish *In re Intuniv*). On the other hand, McGuire conducted a sensitivity

20   analysis, using Jazz's own forecasts, that determined Jazz would have made "an additional $█

21   million by withholding an in-house AG during just the first six months." Dkt. 690-2, at 9. A

22   reasonable juror could rely on such evidence in concluding an implicit AG agreement existed.

23   Indeed, Jazz's internal forecasts assumed Jazz would not market its own AG alongside Hikma's.

24   The mere *possibility* Jazz could have profitably entered the AG market would not preclude a

---

[5] That said, as Defendants note, there would appear to be limited upside to Jazz in using a third party to distribute a Jazz AG given that it would have to be distributed through the same central pharmacy as Xyrem. *See* Dkt. 658-1, at 8 n.19.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    factfinder from finding the aforementioned royalty structure was part of an implicit agreement to

2    incentivize the opposite outcome.

3          Further, Defendants' claim that "there is no evidence of penalties to Jazz should it choose

4    to launch an AG" disregards the fact that such a launch would push prices and royalty rates down.[6]

5    *See id.* The royalty structure to which Jazz agreed could be reasonably deemed part of a plan to

6    control how much of the sodium oxybate market Hikma could access. This accords with the

7    premise of a reverse payment antitrust claim that "the patentee seeks to induce the generic

8    challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in

9    the competitive market." *FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013). An implicit no-AG

10   agreement potentially provides value to Hikma by ensuring it would retain a certain share of

11   supracompetitive profits. Once Hikma was going to enter the Xyrem market, it would have been in

12   both Jazz's and Hikma's interests to prevent price competition. There is no rule that any implicit

13   no-AG agreement must have hurt Jazz to have constituted a reverse payment to Hikma.

14   Defendants are not entitled to summary judgment to the extent Plaintiffs claim Hikma's royalty

15   obligations were part of an implicit no-AG agreement.

16                          ***ii.    Below-market royalty rates***

17         The next question is whether a reasonable juror could find a market rate for royalties exists

18   such that Hikma received a below-market royalty rate from Jazz constituting a reverse payment.

19   Defendants say no evidence of a market rate has been presented that would allow jurors to

20   conclude Jazz charged Hikma a below-market royalty rate. They argue that Plaintiffs' own experts

21   rely on a study that found royalties of ■ to ■%—what Hikma agreed to pay after its 180-day

22   exclusivity period—fall within the relevant industry benchmark of 50 to 92%. Dkt. 658-1, at 12.[7]

23

24   [6] Defendants also argue Plaintiffs try to have it both ways by labeling the "■% profit share to
     Jazz" as both "too high" and "too low." Dkt. 658-1, at 10–11. As Plaintiffs explain, however, the
25   ■% profit share with Jazz is both "high enough to disincentivize Jazz from launching a second,
     Jazz AG" and low enough "to incentivize Hikma to continue selling the Hikma AG" rather than
26   enter the market with an ANDA. Dkt. 690-2, at 13.

27   [7] Fed. Trade Comm'n, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*
     (2011) ("FTC Report"), https://www.ftc.gov/sites/default/files/documents/reports/authorized-

28

Michael Johnson (one of Plaintiffs' experts) opines that "the arms-length market rate royalty split between a brand and a generic distributor for an authorized generic is about 80% to 90% to the brand," and, thus, that Jazz's ██% royalties were low enough to constitute a reverse payment to Hikma. Dkt. 690-2, at 13 (citing Dkt. 655-34, Johnson Rpt. ¶ 93). The FTC Report to which Johnson refers seems to support a considerably lower market rate for royalties in the settlement context. FTC Report at 77 n.55. Defendants point to evidence about royalty rates paid in the particular context of Hatch-Waxman litigation with a first-filer in support of their claim that the relevant market rate for royalties is lower than Plaintiffs say it is. Dkt. 658-1, at 12. Of the settlements to which Defendants point, at least two appear to have been challenged as anticompetitive. The parties' competing claims concerning what constitutes the market rate for royalty payments raise a factual dispute about the relevant market rate for royalties such that summary judgment on the question is inappropriate.

Defendants next assert that under *Actavis*, a below-market royalty theory cannot constitute a reverse payment at all. *Actavis* explained that in traditional examples of patent settlements, "a party with a claim (or counterclaim) for damages receives a sum equal to or less than the value of its claim." 570 U.S. at 152. The Supreme Court contrasted these settlements, which do not necessarily implicate antitrust liability, with "reverse payment settlements" where "a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market." *Id.* Defendants contend Jazz cannot be deemed to have made a reverse payment to Hikma by charging too little in royalties and, therefore, leaving money on the table. Under this theory, royalties are unobjectionable forward payments from the generic to the brand. *See Mayor & City Council of Balt. v. AbbVie, Inc.*, 42 F.4th 709, 715–16 (7th Cir. 2022) ("*Mayor of Baltimore*") (interpreting *Actavis* to have rejected "treating an 'implicit net payment' as equivalent to an actual payment").

_____

generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

United States District Court
Northern District of California

1    In *Mayor of Baltimore*, the Seventh Circuit found no reverse payment where potential

2    biosimilar producers began litigation with plausible monetary claims and were not paid to delay

3    their entry into the market. *Id.* Defendants say that here, too, *Jazz* had a claim for infringement

4    damages and eventually walked away from settlement with the promise of royalties. Dkt. 716-1, at

5    8–9 (noting Plaintiffs withdrew their allegations that Jazz's patent infringement claims were a

6    sham).[8] This case, however, tracks *Actavis*'s concern with reverse payment settlements where a

7    party "with no claim for damages" (here, a generic at the start of patent litigation) "walks away

8    with money simply so it will stay away from the patentee's market." 570 U.S. at 152. This case is

9    thus distinguishable from *Mayor of Baltimore*, where the court found each of the biosimilar

10   producers had plausible monetary claims from the start. Further, "a reverse payment can take

11   various forms," and there is no basis to make "immune from judicial scrutiny" a royalty

12   arrangement that plausibly underpays the patentee. *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963,

13   1015–16 (N.D. Cal. 2023) ("*HIV I*"). To do so would simply encourage actors seeking to keep

14   generics out of the market to become more creative about how to transfer value. *Actavis* does not

15   demand such a rule.

16                      ***iii.    Acceleration clauses***

17   Defendants also seek summary judgment to the extent Plaintiffs assert the acceleration

18   clause in the Jazz-Hikma settlement constituted a reverse payment to Hikma. The Jazz-Hikma

19   settlement provided that Hikma could bring the AG to market before January 2023 if a generic

20   entered the market without Jazz's permission or Jazz's unexpired patent claims were invalidated

21   or rendered unenforceable. This acceleration clause is alleged to be a potential source of value to

22   Hikma by disincentivizing other generic manufacturers from coming to market. *See* Dkt. 655-41,

23   McGuire Rpt. ¶ 56. Similarly, acceleration clauses in Jazz's settlements with other generic

---

[8] Jazz would not have had a claim for infringement damages unless a generic had launched at risk
and then been found liable for patent infringement. *See In re Nexium (Esomeprazole) Antitrust
Litig.*, 42 F. Supp. 3d 231, 281–82 (D. Mass. 2014) (noting AstraZeneca's entitlement to damages
after Teva marketed drug at risk before AstraZeneca won infringement case).

1   manufacturers are claimed to have threatened all involved entities with competition should any

2   generic producer decide to deviate from the scheme to restrict generic output. Defendants argue

3   there is no evidence the acceleration clauses were either understood by Jazz and Hikma to

4   disincentivize generic entry or that they actually deterred generic entry.

5        Defendants insist that acceleration clauses are commonplace, and the only way Hikma's

6   acceleration clause could have acted as a reverse payment was based on a but-for world Plaintiffs

7   used to but no longer allege (one with a settlement but not acceleration clause). Now, according to

8   Defendants, Plaintiffs' but-for world is one in which no settlement would have occurred at all, and

9   "Plaintiffs offer no proof that the Hikma acceleration clause provided anything of value to which

10  Hikma was not already entitled." Dkt. 716-1, at 10. This is because Hikma would be entitled to

11  regulatory exclusivity in both the settlement and but-for worlds. Plaintiffs respond that whether

12  their theory of how the acceleration clause is anticompetitive (compared to an alternative

13  settlement) aligns with their damages models has no bearing on their ability to present evidence to

14  a jury concerning the threat the acceleration clause posed to competition. Dkt. 690-2, at 16.

15       To the extent Plaintiffs suggest the acceleration clause conferred value to Hikma by

16  preserving its first-filer exclusivity, that argument does not persuade. In *In re Revlimid &*

17  *Thalomid Purchaser Antitrust Litigation*, the district court dismissed allegations an acceleration

18  clause constituted a reverse payment where that clause "merely preserved the status quo"—the

19  filer's exclusivity period—despite the settlement. No. 19-7532 (ES) (MAH), 2024 WL 2861865,

20  at *66 (D.N.J. June 6, 2024). The acceleration clause conferred no additional value on the

21  pharmaceutical company in that case, Natco, because Natco was entitled to first-filer exclusivity

22  both before and after settlement. *Id.* at 65. So too here; Hikma merely retained first-filer

23  exclusivity by virtue of its settlement with Jazz. Plaintiffs offer no proof of the additional value the

24  acceleration clause supposedly provided Hikma in terms of exclusivity. This is so in part because

25  Plaintiffs provide no basis for a reasonable juror to conclude Hikma would have agreed to a

26  settlement without an acceleration clause or otherwise compromised its regulatory exclusivity.

27       Plaintiffs' next asserted basis for finding the acceleration clause an anticompetitive reverse

payment is that it deterred generics from entering the sodium oxybate market. After Hikma's settlement, several generics "abandoned their challenges to the Xyrem patents." Dkt. 690-2, at 16. Plaintiffs point to McGuire's testimony that acceleration clauses discourage generics from continuing to engage in patent litigation in linking the Jazz-Hikma acceleration clause to these abandoned challenges. Dkt. 655-43, McGuire Dep., at 57. The concept that acceleration clauses disincentivize generics from continuing litigation because they would "bear 100% of the cost and risk associated with continuing the patent challenge" but be entitled to only a fraction of the rewards makes sense. *See In re Revlimid*, 2024 WL 2861865, at *66. Hikma's settlement with Jazz removed it from the concerted challenge to Jazz's patents, but the acceleration clause ensured Hikma would enjoy the rewards of any successful patent challenge. A reasonable juror could assess the incentives the acceleration clause created in combination with evidence several generics subsequently abandoned their patent challenges and conclude the acceleration clause conferred value and was anticompetitive. *Compare id.* at *66 (rejecting this theory under distinguishable factual circumstances where generics were, on plaintiffs' own allegations, *not* disincentivized from patent litigation and filing ANDAs). Plaintiffs also point to the fact that some generics later entered into their own settlements with Jazz where they "received a slice of higher-priced authorized generic sales that came from reduced generic competition." Dkt. 690-2, at 17. Summary judgment on the argument the acceleration clause constituted a reverse payment is unwarranted.

### 2.   Reverse Payment Allegations in the Jazz-Par, Jazz-Lupin, and Jazz-Amneal Settlements

Defendants seek summary judgment on Plaintiffs' claims of reverse payments relating to Jazz's settlements with Par, Lupin, and Amneal. They argue that none of the reverse payments Plaintiffs allege (the acceleration clauses, cash payments for ostensibly-saved litigation costs, and volume-limited licenses to sell the Xyrem AG) are supported by sufficient evidence.

#### i.   *Acceleration clauses*

Defendants seek summary judgment with respect to the acceleration clauses in Jazz's

United States District Court
Northern District of California

1  settlements with Par, Lupin, and Amneal because, as above, "there is no evidence that the

2  acceleration clauses were designed to, and in fact did, deter other generics from pursuing their

3  patent litigations" and because they were not monetarily valued. Dkt. 658-1, at 18. For the same

4  reasons this argument fails in the context of the Jazz-Hikma settlement (discussed above), it fails

5  here.

6        *ii.*      **Litigation fees**

7       Second, Defendants argue Plaintiffs have no evidence Jazz's separate settlements with Par

8  ($▮ million), Lupin ($▮ million), or Amneal ($▮ million) exceeded Jazz's expected litigation

9  costs in each case. Indeed, where a reverse payment "reflects traditional settlement considerations,

10  such as avoided litigation costs or fair value for services, there is not the same concern that a

11  patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of

12  noninfringement." *Actavis*, 570 U.S. at 156. One of Plaintiffs' experts, McGuire, opined that Jazz

13  would have spent only $5 to 6 million on litigation with Par, Lupin, and Amneal and that the $▮

14  million Jazz actually paid far exceeded that range. McGuire Rpt. ¶ 226. Plaintiffs, moreover,

15  contend the settlements with Par, Lupin, and Amneal have to be evaluated as part of the aggregate

16  value Jazz transferred across all its reverse payments and that this aggregate sum far exceeds how

17  much Jazz would have spent in litigation costs.

18       McGuire's assessment that Jazz saved only $5 to 6 million in litigation costs by settling

19  with Par, Lupin, and Amneal is too conclusory for Plaintiffs' allegations that Jazz's cash payments

20  constituted reverse payments to survive summary judgment. Defendants claim Plaintiffs have to

21  show, before reaching a rule of reason analysis, that "each challenged term" of a settlement—in

22  isolation—was large and unjustified. Dkt. 716-1, at 12 (citing *United Food & Com. Workers Loc.*

23  *1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1066 (N.D. Cal. 2014)). This view is not

24  universally held. *See, e.g.*, *In re HIV Antitrust Litig.*, No. 19-cv-2573, 2023 WL 5670808, at *8

25  (N.D. Cal. Mar. 19, 2023) ("*HIV II*") (finding "whether a payment is large and unjustified is *part*

26  of the rule of reason analysis"). Nor do all courts look at challenged terms in isolation to assess

27  whether they are large and unjustified reverse payments. *See In re Wellbutrin XL Antitrust Litig.*,

28

133 F. Supp. 3d 734, 753–54 (E.D. Pa. 2015), *aff'd*, 868 F.3d 132. Even considering the cash payments Jazz paid in asserted saved litigation costs within the context of the broader settlement agreements, there is insufficient evidence to generate a genuine dispute of material fact that these cash payments were reverse payments. Plaintiffs' sole support for their claim that Jazz paid the generics more than it saved in litigation costs is McGuire's conclusory assertion that Jazz would have saved the same amount in litigation costs by settling with Amneal, Lupin, and Par as it saved from settling the Hikma litigation. This is insufficient to create a disputed question. Defendants are entitled to summary judgment to the extent Plaintiffs claim that Jazz's cash payments to Amneal, Lupin, and Par for saved litigation costs constituted reverse payments.

### iii.      *Volume-limited licenses*

In Defendants' view, the volume-limited licenses Jazz agreed to in its settlements are indistinguishable from commonplace, procompetitive licenses, and Jazz had no obligation to grant unlimited licenses. Defendants also dispute Plaintiffs' evidence, *see* McGuire Rpt. ¶¶ 219–222, that these licenses were based on below-market royalties to be paid by the generics to Jazz, arguing that "Plaintiffs lack proof that Jazz must charge a 'market' rate that these royalties fall 'below.'" Dkt. 716-1, at 13. They insist this evidence reflects a claim never made in Plaintiffs' complaints and that, therefore, cannot preclude summary judgment.[9]

Licensing agreements are often subjected to rule of reason antitrust scrutiny. *See* MTD Order at 53 (citing cases). Plaintiffs point to Jazz's sales projections as evidence the generics expected to make more money selling a limited quantity of branded Xyrem at monopoly prices than if they had pursued litigation against Jazz. Defendants argue Plaintiffs have no evidence that Par, Lupin, or Amneal had access to these sales projections such that there is no basis to quantify "*the generics' expectations* of a best-case litigation scenario at the time of settlement." Dkt. 716-1,

---

[9] The CAC explicitly alleged each percentage of the Xyrem market allocated to generics was worth approximately $13.5 million. CAC ¶ 270. It also averred the Jazz-Hikma settlement depended on the "royalty rate increasing based on increased net sales of the Hikma AG" with the eventual effect of keeping prices high. *Id.* ¶ 231.

United States District Court
Northern District of California

at 13–14 (emphasis added). Whether Par, Lupin, and Amneal expected profits exactly in line with Jazz's sales projections does not resolve, for summary judgment purposes, whether the volume-limited licenses constituted a large and unjustified reverse payment. A reasonable juror could rely on, for instance, Jazz's sales projections in evaluating whether a reverse payment occurred. Summary judgment is not warranted with respect to these claims.[10]

## B.  Conspiracy to Allocate the Market

Defendants attack Plaintiffs' theory that Jazz, Hikma, Par, Lupin, and Amneal conspired to allocate the market for Xyrem. At the motion to dismiss stage, the district court found plausible averments that each Defendant "had reason to know—or actually knew—that Jazz was allegedly allocating the market for Xyrem and its generics" because of "Jazz's public and tightly sequenced settlements of longstanding patent cases." MTD Order at 46, 47. Second, the district court determined Plaintiffs plausibly alleged that each Defendant "had reason to believe that their own benefits derived from the operation were probably *dependent on the success of the entire venture*." *Staley v. Gilead Sciences, Inc.*, No. 19-cv-2573, 2020 WL 5507555, at *8 (N.D. Cal. July 29, 2020) (emphasis in original) (cleaned up).

Defendants now insist there is insufficient evidence to support a jury finding that a conspiracy existed and that Plaintiffs' "theory of anticompetitive conduct is not legally cognizable." Dkt. 658-1, at 21. A conspiracy claim may be supported by direct or circumstantial evidence. "To survive a motion for summary judgment, a plaintiff seeking damages . . . must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (cleaned up). Direct evidence is that which is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* "[M]ere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim." *In re Musical Instruments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir 2015). "Plus factors" are "economic actions and outcomes

---

[10] To the extent Defendants contend *Actavis* had nothing to say about volume-limited licenses, that argument did not succeed at the motion to dismiss stage and does not prevail here.

that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action" and can distinguish "parallel conduct from impermissible conspiracy." *Id.* Where a party rests a claimed conspiracy solely on circumstantial evidence, a defendant can rebut that assertion such that the plaintiff must then "provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *In re Citric Acid Litig.*, 191 F.3d at 1094. "The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id.*

### 1. Evidence of conspiracy

Defendants first claim Jazz and Hikma could not have allocated the market because Hikma was entitled, as first-filer, to 180 days of market exclusivity pursuant to the Hatch-Waxman Act. This exclusivity does not prevent a brand from launching AGs through either itself or third parties. Dkt. 690-2, at 20. Jazz and Hikma prohibited third-party AGs in their settlement agreement during Hikma's exclusivity period. Further, there is sufficient evidence to survive summary judgment that Jazz and Hikma entered into an implicit no-AG agreement.

More generally, a factual dispute arises regarding whether an overarching conspiracy to allocate the market existed. Defendants argue the existence of four separately-negotiated settlement agreements is not direct evidence of conspiracy, and that Plaintiffs are left with circumstantial evidence of collusion that Defendants rebut. For instance, Defendants point to the fact each of the settlements occurred months apart as evidence that wounds Plaintiffs' theory of an overarching conspiracy. Co-conspirators, in other words, would not have continued actively litigating against one another. Nor, according to Defendants, can much be inferred from the similar provisions incorporated across the four settlement agreements given the generic companies' similar positions vis-à-vis one another and the ubiquity of acceleration clauses. Defendants claim this is so even though Jazz made public statements about its settlement agreements as such announcements are normal business practice rather than evidence of anticompetitive behavior. Defendants point to how Jazz entered into several settlements with generic companies containing similar terms that are not challenged in this litigation as a logical

1    hole at the center of Plaintiffs' theory of conspiracy.

2         As direct evidence of conspiracy, Plaintiffs point to Jazz's creation of a "Calculated Value

3    Adjustment" in order to assure generics settling after Hikma "would receive similar terms" to the

4    others and be apprised of the details of the other settlements. Dkt. 690-2, at 21. Entities that had

5    entered into a conspiracy to allocate a market would in theory retain a meaningful interest in

6    ensuring that the terms of the settlements by which the conspiracy would proceed matched their

7    expectations. Defendants challenge the evidentiary value of the "Calculated Value Adjustment" on

8    the basis it is cited only once by Plaintiffs' economics expert and that it is not "smoking-gun

9    evidence." Dkt. 716-1, at 15 (quoting *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822

10   (9th Cir. 2023)). The Calculated Value Adjustment is not all Plaintiffs claim to offer in the direct

11   evidence department, as there is also evidence Jazz informed Lupin it would benefit from a market

12   decline trigger in the Jazz-Hikma settlement. *See* P.D.2. Ex. 421. Defendants say this "direct

13   evidence" is nothing of the sort, as it requires drawing further inferences.

14        Plaintiffs also point to circumstantial evidence of conspiracy. First, they explain how each

15   settlement agreement contained an acceleration clause meant to disincentivize other generics from

16   entering the market. Rather, each generic had the common incentive to "prevent unrestrained

17   generic competition," avoid a "price cliff," and settle. Dkt. 690-2, at 22. Jazz's revenue forecasts

18   are also circumstantial evidence of a conspiracy to allocate the market. Notably, Jazz's revenue

19   forecast changed after its settlement with Hikma; afterwards, Jazz projected its revenues could

20   increase from Hikma royalties (assuming it could keep other ANDAs off the market). Then,

21   "[a]fter settling with Par, Lupin, and Amneal, Jazz predicted in December 2018 that the price of

22   generic Xyrem would remain unchanged through December 31, 2025." Dkt. 690-2, at 23. The

23   later-filing generics forecast that prices would not change even after the end of Hikma's

24   exclusivity period when they would enter with limited-volume licenses. This forecast evidence

25   tends to show that Jazz, as well as the later-filing generics, knew what to expect from the

26   combined effects of their settlement agreements. They forecast that the settlement agreements in

27   combination would produce a market without unrestrained price competition.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants respond this circumstantial evidence of collusion is at best a "common motive to conspire" and that this "does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." Dkt. 716-1, at 16 (quoting *In re Musical Instruments*, 798 F.3d at 1195). They point, for instance, to the lack of evidence that settlement discussions between any of the parties were anything but bilateral discussions and the fact that no witness testified to "coordinating settlements or revealing non-public settlement details." Dkt. 658-1, at 24.

Taking a holistic view of the record, Plaintiffs have put forth sufficient evidence of a conspiracy to allocate the market to survive summary judgment. Of particular note is that Jazz communicated to Lupin, during settlement negotiations, details about the "market decline trigger" in the Hikma settlement agreement. Dkt. 692-5, at 4. This evidence, in combination with Jazz's "Calculated Value Adjustment" tool, is sufficient to raise a material dispute regarding whether Jazz and the settling generics communicated to ensure each entity received comparable, suitable terms vis-à-vis one another. Indeed, there is evidence Jazz kept each generic on the same page of the alleged conspiracy by working to become "increasingly skilled in [its] ability to explain" the effects of terms in other generic settlements. Ex. 421. Defendants interpret this evidence as demonstrating no preceding agreement between competitors, but this is not the only possible reasonable interpretation. Similarly, Jazz's forecasts indicate it "knew what it needed to do" in terms of settlement with the remaining generics to keep prices high. Dkt. 690-2, at 23. This evidence goes beyond the "consciously parallel conduct" that, without more, cannot sustain a conspiracy claim past summary judgment. Defendants do not fully rebut Plaintiffs' evidence that the settlement agreements were not negotiated independently of one another. Evidence that generic companies continued to seek assurances from Jazz that they were not receiving worse terms than competitors does not disprove the existence of an overarching conspiracy. It is possible—even probable—that competitors with existing agreements would take care to ensure those agreements were carried out according to their terms.

### 2.  Market definition

Defendants argue that even assuming Plaintiffs can show sufficient evidence of a conspiracy to allocate a market, they lack evidence on the other elements of their market allocation claim. A market allocation claim requires proving both market power and injury in a properly defined relevant market. *See Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) ("A threshold step in any antitrust case is to accurately define the relevant market.") (citation omitted), *cert. denied*, 2024 WL 2116338 (May 13, 2024). Defendants argue the relevant market Plaintiffs now claim was allocated was the market for generic Xyrem, but that this is different from the market Plaintiffs initially advanced. This other market, Defendants contend, was the broader sodium oxybate market, containing "not only generic Xyrem, by also brand Xyrem, Xywav, and other sodium oxybate products." Dkt. 658-1, at 27. Plaintiffs' response is that Defendants' argument boils down to mere semantics. Plaintiffs' experts (Dr. Martha Starr and McGuire) do refer to the broader sodium oxybate market; when McGuire refers to the "generic market," he was not using the term market "in connection with the relevant antitrust product market or market definition." Dkt. 690-2, at 24. Plaintiffs' argument that their relevant market definition was, and remains, the sodium oxybate market is persuasive. There is no issue with Plaintiffs' market allocation theory from a market definition perspective.[11]

### C.  Causation

As an independent basis for summary judgment, Defendants assert Plaintiffs failed to show any ANDA product would enter the market before 2024 and that Plaintiffs have therefore not met their burden to show the alleged anticompetitive conduct caused them injury. They point to Hikma's issues with the dimer, with obtaining commercial quantities of DEA quota, and to the argument Hikma would not have launched at risk. They also dispute Plaintiffs' claim that Hikma

---

[11] Defendants argue that because Plaintiffs failed to prove reverse payments in each of the individual settlements, their illegal market allocation allegations as to those settlements cannot proceed. Plaintiffs have survived summary judgment with respect to their reverse payment claims, so this argument is unavailing.

United States District Court
Northern District of California

1     would have forfeited its exclusivity such that, had Hikma not launched its ANDA product, other

2     generics could have obtained FDA approval to do so by 2019.

3         **1.  The dimer issue**

4         Defendants claim Hikma would not have been able to launch its generic before resolving

5     issues with the dimer in the active pharmaceutical ingredient ("API") of its ANDA product, which

6     it was unable to do in the real world until August 2023. A "dimer" is a chemical impurity; a

7     central dispute in this case is whether the API that Hikma used for its ANDA contained more

8     dimer than permitted under the relevant specifications. If Hikma's generic product contained out-

9     of-specification dimer, this could have delayed its ability to bring its generic product to market.

10    The parties disagree about whether Hikma thought the dimer it found in its product during

11    impurity testing was an "analytical artifact" of the testing process.[12] *See, e.g.*, Ex. 200. Defendants

12    argue Hikma knew the dimer it found in its product "was more than an analytical artifact and

13    could be present in the API of its proposed product." Dkt. 658-1, at 3; *see also* Dkt. 659-3, at 7

14    (citing internal emails and an email from Norac, Hikma's then-API supplier). Plaintiffs, in

15    comparison, focus on Hikma's rejection of the September 2014 views of some of its employees

16    that the dimer was more than an analytical artifact and decision to stand by its initial

17    representation to the FDA that the dimer was not present in its API. It is undisputed the FDA

18    approved Hikma's ANDA in 2017. Defendants contend the evidence shows Hikma's product

19    contained so much dimer in 2017 it qualified as "adulterated" and that this prevented Hikma from

20    legally marketing its ANDA until it dealt with the dimer issue with the FDA.

21        Defendants point to evidence that Norac (Hikma's original API supplier) believed the

22    dimer was not an analytical artifact but a real problem with the API. *See* Ex. 201. Plaintiffs

23    criticize the reliability of Norac's dimer level estimates in part on the basis that Norac used gas

24    chromatography to measure dimer.[13] Once Hikma changed API suppliers in 2020, its new API

25    _____

26    [12] As relevant here, an "analytical artifact" refers to a measured impurity produced by the
      analytical methods used but that is not actually present in the product. *See* Dkt. 658-1, at 3.

27    [13] Plaintiffs argue in their motion to exclude that gas chromatography testing produces inaccurate

28

supplier used a different manufacturing process by which it was able to meet Hikma's pH and dimer-related targets. Liquid chromatography testing after this supplier switch revealed dimer levels within FDA specifications. This does not demand a conclusion that gas chromatography was the sole reason Hikma believed it had a dimer problem. Hikma "change[d] its API supplier, change[d] its manufacturing process, and conduct[ed] several years of testing" in resolving the issue. Dkt. 658-1, at 29. These are each reasons to think the dimer issue was more than the product of unreliable testing. Neither is it, however, conclusive evidence Hikma *had* a dimer problem before switching API suppliers that was fixed by its new supplier's manufacturing process.

Rather, there is a factual dispute concerning whether, notwithstanding the dimer issue, Hikma would have been able to launch its ANDA when it was approved in 2017. Though there is evidence some Hikma employees thought in 2014 that the dimer was not merely an analytical artifact of sample preparation, Hikma decided not to submit this language to the FDA, and Defendants' expert, Benoit Cossart, recognized Hikma concluded it had "found no evidence the dimer was present in the API." Dkt. 655-17, Cossart Rebuttal Rpt. ¶ 99; *see* Dkt. 690-2, at 30. A reasonable jury could determine that Hikma still believed the dimer was an analytical artifact in 2014 and thus posed no impediment to launch after FDA approval in 2017. There is a factual dispute about whether Norac's API had different dimer levels than Veranova's API; though it is plausible Veranova's use of malic acid in its API *fixed* a dimer problem, the evidence does not conclusively show this is what happened. Further, Plaintiffs persuasively argue that Hikma could have fixed a dimer issue had one actually existed and then launched. *See* Dkt. 690-2, at 31. As evidence for this proposition, Plaintiffs point to how Hikma was able to submit a Prior Approval Supplement ("PAS") to the FDA in 2022 alerting the Agency to its use of a new API that was eventually approved in 2023. Though Defendants argue Hikma was barred from fixing its alleged dimer problem until 2023 when it could add malic acid to the API without infringing Jazz's formulation patents, other generics used pH adjusters, including malic acid, before 2023 despite

dimer measurements. *See* Dkt. 660-2, at 30.

the patents.

All told, there are factual disputes about whether Hikma's API contained too much dimer and whether Hikma could have fixed a dimer problem, if one existed, and launch well before 2024. Summary judgment on Defendants' causation argument relating to Hikma's alleged dimer issues is therefore unwarranted.

## 2. DEA commercial quota

Sodium oxybate manufacturers are required to obtain DEA authorization (known as "quota") in order to use GHB because of GHB's Schedule 1 status. Hikma has applied for but been denied DEA quota several times. Defendants argue Hikma's real-world failures to obtain DEA quota constitute dispositive evidence that Hikma would not have been able to obtain DEA quota in Plaintiffs' but-for world. Plaintiffs respond that the reason Hikma ███████████ ███████████████████████████████████████████████. Dkt. 690-2, at 32–33. They argue that "Defendants have not identified a single launch of any generic drug that was prevented or delayed solely due to denial of DEA quota." *Id.* at 33.

Plaintiffs' expert, Allen, opines that the DEA will typically deny excessive quota requests but expect to receive a new request when a company "has clearly planned to launch their product and initiate commercial manufacturing." Dkt. 655-4, Allen Reply Rpt. ¶ 30. He explains, based on his experience, that if Hikma ████████████████████████████████████████████████ and could, in any event, request meetings with the DEA to facilitate its quota requests. Defendants argue the DEA ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████ Ex. 318, at 1–2. There is a factual dispute concerning whether Hikma ██████████████████████████████████████████████.

## 3. Operationalized REMS

There is no basis to find Hikma would not have been able to launch for lack of an

United States District Court
Northern District of California

operationalized REMS given the potential anticompetitive cause (Jazz's conduct) for its absence.

Moreover, there is evidence that a generic REMS could have been operationalized within a year

and a half of Hikma's ANDA approval, which would have been years before 2024 (the earliest

Defendants suggest operationalization was possible). *See* Dkt. 690-2, at 33 (citing Dkt. 655-37,

Lessem Rpt. ¶¶ 159, 163).

### 4. Launching at risk

Defendants contend Hikma was never willing to launch a generic at risk thereby

undermining Plaintiffs' theory that a March 2016 generic launch was possible. As discussed above

with respect to Defendants' summary judgment challenge to Plaintiffs' REMS-related

anticompetitive claims, whether Hikma would have launched at risk as early as March 2016

remains a factual issue.

### 5. Forfeiture

Defendants argue that if Hikma were unable to launch its ANDA before 2024, every other

generic would be bottlenecked from doing so because Hikma enjoyed 180-day exclusivity. There

are disputed issues of fact about whether Hikma could have launched before 2024 such that

whether Plaintiffs have properly asserted a forfeiture theory is somewhat academic. Nonetheless,

there is a live dispute about whether and when Hikma would have forfeited its exclusivity by

failing to launch. Experts in this case have explained the statutory framework for forfeiture, and

Thomas and Allen will be permitted to offer limited opinions on Hikma's potential forfeiture as

well. *See* Order Granting in Part and Denying in Part Plaintiffs' Motion for Relief from

Nondispositive Pretrial Order.[14]

---

[14] Plaintiffs' expert Armitage opined how, once patent litigation is resolved, "the first-filer's 180-day generic drug approval exclusivity period can be forfeited absent ability of the first filer commencing commercial marketing." Dkt. 655-6, Armitage Rebuttal Rpt. ¶ 106 n.142. A first-filer forfeits if "at least 30 months has passed since the first-to-file generic filed its ANDA and it does not market its product 75 days after" resolution of the patent litigation. *Id.* ¶ 57. Defendants claim these excerpts of Plaintiffs' experts' reports do not "address what *would have happened* in any but-for world." Dkt. 716-1, at 22. Armitage, though, explicitly refers to what would have happened had Hikma forfeited its exclusivity period: "on or before July 1, 2023, other Xyrem ANDAs could be approved for marketing and other ANDA holders" and could commence

1

2

**D. Humana's, HCSC's, and BCBS Florida's Damages Claims on Behalf of Non-Party Clients**

3      Plaintiffs Humana, HCSC, and BCBS Florida (the "ASO Providers") supply, through

4  insurer subsidiaries, services such as claims processing to non-party entities. Defendants argue the

5  ASO Providers lack antitrust standing to sue on behalf of these non-party clients because they do

6  not pay alleged Xyrem overcharges on their behalf. Antitrust standing generally requires a

7  showing that an entity has purchased a product or paid an overcharge. *See City of Oakland v.*

8  *Oakland Raiders*, 20 F.4th 441, 448–49 (9th Cir. 2021). The ASO Providers do not have antitrust

9  standing to sue on behalf of non-party clients because the ASO Providers (for such clients only)

10  have not paid overcharges for Xyrem prescriptions and thus do not bear any risk related to the

11  overcharges.

12      Additionally, the ASO Providers appear to lack authority to pursue non-class claims on

13  behalf of "ASO clients they purport to represent." Dkt. 716-1, at 22. The ASO Providers seek to

14  establish their capacity to sue by presenting a selection of contracts they have with those clients;

15  they do not, however, cite any contractual provision granting them authority to sue. Defendants

16  are entitled to summary judgment to the extent the ASO Providers assert claims on behalf of non-

17  party clients who were allegedly overcharged for Xyrem both on antitrust standing and capacity to

18  sue grounds.

19      **E. Injunctive Relief**

20      Finally, Defendants seek summary judgment on Plaintiffs' requested injunctive relief.

21  Defendants claim Plaintiffs have failed to identify with the required specificity the injunctive relief

22  they seek, except to suggest that the Court strike parts of the Par, Lupin, and Amneal settlements.

23  With respect to this suggestion, Defendants contend the Court lacks the authority to rewrite or

24  otherwise line-edit a settlement agreement between two parties. Defendants also argue there is no

25  evidence in the record that striking the volume caps on the settlements would improve competition

26

_____

27  marketing generic Xyrem. Armitage Rebuttal Rpt. ¶ 106 n.142.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

and, therefore, redress harm to Plaintiffs. Plaintiffs respond that courts have significant discretion in crafting appropriate injunctive relief and that the scope of proper injunctive relief will be best assessed at trial.

Even accepting the bold proposition that a district court has the authority to rewrite a settlement agreement, there is little basis upon which to conclude that striking the volume limits in the aforementioned settlements would improve competition. A plaintiff must show they have standing "for each form of relief sought." *Wash. Env. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013). Plaintiffs have not identified injunctive relief that would likely redress their asserted injuries; having failed to make such a showing, Plaintiffs lack standing to pursue such relief. *Id.* at 1146. Summary judgment is warranted to the extent Plaintiffs seek injunctive relief.

## VI. PLAINTIFFS' SUMMARY JUDGMENT MOTION

Plaintiffs move for summary judgment on five issues: (1) that Jazz and Hikma entered into an agreement in restraint of trade in the U.S. market for Xyrem; (2) that Jazz "possessed substantial market power in the U.S. market for Xyrem and its generic equivalents during the relevant time period"; (3) that Jazz could not show infringement of the '963 patent; (4) that "the restraints on trade affected intrastate commerce" and that "paying higher prices is the type of injury the antitrust laws were intended to protect against"; and (5) that Defendants' statute of limitations, laches, and mitigation of damages defenses should be dismissed. Dkt. 661-2, at 2.

### A. Agreement in Restraint of Trade

The parties agree that in April 2017, Jazz and Hikma entered into an agreement that resolved their patent litigation, afforded Hikma the right to market an AG, and set the terms for Hikma's eventual sale of an ANDA generic Xyrem product as early as July 1, 2023. This agreement consisted of three documents: the Settlement Agreement, the License Agreement, and the AG Agreement ("the Agreements"). Plaintiffs seek judgment as a matter of law that the Agreements constitute a restraint with "significant potential for anticompetitive effects." Dkt. 661-2, at 12.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   Settlement Negotiations

Plaintiffs argue Defendants should be precluded from arguing that "the order in which the parties arrived at certain terms [in the Agreements] is instructive or represents a separate and prior agreement." *Id.* at 14. They do so on the grounds that evidence of the negotiations leading to the Agreements would needlessly confuse and distract the jury. Defendants disagree, accusing Plaintiffs of overreach when (in Defendants' view) their antitrust claims rest on a showing of conspiracy beyond the written Agreements. The parties appear to be engaged primarily in a fight over the relevance of pre-contract negotiations rather than over competing interpretations of the Agreements. Plaintiffs do not point to authority for the proposition that, when considering an integrated contract, consideration of the negotiations that produced the contract are forbidden in all circumstances.

New Jersey law governs the Agreements. New Jersey courts have taken an expansive view of the evidence that may be admitted in order to determine the meaning of a contract. *See Conway v. 287 Corp. Center Assocs.*, 901 A.2d 341, 346 (N.J. 2006) (citing RESTATEMENT (SECOND) OF CONTRACTS § 214 ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, whether or not integrated.")). At this stage, Plaintiffs have not shown that the parties' negotiations of the Agreements must be excluded as a matter of New Jersey contract law where the parties, for instance, dispute what Jazz and Hikma agreed to when they settled. *See* Dkt. 684-1, at 8 ("Plaintiffs' "no-AG" theory requires going beyond the four corners of the agreements."). Nor have Plaintiffs offered authority to support the proposition that a jury must be shielded from evidence about negotiations. There is no basis to conclude jurors will be needlessly confused or misled by evidence about the parties' negotiations of the Agreements.

### 2.   Potential for anticompetitive effects

Plaintiffs argue that antitrust law is "grounded in probability" and that a finding that Jazz and Hikma created a restraint with the potential for anticompetitive effects is warranted. Dkt. 661-2, at 15–17. They contend no reasonable juror could dispute that Jazz had a "significant economic

incentive . . . not to sell a second generic and compete with Hikma when generic entry began" and that Jazz was unlikely to sell an AG Xyrem. *Id.* at 19–20. Plaintiffs also seek summary judgment on discrete issues such as the existence of the Jazz-Hikma settlement agreement and its terms. On this latter front, Defendants do not appear to contest that the settlement agreement exists or its explicit terms, and the existence of both is established as a matter of law.

The parties dispute whether Plaintiffs must make a threshold showing of a large, unjustified payment before proceeding to the rule of reason analysis. More persuasive are cases that have found no such threshold burden. *See, e.g.*, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402 (E.D. Pa. 2015); *HIV II*, 2023 WL 5670808, at *8. Such cases have found the inquiry into whether a reverse payment was large and unjustified to be part of the rule of reason analysis. *See HIV II*, 2023 WL 5670808, at *8 (noting that "if a payment is large and unjustified, that may indicate anticompetitive effects").

Arriving at the rule of reason analysis, Plaintiffs ask for a legal finding that the Jazz-Hikma settlement agreement had the potential for anticompetitive effects. They point to the incentives the agreement created for Jazz and Hikma and how those incentives had the potential to shape future competition and eliminate price competition. The first step of the rule of reason framework requires a plaintiffs "to prove that the challenged restraint has a *substantial anticompetitive effect* that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (emphasis added). Plaintiffs cite *NCAA v. Board of Regents of University of Oklahoma*, 668 U.S. 85, 104 (1984), and *O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015), for the proposition that plaintiffs meet their initial burden under the rule of reason by showing "a significant potential for anticompetitive effects." *O'Bannon*, though, found that the compensation rules at issue fixed the price of name, image, and likeness rights for recruits and had "significant anticompetitive effects"—not merely a potential for anticompetitive effects. 802 F.3d at 1072. Plaintiffs cite *O'Bannon* for the proposition they need not show the "precise anticompetitive effects" of the agreement at step one to satisfy that stage of the inquiry, but this is a different question. Dkt. 721-2, at 6. It is possible to show anticompetitive effects without precisely measuring those effects.

United States District Court
Northern District of California

1   Relatedly, in *NCAA*, there was an unmistakable, "naked restriction on price and output" such that

2   there was no dispute as to anticompetitive effects even if the precise scope of those effects had yet

3   to be determined. 468 U.S. at 109–10.

4         There is no basis to conclude, at summary judgment, that Plaintiffs have met their initial

5   burden under the rule of reason by showing the Agreements had the potential to cause

6   anticompetitive effects. To the extent Plaintiffs seek a more limited ruling that the Agreements had

7   the potential for anticompetitive effects (but not that this potential satisfies the first step of the rule

8   of reason inquiry), the motion for summary judgment is denied. It will be up to the jury to

9   determine whether and to what extent the Agreements were anticompetitive.

10                  **3.  Lack of a Jazz AG launch**

11         Plaintiffs point to a lack of dispute regarding the fact that Jazz *could have* launched an AG

12   Xyrem product—but did not do so—in seeking a ruling that the Agreements disincentivized such

13   a launch and were, in fact, the reason Jazz has not launched an AG. In their opposition brief,

14   Defendants insist Plaintiffs, during fact discovery, never asked Defendants' witnesses why Jazz

15   did not launch a Xyrem AG. Defendants also point to the affidavit of Jazz's former Head of the

16   Sleep Business Unit, P.J. Honerkamp, in explaining Jazz did not launch a Xyrem AG because its

17   focus had shifted to "the success of its new medicine, Xywav" by January 2023. Dkt. 684-1, at

18   21.[15] They also cite McGuire's deposition testimony that a brand might rationally decide to devote

19   its energy to selling other products rather than a generic. *Id.* For a number of reasons, there

20   remains a factual dispute about why Jazz decided not to market a Xyrem AG.

21                  **B.  Market and Monopoly Power**

22         Plaintiffs seek summary judgment on the question of whether Jazz had market and

23

24   _____

25   [15] Plaintiffs object that Honerkamp's late-produced affidavit contradicts his earlier deposition
testimony (and therefore cannot create an issue of fact). In that earlier testimony, when asked *if*
Jazz had launched its own AG, Honerkamp responded that it had not "as of today." Dkt. 721-2, at

26   11–12. On this record, it is not clear that Honerkamp contradicted his deposition testimony in his

27   later-filed affidavit considering that Plaintiffs originally asked Honerkamp "whether" (not "why
not") Jazz had launched a Xyrem AG.

28

United States District Court
Northern District of California

monopoly power. "Market power" refers to the "power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 646 (1992) (cleaned up). At step one of the rule of reason analysis, a plaintiff can prove "substantial anticompetitive effects *indirectly*" by proving "the defendant has market power" and then that the restraint at issue harms competition. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). "Monopoly power" refers to something greater than "market power"— namely, the "substantial ability to control prices or exclude competition, *id.* at 998 (citation omitted), and is a required showing for monopolization claims. Plaintiffs assert the undisputed direct and indirect evidence demonstrate Jazz had market and monopoly power in the Xyrem market in the United States, warranting summary judgment.[16]

"Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Indirect evidence of market power "is circumstantial evidence pertaining to the structure of the market." *Id.* A circumstantial demonstration of market power requires that a plaintiff "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run. *Id.*

### 1. Direct evidence

#### a. Restricted output

Direct proof of market power includes "evidence of restricted output and supracompetitive prices." *Rebel Oil Co.*, 51 F.3d at 1434. Plaintiffs assert they do not need evidence of restricted output to show direct evidence of market power, and did not attempt to make a showing of restricted output in their opening brief. The question of what showing is required to show direct evidence of market power has not been definitively resolved by the Ninth Circuit. The district

---

[16] Though Plaintiffs seek a finding at summary judgment that Jazz had monopoly power, they offer little analysis of how they have satisfied the more demanding standard for such a showing as compared to that required for establishing market power.

court in *HIV I* conducted a thorough analysis of what the Ninth Circuit requires for direct evidence of market power. *See* 656 F. Supp. 3d at 982. It concluded—despite remaining "ambiguity as to what the Ninth Circuit requires for direct evidence"—that there is at least a convincing argument both showings (restrictive output and supracompetitive prices) are required. *Id.*[17] Plaintiffs point to *Epic Games, Inc.*, a subsequent Ninth Circuit decision, as new authority for the proposition that a restricted output showing is unnecessary. *See* 67 F.4th at 984. There, the court declined to reverse the district court's conclusion that Epic had shown direct evidence of anticompetitive effects despite Apple's argument that "Epic did not show that Apple's restrictions reduced output." *Id.* The Ninth Circuit reasoned a showing of restricted output is not required to show direct evidence of *anticompetitive effects*, not market power. *Id.*

This conclusion about what plaintiffs must show to prove anticompetitive effects with direct evidence, however, says little about what is required to prove market power with direct evidence. Indeed, the Ninth Circuit acknowledged that market power "is the ability for a defendant to profitably raise prices by restricting output." *Epic Games, Inc.*, 67 F.4th at 983. Defendants add that the Ninth Circuit has "never retreated" from its statement in *Rebel Oil Co.* (Dkt. 684-1, at 33) that "if a plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof" of market power. *Rebel Oil Co.*, 51 F.3d at 1434. Plaintiffs argue it "would make no sense to require a greater showing to establish the *potential* for [anticompetitive] effects"—market power—than to prove those anticompetitive effects themselves. Dkt. 721-2, at 16. There is no reason to depart, however, from the Ninth Circuit's statements about direct evidence of market power in *Rebel Oil Co.* and *Epic Games, Inc.*

In their reply brief, Plaintiffs gesture to Jazz's ability to delay rivals' generic entry as proof of its capacity to restrict output. At best, however, there is a disputed factual issue concerning restricted output. *See HIV I*, 656 F. Supp. 3d at 983 (dispute concerning whether generics delayed

---

[17] Nevertheless, the district court found factual questions as to both supracompetitive pricing and restricted output obviated the need to resolve the question. *See HIV I*, 656 F. Supp. 3d at 982.

United States District Court
Northern District of California

market entry raised question of fact on restricted output). This alone is a sufficient basis to deny

summary judgment. Nevertheless, recognizing that the precise showing required to show direct

evidence of market power is hotly contested, an analysis of whether Plaintiffs have shown

supracompetitive pricing is warranted.

### b. Supracompetitive pricing

Plaintiffs claim there is no dispute that Jazz's Xyrem pricing has been supracompetitive

because Jazz was able continually to increase prices without losing sales volume. According to

Plaintiffs, pricing is supracompetitive when brand prices exceed generic prices. *See, e.g.*,

Dkt. 721-2, at 13. Generic drugs are usually priced far below their branded counterparts. Price

forecasts adduced in discovery anticipated that generic Xyrem prices would fall dramatically after

generic entry, particularly after unrestrained generic competition commenced. Indeed, Jazz's own

forecasts predicted that when unrestricted generic competition began, average generic Xyrem

prices would fall by ██%.

Courts have taken different views on whether the competitive price and generic price of a

drug are one and the same. *Compare HIV I*, 656 F. Supp. 3d at 983–85 (declining, at summary

judgment, to so find), *with In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn.

2016) (reasoning that "if competitive prices were being charged before the patented drug had a

generic competitor, then the entry of new competitors would not result in a substantial change in

price"). Defendants argue no court has, at summary judgment, found supracompetitive pricing

solely because the brand price exceeded the generic price. Dkt. 684-1, at 27. The district court in

*HIV I* found particularly problematic the fact that equating the competitive price with the generic

price would render nearly all brand name pharmaceutical companies per se monopolists. 656 F.

Supp. 3d at 984; *see also In re Intuniv*, 496 F. Supp. 3d at 659–60 (finding dispute of material fact

for supracompetitive pricing based on brand manufacturer incentives in the pharmaceutical

industry); *In re Glumetza Antitrust Litig.*, No. 19-cv-5822, 2021 WL 3773621, at *3 (N.D. Cal.

Aug. 25, 2021) (continuing to defend leaving "finding of direct proof of market power in the

hands of the jury"). Plaintiffs' arguments about supracompetitive pricing are not without common-

sense appeal. There is an insufficient basis, however, to hold as a matter of law that the generic price is the competitive price and, thus, that prices that exceed the generic price are supracompetitive.

Next, whether an entity's gross margins on a product are a dispositive lens through which market power can be assessed is at best a debated proposition. Defendants put forth the analysis of their expert economist, Dr. Pierre Cremieux, in taking a different view of how to evaluate whether a supracompetitive price exists. Under that approach, "brand and generic medicines have 'fundamentally different cost structures and face different types and dynamics of competition,' [so] any analysis of the competitive price must account for those differences." Dkt. 684-1, at 29 (quoting Dkt. 655-19, Cremieux Rpt. ¶ 67). For instance, brand drug manufacturers may be more likely to have higher fixed costs relating to drug development as compared to generic manufacturers. This, in turn, is an argument for looking to factors beyond gross margins in trying to determine the competitive price for a drug. *See In re Intuniv*, 496 F. Supp. 3d at 659. Cremieux opines a brand drug might be priced higher than its generic counterparts because of higher underlying costs even in a competitive environment. Plaintiffs argue Cremieux's market power opinions are irrelevant and uninformative (reprising themes present in their *Daubert* motion), but this argument merely goes to the weight of Cremieux's testimony.

### 2.  Indirect evidence

Plaintiffs contend that even if direct evidence does not establish market power in this case, there is sufficient indirect evidence to prove Jazz's market power as a matter of law. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co.*, 51 F.3d at 1434. The central dispute here concerns the relevant market (the "area of effective competition") and a determination of "which products have a reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Epic Games, Inc.*, 67 F.4th at 975 (cleaned up). Cross-price elasticity of demand exists where "an

increase in the price of one product leads to an increase in demand for another." *Olin Corp. v. FTC*, 986 F.2d 1295, 198 (9th Cir. 1993) (citation omitted). A product market includes the relevant product and economic substitutes for that product. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Thus, courts investigate whether product pricing is constrained by other products such that they should be included in the same market.

The relevant market in this case, Plaintiffs say, consists only of Xyrem, generic Xyrem, and Xywav. The geographic scope of the market is the United States and its territories. Plaintiffs' expert's (Starr) cross-price elasticity analysis found that "the only products that exhibit significant, positive cross-price elasticity of demand with Xyrem are its generic equivalents and Xywav." Dkt. 661-2, at 38. This analysis found that no other drug (the potential economic substitutes Starr identified) impeded Jazz's ability to raise Xyrem prices over the course of two decades. Plaintiffs analogize this case to others where courts found "no significant cross-elasticity of demand" between the brand and any drug but the generic. *United Food & Comm. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 362–63 (E.D. Va.), *motion to certify appeal denied*, 2022 WL 1559092 (2022).

Defendants, in critiquing Starr's cross-price elasticity analysis, lean on Cremieux's opinion that Starr's analysis improperly focused on wholesale acquisition cost ("WAC") prices rather than the out-of-pocket costs borne by patients. By this reasoning, a cross-price elasticity analysis focused on WAC prices produces irrelevant results because WAC is not linked to patient demand for Xyrem. *See* Dkt. 684-1, at 34 ("the focus here is squarely on the actual price paid by patients themselves"). Cremieux, though, acknowledges that healthcare plans—which bear the majority of the cost of the drugs—can act to influence demand, are price sensitive, and have tools at their disposal to influence their beneficiaries' drug selections. *See* Dkt. 655-20, Cremieux Dep. 95:9–96:3; Cremieux Rpt. ¶¶ 55–59. WAC is therefore relevant to the cross-elasticity analysis to the extent third-party payors have the capacity to leverage various tools to respond to WAC price increases. If third-party payors can drive demand, a cross-elasticity analysis focused on WAC

should reveal economic substitutes for a product if they exist. Cremieux's criticisms of Starr's use of WAC prices demonstrate a potential limitation of Starr's methodology that would benefit from further development at trial. Defendants also highlight evidence that Jazz took steps to keep patients' out-of-pocket payments for Xyrem low through the use of coupons and rebates, that the prices patients paid for Xyrem was in line with what patients paid for other narcolepsy drugs, and contend patients drive demand. *See HIV I*, 656 F. Supp. 3d at 986. Jazz's active implementation of coupon and rebate programs is evidence it was constrained, to some degree, in its pricing of Xyrem.

Defendants note there are a number of other treatments for narcolepsy, including "SSRIs, SNRIs, modafinil, armodafinil, Sunosi, Wakix, traditional stimulants (Ritalin, Adderall, Adderall ER, Vyvanse), Xyrem, Xywav, Lumryz, and Xyrem AG" that they claim are reasonably interchangeable with Xyrem. Dkt. 684-1, at 37. The process of prescribing a particular drug to treat narcolepsy, among these options, is an individualized one. For support, Defendants cite *HIV I*, where the district court denied the plaintiffs' summary judgment motion where there were "questions of fact as to whether there are HIV drugs other than generics that could be economic substitutes for Defendants' brand drugs." 656 F. Supp. 3d at 986.

Next, Defendants rely on Plaintiffs' formulary documents in arguing Jazz was forced to compete with other narcolepsy drugs. Payors instituted "increasing formulary restrictions for Xyrem" in the face of rising prices and required patients to "consider or take cheaper therapeutic alternatives before taking Xyrem through prior authorization and step therapy requirements." Cremieux Rpt. ¶¶ 57–58. Defendants contend these formulary restrictions show therapeutic substitutes for Xyrem exist and payors are responsive to price considerations. Dkt. 684-1, at 35. Starr's analysis found that "both the price and sales volume of Xyrem *increased*" even as "third-party payors increased their use of formulary tools." Dkt. 721-2, at 19. Plaintiffs argue this fact precludes a finding that other drugs constrained Jazz's pricing of Xyrem. That Xyrem's WAC and sales volume continued to increase does not indicate Jazz faced *no* pricing constraints. There is a factual dispute regarding whether formulary restrictions kept Xyrem's price or sales lower than

1    either would have been in their absence or forced Jazz to offer rebate and coupon programs. *See In*

2    *re Intuniv*, 496 F. Supp. 3d at 666. Thus, Plaintiffs are not entitled to summary judgment on the

3    question of whether indirect evidence establishes Jazz had market power in the relevant antitrust

4    market.

5    **C.  The '963 Patent**

6    Plaintiffs seek a ruling that Jazz would not have been able to show infringement of the

7    '963 patent. This patent "relates to the use of Jazz's Xyrem REMS . . . and is directed to using a

8    central computer database to track and control prescriptions for a sensitive drug." Dkt. 661-2, at

9    43. Plaintiffs argue that a "single computer database" including multiple fields is a key limitation

10   of the '963 patent. They then point to the generics' FDA-approved REMS, which uses four

11   separate "databases" for the fields rather than a single one, and argue Jazz would have had to

12   "prove that a REMS that had separate patient and prescriber fields in distinct databases would

13   infringe a patent that claimed a single computer database combining the two fields." Dkt. 721-2, at

14   23. Plaintiffs assert Jazz has pointed to nothing to suggest it would have been able to meet this

15   burden.

16   Defendants respond, with some incredulity, that Plaintiffs are seeking summary judgment

17   on an infringement issue when their own expert (Dr. Michael Davitz) concluded Jazz *would* have

18   been able to show infringement of the '963 patent and Defendants' experts agreed.[18] Defendants

19   object that Plaintiffs' argument about databases was never made in the patent litigation before the

20   New Jersey district court. Where the state of the record is that Plaintiffs' own expert proffers an

21   opinion at odds with the legal finding Plaintiffs now ask the Court to draw, summary judgment is

22   unwarranted.

23

24

25

26   ───────────────

[18] Though Plaintiffs sought to supplement Davitz's opinion with this new argument, the magistrate
27   judge properly struck that opinion.

28

United States District Court
Northern District of California

### D. Intrastate Commerce and Antitrust Injury

#### 1. Intrastate Commerce

Plaintiffs assert there is no factual dispute that Defendants' conduct affected intrastate commerce in the States that have intrastate nexus requirements in their antitrust laws where Plaintiffs have pleaded a "nationwide antitrust violation." Dkt. 661-2, at 45. Defendants argue, among other things, that a showing of interstate activity is insufficient in many States to show intrastate activity. Defendants point to 14 States' laws as requiring anticompetitive conduct have a significant nexus to intrastate commerce.[19] At the *motion to dismiss* stage, courts have found the intrastate commerce requirement satisfied where payors allege a "nationwide antitrust violation that increased prices paid by the end payors in each state." *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14–md–02503–DJC, 2015 WL 5458570, at *16 (D. Mass. Sept. 16, 2015).

Nearly all of the opinions Plaintiffs cite in support of their request for summary judgment on the intrastate commerce element of their claims were issued at the motion to dismiss stage. The sole evidence to which Plaintiffs point in support of their summary judgment request is that in each State "the total amount paid for Xyrem sold in that state exceed[ed] $12 million." Dkt. 721-2, at 25. It is far from clear this evidence satisfies the intrastate nexus requirements in each of the relevant States. *See In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266–67 (S.D.N.Y. 2019) (holding the "antitrust law of Mississippi focuses on the location where the anticompetitive conduct occurred" and requires at least some conduct occurring wholly intrastate). Whether, for each State, the anticompetitive conduct Plaintiffs allege occurred meets that State's intrastate commerce requirement remains a factual dispute.

#### 2. Antitrust Injury

Next, Plaintiffs seek a ruling that the injury they assert in this case—"higher prices for

---

[19] These States are Connecticut, the District of Columbia, Hawaii, Maine, Mississippi, Nevada, New Hampshire, New York, North Carolina, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin.

brand and generic sodium oxybate products than they would have paid in the absence of the challenged conduct"—constitutes the kind of injury, if proven, the antitrust laws protect against. Dkt. 661-2, at 45–46. Defendants argue such a ruling is unwarranted on the basis the four-factor antitrust analysis should be conducted all at once. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (listing requirements to prove antitrust injury). Put differently, Defendants call unprecedented Plaintiffs' request for summary judgment on a single component of the antitrust injury analysis. Plaintiffs point to Federal Rule of Civil Procedure 56(a), which permits a party to seek summary judgment on a "part of [a] claim," as authority supporting their request.

Neither party really disputes that paying higher prices for sodium oxybate products— where those higher prices result from anticompetitive conduct—is the type of injury the antitrust laws are intended to prevent. Defendants argue the evidence will show the only ANDA that could have made it to market (and lowered prices) would have been an adulterated Hikma product. Plaintiffs' request for summary judgment, however, is expressly limited to a scenario in which anticompetitive conduct caused overcharges and a generic would have been able to come to market absent the anticompetitive conduct. Defendants note that summary judgment on this component of the antitrust inquiry is conditioned on Plaintiffs succeeding on a number of fronts at trial. There is no need to grant summary judgment on a part of a claim that relies on as-yet-unproven predicates.

### E.  Affirmative Defenses

Plaintiffs seek summary judgment on Defendants' statute of limitations, laches, and failure to mitigate affirmative defenses.

#### 1.  Statute of limitations

The settlement agreements Plaintiffs allege were anticompetitive, as well as Hikma's AG Xyrem sales, were entered into within four years of when Plaintiffs filed their initial class complaint. Four years is also the statute of limitations under almost all of the laws under which Plaintiffs sue; the only shorter limitations periods are three years (in Mississippi and Tennessee).

*See* Dkt. 661-2, at 46 n.18. Plaintiffs further argue "continuing sales of Xyrem at supracompetitive prices" fall within the statute of limitations periods applicable here. Dkt. 661-2, at 47-48. Defendants do not argue that "Plaintiffs' claims of conspiracy and anticompetitive agreements" are untimely, Dkt. 721-2, at 27, and partial summary judgment is appropriate on Defendants' statute of limitations defense for those claims. Partial summary judgment is also appropriate for States with five or six-year statutes of limitations for all of Plaintiffs' claims.

Defendants argue that Plaintiffs' REMS-related allegations involve conduct that ended in 2015 and therefore fall outside of the statute of limitations for a majority of States. Plaintiffs respond that the REMS-related allegations did not complete their monopolization claims against Jazz; according to Plaintiffs' allegations, Jazz engaged in later acts delaying generic entry into the sodium oxybate market. A statute of limitations restarts where an overt act is a (1) "new and independent act that is not merely a reaffirmation of a previous act" and (2) "inflict[s] new and accumulating injury on the plaintiff." *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).[20] Plaintiffs allege Jazz formed anticompetitive contracts that advanced its monopolistic scheme within the relevant statutes of limitations, and the fact that the REMS-related conduct ended earlier than other parts of the alleged scheme is not enough to sustain a statute of limitations defense. Plaintiffs' motion for summary judgment on Defendants' statute of limitations defense is granted.

### 2.  Laches

Regarding laches, Plaintiffs say there is no evidence they were aware of anticompetitive conduct more than four years before filing their first complaint, largely because Jazz and Hikma did not settle until 2017. While some Plaintiffs filed suit just over three years after the Jazz-Hikma settlement, others waited longer. Defendants point to "key business decisions they have made" in reliance on the challenged settlements as the basis for their prejudice under a laches inquiry.

---

[20] Though a statute of limitations may restart, that does not necessarily reset the statute of limitations for damages that accrued earlier.

United States District Court
Northern District of California

Dkt. 684-1, at 48. This reference to "key business decisions" is insufficient to show a factual dispute regarding whether Defendants were prejudiced by when Plaintiffs decided to file suit. In his deposition, P.J. Honerkamp testified, vaguely, that "some R&D efforts may not have been initiated" had Plaintiffs filed suit earlier. Dkt. 658-21, at 8. This testimony does not explain how Defendants were harmed by any delay on the part of Plaintiffs in filing suit. Plaintiffs are entitled to summary judgment on Defendants' laches defense.

### 3. Failure to mitigate

A victim of a horizontal price-fixing scheme does not have the option to mitigate damages because there is no other supplier from whom they might find a cheaper product. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. 07–1827, 10–1064, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012). Defendants do not dispute this, but argue (1) this is a reverse payments case rather than a horizontal price-fixing case and (2) Plaintiffs also bring unilateral monopolization claims and conspiracy to restrain trade claims. Factual disputes concerning whether Plaintiffs could have mitigated damages by shifting their members to the lower-cost AG that entered the market in January 2023 more quickly or sought other treatment options for their narcolepsy more aggressively remain. Summary judgment on Defendants' mitigation of damages defense is unwarranted.

### VII.   CONCLUSION

Jazz's motion for summary judgment and Defendants' joint motion for summary judgment are both granted in part and denied in part. Plaintiffs' motion for partial summary judgment is granted in part and denied in part.

*For Jazz's motion for summary judgment:*

- Summary judgment is granted with respect to Plaintiffs' sham litigation claims.

- Summary judgment is denied with respect to Jazz's REMS-related conduct.

- Summary judgment is granted with respect to Opt-Out Plaintiffs' claims for Xywav damages.

- Summary judgment is granted with respect to Plaintiffs' unilateral monopolization claims

to the extent California, Kansas, New York, and Tennessee do not recognize such claims.

*For Defendants' joint motion for summary judgment:*

- Summary judgment is generally denied with respect to Plaintiffs' reverse payment claims, except concerning avoided litigation fees.
- Summary judgment is denied with respect to Plaintiffs' market allocation claims.
- Summary judgment is denied with respect to Defendants' causation arguments.
- Summary judgment is granted with respect to Humana's and HCSC's damages claims for damages on behalf of non-parties where Humana and HCSC did not pay overcharges.
- Summary judgment is granted with respect to Plaintiffs' claim for injunctive relief.

*For Plaintiffs' motion for partial summary judgment:*

- Summary judgment is denied with respect to Plaintiffs' request for a finding that Jazz and Hikma entered into an agreement in restraint of trade with significant potential for anticompetitive effects.
- Summary judgment is denied with respect to Plaintiffs' request for a finding that Jazz had market and monopoly power.
- Summary judgment is denied with respect to Plaintiffs' request for a finding that Jazz could not show infringement of the '963 patent.
- Summary judgment is denied with respect to Plaintiffs' request for a finding that alleged restraints on trade affected intrastate commerce or that paying higher prices is the type of injury the antitrust laws were intended to protect against.
- Summary judgment is granted with respect to Plaintiffs request that Defendants' statute of limitations and laches affirmative defenses be stricken.
- Summary judgment is denied with respect to Defendants' failure to mitigate affirmative defense.

**IT IS SO ORDERED**.

Dated: August 16, 2024

_____
RICHARD SEEBORG
Chief United States District Judge