1

*[Submitting Counsel on Signature Page]*

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

13

14    IN RE: XYREM (SODIUM OXYBATE)
ANTITRUST LITIGATION

15

16    THIS FILING RELATES TO: ALL END-
PAYOR ACTIONS

17

18

19

20

21

22

23

24

25                          **REDACTED - FILED UNDER SEAL**

26

27

28

Case No. 3:20-md-02966-RS

**CLASS PLAINTIFFS' NOTICE OF
MOTION AND MOTION FOR CLASS
CERTIFICATION, AND
MEMORANDUM OF LAW IN
SUPPORT THEREOF**

**ORAL ARGUMENT REQUESTED**

Date:         TBD
Time:         TBD
Courtroom:  3, 17th Floor

The Honorable Richard Seeborg

1                                **<u>TABLE OF CONTENTS</u>**

NOTICE OF MOTION AND MOTION ................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................... 3

I.      INTRODUCTION ........................................................................ 3

II.     PROCEDURAL BACKGROUND. ................................................ 5

III.    STATEMENT OF FACTS ............................................................ 5

      A.    Xyrem is Approved and Becomes a Blockbuster Product for Jazz ....................... 5

      B.    Generic Competition Poses the Threat of Huge Profit Losses for Jazz ................ 6

      C.    Jazz's Efforts, and Defendants' Agreements, to Delay Generic Competition ........ 7

          1.    Jazz exploited the Risk Evaluation and Mitigation Strategy ("REMS") approval process to delay generic competition. ....................... 7

          2.    Jazz prolonged the Xyrem patent litigation as long as it could before reaching anticompetitive pay-for-delay deals with the Generic Defendants. ................................................ 9

          3.    Once generic entry was inevitable, Jazz sought to suppress generic entry ██████████ .................................................. 10

      D.    The Impact of Defendants' Conduct on the Classes ............................... 11

IV.   ARGUMENT ...................................................................... 12

      A.    The Requirements of Rule 23(a) Are Satisfied ..................................... 13

          1.    The Proposed Classes Are Sufficiently Numerous .................................. 13

          2.    Class Plaintiffs' Claims Involve Common Questions of Law and Fact ................. 13

          3.    Class Plaintiffs' Claims Are Typical of the Claims of the Classes ............. 14

          4.    Class Plaintiffs Will Fairly and Adequately Represent the Interests of the Classes ...................................................... 15

      B.    The Requirements of Rule 23 (b)(3) Are Satisfied ................................ 16

          1.    Common Issues Predominate as Class Plaintiffs' Theories of Liability ........... 17

               a.    Conspiracy Claims (Counts 7 – 11 and 13) ................................ 17

               b.    Monopolization Claim (Count 12) ....................................... 18

          2.    Common Issues Predominate as to Market Power ................................. 18

          3.    Common Issues Predominate as to Antitrust Injury ............................. 19

               a.    Common Evidence Shows that Delays in the Introduction of Generic Drugs Result in Supracompetitive Prices for End Payors ............... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.    Common Evidence Shows that Generic Xyrem Would Have Been Substantially Less Expensive than Branded Xyrem and Xywav ................................................................................. 21

c.    Common Evidence Shows that Injury Would Have Been Widespread Among Health Benefit Plan Payor Class .................. 23

d.    Members of the Health Benefit Plan Payor Class Were Injured ................................................................................. 24

4.    Plaintiffs Will Establish Aggregate Damages Through Common Evidence and Economic Models Tied to Their Theories of Liability ....... 25

5.    Plaintiffs' Claims Are Manageable ............................................................. 28

a.    Common Evidence Will Be Used to Demonstrate Defendants' Violations of the Applicable Laws and Aggregate Damages ............................................................. 29

b.    Claims Submission and Administration ........................................ 30

6.    A Class Action Is a Superior Means of Adjudicating Plaintiffs' Claims ................................................................................. 31

C.    The Requirements of Rule 23 (b)(2) Are Satisfied ............................................... 32

D.    Ascertainability Is No Impediment to Certification ............................................. 34

V.    CONCLUSION ............................................................................................ 35

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Alaska Airlines v. United Airlines,*
4      948 F.2d 536 (9th Cir. 1991) ................................................................. 17

5      *Amchem Products, Inc. v. Windsor,*
       521 U.S. 591 (1997) ............................................................. 15, 16, 17, 32
6
       *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
7      133 S. Ct. 1184 (2013) ............................................................................ 12

8      *Boston Retirement System v. Uber Technologies, Inc.,*
       2022 WL 2954937 (N.D. Cal. 2022) ...................................................... 15
9
       *Briseno v. ConAgra Foods, Inc.,,*
10     844 F.3d 1121 (9th Cir. 2017) ................................................... 25, 31, 34

11     *Castillo v. Bank of America, NA,*
       980 F.3d 723 (9th Cir. 2020) ................................................................. 14
12
       *City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.,*
13     867 F.3d 434 (3d Cir. 2017) ................................................................... 35

14     *Comcast Corp. v. Behrend,*
       569 U.S. 27 (2013 .................................................................................. 27
15
       *Edwards v. Nat'l Milk Producers Fed.,*
16     2014 WL 4643639 (N.D. Cal. Sept. 16, 2014) ...................................... 26

17     *Ferrell v. Wyeth-Ayerst, Labs., Inc.,*
       2007 U.S. Dist. LEXIS 44391 (S.D. Ohio June 19, 2007) ...................... 13
18
       *FTC v. Actavis, Inc.,*
19     133 S. Ct. 2223 (2013) ........................................................................ 6, 20

20     *Gen. Tel. Co. of Sw. v. Falcon,*
       457 U.S. 147 (1982) ............................................................................... 13
21
       *Halliburton Co. v. Erica P. John Fund, Inc.,*
22     573 U.S. 258 (2014) ............................................................................... 20

23     *Hanlon v. Chrysler Corp.,*
       150 F.3d 1011 (9th Cir. 1998) ................................................... 14, 15, 16
24
       *Hawaii v. Standard Oil Co.,*
25     405 U.S. 251 (1972) ............................................................................... 12

26     *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty v. Momenta Pharm., Inc.,*
27     333 F.R.D. 390 (M.D. Tenn. Sept. 20, 2019) .................................... 12, 15

28

*In re Abbott Labs. Norvir Antitrust Litig.*,
2007 WL 1689899 (N.D. Cal. June 11, 2007) ........................................................... 13

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001).................................................................... 13, 27

*In re Cipro Cases I & II*,
121 Cal. App. 4th 402 (2004)........................................................................... 17, 23

*In re Citric Acid Antitrust Litig.*,
1996 WL 655791 (N.D. Cal. Oct. 2, 1996).................................................................. 15

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
270 F.R.D. 521 (N.D. Cal. 2010) ........................................................................... 30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2006 WL 1530166 (N.D. Cal. June 5, 2006) .............................................................. 15

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*,
2020 WL 1180550 (D. Kan. Mar. 10, 2020)................................................... passim

*In re Flonase Antitrust Litig.*,
284 F.R.D. 207 (E.D. Pa. 2012) ......................................................... 13, 26, 27, 28

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020) .......................................................... 6, 19, 21, 27

*In re High-Tech Emp. Antitrust Litig*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................ 12, 13, 19

*In re High-Tech Employee Antitrust Litig.*,
2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) .............................................................. 26

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017)................................................... passim

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. Oct. 17, 2019) .................................................. 12, 25, 27

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. Feb. 11, 2021)........................................................... 12, 25

*In re NASDAQ Market-Makers Antitrust Litigation*,
169 F.R.D. 493 (S.D. N.Y. 1996)........................................................................... 34

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013), *aff'd*, 777 F.3d 9 (1st Cir. 2015)............................. 13, 26, 27

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ........................................................................... 19

*In re Opana ER Antitrust Litig.*,
2021 WL 3627733 (N.D. Ill. June 4, 2021) ........................................................... 12, 13

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2015)....................................................................................... 29

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
  338 F.R.D. 294 (D. Mass. May 14, 2021)......................................................... 12, 13, 25

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004) .......................................................................... 28, 29

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  335 F.R.D. 1 (E.D.N.Y. 2020) ........................................................................... passim

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  2017 WL 4621777 (D. Mass. Oct. 16, 2017)................................................. 12, 25, 32

*In re Static Random Access memory (SRAM) Antitrust Litig. ("In re SRAM")*,
  264 F.R.D. 603 (N.D. Cal. 2009) ....................................................................... 32, 34

*In re Terazosin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004) .......................................................................... 13, 30

*In re TFT-LCD Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .................................................................. 26, 32, 34

*In re Thalomid & Revlimid Antitrust Litig.*,
  2018 WL 6573118 (D.N.J. Oct. 30, 2018) ................................................................. 25

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014)................................................................................. 20

*In re Wellbutrin XL Antitrust Litig.*,
  282 F.R.D. 126 (E.D. Pa. 2011) ............................................................................... 13

*In re: Zetia (Ezetimibe) Antitrust Litigation*,
  2021 WL 3704727 (E.D. Va. Aug. 20, 2021) ................................................. 12, 13, 19

*Jazz Pharms., Inc. v. Amneal Pharms., LLC*,
  895 F.3d 1347 (Fed. Cir. 2018)................................................................................... 9

*Kohen v. PIMCO*,
  571 F.3d 672 (7th Cir. 2009)..................................................................................... 20

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013)..................................................................................... 26

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
  995 F.3d 123 (4th Cir. 2021)..................................................................................... 19

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir 2022)................................................................................. passim

*Overpeck v. FedEx Corp.*,
  2022 WL 888441 (N.D. Cal. Mar 25, 2022) .............................................................. 34

*Robbins v. Phillips 66 Co.*,
   2021 WL 4932729 (N.D. Cal. Mar. 29, 2021) ............................................................ 34

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ...................................................................................... 31

*Sarmiento v. Sealy, Inc.*,
   2020 WL 4458915 (N.D. Cal. May 27, 2020) ............................................................ 34

*Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*,
   540 F. Supp. 3d 182 (D.R.I. May 18, 2021) ...................................................... 12, 13

*Terry v. Hoovestol, Inc.*,
   2018 WL 6439167 (N.D. Cal. Dec. 7, 2018) ............................................................ 13

*Teva Pharms. USA, Inc. v. Abbott Lab'ys*,
   252 F.R.D. 213 (D. Del. 2008) .............................................................................. 13, 27

*TransUnion v. Ramirez*,
   141 S. Ct. 2190 (2021) .................................................................................................. 31

*Unte v. Home Depot U.S.A., Inc.*,
   2022 WL 1443338 (N.D. Cal. May 6, 2022) ............................................................ 31

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................................. 13, 14

*Williams v. Apple, Inc.*,
   338 F.R.D. 629 (N.D. Cal. 2021) ................................................................................ 34

*Zenith Radio Corp. v. Hazeltine Research*,
   395 U.S. 100 (1969) ...................................................................................................... 19

**STATUTES**

21 U.S.C. § 355(j)(5)(B)(iv) ....................................................................................................... 6

21 U.S.C. § 355-1 ........................................................................................................................ 7

21 U.S.C. § 355-1(i)(1)(C) .......................................................................................................... 8

**OTHER AUTHORITIES**

5 Moore's Federal Practice § 23.21 (3d ed. 2021) ................................................................ 34

Drug Price Competition and Patent Term Restoration Act (Pub. L. No. 98-417, 98 Stat. 1585
   (1984) ................................................................................................................................ 6

**RULES**

Fed. R. Civ. P. 23 .............................................................................................................. passim

## NOTICE OF MOTION AND MOTION

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on a date and time at the Court's convenience, before the Honorable Richard Seeborg, Plaintiffs A.F. of L. – A.G.C. Building Trades Welfare Plan, Blue Cross Blue Shield Association, The City of Providence, Rhode Island, Government Employees Health Association, New York State Teamsters Council Health and Hospital Fund, Ruth Hollman, Self-Insured Schools of California, and UFCW Local 1500 Welfare Fund ("Class Plaintiffs") will respectfully move this Court for an Order certifying the following classes.

Class Plaintiffs (except Ruth Hollman) move, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), for an Order certifying the following class (the "Health Benefit Plan Payor Class") with respect to their claims under Counts 7-11 (for conspiracy in restraint of trade against under state law) and 12 (for monopolization under state law) of the Consolidated Class Action Complaint ("Complaint") ECF 62:[1]

> All entities in the Class States[2] that, for consumption by their members, employees, insureds, participants, or beneficiaries, and other than for resale, paid and/or provided reimbursement for some or all the purchase price for Xyrem and/or Xywav during the time from January 17, 2017, through and until the date of class certification.
>
> Excluded from the Health Benefit Plan Payor Class are: (1) Defendants and their counsel, parents, subsidiaries, and affiliates; (2) Express Scripts Specialty Distribution Services, Inc. and any of its counsel, parents, subsidiaries, and affiliates; and (3) federal and

[1] In her ruling on the motions to dismiss, the Honorable Lucy H. Koh dismissed Plaintiffs' federal antitrust claims for damages under the Sherman Act. Plaintiffs, therefore, do not seek certification of a nationwide class for damages, but reserve their right to seek to certify such a class should the Court later determine that Plaintiffs may pursue damages claims as direct purchasers under the Sherman Act. In addition, on March 30, 2021, Judge Koh entered an order limiting the current phase of the litigation to ten of Plaintiffs' seventeen causes of action. ECF 62. Plaintiffs' proposed Heath Benefit Plan Payor Class includes only those states whose claims are at issue in the ten causes of action presently at issue. Plaintiffs reserve their right to seek certification of the claims not presently at issue and to seek damages for class members in the states whose claims are at issue in the ten causes of action presently at issue

[2] The Class States are Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

state governmental entities. This exclusion does not include cities, towns, municipalities, or counties or carriers for Federal Employee Health Benefit plans.[3]

Class Plaintiffs also move, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), for an Order certifying the following class (the "Injunctive Relief Class" and together with the Health Benefit Plan Payor Class, the "Classes") with respect to their claims under Count 17:

All individuals and entities in the United States and its territories that, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries purchased, other than for resale, paid for and/or provided reimbursement for some or all of the purchase price for Xyrem and/or Xywav during the time period from January 17, 2017, through and until the anticompetitive effects of the Defendants' unlawful conduct cease.

Excluded from the Injunctive Relief Class are (1) Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates, (2) Express Scripts Specialty Distribution Services, Inc. and any of its counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates, (3) federal and state governmental entities. This exclusion does not include cities, towns, municipalities, counties or carriers for Federal Employee Health Benefit plans, (4) any "single flat co-pay" consumers whose benefit plan requires a co-payment that does not vary based on the drug's status as a brand or generic, and (5) all judges assigned to this case and any members of their immediate families.

Class Plaintiffs will also move the Court to appoint them as Class representatives and to appoint as class counsel under Rule 23(g) the individuals who were previously appointed interim class counsel, namely Dena Sharp of Girard Sharp LLP and Michael M. Buchman of Motley Rice LLC as Co-Lead Class Counsel; and Joseph Saveri of Joseph Saveri Law Firm, Inc.; Jessica R. MacAuley of Hagens Berman Sobol Shapiro LLP; Karin E. Garvey of DiCello Levitt LLC; Kenneth Wexler of Wexler Boley & Elgersma LLP; Clark Craddock of the Radice Law Firm; John Macoretta of Spector Roseman & Kodroff PC; and Mark Fischer of Rawlings & Associates, PLLC as members of the Plaintiffs' Steering Committee.

---

[3] Class Plaintiffs' complaint also lists fully-insured health plans and pharmacy benefits managers as excluded groups. Such plans and entities do not, however, pay or provide reimbursement for Xyrem or Xywav and thus are not class members to begin with. There is, therefore, no need to specifically exclude them.

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

This motion is based upon this Notice of Motion and Motion, the incorporated Memorandum of Law, the Joint Declaration of Co-Lead Counsel and its exhibits ("Co-Lead Decl."), the expert Declaration of Dr. Rena Conti ("Conti Rpt.") (Co-Lead Decl., Ex. 27), the expert Declaration of Laura Craft ("Craft Decl.") (*id*., Ex. 28), the Declaration of Eric Miller ("Miller Decl.") (*id*., Ex. 29), and any argument that may be presented to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are:

(1)    whether the Court should certify the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3);

(2)    whether the Court should appoint Class Plaintiffs as Class Representatives;

(3)    whether the Court should appoint Interim Co-Lead Class Counsel and the Plaintiffs' Steering Committee as Class Counsel; and

(4)    whether the Court should conduct an evidentiary hearing on this motion.

## MEMORANDUM OF LAW

## I.    INTRODUCTION

Class Plaintiffs' antitrust claims against Jazz[4], Hikma[5], and the other Generic Defendants[6] satisfy Rule 23's requirements and are well-suited for class certification. The claims arise from a single anticompetitive scheme directed toward all Xyrem and Xywav end payors, each of whom made purchases through a single authorized pharmacy. The central question in this case—whether Defendants engaged in anticompetitive conduct to delay the release of generic Xyrem—is an issue common to all class members that can be established based on class-wide evidence. To satisfy Rule 23, the Classes will rely on common evidence and well-accepted

---

[4] Jazz Pharmaceuticals Plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz").

[5] Hikma Labs, Inc. (formerly known as Roxane Laboratories, Inc.), Hikma Pharmaceuticals USA Inc. (formerly known as West-Ward Pharmaceuticals Corp.), Eurohealth (USA), Inc., and Hikma Pharmaceuticals plc. (collectively, "Hikma").

[6] Amneal Pharmaceuticals LLC ("Amneal"); Lupin Ltd, Lupin Pharmaceuticals Inc., and Lupin, Inc. ("Lupin"); Par Pharmaceuticals, Inc. ("Parr"). Hikma, Amneal, Lupin, and Par are collectively referred to as the Generic Defendants.

1   methodologies to estimate the price that generic Xyrem would have sold for and the share of

2   prescriptions that would have been filled with the generic had it been available. Class Plaintiffs

3   will use common evidence to establish class-wide impact and estimate aggregate damages.

4        Jazz is the sole manufacturer of the narcolepsy drug Xyrem, the brand name version of

5   sodium oxybate. More than a decade ago, other drug manufacturers began to petition the United

6   States Food & Drug Administration ("FDA") for permission to manufacture, market and sell

7   generic versions of Xyrem. The Hatch-Waxman Act, which Congress passed in 1984, is

8   designed to promote and incentivize generic competition so that less expensive but nearly

9   identical generic versions of branded drugs are promptly available. Insurance plans incentivize

10  and mandate the substitution of generic for brand name drugs when a generic equivalent is

11  available. Consequently, generic drugs quickly capture nearly all of the brand company's sales.

12  The attendant loss of significant revenue posed a serious problem for Jazz, since Xyrem is the

13  company's flagship product, generating over $1 billion in yearly revenues. In 2018, Jazz's net

14  sales of Xyrem were more than ████████████████████████████. Co-Lead

15  Decl., Ex. 1 at 7. Jazz's significant profits are the result of huge price increases Jazz has taken on

16  the drug over the years, and its success in delaying competition from generic versions of Xyrem.

17       In response to the imminent threat of generic entry, Jazz colluded with the Generic

18  Defendants instead of competing. Jazz subverted the intent of the Hatch-Waxman Act and

19  suppressed generic competition, at end-payors' expense, through: (i) deliberately prolonging

20  FDA review and approval of the process through which manufactures would need to sell generic

21  Xyrem; (ii) protracted patent infringement litigation and anticompetitive agreements with the

22  Generic Defendants to delay full generic competition until 2026; and (iii) switching patients to

23  Xywav—a slightly modified version of Xyrem—before generic entry. As a direct and proximate

24  result of Defendants' anticompetitive conduct, Xyrem (and now Xywav) purchasers have paid,

25  and continue to pay, more for their prescriptions than they would in a fully competitive market.

26       Courts across the country, including in this District, routinely certify end-payor classes in

27  similar pharmaceutical antitrust cases. This case likewise presents a compelling basis for class

28  certification. Each of the requirements of Rule 23(a) is satisfied, common issues predominate

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

1    under Rule 23(b)(3), and certification under Rule 23(b)(2) is appropriate to address the ongoing

2    harm caused by Defendants' conduct because they have acted on grounds that apply generally to

3    the Injunctive Relief Class. As demonstrated below, the class action mechanism is the superior

4    method to adjudicate those claims while providing a manageable basis to proceed. Accordingly,

5    Class Plaintiffs respectfully request that the Court certify the proposed Health Benefit Plan Payor

6    Class and Injunctive Relief Class.

7    **II.**     **PROCEDURAL BACKGROUND.**

8        The Consolidated Class Action Complaint ("CCAC" or "Complaint") contains seventeen

9    counts asserting various antitrust and consumer protection claims under federal and state law.

10   *See* ECF 62 at 88-121. To streamline this litigation, the Honorable Lucy H. Koh directed the

11   parties to identify the ten causes of action that would proceed through initial resolution, with the

12   remaining claims being litigated thereafter. ECF 66 at 2. On March 30, 2021, Judge Koh entered

13   an Order identifying those causes of action. ECF 83. Judge Koh subsequently dismissed three of

14   those ten claims, *i.e.*, Plaintiffs' federal Sherman Act damages claims. ECF 138 at 80-81.[7]

15   Accordingly, Class Plaintiffs now seek certification of the claims contained in Counts 7-11 (for

16   conspiracy in restraint of trade under state law), Count 12 (for monopolization under state law)

17   and Count 17 (for injunctive relief under federal law).[8]

18   **III.**    **STATEMENT OF FACTS**

19       **A.**     **Xyrem is Approved and Becomes a Blockbuster Product for Jazz**

20       In the late 1990s, Orphan Medical developed and applied for FDA approval of Xyrem, a

21   sodium oxybate drug product. Compl., ¶ 125. In July 2002, the FDA approved Xyrem for

22   treatment of cataplexy (sudden muscle weakness) in narcolepsy patients, and in November 2005,

23   for treatment of excessive daytime sleepiness. *Id*., ¶ 127. In 2005, Jazz purchased Orphan

24

25   [7] Judge Koh's order identified Count 12 (along with Counts 5 and 6) as subject to dismissal
     because it was a "federal antitrust claim[] for damages." ECF 138 at 80. Count 12 is Plaintiffs'
26   claim for monopolization under state law and Count 1 is Plaintiffs' claim for monopolization
     under federal law. Plaintiffs, therefore, move for certification of their claims under Count 12, but
27   not Count 1.

28   [8] Class Plaintiffs reserve their right to seek certification of their remaining claims in a subsequent
     motion as directed by the Court.

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
                                                      CASE NO. 20-MD-2966-RS

Medical, including all rights to Xyrem. *Id.*, ¶ 134. The FDA granted Jazz market exclusivity to sell Xyrem until November 2012. Co-Lead Decl., Ex. 2.

**B.     Generic Competition Poses the Threat of Huge Profit Losses for Jazz**

In 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act (Pub. L. No. 98-417, 98 Stat. 1585 (1984), also known as the Hatch-Waxman Act, which "implements a network of incentives to encourage faster introduction of low-cost generics into the pharmaceutical market . . . ." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 472 (N.D. Cal. 2020). The Hatch-Waxman Act fosters generic competition because generic drugs typically cost significantly less than their brand name counterparts. Recognizing these costs savings for the American public and the fact that generics are nearly identical to the branded product ("bioequivalent"), state laws make the substitution of the generic for the brand automatic at the pharmacy counter when a generic is available. IQVIA—the leading provider of data in the healthcare sector—reports that the generic is dispensed 97% of the time. Compl., ¶ 84.

In July 2010, about two years before Jazz's orphan drug exclusivity was set to expire, Roxane (Hikma's predecessor) submitted the first ANDA for Xyrem to the FDA. Consistent with the Hatch-Waxman Act, as the first patent challenger to file an ANDA, Roxane/Hikma became entitled to "180-day exclusive-right-to-sell advantage" over other generic competitors. *FTC v. Actavis, Inc.,* 133 S. Ct. 2223, 2226 (2013); 21 U.S.C. § 355(j)(5)(B)(iv). Other generic manufacturers later filed their own ANDAs for authorization to enter the Xyrem market, which they would be able to do after Roxane/Hikma's 180-day market exclusivity period expired and the FDA approved their ANDAs.

Jazz was keenly aware that the introduction of generic competition for Xyrem would negatively impact its company revenues. ████████████████████████████████████ ██████████████████████████████████████ Co-Lead Decl., Ex. 1 at 18. ████████████████████████████████████████████ ████████████████████████████ *Id.*, Ex. 3 at 62.

**C.    Jazz's Efforts, and Defendants' Agreements, to Delay Generic Competition**

To protect its Xyrem revenue and profits from generic competition, Jazz devised a three-pronged strategy to insulate its Xyrem monopoly from generic competition: (i) abuse of the REMS process to inject delay; (ii) engage in protracted patent infringement litigation and enter into "pay for delay" agreements with the Generic Defendants to eliminate full generic competition on the merits until 2026; and (iii) switch patients to Xywav before generic entry.

**1.    Jazz exploited the Risk Evaluation and Mitigation Strategy ("REMS") approval process to delay generic competition.**

As part of its NDA approval process, Orphan Medical developed a Risk Minimization Action Plan ("RiskMAP") to mitigate any risks associated with Xyrem—a derivative of gamma-hydroxybutyrate ("GHB"). Compl., ¶¶ 128, 131. GHB is a Schedule I drug that was known as a "date-rape" drug in the 1990s. *Id.*, ¶¶ 128-29. The Xyrem RiskMAP featured an exclusive specialty mail order pharmacy distributor, Express Scripts Specialty Distribution Services ("ESSDS"), to strictly control distribution. *Id.*, ¶ 287.

In 2007, Congress enacted a new statutory framework under which Jazz was required to transition its RiskMAP to a REMS. *See* 21 U.S.C. § 355-1. Jazz initially proposed to replace the single pharmacy with multiple certified pharmacies. Compl., ¶ 168. Jazz explained that "[t]he demand for sodium oxybate for illicit purposes is nearly nonexistent," while the Xyrem RiskMAP was "complex and cumbersome[.]" Co-Lead Decl., Ex. 4 at 77. ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ *Id.*, Ex. 5 at 29. But Jazz fought the FDA's determination, first filing a formal dispute resolution request and, after losing, an appeal. Compl., ¶ 170. ████████████████████████████████ ███████████████████████████████████████████ ██████████████████████ Co-Lead Decl., Ex. 6 at 299–300.

Win or lose, Jazz stood to gain from its fight with the FDA. Jazz continued to sell Xyrem under its RiskMAP pending approval of its proposed REMS. This posed a problem for generic

1  competitors since the statute requires that a generic drug have a single shared REMS system with

2  the brand or a comparable REMS. 21 U.S.C. § 355-1(i)(1)(C). Thus, if Jazz did not have a

3  REMS, neither could any generic. This created an opportunity for Jazz to frustrate the REMS

4  approval process to prevent and/or delay generic competition.

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████ Co-Lead

9  Decl., Ex. 7 at 71. ████████████████████████████████████████████

10  ████████████████████████████████████ *Id*. at 371-72.

11       Jazz's abuse of the REMS approval process did not stop there. In 2012, Jazz and Roxane

12  were required to negotiate a shared REMS. ██████████████████████████████

13  ██████████████████████████████ Also beginning in 2012, generic manufacturers,

14  Amneal, Par, Ranbaxy, Watson, Wockhardt, and Lupin, filed ANDAs referencing Xyrem and

15  joined the negotiations. █████████████████████████████████████████

16  ████████████████████████████████████████████████ *Id.* at

17  76–81. ██████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ████████████████████████████████████ *Id*., Ex. 9 at 406.

21  That same day, the FDA granted final approval to the ANDA submitted by Roxane, which had

22  been acquired by Hikma in 2016, and two days later, the FDA granted tentative approval to

23  Amneal and Sun's ANDAs. Compl., ¶¶ 153, 200; Co-Lead Decl., Ex. 10.[9]

24

25

26

27  _____

[9] *See also Drugs@FDA: FDA-Approved Drugs*, FDA.gov (last visited Nov. 15, 2022),

28  https://www.fda.gov/drugs/development-approval-process-drugs/drug-approvals-and-databases (timing of ANDA approvals).

2.    Jazz prolonged the Xyrem patent litigation as long as it could before reaching anticompetitive pay-for-delay deals with the Generic Defendants.

Sodium oxybate is a known compound that lacks patent protection. As Orphan Medical told the FDA in 1997: "The major reason why no company has heretofore developed GHB for any indication is that there is a lack of patent protection, not because of the lack of safety or efficacy." Co-Lead Decl., Ex. 11 at 57–58. Orphan nonetheless obtained several patents related to Xyrem consisting of two patent families: (i) the formulations of sodium oxybate, the methods of treating sleep conditions, and manufacturing processes ("Formulation Patents"); and (ii) the distribution of Xyrem ("REMS Patents").

On November 22, 2010, soon after Roxane filed its ANDA, Jazz commenced patent infringement litigation against Roxane in the District of New Jersey for patent infringement, asserting infringement of both the Formulation Patents and the REMS Patents. Compl., ¶¶ 148-50. Amid the Roxane patent litigation (and even though Xyrem had been marketed since 2002), Jazz obtained new Formulation and REMS Patents, as well as a new family of patents relating to the interaction of Xyrem and Depakote (the "Drug Interaction Patents"). Jazz sued Roxane for infringement of these new patents in order to delay the litigation and generic market entry. Jazz also sued the other Generic Defendants, some of whom petitioned for *inter partes* review of the REMS Patents to the Patent Trial and Appeal Board ("PTAB"). Between July 2016 and March 2017, the PTAB found that nearly all[10] the claims of the REMS Patents were invalid as obvious, which the Federal Circuit affirmed in 2018. *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347 (Fed. Cir. 2018).

In early 2017, Jazz was running out of ways to delay generic competition. Three generics had received FDA approval of their ANDAs, including approvals of their proposed REMS. Most of the REMS Patents had been found invalid. Hikma's trial was scheduled for May 2017.

With generic competition approaching and on the eve of trial, Jazz elected to settle the patent infringement litigation with Hikma by means of an unlawful "pay-for-delay" agreement.

_____

[10] ████████████████████████████████████████████████████

1  *See* Compl., ¶ 211; *see also* Co-Lead Decl., Ex. 13–15. Under this agreement, Hikma dropped its

2  challenges to Jazz's patents and agreed not to launch its generic Xyrem product until July 2023 at

3  the earliest. *See* Compl., ¶ 214. In exchange, Jazz agreed to let Hikma sell an authorized generic

4  ("AG")—Jazz's brand Xyrem with Hikma's artwork on the label, rather than Hikma's true

5  generic product—as the exclusive generic on the market for the first six months of 2023. *See* Co-

6  Lead Decl., Ex. 16. Jazz also provided other consideration, including an "acceleration" clause that

7  allowed Hikma to launch earlier under certain conditions. *See* Compl., ¶ 215.

8       The other Generic Defendants knew that Hikma's 180-day market exclusivity period

9  under the Hatch-Waxman Act prevented them from entering the market during the first six

10  months of generic competition, and that the settlement delayed Hikma's launch until at least

11  January 1, 2023. Thus, in 2018, each of the remaining generics settled with Jazz. *Id.* at ¶ 248. Par,

12  Lupin, and Amneal each agreed to their own pay-for-delay agreements with Jazz. Each agreed to

13  drop its patent challenges and postpone the launch of its own product until 2026. Each was

14  permitted to launch an AG on July 1, 2023, with sales capped at "a low single digit percentage"

15  of brand unit sales each. Compl., ¶¶ 250-51, 257-58, 264-65; *see also* ECF 138 at 15.

16       3.    Once generic entry was inevitable, Jazz sought to suppress generic entry

17  ▮▮▮▮▮▮▮▮▮▮▮▮

18       After securing settlements designed to prevent generic competition on the merits until

19  2026, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮ Co-Lead Decl., Ex. 17 at 17; *id.*, Ex. 18 at 6–13. ▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮ *Id.*, Ex. 18 at 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. 19 at 7. Jazz's continued success is evident: there

26  is still no generic version of Xyrem available today, and full competition on the merits will not

27  begin until 2026.

28

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

**D.    The Impact of Defendants' Conduct on the Classes**

The alleged anticompetitive conduct has harmed health benefit plan payors (sometimes referred to as "third party payors" or "TPPs") by depriving them of the opportunity to pay for a less expensive generic version of Xyrem sooner. Prescription drug benefit plans incentivize the use of generic drugs by making them less expensive to the consumer than the branded product. Health benefit plans —entities that provide prescription drug plans—pay the bulk of drug costs and sustain antitrust injury when forced to pay for the higher priced branded product in the absence of generic competition. Here, health benefit plan payors paid overcharges when they were forced to pay for branded Xyrem instead of being given the opportunity to purchase a less expensive generic version of the drug.

Class Plaintiffs allege that health benefit plan payors that paid for branded Xywav were likewise harmed. Absent Defendants' anticompetitive conduct, generic entry for Xyrem would have occurred before the launch of Xywav in November 2020. With earlier generic entry, the sodium oxybate market would have been dominated by the generic versions Xyrem by the time Xywav launched—if Jazz ever launched Xywav *at all*. *See* Co-Lead Decl., Ex. 20 at 25 ████ ████████████████████████████████████████████████████████████. Assuming a healthy competitive environment, regardless of whether class members have paid for branded Xyrem or Xywav, they would have paid less absent Defendants' anticompetitive conduct. And these harms are ongoing. Because the settlement agreements limit the amount of generic Xyrem that the Generic Defendants can sell from 2023 through the last day of 2025, true competition from generic versions of Xyrem will not begin until 2026.

Class Plaintiffs' expert, Dr. Rena Conti, has used class-wide evidence to demonstrate that members of the Health Benefit Plan Payor Class suffered antitrust impact because of Defendants' conduct. Dr. Conti has estimated that the Health Benefit Plan Payor Class suffered nearly $1.84 billion in aggregate damages. *Id*., ¶ 140. Absent injunctive relief, damages will substantially increase each year going forward.

1  **IV.**    **ARGUMENT**

2         "The Supreme Court has long recognized that class actions serve a valuable role in the

3  enforcement of antitrust laws." *In re High-Tech Emp. Antitrust Litig*, 985 F. Supp. 2d 1167, 1179

4  (N.D. Cal. 2013) (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972)). Before

5  certifying a class action, a district court must be satisfied that the prerequisites of Rule 23 have

6  been met. *See Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th

7  651, 664 (9th Cir 2022) (*en banc*) (cert. denied Nov. 14, 2022). A plaintiff "must prove the facts

8  necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a

9  preponderance of the evidence." *Id*. at 665. At the class certification stage, merits questions may

10  be considered only to determine whether Rule 23 prerequisites for class certification have been

11  met. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).

12         Federal courts—including in this District—frequently certify end-payor classes in

13  pharmaceutical antitrust cases. *See, e.g.*, *In re HIV Antitrust Litig.*, No. 19-cv-02573, ECF 1452-

14  7 (N.D. Cal. Sept. 27, 2022) (Co-Lead Decl., Ex. 21); *In re Lidoderm Antitrust Litig.*, 2017 WL

15  679367 (N.D. Cal. Feb. 21, 2017); *In re: Zetia (Ezetimibe) Antitrust Litigation*, 2021 WL

16  3704727 (E.D. Va. Aug. 20, 2021); *In re Opana ER Antitrust Litig.*, 2021 WL 3627733 (N.D. Ill.

17  June 4, 2021), *as amended*, Case No. 14-cv-10150, ECF No. 746 (N.D. Ill. Aug. 11, 2021); *Sheet

18  Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d

19  182 (D.R.I. May 18, 2021); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D.

20  294 (D. Mass. May 14, 2021); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D.

21  527 (S.D.N.Y. Feb. 11, 2021); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust

22  Litig.*, 335 F.R.D. 1 (E.D.N.Y. 2020); *In re EpiPen (Epinephrine Injection, USP) Marketing,

23  Sales Practices and Antitrust Litig.*, 2020 WL 1180550 (D. Kan. Mar. 10, 2020); *In re Loestrin

24  24 FE Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. Oct. 17, 2019); *Hosp. Auth. of Metro. Gov't

25  of Nashville & Davidson Cty v. Momenta Pharm., Inc.*, 333 F.R.D. 390 (M.D. Tenn. Sept. 20,

26  2019); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777 (D. Mass.

27  Oct. 16, 2017).[11] At least eight end-payor class actions were certified in 2020, 2021, and 2022

28  ─────────────────────
[11] *See also In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168 (D. Mass. 2013), *aff'd*,
*Footnote continued on next page*

alone.[12] Generic suppression claims are well suited for class treatment because common evidence shows defendants' anticompetitive conduct and that such conduct prevented and delayed end-payors from obtaining more timely access to a lower-priced generic.

**A.     The Requirements of Rule 23(a) Are Satisfied**

**1.     The Proposed Classes Are Sufficiently Numerous**

Rule 23(a)(1) requires that members of a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class with more than 40 members "raises a presumption of impracticability of joinder on numbers alone." *Terry v. Hoovestol, Inc.*, 2018 WL 6439167, at *3 (N.D. Cal. Dec. 7, 2018) (Tigar, J.). Data produced by ESSDS shows that there are tens of thousands of prescriptions of Xyrem and/or Xywav per month. Conti Rpt., ¶ 50. Accordingly, Class Plaintiffs easily satisfy Rule 23(a)(1).

**2.     Class Plaintiffs' Claims Involve Common Questions of Law and Fact**

Rule 23(a)(2) requires "questions of law or fact common to the class." A common question is one that is "capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The rule does not require that *all* questions be common to the class. To the contrary, even a single common question will suffice. *Id.* at 359. "Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke'" because proof of the violation "'will focus on defendants' conduct and not on the conduct of individual class members.'" *In re*

_____

[12] *HIV*, Co-Lead Decl., Ex. 21; *Zetia*, 2021 WL 3704727; *Opana*, 2021 WL 3627733; *Sheet Metal Workers*, 540 F. Supp. 3d 182; *Ranbaxy*, 338 F.R.D. 294; *Namenda*, 2021 WL 509988; *Restasis*, 335 F.R.D. 1; *EpiPen*, 2020 WL 1180550.

777 F.3d 9 (1st Cir. 2015); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126 (E.D. Pa. 2011); *Teva Pharms. USA, Inc. v. Abbott Lab'ys*, 252 F.R.D. 213 (D. Del. 2008); *Ferrell v. Wyeth-Ayerst, Labs., Inc.*, 2007 U.S. Dist. LEXIS 44391, at *6 (S.D. Ohio June 19, 2007); *In re Abbott Labs. Norvir Antitrust Litig.*, 2007 WL 1689899 (N.D. Cal. June 11, 2007); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.*, No. 04-mc-535 (D.D.C. Jan. 6, 2006) (ECF No. 30); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004); *Ferrell v. Wyeth-Ayerst Labs, Inc.*, No. 01-cv-447 (S.D. Ohio July 1, 2004) (ECF No. 100); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001).

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

*High-Tech*, 985 F. Supp. 2d at 1180 (citing *Dukes*, 564 U.S. at 349). Here, key questions of law or fact common to the Health Benefit Plan Payor Class turn on Defendants' anticompetitive conduct, including:

    a)  Whether Jazz unlawfully maintained and continues to maintain monopoly power through all or part of their overall anticompetitive scheme;

    b)  Whether Defendants conspired to delay generic competition for Xyrem;

    c)  To the extent procompetitive justifications exist, whether there were less restrictive means of achieving them;

    d)  Whether Defendants' conduct was a substantial contributing factor in causing some amount of delay of the entry of generic Xyrem;

    e)  Whether Defendants' conduct caused antitrust injury through overcharges paid by the members of the Health Benefit Plan Payor Class;

    f)  Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and/or interstate commerce;

    g)  The determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic conduct caused; and

    h)  The quantum of overcharges class members paid, and will continue to pay, as a result of Defendants' unlawful conduct.

*See* Compl., ¶ 338. These questions are common to the proposed classes. *See HIV*, Co-Lead Decl., Ex. 21, at 9 (in generic delay cases there are "clearly common questions of law and fact"); *Lidoderm*, 2017 WL 679367, at *1 (common questions included: "Did defendants engage in anticompetitive conduct? Did that conduct lead to overcharges for brand and generic lidocaine patches? What aggregate damages resulted from the overcharges?"); *EpiPen*, 2020 WL 1180550, at *13 (listing similar common issues). Thus, the proposed classes easily satisfies the requirements of Rule 23(a)(2).

        3.    <u>Class Plaintiffs' Claims Are Typical of the Claims of the Classes</u>

      Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Castillo v. Bank of America, NA*, 980 F.3d 723, 729 (9th Cir. 2020) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). The claims of named plaintiffs are typical of the class when a plaintiff's claim "arise[s] from the

1  same event, practice or course of conduct that gives rise to the claims of the absent class

2  members" and is "based on the same legal or remedial theory." *In re Dynamic Random Access*

3  *Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *4 (N.D. Cal. June 5, 2006) (alteration

4  in original) (citation omitted). "[C]laims are 'typical' if they are reasonably co-extensive with

5  those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at

6  1020. Class Plaintiffs' claims and those of absent class members arise from the same course of

7  conduct, namely, Defendants' anticompetitive scheme to prevent or delay the availability of less

8  expensive generic Xyrem. *See Hosp. Auth.*, 333 F.R.D. at 404 (finding typicality satisfied where

9  "Plaintiffs and putative [End-Payor] class members have claims that arise from the same course

10  of conduct—the Defendants' alleged anticompetitive conspiracy to reduce generic competition

11  in the enoxaparin market and reap the benefits of the resulting overcharges."). Here, "[t]he legal

12  theory that plaintiffs primarily rely upon is antitrust liability. Because plaintiffs and all class

13  members share these claims and this theory, the representatives' claims are typical of all." *In re*

14  *Citric Acid Antitrust Litig.*, 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996). Defendants'

15  suppression of competition caused the named Class Representatives and members of the

16  proposed Health Benefit Plan Payor Class to suffer the same antitrust injury – paying

17  overcharges for Xyrem and/or Xywav.

18      **4.    Class Plaintiffs Will Fairly and Adequately Represent the Interests of the
19            Classes**

20      Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

21  the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry . . . serves to uncover

22  conflicts of interest between named parties and the class they seek to represent." *Amchem*

23  *Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997). To determine whether plaintiffs will fairly

24  and adequately represent a class, courts consider whether the named plaintiffs: (i) have any

25  conflicts of interest with other class members; and (ii) will prosecute the action vigorously on

26  behalf of the class. *See Boston Retirement System v. Uber Technologies, Inc.*, 2022 WL 2954937

27  * 4 (N.D. Cal. 2022) (Seeborg, J.). Where, as here, the overarching question is based on the

28  Defendants' conduct, named Plaintiffs and the Health Benefit Plan Payor Class have the same

1   objective: proving that Defendants acted unlawfully and that purchasers paid, and continue to

2   pay, overcharges as a result. There is no conflict because this common purpose is at the "heart of

3   the litigation." *Id.*

4          Class Plaintiffs are also represented by counsel experienced in pharmaceutical antitrust

5   litigation who were appointed as interim class counsel (ECF No. 59) and have committed and

6   will continue to commit the resources necessary to zealously litigate this action on behalf of the

7   proposed Classes. *See* Co-Lead Decl., ¶ 32 for hyperlinks to proposed Co-Lead Counsel's and

8   Plaintiff Steering Committee's biographies. Accordingly, Rule 23(a)(4) is satisfied, Dena Sharp

9   of Girard Sharp LLP and Michael M. Buchman of Motley Rice LLC should be appointed as Co-

10  Lead Class Counsel, and Joseph Saveri of Joseph Saveri Law Firm, Inc.; Jessica R. MacAuley of

11  Hagens Berman Sobol Shapiro LLP; Karin E. Garvey of DiCello Levitt LLC; Kenneth Wexler of

12  Wexler Boley & Elgersma LLP; Clark Craddock of the Radice Law Firm; John Macoretta of Spector

13  Roseman & Kodroff PC; and Mark Fischer of Rawlings & Associates, PLLC should be appointed

14  as members of the Plaintiffs' Steering Committee.

15         **B.     The Requirements of Rule 23 (b)(3) Are Satisfied**

16         Class Plaintiffs seek certification of the proposed Health Benefit Plan Payor Class under

17  Rule 23(b)(3) for violations of state antitrust laws (Counts 7-12; Compl. at ¶¶ 393-471). Under

18  Rule 23(b)(3), certification is appropriate where "the court finds that questions of law or fact

19  common to class members predominate over any questions affecting only individual members,

20  and that a class action is superior to other available methods for fairly and efficiently

21  adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether

22  proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*,

23  521 U.S. at 623. The rule is satisfied when "[a] common nucleus of facts and potential legal

24  remedies dominates [the] litigation." *Hanlon*, 150 F.3d at 1022. A plaintiff carries his burden

25  when "a common issue relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4[th] at 665.

26  "When common questions present a significant aspect of the case and they can be resolved for

27  all members of the class in a single adjudication, there is clear justification for handling the

28  dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

(citation omitted). Class Plaintiffs need not prove their case at the class certification stage but must instead show that a predominating common question or questions are "*capable* of class-wide resolution." *Olean*, 31 F.4th at 665. The issues at the heart of this litigation—Defendants' alleged violations of the antitrust laws, market power, antitrust impact, and aggregate damages—are common to the Health Benefit Plan Payor Class. Class Plaintiffs, therefore, meet their burden of establishing predominance.

> 1.    Common Issues Predominate as Class Plaintiffs' Theories of Liability

It is well recognized that "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625. "[C]ommon issues usually predominate in cases where the defendants are alleged to have engaged in collusive, anticompetitive conduct resulting in artificially high market-wide prices for a product." *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 411 (2004) (collecting cases). The focus is on Defendants' conduct and the effect on the market, which are common to all class members. The focus *is not* on the actions of individual class members. *See Glumetza*, 336 F.R.D. at 475 (citing *Alaska Airlines v. United Airlines*, 948 F.2d 536, 540 (9th Cir. 1991)); *see also HIV*, Co-Lead Decl., Ex. 21, at 33 (same) (citing *Namenda*, 338 F.R.D at 551). Defendants' antitrust violations will be shown with common proof for Class Plaintiffs' claims, as described further below.

> a.    *Conspiracy Claims (Counts 7 – 11 and 13)*

The central liability question in this case, as in many generic delay antitrust cases, is whether Jazz made a *quid pro quo* payment to the Generic Defendants "in return for staying out of the market." *Actavis*, 133 S. Ct. at 2234. To establish Defendants' anticompetitive agreement, Plaintiffs will present common evidence such as the settlement agreements which Jazz entered into with Hikma and the other Generic Defendants which caused them to "stay[] out of the market" longer than they otherwise would have. *Id.* The agreements prevented full competition on the merits until 2026, thus allowing only for limited generic entry in 2023 on terms that were designed to prevent full competition. Common proof will also quantify the value of the payments, as well as the parties' expected profits with and without the unlawful payments. In other words, "the illegality of defendants' scheme turns on details of the payment and

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

1    defendants' purposes — evidence common to every purchaser." *Glumetza*, 336 F.R.D. at 475.

2    As such, "common issues predominate in proving [Defendants'] antitrust violation" because

3    Plaintiffs will establish their claims using common evidence that focuses "on the defendants'

4    conduct and not on the conduct of the individual class members." *In re DRAM,* 2006 WL

5    1530166, at *7.

6                    b.    *Monopolization Claim (Count 12)*

7         Common evidence will also be used to show Jazz's unlawful monopolization.

8    "[M]onopolization claims readily lend themselves to common evidence. They require: (i) the

9    possession of monopoly power in the relevant market; and (ii) the willful acquisition or

10   maintenance of that power as distinguished from growth or development as a consequence of a

11   superior product, business acumen, or historic accident. So, the state of the market and

12   defendants' use and maintenance of monopoly power, as opposed to individual plaintiff's

13   conduct, drives the claim." *Glumetza*, 336 F.R.D. at 475 (internal quotation omitted). Here,

14   common evidence of Jazz's maintenance of monopoly power will include its agreements with

15   Hikma and other Generic Defendants, its interactions with the FDA concerning its REMS

16   program (which even the FDA recognized "could have the effect of blocking or delaying

17   approval of generic versions of Xyrem" (Compl., ¶ 172)), internal documents and

18   communications from Jazz, and the expert analysis from the patent infringement litigation.

19              2.    Common Issues Predominate as to Market Power

20        Class Plaintiffs can establish that Jazz possessed and continues to possess market power

21   through both direct and circumstantial evidence that is common to the Health Benefit Plan Payor

22   Class. *See EpiPen*, 2020 WL 1180550, at *51 (market power presented a common issue). Direct

23   evidence, which includes historical pricing data from Jazz and industry sources, will show Jazz

24   was able to raise and maintain the prices of branded Xyrem and Xywav irrespective of the

25   pricing of other products and without a corresponding loss of sales. Defendants' internal

26   documents, models, and forecasts will also provide indirect evidence of Jazz's market power and

27   ability to maintain supracompetitive prices for Xyrem and Xywav. Information concerning

28

1   Jazz's marginal costs and an analysis of the size of the reverse payments will be further common

2   evidence of Jazz's market power.

3               3.       Common Issues Predominate as to Antitrust Injury

4          "'Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that

5   results from a violation of the antitrust laws.'" *In re High-Tech*, 985 F. Supp. 2d at 1192 (citation

6   omitted). To prove antitrust impact, a plaintiff must show some damage due to a defendant's

7   violations. *See Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 114, n.9 (1969).

8          Class Plaintiffs will use common proof to establish that members of the proposed Health

9   Benefit Plan Payor Class paid overcharges as a result of Defendants' antitrust violations—*i.e.*,

10   the difference between what they paid for branded Xyrem and Xywav and what they would have

11   paid for generic Xyrem. "[A]ntitrust injury occurs the moment the purchaser incurs an

12   overcharge, whether or not that injury is later offset." *In re Nexium Antitrust Litig.*, 777 F.3d 9,

13   27 (1st Cir. 2015); *Lidoderm*, 2017 WL 679367, at *21 (citing *Nexium*); *Mayor of Baltimore v.*

14   *Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) (asserting that "each time

15   [pharmaceutical company] sold [branded drug] at a supracompetitive price . . . , it illegally

16   exercised monopoly power . . . thus committing an overt act that caused injury and violated the

17   antitrust laws"); *Zetia*, 2021 WL 3704727, at *2 ("[I]njury occurs at the moment a single

18   overcharge occurs due to the alleged anticompetitive conduct."). A plaintiff must provide

19   evidence that is "capable" of showing class-wide impact and would be "sufficient to sustain a

20   jury verdict on the question of antitrust impact." *Olean*, 31 F.4th at 685; *see also id.* (finding a

21   defendant may "challenge the persuasiveness of such evidence at trial").

22          Class-wide impact is the natural consequence of Defendants' anticompetitive scheme. As

23   explained in more detail below, delayed generic entry typically leads to the payment of

24   overcharges by end payors because generic drugs are less expensive than their brand name

25   counterparts. This "driving question" is "what did defendants' scheme do to the market?"

26   *Glumetza*, 336 F.R.D. at 476. Even as to the secondary question of "which class members were

27   swept up in the scheme" (*id.*), common evidence also shows that it is almost certain that

28   members of the Health Benefit Plan Payor Class were injured. For these reasons, courts have

1    routinely found that common issues predominate in generic delay antitrust class actions. *See* Part

2    IV, *supra*.

3        In this case, Dr. Conti explains that all or virtually all members of the Health Benefit Plan

4    Payor Damages Class would have paid less for purchases of sodium oxybate. Conti Rpt., ¶ 3.

5    Even if the Health Benefit Plan Payor Class contained some uninjured members, the relevant

6    question is whether there is "reason to think that [individualized] questions will overwhelm

7    common ones and render class certification inappropriate under Rule 23(b)(3)." *Halliburton Co.*

8    *v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277 (2014). The Ninth Circuit has explicitly held that

9    there is no prohibition on "the certification of a class that potentially includes more than a de

10   minimis number of uninjured class members." *Olean*, 31 F.4th at 669.[13]

11                    a.    Common Evidence Shows that Delays in the Introduction of Generic
                          Drugs Result in Supracompetitive Prices for End Payors
12

13        The Supreme Court has explained that in a pay-for-delay case, the "payment's objective

14   is to maintain supracompetitive prices to be shared among the patentee and the challenger rather

15   than face what might have been a competitive market." *Actavis*, 133 S. Ct. at 2236. A "payment

16   in return for staying out of the market . . . simply keeps prices at patentee-set levels" and allows

17   drug companies to divide monopoly profits with the result that "[t]he patentee and the challenger

18   gain; the consumer loses." *Id*. at 2234-35. Thus, overcharges caused by delayed generic entry are

19   a "well-recognized type of antitrust injury." *Lidoderm*, 2017 WL 679367, at *10.

20        Health benefit plan payors lose when they are denied access to less expensive generic

21   versions of drugs. *See Restasis*, 335 F.R.D. at 9 ("[G]eneric drugs are favored because they are

22   generally much cheaper than their brand name counterparts."). According to a study conducted

23   by the Federal Trade Commission, generic drugs are typically 85% less expensive than the brand

24   versions of the same drug. Conti Rpt., ¶ 66. And the laws of the states at issue generally *require*

25

26   ---
     [13] *See also Kohen v. PIMCO*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) ("[A] class will often
     include persons who have not been injured by the defendant's conduct," but that "possibility or
27   indeed inevitability does not preclude class certification."); *In re Urethane Antitrust Litig.*, 768
     F.3d 1245, 1254 (10th Cir. 2014) (upholding class antitrust verdict where "[i]t is true that some of
28   the plaintiffs may have successfully avoided damages.").

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
                                                    CASE NO. 20-MD-2966-RS

that the pharmacy substitute a prescription for a brand name product with the less expensive generic version of the drug. *Id.,* ¶ 41. In addition, formularies, higher co-payments for branded drugs than generic drugs, and other "institutional mechanisms promote or require the substitution of less expensive generic drugs for brand versions once a generic drug enters the market." *Restasis*, 335 F.R.D. at 12; *see also* Conti Rpt., ¶ 42. According to IQVIA—the leading pharmaceutical data analytics firm in the world—when generic versions of a drug are available, they are, on average, dispensed 97% of the time. Conti Rpt., ¶ 76. Dr. Conti's report details the academic literature and studies showing that generic products are significantly less expensive than their brand name counterparts and offer payors substantial cost savings. *Id.*, ¶¶ 61-72.

Evidence of the general market dynamics of the pharmaceutical industry is highly relevant to the question of whether end payors here would have paid less had generic Xyrem been available earlier. Highly persuasive to the court in *Lidoderm*, for example, was the "well-established academic and industry-accepted evidence of the swift and significant (in volume) switch to generic drugs mandated by state laws and the economic realities upon generic entry." 2017 WL 679367, at *10. And because "the introduction of generic drugs creates significant cost savings for consumers at most levels of the distribution chain," delays in generic entry cause end payors like health benefit plan payors to pay significant overcharges. *Id*. The *Glumetza* court likewise relied on the "economic literature" that "reliably concludes generic drugs, as essentially-identical commodities, compete with the brand and with each other based on price, lowering prices." 336 F.R.D. at 476. As explained in more detail below, absent Defendants' anticompetitive conduct, the market for sodium oxybate would have followed this well-established trend: generic Xyrem would have been less expensive than brand Xyrem or Xywav, and prescriptions would have been filled with the generic had it been available, thereby saving Class members in this case over a billion dollars (and counting).

        b.     *Common Evidence Shows that Generic Xyrem Would Have Been Substantially Less Expensive than Branded Xyrem and Xywav*

Class Plaintiffs' expert, Dr. Rena Conti, provides a detailed analysis of how the delayed entry of generic Xyrem caused Health Benefit Plan Payor Class members to pay overcharges

1   (and thus suffer antitrust injury) utilizing class-wide evidence and methodologies. Dr. Conti uses

2   data from ESSDS—the single pharmacy that has dispensed Xyrem and Xywav—to determine

3   the prices paid by Health Benefit Plan Payor Class members for each branded Xyrem and

4   Xywav sale. Dr. Conti compares ESSDS prices to the estimated price at which generic Xyrem

5   would have sold. In addition to the relevant economic literature, Dr. Conti's estimate of the price

6   generic Xyrem would have sold for is informed by two well-accepted, class-wide

7   methodologies: Defendants' internal projections and the performance of an analogous

8   "benchmark" drug. *See Restasis*, 335 F.R.D. at 17 n.13 (the difference between the brand and

9   generic prices "will be resolved through the jury through the use of common evidence[.]").

10      *First*, Dr. Conti looks to forecasts authored by the Generic Defendants that predict how

11  price would be affected by generic entry. ██████████████████████████████

12  ████████████████████████████████████████████████

13  ███████████████ Conti Rpt., ¶ 73. ████████████████████████

14  ████████████████████████████ *Id*. Jazz forecast that in 2026—once true generic

15  competition begins—the price of generic Xyrem will be "93% lower than Xyrem." Co-Lead

16  Decl., Ex. 22 at 3. █████████████████████████

17  ████████████████████████████████████████████

18  ██████████████████████████████████ *Id*., Ex. 23 at 19.

19      *Second*, to model the specific price of generic Xyrem, Dr. Conti uses the real-world

20  prices of another narcolepsy drug: Provigil. Provigil is well-suited as a benchmark product

21  because it shares key features with Xyrem, in that Provigil: (i) treats the same condition; (ii) has

22  had a similar market volume of over a billion dollars in yearly sales; (iii) is administered orally;

23  and (iv) experienced a generic launched in 2012 (within several years of generic entry date used

24  by Dr. Conti). Conti Rpt., ¶¶ 107-10. Studies have shown that these common features are

25  important factors when evaluating the performance of similar generic versions of a product. *See*

26  *id*., ¶ 108 (citing studies finding more generic entry for drugs with large annual sales).

27      Dr. Conti's analyses (and the well-established academic literature) support her estimate

28  that after launching at ████ of the brand price, the price of generic Xyrem would have declined

- 22 -

further. Conti Rpt., ¶ 133.[14] Meanwhile, the price of brand name Xyrem and Xywav that Health

Benefit Plan Payor Class members did pay rose dramatically. *Id*. As a result, the difference

between the prices purchasers actually paid and what they would have paid had a generic been

available—*i.e.*, the overcharge—has continued to rise during the class period. *Id*. At launch the

generic would have cost ███ less per prescription than the brand and ███ less per

prescription two years later. *Id*.

> c.    *Common Evidence Shows that Injury Would Have Been Widespread*
> *Among Health Benefit Plan Payor Class*

Dr. Conti's class-wide methodologies rely upon Defendants' own projections, industry

literature, and benchmark products to demonstrate that Health Benefit Plan Payor Class members

would have purchased the less expensive generic had it been available, and thus were injured by

delayed generic entry. As noted above, when generic versions of drugs are available, they are

dispensed 97% of the time (meaning that, on average, generic erosion curves reach 97%). Conti

Rpt., ¶ 76. Consistent with normal industry practice and ████████████████████

████████████████████████████████████████████████

████ . *Id*., ¶ 78. ██████ Par estimated that, within one year of generic entry, the

generics would capture ███ and 93% of the market, ██████ . *Id*., ¶ 79.

Dr. Conti's analysis provides class-wide evidence that is more than "capable of

answering the question whether there was antitrust impact due to the collusion on a class-wide

basis, thus satisfying this prerequisite of Rule 23(b)(3)." *Olean*, 31 F.4th at 676; *see also In re*

*Cipro Cases I and II*, 121 Cal. App. 4th at 411 ("The damages suffered by the class depends

primarily on the effect of [the defendant's] alleged monopoly on the overall market for

ciprofloxacin. This is a matter that is subject to class-wide proof by way of expert testimony,

without regard to the particular circumstances of each individual class member."). And that

---

[14] At this stage of the litigation, Class Plaintiffs are not taking a conclusive position on when
generic Xyrem would have entered the market absent Defendants' conduct. Dr. Conti's model is
flexible and can be adjusted to demonstrate damages and impact regardless of the entry date
ultimately put forward by the Class Plaintiffs and/or selected by the jury. For purposes of
showing how classwide impact and damages can be measured, Dr. Conti primarily uses a January
2017 generic entry date. To demonstrate the flexibility of the model, Dr. Conti has also analyzed
impact and damages using a July 2020 generic entry date.

analysis shows that it is exceedingly unlikely that members of the Health Benefit Plan Payor Class would have been uninjured.

> ### d.     Members of the Health Benefit Plan Payor Class Were Injured

Health benefit plan payors are self-insured entities that provide prescription drug benefit coverage and pay the portion of the drug cost that is not paid by the consumer (*i.e.* the health benefit plan payors' members, beneficiaries, and insureds). Their injuries are thus straightforward: when prescription drugs are more expensive because a generic version is unavailable, they spend more money than they would have had a generic version been available.

Using Provigil as a benchmark, Dr. Conti estimates that ultimately 95-98% of branded Xyrem and Xywav *prescriptions* would have been filled with a generic version of Xyrem had it been available earlier. Conti Rpt., ¶ 130. As Dr. Conti explains, because consumers make numerous Xyrem and/or Xywav purchases, and the chance that each one of those purchases would have been for the generic is 2-5%, the likelihood that any health plan beneficiary would have never filled a prescription with the generic is much lower than 2-5%. Conti Rpt., ¶ 80; *see EpiPen*, 2020 WL 1180550, at *32-33 (finding persuasive a similar "probability analysis"). And because health benefit plan payors typically provide prescription benefit coverage for a large number of beneficiaries, the likelihood that a single one of the prescription paid for by a particular health benefit plan payor would not have been substituted with generic Xyrem had it been available is even lower and presents a "largely hypothetical" situation. Conti Rpt., ¶ 86; *see HIV*, Co-Lead Decl., Ex. 21 at 40 ("[A] TPP is injured so long as *one* of its members would have, on *one* occasion, bought generic in lieu of brand[.]"). There is, therefore, "no sound basis to conclude that any TPP would not have been injured" by the delayed entry of generic Xyrem. *Restasis*, 335 F.R.D. at 29; *see also HIV*, Co-Lead Decl., Ex. 21 at 42 ("[W]ith such a high generic conversion rate, it can reasonably be inferred that most TPPs would be injured because they would suffer injury from just one TPP member (individual consumer) buying generic over brand one time[.]").[15]

---

[15] As noted above, Jazz has steadily and drastically increased the price of Xyrem during the same period it has successfully delayed the launch of competing generic products. Class Plaintiffs

*Footnote continued on next page*

1    While Jazz pays "rebates" long after transactions are consummated, those payments are

2    entirely irrelevant to whether health benefit plan payors were impacted for two reasons. The

3    relevant question is whether a plaintiff paid an overcharge *at the time of purchase*—not whether

4    it was allegedly later offset by rebates. It is for this and other reasons that courts have repeatedly

5    found that rebates or other post-purchase payments are irrelevant to the question of whether a

6    health benefit plan payor was injured. *See Lidoderm*, 2017 WL 679367, at *21 (post-overcharge

7    rebates are insufficient to disprove antitrust injury); *Ranbaxy*, 338 F.R.D. at *306 (same);

8    *Namenda*, 338 F.R.D. at 557-58 (same); *Restasis*, 335 F.R.D. at 29 (same); *Loestrin*, 410 F.

9    Supp. 3d at 393 (same); *Solodyn*, 2017 WL 4621777 at *18 (same); *In re Thalomid & Revlimid*

10    *Antitrust Litig.*, No. CV 14-6997, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018) (same).[16]

11    The notion that rebates could prevent health benefit plan payors from being injured is also

12    misplaced in this case because ████████████████████████, meaning that

13    they would be irrelevant to health benefit plan payors' injuries stemming from transactions ██

14    ██████. Conti Rpt., ¶ 123. ████████████████████████████

15    ██████ *Id.*

    4.   <u>Plaintiffs Will Establish Aggregate Damages Through Common Evidence</u>
<u>and Economic Models Tied to Their Theories of Liability</u>

18    Class Plaintiffs will also show that aggregate damages incurred by the Health Benefit

19    Plan Payor Class can be reliably measured on a class-wide basis. "If damages are capable of

20    measurement of a classwide basis, then there is no Rule 23(b)(3) predominance problem." *HIV*,

21    Co-Lead Decl., Ex. 21 at 47; *see also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th

22    Cir. 2017) (affirming use of "aggregate liability" and finding that such an approach "does not

---

[16] While many of these decisions held that rebates may be relevant to the amount of damages incurred by health benefit plan payors (though not the existence of antitrust injury), in this case Class Plaintiffs assert that rebates are irrelevant even to the issue of damages and should not be "offset" against the overcharges incurred by the Health Benefit Plan Payor Class. Plaintiffs will fully brief this issue at the appropriate time in advance of trial.

reserve their right to assert that, absent Defendants' conduct, class members would have been injured even for prescriptions for the brand after the generic was available (because generic entry would have lessened or eliminated Jazz's brand price increases that class members have paid). Dr. Conti would adjust aggregate overcharges accordingly. Conti Rpt., ¶ 132.

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

implicate the defendant's due process interest at all"); *Nexium*, 297 F.R.D. at 182 (quotation omitted) (finding the "use of aggregate damages calculations is well established in federal court" and is "implied by the very existence of the class action mechanism itself."). Because an antitrust defendant's conduct prevents the parties from knowing exactly what would have happened in a competitive market, "well-established Supreme Court and Ninth Circuit authority hold[s] that damages in antitrust cases often cannot, and therefore need not, be proven with exact certainty." *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014); *see also Edwards v. Nat'l Milk Producers Fed.*, 2014 WL 4643639, at *6 (N.D. Cal. Sept. 16, 2014) ("[D]amages in antitrust cases need not be proven with exact certainty[.]"). A proposed method for determining class-wide damages is sufficient if it is not "so insubstantial as to amount to no method at all." *In re TFT-LCD Antitrust Litig.,* 267 F.R.D. 583, 606 (N.D. Cal. 2010) (citations omitted).

Here, Dr. Conti uses a widely accepted methodology for calculating damages directly tied to the theory of liability. Conti Rpt., ¶ 120. Dr. Conti first estimates the price of generic Xyrem had it been available starting in January 2017. *Id.*, ¶¶ 132-33. Next, Dr. Conti uses this estimated generic price to calculate the difference between what end payors actually paid for brand Xyrem and Xywav and what they would have paid for generic Xyrem had it been available. *Id.* Dr. Conti then determines the amount of the overcharge that would have been paid by health benefit plan payors. *Id.*, ¶¶ 133-35. Lastly, Dr. Conti multiplies the overcharge for health benefit plan payors by the quantity of generic Xyrem that would have been purchased to determine the total overcharges for the Health Benefit Plan Payor Class. *Id.*, ¶¶ 135-36.

Dr. Conti's damages methodology has been approved in other generic delay cases and "is relatively straightforward as aggregate class-wide damages equal the difference between the costs paid by class members []in the actual world versus the costs class members would have paid []in the 'but-for' world . . . ." *Flonase*, 284 F.R.D. at 232. Consistent with *Comcast*, Dr. Conti's model is directly tied to Class Plaintiffs' theory of liability: that Defendants' anticompetitive conduct foreclosed generic competition in the market for Xyrem/Xywav. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (acknowledging that "plaintiffs

1 must be able to show that their damages stemmed from the defendant's actions that created the

2 legal liability") (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 38–39 (2013)). The aggregate

3 damages amount also properly reflects the scope of the proposed Health Benefit Plan Payor

4 Class. Dr. Conti used only the volume of Xyrem and Xywav purchases in the states at issue, and

5 during the relevant timeframe, to calculate aggregate damages. Conti Rpt., ¶ 120.

6     The evidence that underpins Dr. Conti's analysis includes: (i) evidence of the impact of

7 the Hatch-Waxman Act and related FDA regulations on market conditions; (ii) evidence of the

8 effects of generic competition on prices; (iii) transaction-level data showing actual prices and

9 quantities sold for Xyrem and Xywav during the class period; and (iv) what the price and

10 quantities sold for generic Xyrem would have been absent Defendants' unlawful conduct. Each

11 of these forms of proof is common to the Health Benefit Plan Payor Class and, "[i]n

12 pharmaceutical antitrust actions, courts have long accepted opinions based on exactly the sources

13 from which [plaintiffs' expert] models his opinions: academic studies, aggregated retail prices,

14 and forecasts." *Loestrin*, 410 F. Supp. 3d at 391 (citing cases); *see also Glumetza*, 336 F.R.D. at

15 479 ("Common evidence drives each of these values."); *Restasis*, 335 F.R.D. at 12 ("common

16 proof" of "classwide damages" included "generic Restasis' penetration rate and price in the but-

17 for world as well as the number of Restasis prescriptions purchased during the class period").[17]

18     Significantly, Dr. Conti's aggregate damages calculations *do not* include damages

19 attributable to purchases that did not result in an overpayment or are not within the definition of

20 the Health Benefit Plan Payor Class. Dr. Conti does not calculate any damages related to

21 prescriptions provided for free.[18] Conti Rpt., ¶ 120. And to account for the share of purchases

[17] *See also Nexium*, 297 F.R.D. at 176-183 (transactional data and expert's damages model); *Lidoderm*, 2017 WL 679367, at *17 ("defendants' own forecasts, academic research applicable to the generic/brand drug pricing market, and [their expert's] model"); *Teva Pharm.*, 252 F.R.D. at 229-30 ("scholarly economic literature, governmental studies and empirical evidence analyzing the market wide effects of unfettered generic competition on the prices and market shares of both brand and generic drugs"); *Cardizem*, 200 F.R.D. at 340-42 (economic literature, projections and sales data); *Flonase*, 284 F.R.D. at 220-225 ("yardstick" methodology, market data and general economic principles).

[18] Dr. Conti does not need to adjust the damages for the Health Benefit Plan Payor Class due to the fact that some consumers paid for their prescriptions using coupons. In such scenarios, the

*Footnote continued on next page*
CLASS PLA... ...
CASE NO. 20-MD-2966-RS

1   that would have been for the brand even after generic entry, Dr. Conti only multiplies per-

2   prescription overcharges by the number of prescriptions that she estimates would have been

3   filled with the generic (as opposed to all Xyrem and Xywav prescriptions). *Id.*, ¶ 132; *see*

4   *Lidoderm*, 2017 WL 679367, at *19 ("[E]stimating the number of Brand Loyalist purchases . . .

5   is a sufficiently reliable method to remove purchases form the aggregate damages award[.]"). Dr.

6   Conti has thus "shown *how* purchases attributable to class members who were not damaged can

7   be excluded on a classwide basis." *Id*. at *24; *see also Restasis*, 335 F.R.D. at 26 ("[U]ninjured

8   class members here will not contribute to the size of any damage award[.]").

9          Finally, Class Plaintiffs' position is that rebates and price protection payments received

10  by health benefit plan payors should not be deducted from the aggregate overcharges

11  (particularly because Jazz used rebates as a means of extending its unlawful monopoly). But if

12  the Court ultimately determines that Class Plaintiffs must make such deductions, Dr. Conti's

13  methodology is flexible and can be adjusted to use evidence that is common to the Class (*i.e.*, the

14  overcharge and the rebate payments). Conti Rpt., ¶ 124 (implementing such adjustments).

15                 5.    Plaintiffs' Claims Are Manageable

16         Class Plaintiffs' claims turn on evidence of Defendants' conduct and the impact of that

17  conduct is class-wide, making the trial of those claims straightforward. To demonstrate how a

18  trial would proceed in this matter, Class Plaintiffs submit a proposed trial management plan

19  outlining the key aspects of a trial, and the subsequent process for allocating damages among the

20  members of the Class. Co-Lead Decl., Ex. 24 ("Trial Plan"). As the Trial Plan and proposed

21  verdict form (*id*., Ex. 25) ("Exemplar Verdict Form") show, the fact that Class Plaintiffs bring

22  their claims under the laws of multiple states will not make the trial unmanageable. Prosecution

23  of these claims as part of class proceedings will undoubtedly "achieve economies of time, effort,

24  and expense, and promote . . . uniformity of decision as to persons similarly situated." *See Relafen*,

25  221 F.R.D. at 287-88; *Flonase*, 284 F.R.D. at 234. And, in any event, "failure to certify an action

26  under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should

27

28  health benefit plan payors pays the same amount regardless of whether the consumer reduces its
    own contribution through a coupon. Conti Rpt., ¶ 88.

1    be the exception rather than the rule." *In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2015)

2    (internal quotation omitted).

3              *a.    Common Evidence Will Be Used to Demonstrate Defendants'*

4                     *Violations of the Applicable Laws and Aggregate Damages*

5              At trial, the jury will hear evidence of Defendants' legal violations that is common to the

6    class, including testimony and documents concerning Defendants' unlawful agreements and

7    Jazz's monopolistic conduct. As noted above, at this point in time, the Class Plaintiffs are

8    proceeding with Causes of Action Causes of Action 7-12 and 17. Compl., ¶¶ 393-471, 512-518.

9    Under Causes of Action 7-12, Class Plaintiffs' state law claims encompass purchases of Xyrem

10   and Xywav in California and 28 other states, plus the District of Columbia and Puerto Rico. In a

11   multi-district litigation, courts typically apply the choice of law rules of each of the transferor

12   courts, which in turn apply the choice of law rules of the states in which they sit.[19] All of the

13   class action complaints in this MDL were filed in this District and the Southern District of New

14   York (*see* ECF No. 1). Courts look to the Restatement (Second) of Conflict of Laws for guidance

15   and have adopted approaches that require consideration of the relevant policies and interests. *See*

16   *Restasis*, 335 F.R.D. at 34 (applying Restatement of California and New York claims). Because

17   the underlying policy of an indirect purchaser action is consumer protection, "[t]he location of

18   consumers' purchases . . . assumes special significance" in the choice of law analysis. *In re*

19   *Relafen Antitrust Litig.*, 221 F.R.D. 260, 277-78 (D. Mass. 2004). Thus, the Class Plaintiffs'

20   purchases are governed by the law of the state in which the purchases were made. *See Restasis*,

21   335 F.R.D. at 34-36 (applying the laws of the states where Restasis purchases were made after

22   performing a detailed California and New York choice of law analysis).

23             The state antitrust statutes invoked by Class Plaintiffs mirror the federal antitrust laws,

24   contain a federal harmonization provision, and/or have been interpreted in harmony with federal

25   law. *See* Co-Lead Decl., Ex. 26 ("Chart of State Laws"). And with respect to the few consumer

26   protection statutes asserted in Count 12, antitrust violations are sufficient to state a claim under

27

28   [19] Multidistrict Lit. Man. 9:18 ("The [Judicial] Panel [on Multidistrict Litigation] has recognized
     that the transferee court will be obligated to apply the law the transferor forum would apply.").

the statute. *Id*. As other courts have recognized, "differences in the applicable state laws [] do not appear to be material or even significant." *Lidoderm*, 2017 WL 679367, at *27; *HIV*, Co-Lead Decl., Ex. 21 at 24-32 (finding differences in state antitrust and unfair competition laws were not material). But if they are, "those differences can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one." *Id*.; *see also In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521 (N.D. Cal. 2010) (finding variations "may be handled at trial by grouping similar state laws together and applying them as a unit") (internal quotation omitted). That is precisely what Class Plaintiffs have proposed in this case: grouping similar state laws and addressing any differences with a small number of simple verdict form questions. *See* Ex. 25 (Exemplar Verdict Form).

In sum, "[n]umerous courts in this District have certified cases involving indirect purchaser claims under different state laws." *Lidoderm*, 2017 WL 679367, at *27 (collecting cases). Courts in generic delay cases have recognized that any challenges raised by the application of several state's laws "are ones that routinely arise in complex litigation, and they are insufficient to overcome the innumerable advantages that class treatment will afford." *Terazosin*, 220 F.R.D. at 701. Certification of classes asserting a wide range of state law antitrust claims is thus routinely granted. *E.g. Lidoderm*, 2017 WL 679367, at *27 (finding no manageability problems when certifying 17-state class); *HIV*, Co-Lead Decl., Ex. 21 at (35 state class); *Restasis*, 335 F.R.D. at 32 (31 state class).

At trial, Class Plaintiffs will also present evidence concerning the aggregate damages flowing from Defendants' violations. Dr. Conti's model can easily be implemented for any entry date the jury might find or the scope of the state laws under which Class Plaintiffs can seek damages. *See* Conti Rpt., ¶ 105.

### b.    Claims Submission and Administration

After trial, Class Plaintiffs will send notice of the outcome to class members and provide them an opportunity to submit claims for payment from the recovery. Health benefit plan payors will use their purchasing records to submit their claims and will be asked to provide information, under oath, confirming their membership in the Health Benefit Plan Payor Class and/or

1    entitlement to damages (*i.e.*, that they are not a federal or state plan). *See* Miller Decl., ¶¶ 3-5, 11

2    (explaining similar process in other pharmaceutical product litigations). Use of certifications in

3    this fashion has been endorsed by the Ninth Circuit and by other courts in generic delay cases.

4    *See Briseno*, 844 F.3d at 1132 ("[W]e see no reason to refuse class certification simply because

5    that same consumer will present her affidavit in a claims administration process after a liability

6    determination has already been made[.]"); *Restasis*, 335 F.R.D. at 24 (finding that attesting to

7    certain facts on claim forms is an "an accepted means to establish a class member's entitlement

8    to recovery in class action litigation"). Health benefit plan payors who provide information

9    indicating that they would not be entitled to damages can be excluded from any post-trial

10   recovery (or from the class in advance of trial). *See Ruiz Torres v. Mercer Canyons Inc.*, 835

11   F.3d 1125, 1137 (9th Cir. 2016) ("[T]he district court is well situated to winnow out those non-

12   injured members at the damages phase of the litigation, or to refine the class definition[.]").

13          Use of claims administrators to make determinations concerning entitlements to receive

14   damages is well-settled. *See Briseno*, 844 F.3d at 1131 (finding at "the claims administration

15   stage, parties have long relied on 'claim administrators, various auditing processes, sampling for

16   fraud detection, follow-up notices to explain the claims process, and other techniques tailored by

17   the parties and the court' to validate claims"); *HIV*, Co-Lead Decl., Ex. 21 at 39 ("Issues as to . .

18   . damages allocation . . . do not defeat predominance."); *Lidoderm*, 2017 WL 679367, at *24

19   ("Post-judgment claims forms and other tools can be used to allow defendants to test a class

20   member's purported entitlement to damages and to apportion damages appropriately between

21   class members."). Through this process, "class members who are not entitled to damages [will]

22   be weeded out at the claims phase, preventing any individuals without standing from

23   'recover[ing] individual damages.'" *Unte v. Home Depot U.S.A., Inc.*, 2022 WL 1443338, at *8

24   (N.D. Cal. May 6, 2022) (quoting *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)).

25          6.      A Class Action Is a Superior Means of Adjudicating Plaintiffs' Claims

26          Rule 23(b)(3)'s superiority requirement is also satisfied here. The superiority requirement

27   ensures that a class action will "achieve economies of time, effort, and expense, and promote . . .

28   uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

1    bringing about other undesirable results." *Amchem*, 521 U.S. at 615. "The policy at the very core

2    of the class action mechanism is to overcome the problem that small recoveries do not provide

3    the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*,

4    521 U.S. at 617 (quoting omitted); *see also Solodyn*, 2017 WL 4621777, at *21.

5          Courts examine four factors in making the superiority determination: "(A) the class

6    members' interests in individually controlling the prosecution … of separate actions; (B) the

7    extent and nature of any litigation concerning the controversy already begun by … class

8    members; (C) the desirability or undesirability of concentrating the litigation of the claims in the

9    particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P.

10   23(b)(3). Only a small handful of large insurance companies have filed individual actions, but

11   for the rest of the class (the vast majority with much smaller individual claims), the prosecution

12   of separate cases would waste time and resources and create the risk of inconsistent rulings.

13   Aside from the few individual plaintiffs, there is no indication that Class members have "any

14   significant interest in individually prosecuting their claims" and "[i]n antitrust cases such as this,

15   the damages of individual indirect purchasers are likely to be too small to justify litigation, but a

16   class action would offer those with small claims the opportunity for meaningful redress." *In re

17   Static Random Access memory (SRAM) Antitrust Litig. ("In re SRAM")*, 264 F.R.D. 603, 615

18   (N.D. Cal. 2009); *In re TFT-LCD*, 267 F.R.D. at 608.

19         **C.    The Requirements of Rule 23(b)(2) Are Satisfied**

20         Class Plaintiffs also seek certification of an Injunctive Relief Class of all purchasers and

21   payors of Xyrem and/or Xywav in the United States seeking injunctive relief for violations

22   Sections 1 and 2 of the Sherman Act. Compl., ¶¶ 512-18 (Count 17).[20] Rule 23(b)(2) provides

23   that an injunctive relief class should be certified "if the party opposing the class has acted or

24   refuses to act on grounds that apply generally to the class so that final injunctive relief or

25   corresponding declaratory relief is appropriate respecting the class as a whole." Relief to each

26   member of the class need not be identical, it must only be beneficial.

27   _____

28   [20] For the reasons, explained above, Class Plaintiffs satisfaction of the Rule 23(a) requirements
     apply with equal force to the Injunctive Relief Class. *See* Part IV.A.

The Injunctive Relief Class members include both health benefit plan payors (*i.e.*, members of the Health Benefit Plan Payor Class) as well as consumers. As explained above and in Dr. Conti's report, Defendants' ongoing anticompetitive conduct has caused harm to the Health Plan Payor Class members. Because Xyrem and Xywav are maintenance drugs, and health benefit plan payors cover large numbers of beneficiaries, there is a substantial chance that health benefit plan payors will continue to provide reimbursement of Xyrem or Xywav.

Dr. Conti's report also explains that consumers are harmed by the delay of generic versions of Xyrem. Consumers pay their portion of the cost of prescription drugs through one of three methods, each of which requires the consumer to pay more for branded drugs than their generic equivalents. *First*, consumers without insurance (referred to as "cash payors") pay the entire price of the drug, which would have been lower for generic Xyrem. Conti Rpt., ¶ 97. *Second*, most consumers with insurance pay for prescription drugs based on their "co-payment," *i.e.*, a set dollar amount per prescription. Nearly all co-payment prescription drugs plans incentivize the use of generics by requiring the consumer to pay a higher co-pay for branded drugs than generic drugs, meaning "co-payment" consumers would have paid less for generic Xyrem than branded Xyrem or Xywav. *Id.*, ¶¶ 95-96. *Third*, some consumers are on "coinsurance" plans in which they pay a percentage of the drug cost. Both the drug cost and the percentage paid by the consumer are higher for branded Xyrem and Xywav than they would be for generic Xyrem. *Id.*, ¶ 92-94.[21] Consumers that have used Xyrem and/or Xywav face a significant threat of future injury because Xyrem and Xywav are maintenance drugs and there is a reasonable probability that consumers will continue purchasing the products into the future.

Defendants' unlawful agreements remain in place and continue to operate as barriers to entry, preventing full competition on the merits. Even when authorized generics enter the market in 2023, they will do so pursuant to the anticompetitive terms of the settlement agreements. *See* Compl., ¶¶ 7-9; ECF 138 at 15–18 (discussing limited authorized generic sales). It is not until

---

[21] Programs offered by in which patients could receive Xyrem or Xywav for free are irrelevant to questions of classwide impact. Health benefit plan payors whose members received only free Xyrem or Xywav are not included in the class definition, which requires that the health benefit plan payor have paid for the drug.

1  2026 that there will be competition from multiple independent ANDA products, at which point

2  prices will begin to decrease to towards a fully competitive level. *Id*. Unless the Court grants

3  equitable relief prohibiting Defendants from continuing their anticompetitive scheme, Jazz will

4  continue to harvest the market for branded Xywav and members of the Injunctive Relief Class

5  will continue to pay hundreds of millions of dollars in overcharges each year. *See* Conti Rpt., ¶

6  136 (finding the Class paid hundreds of millions in overcharges each of the last two years)

7  Certification of a 23(b)(3) damages class does not preclude injunctive relief either.[22]

8  Certification under Rule 23(b)(2) is thus also appropriate.

9      **D.**    **Ascertainability Is No Impediment to Certification**

10        As this Court and others in this District have explained, there is no "ascertainability"

11  requirement "recognized in the Ninth Circuit." *Robbins v. Phillips 66 Co.*, 2021 WL 4932729, at

12  \*3 n.4 (N.D. Cal. Mar. 29, 2021) (*quoting Briseno*, 844 F.3d at 1124 n.4); *Sarmiento v. Sealy,*

13  *Inc.*, 2020 WL 4458915, at n. 3 (N.D. Cal. May 27, 2020) ("[T]he Ninth Circuit ruled

14  definitively that ascertainability is not a requirement under Rule 23[.]"); *Overpeck v. FedEx*

15  *Corp.*, 2022 WL 888441, at \*12 (N.D. Cal. Mar 25, 2022) ("[T]he Ninth Circuit has held that the

16  court is not to consider ascertainability at the class certification stage[.]"); *Williams v. Apple,*

17  *Inc.*, 338 F.R.D. 629, 645 (N.D. Cal. 2021) ("The Ninth Circuit has disagreed that

18  ascertainability was an element of class certification.").[23] Class Plaintiffs thus do not need to

19  provide a mechanism for establishing ascertainability.

---

20  [22] *In re TFT-LCD*, 267 F.R.D. at 596 (certifying a class seeking both injunctive relief and

21  damages under Rule 23(b)(2) because the class alleged that the defendants could resume their
     illegal price-fixing conspiracy on short notice); *In re SRAM*, 264 F.R.D. at 615 (certifying both a

22  nationwide class under Rule 23(b)(2) for injunctive relief and nearly 30 state plaintiff classes
     under Rule 23(b)(3)); *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 517

23  (S.D. N.Y. 1996) (certifying a class under Rule 23(b)(2), despite the class's request for treble
     damages, because "the requested declaratory and injunctive relief will be necessary to ensure that

24  [plaintiffs] are not harmed in the future by Defendants' anticompetitive conduct").

25  [23] To the extent certification has been denied in other end-payor pharmaceutical antitrust cases on
     ascertainability grounds (such as the *Niaspan* decision), those holdings are inapposite because (i)

26  the Ninth Circuit has rejected any sort of ascertainability requirement and (ii) none of those cases
     involved a single source of data, like ESSDS, for all purchases of the drug at issue. *See* 5 Moore's

27  Federal Practice § 23.21 (3d ed. 2021) ("Other circuits to consider the Third Circuit's
     [ascertainability] approach have rejected it."); *City Select Auto Sales, Inc. v. BMW Bank of N. Am.*

28  

CLASS PLAINTIFFS' ~~Footnote continued on next page~~
CASE NO. 20-MD-2966-RS

*Footnote continued on next page*

1   Even if this Court were inclined to engage in an ascertainability analysis, the Court

2   should determine that the Health Benefit Plan Payor Class is ascertainable because it is "based

3   on objective criteria that allow potential class members to determine whether they are included

4   in the class." *Lidoderm*, 2017 WL 679367, at *25. The class definition is based entirely on

5   objective criteria: the drug purchased, the states in which the purchases were made, and the

6   relevant time period. *See id.* (involving a similar class definition based on "objective criteria that

7   allow potential class members to determine whether they are included in the class"); *Restasis*,

8   335 F.R.D. at 40 (same); *EpiPen*, 2020 WL 1180550, at *11-12 (same).

9   Although not needed, ample evidence exists—including Declarations from Eric Miller

10  (Vice President of claims administrator A.B. Data, Ltd.) and Laura Craft (a widely-recognized

11  expert concerning the pharmaceutical industry)—from which to conclude that determining

12  whether an entity would qualify as a class member and be entitled to damages will not pose

13  significant difficulties. *See generally* Miller Decl., Craft Decl. Through the claims administration

14  process health benefit plans will provide information related to their payments for Xyrem and/or

15  Xywav and confirm that they meet the requirements for inclusion in the Health Benefit Plan

16  Payor Class. Miller Decl. at 5-7. Thus, for both legal and factual reasons, ascertainability is not

17  an impediment to certification in this case.

18  **V.     CONCLUSION**

19  For the reasons set forth above, Class Plaintiffs respectfully request that the Court certify

20  the proposed Classes, appoint the named plaintiffs to serve as Class representatives, appoint Co-

21  Lead Counsel and the Plaintiffs Steering Committee, and order such further and additional relief

22  as the Court deems appropriate under the circumstances.

---

*Inc.*, 867 F.3d 434, 443 & n.3 (3d Cir. 2017) ("circuits that have carefully considered whether to adopt our new requirement have declined to do so.") (Fuentes, J., concurring).

Dated: November 16, 2022

Respectfully submitted,

By: */s/ Dena C. Sharp*

Dena C. Sharp (State Bar No. 245869)
Scott Grzenczyk (State Bar No. 279309)
Tom Watts (State Bar No. 308853)
Jordan Isern (State Bar. No. 343159)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dsharp@girardsharp.com
scottg@girardsharp.com
tomw@girardsharp.com
jisern@girardsharp.com

By: */s/ Michael M. Buchman*
Michael M. Buchman (*pro hac vice*)
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
Tel: (212) 577-0050
mbuchman@motleyrice.com

*Interim Co-Lead Class Counsel*

- 36 -

## **ATTESTATION**

I, Dena C. Sharp, am the ECF User whose identification and password are being used to file this Motion for Class Certification Pursuant to Civil L.R. 5-1(i)(3), I attest under penalty of perjury that concurrence in this filing has been obtained from all counsel.


DATED:  November 16, 2022                          /s/ *Dena C. Sharp*
                                                                          Dena C. Sharp

CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 20-MD-2966-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2022, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. I also caused a copy of the foregoing document to be served via email on counsel of record for all parties.

<u>/s/ *Dena C. Sharp*</u>
Dena C. Sharp

- 38 -